# TAB 10

1       UNITED STATES BANKRUPTCY COURT
         DISTRICT OF DELAWARE

2

3 IN RE:         ) Case No. 11-12010 (KG)
            ) Chapter 11

4 LOS ANGELES DODGERS LLC et al., )
            )

5            ) Courtroom No. 3
     Debtors.     ) 824 Market Street

6            ) Wilmington, Delaware 19801
            )

7            ) November 30, 2011
            ) 10:00 A.M.

8

9         TRANSCRIPT OF HEARING
       BEFORE HONORABLE KEVIN GROSS
      UNITED STATES BANKRUPTCY JUDGE

10

 APPEARANCES:

11

 For the Debtors:     Young Conaway Stargatt & Taylor, LLP

12            By: ROBERT BRADY, ESQ.
            The Brandywine Building

13            1000 West Street, 17th Floor
            Wilmington, Delaware 19801

14            (302) 571-6600

15            Dewey & Leboeuf, LLP
            BY: SIDNEY P. LEVINSON, ESQ.

16              BRUCE BENNETT, ESQ.
            333 South Grand Avenue, Suite 2600

17            Los Angeles, California 90071
            (213) 621-6000

18

 ECRO:         GINGER MACE

19

 Transcription Service:   Reliable

20            1007 N. Orange Street
            Wilmington, Delaware 19801

21            Telephone: (302) 654-8080
            E-Mail: gmatthews@reliable-co.com

22

 Proceedings recorded by electronic sound recording:

23 transcript produced by transcription service.

24

25

Date Filed 12/2/1

Docket No. 888

```
 1   For Fox Sports:          Morris Nichols Arsht & Tunnell
                              By:  GREG WERKHEISER, ESQ.
 2                            1201 North Market Street
                              18th Floor
 3                            Wilmington, DE  19899
                              (302) 658-9200
 4
     For the Committee:       Pinckney Harris Weidinger
 5                            By:  KEVIN CAPUZZI, ESQ.
                              1220 North Market Street
 6                            Wilmington, Delaware 19801
                              (302) 504-1497
 7
     TELEPHONIC APPEARANCE:
 8
     For The Office of the    White & Case
 9   Commissioner of Baseball By:  THOMAS LAURIA, ESQUIRE
     d/b/a Major League             GLEN KURTZ, ESQUIRE
10   Baseball:                1155 Avenue of the Americas
                              New York, New York 10036-3787
11
     For the Committee:       Morrison Foerster
12                            By:  TODD GOREN, ESQ.
                              1290 Avenue of the Americas
13                            New York, New York 10104
                              (212) 478-8000
14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                                    INDEX

2                                                                    Page

3    NOTICE OF AGENDA MATTERS:
     For the Debtors, by Mr. Brady                              4
4    For the Debtors, by Mr. Levinson                           6
     For the Debtors, by Mr. Brady                              7
5    For Prime Ticket, by Mr. Werkheiser                        8
     For the Debtors, by Mr. Levinson                          10
6    For MLB, by Mr. Kurtz                                      41
     For the Official Committee, by Mr. Goren                  74
7    For the Debtors, by Mr. Levinson                          77
     For MLB, by Mr. Kurtz                                      94
8    For the Debtors, by Mr. Levinson                          99
     For Prime Ticket, by Mr. Werkheiser                      100
9    For the Debtors, by Mr. Levinson                         107
     For Prime Ticket, by Mr. Werkheiser                      113
10   For the Debtors, by Mr. Bennett                          121
     For Prime Ticket, by Mr. Werkheiser                      124

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1              THE CLERK:   Please rise.

2              THE COURT:   Good morning, everyone; thank you and

3     please be seated.   It's good to see you all and we are

4     obviously here in the Los Angeles Dodger's case and, Mr.

5     Brady, good morning.

6              MR. BRADY:   Good morning, Your Honor, Robert Brady

7     on behalf of Los Angeles Dodgers LLC, et al.   Turning to the

8     amended agenda for today's hearing.

9              THE COURT:   Yes.

10             MR. BRADY:   With respect to number one, Your Honor,

11    we had listed that as resolved.   I know Fox takes issue with

12    that in connection with their joinder.   I think what Your

13    Honor indicated yesterday is it would not be going forward

14    today in any event.   There's still the open issue of whether

15    the joinder keeps it alive --

16             THE COURT:   Exactly --

17             MR. BRADY:   -- if baseball withdrawals it.

18             THE COURT:   Yes, that does remain an open issue.

19             MR. BRADY:   Okay and Your Honor indicated we'll take

20    up today what the agenda for December 7th will be.

21             THE COURT:   That's right.

22             MR. BRADY:   Matters 2 through 5 are as indicated on

23    the agenda.   With respect to matter 6 that's a Fox motion to

24    seal documents.   No objections have been received.   I believe

25    Mr. Werkheiser has an order on that if Your Honor wishes to

5

1  consider that.

2         THE COURT:  Mr. Werkheiser, you may, of course; good

3  morning.

4         MR. WERKHEISER:  And, Your Honor, Gregory Werkheiser

5  appearing on behalf of Prime Ticket, also known as Fox

6  Sports.  And I just wanted to confirm for the record that we

7  were not aware of any objections to this and based on that --

8         THE COURT:  I am not either --

9         MR. WERKHEISER:  -- I would ask to hand up the

10 order.

11        THE COURT:  Thank you.  You certainly may hand it up

12 and I will sign it.  Thank you, sir, good to see you.  The

13 last day of the month.  All right, I've signed the order.

14        MR. BRADY:  Thank you, Your Honor.  With respect to

15 matter 7, an order was entered by Your Honor yesterday.

16        THE COURT:  Yes.

17        MR. BRADY:  Matter 8 an order was entered this

18 morning.

19        THE COURT:  Correct.

20        MR. BRADY:  That takes us to matter 9 which is an

21 uncontested settlement between the Debtors and Facility

22 Merchandising, Inc.  Mr. Levinson is available if Your Honor

23 has any questions with respect to that.

24        THE COURT:  Wonderful; thank you, Mr. Brady.  Mr.

25 Levinson, good morning.

6

1      MR. LEVINSON:  Good morning, Your Honor, Sid

2  Levinson of Dewey LeBoeuf for the Dodgers.

3      THE COURT:  Yes, sir.

4      MR. LEVINSON:  Your Honor, thank you for hearing

5  this motion on short notice.

6      THE COURT:  Yes.

7      MR. LEVINSON:  We did receive no objections.  The

8  deadline was Monday.  I think we've set out in our papers the

9  reasons why we think its appropriate to proceed with the

10  settlement.  Your Honor has some familiarity from earlier in

11  the case.

12      THE COURT:  I do.

13      MR. LEVINSON:  And we were able through mediation,

14  Judge Weinstein of JAMS was kind enough to make time

15  available on his very busy schedule to hear us in mediation,

16  and we were able to reach a settlement that I would regard as

17  a business settlement.  And all of the parties are prepared

18  to proceed to close it tomorrow.  And there is some urgency

19  to it, so unless Your Honor has any questions I have a

20  proposed form of order.

21      THE COURT:  I do not.  It certainly appears to me

22  to be fair, reasonable, and in the Debtors' best interest.

23  And I'm pleased that you've reached a settlement.

24      MR. LEVINSON:  Thank you, Your Honor, may I

25  approach?

7

1          THE COURT:  You may.  Thank you.  All right, now

2   it's Mr. Brady.

3          MR. BRADY:  Your Honor, matters 10 and 11 are both

4   seal motions; one by Fox, one by the Debtors in connection

5   with pleadings filed or relating to the telecast rights

6   procedures motions.  Both were under request of short notice.

7          THE COURT:  Yes.

8          MR. BRADY:  I sent the Court a prepared short notice

9   and consider those today.  They are unopposed as of now.  And

10  we have forms of order we can hand up if Your Honor --

11         THE COURT:  I am prepared to grant those motions;

12  yes, I am, Mr. Brady.

13         MR. WERKHEISER:  May I approach, Your Honor?

14         THE COURT:  Yes, Mr. Werkheiser, thank you.  The

15  Court thanks Mr. Brady.  All right.

16         MR. BRADY:  So, Your Honor, what remains are status

17  and scheduling with respect to the Debtors' exclusivity

18  extension motion, the amended telecast rights procedures

19  motion, Fox's motion to dismiss the case, and then fee

20  application.  So I'm not sure if Your Honor wants to do --

21         THE COURT:  Let's do fee applications.  That may

22  free up some people and I don't know if anyone wishes to be

23  heard with respect to those.  I have reviewed them.  I

24  reviewed them along with my law clerk personally, and I found

25  them to be appropriate and in good order.  And unless anyone

8

1    has an objection, I am prepared to sign an order granting

2    them.

3            MR. BRADY:  Thank you, Your Honor.  We do have a

4    form of order that covers all professionals --

5            THE COURT:  Good --

6            MR. BRADY:  And it was vetted with each professional

7    to confirm the numbers are correct, so I do have that.  I see

8    Mr. Werkheiser standing, so I'll let him speak and then I can

9    hand up the order.

10           THE COURT:  Sure.  Mr. Werkheiser.

11           MR. WERKHEISER:  Good morning, Your Honor, again

12   rising for Prime Ticket also known as Fox Sports.  Your

13   Honor, we did not as to the Blackstone application, which

14   procedurally actually they filed their first monthly

15   application with a deadline of the other day, notwithstanding

16   that their also included in the first interim fee request.

17   We do not object to allowance and payment on an interim

18   basis.  We did file a reservation of rights.

19           THE COURT:  Yes.

20           MR. WERKHEISER:  Consistent with a reservation that

21   was also included in the order approving the retention of

22   Blackstone in paragraph nine making clear that allowance and

23   payment on an interim basis is without prejudice to any of

24   our rights including, but not limited to, to object to

25   further interim applications and to object on a final basis

1   and our positions on the various media rights activities

2   occurring in this case.  As Your Honor knows, those are still

3   issues that are pending before the Court, have not been

4   adjudicated.  And it may be at the end of the day that that

5   is not appropriate compensation on a final basis and so we

6   would reserve as to that, among other things, Your Honor.

7         THE COURT:  Thank you.  And thank you for bringing

8   that to my attention because I really should have noted that

9   these are interim fee applications.  They are subject to all

10  applications such as this or subject to final review.  And

11  that includes, of course, Blackstone as well.

12        MR. WERKHEISER:  Thank you, Your Honor.

13        THE COURT:  Thank you, Mr. Werkheiser.

14        MR. BRADY:  Your Honor, if I may approach?

15        THE COURT:  You may; you sure may.  Thank you.

16  Thank you, Mr. Brady.  You know I was going to mention that

17  it seems so subdued in here, but I fear that maybe that

18  portion of the hearing is coming to an end.  All right I am

19  ready to hear parties on further proceedings and scheduling.

20        Mr. Levinson, good morning again, sir.

21        MR. LEVINSON:  Good morning again and thank you,

22  Your Honor.  And thank you with respect to the fee

23  applications.  I do understand how much time it takes to go

24  through them.  I only have to go through one of them --

25        THE COURT:  That's right.

1          MR. LEVINSON:  So thank you very much.

2          THE COURT:  You bet.

3          MR. LEVINSON:  With respect to December 7th --

4          THE COURT:  Yes.

5          MR. LEVINSON:  A couple housekeeping matters first

6    I'd like to address and then we can talk a little bit about

7    sort of the agenda and some of what I think are the important

8    issues that we ought to resolve today.

9          First, in connection -- the moving of the hearing,

10   the agreement that came out of the mediation with Judge

11   Farnan to effectively have any standstill until December 7th

12   had a couple very important components and just want to make

13   Your Honor aware of that.  First, in connection with that

14   agreement Fox agreed that in the event Your Honor grants the

15   relieve that we sought in our motion on December 7th that

16   includes the commencement of the 45 day negotiation period

17   that the first seven days of such period shall be between

18   November 30th and December 7th.  And that, I think, is

19   consistent with the comments Your Honor had at the status

20   conference, at least your inclination at that time.

21         THE COURT:  Yes, I mean you're negotiating now as

22   far as I'm concerned, and it makes sense that that would be

23   the case.

24         MR. LEVINSON:  Right and Fox agreed, and again, in

25   connection with mediation that, again, if Your Honor grants

1   the relief that it will start as of November 30th.

2          THE COURT:  Okay.

3          MR. LEVINSON:  So that's important.  Second, as part

4   of the agreement with respect to the standstill in moving the

5   hearing to December 7th, the parties agreed that neither one

6   will file pleadings, file letters, you know, serve any

7   papers, you know, communicate with the Court until the

8   December 7th hearing.  Obviously, we have the status

9   conference today and we need to talk about what is and isn't

10  going to happen at the hearing.

11         THE COURT:  And I've got a box full of documents and

12  pleadings so I think I'm up to speed.

13         MR. LEVINSON:  Right, no, no, and we'll talk some

14  again because we do need to talk in advance of the hearing.

15         THE COURT:  Yes.

16         MR. LEVINSON:  And today's the day to do that.

17         THE COURT:  Yes.

18         MR. LEVINSON:  In terms of what the hearing is going

19  to look like.  But there is one exception to what I just said

20  and that's that the parties may serve subpoenas to compel

21  witnesses to appear, but also that the parties may file and

22  respond to any motions to quash any subpoenas that are

23  served.  And that, you know, the proceeding, the sentence is

24  not going to be construed as a waiver of any right of any

25  party to preclude or seek to preclude the testimony of any

1   witness on any ground, so all those rights are reserved.  So,

2   again, that was part of the agreement to move from November

3   30 to December 7th.

4         So that gets us, I think, to Your Honor's e-mail

5   yesterday to want to talk about the agenda for the December

6   7th hearing.  And I think that probably the biggest issue in

7   terms of the agenda, in terms of the scheduling, in terms of

8   how much time are we going to need for this particular

9   hearing is there's a disagreement between the parties as to

10  who can be called as witnesses at the hearing.  And,

11  ultimately, what the scope of the hearing is going to be.

12        And I want to begin by making the point which is

13  stated in the reply brief that we filed on Monday that the

14  Court doesn't really need to hear any evidence in order to

15  approve these marketing procedures.  I mean that's our

16  position.  This Court has in previous hearings such as the

17  DIP financing hearing kept a, you know, a very tight rein on

18  relevance to avoid letting these hearings turn into, I think

19  Your Honor's word was a side show.

20        THE COURT:  Yes.

21        MR. LEVINSON:  And this hearing should be no

22  exception.  I mean this is a procedures motion.  And the

23  focus really ought to remain on those procedures.

24        Now with Your Honor's indulgence, I want to talk in

25  a little bit more detail about the limited showing that does

1  need to be made and why we think Fox should not be allowed to

2  turn the December 7th hearing into sort of a free for all that

3  it proposes to do.  To meet its burden, the Dodgers are

4  required only to show that the marketing and the telecast

5  rights are an exercise of sound business judgment, and that's

6  what we need to show.  And our position is, I mean it's

7  really simple.  By exposing the telecast rights to the market

8  now, the Dodgers will maximize their value.  I mean this is

9  Bankruptcy law 101.

10          Value maximization, I mean this is, you know, it's

11  effectively like a safe harbor, sort of a lighthouse.  You

12  can kind of choose whatever metaphor you want, but in

13  Bankruptcy if you're maximizing value you're serving the

14  proper purpose of Bankruptcy.  I mean even in the case on

15  which Fox principally relies in its papers the Integrated

16  Telecom case, I noticed when I was reading through last night

17  you were involved in the case.  So, once, again, I don't need

18  to go into detail about the case, although I may not be able

19  to resist the urge.  But one thing that that case

20  specifically recognizes that maximizing the value of the

21  Debtors' estate is a "valid Bankruptcy purpose," you know,

22  even with a solvent Debtor.  And it supports a showing of

23  good faith.

24          I don't think Fox can legitimately contest the value

25  maximization is the purpose of the relief that's sought by

14

1  the Dodgers in a procedures motion.  I mean after all, I

2  think that's why Fox is opposing the motion because Fox

3  doesn't want the Debtors to maximize the value of the

4  telecast rights.  Rather, Fox wants to pay as little as

5  possible for the telecast rights.  And Fox essentially admits

6  this when it claims -- and, again, that's just a claim which

7  we dispute -- but claims that it will be harmed if forced to

8  pay market value.

9        I don't think you need an evidentiary hearing on

10  this point.  Just as the benefit of marketing the license of

11  the telecast rights is obvious, so is the benefit of the

12  estate doing that now rather than allowing that process to

13  occur later.  And why do I say that?  Because by marketing

14  the rights during the Bankruptcy case and being in a position

15  to negotiate a licensing agreement with Fox or another party

16  including a Dodger branded RSN in the carve out that's

17  specifically in the contract, not in all the excerpts that

18  were provided to Your Honor of the contract but in the

19  contract itself.  Buyers will pay a higher price for the team

20  and the estate will benefit.

21        You know when Fox argues that buyers of the team

22  could get that value later, Fox really is missing the point.

23  Our job is to realize value for the estate.  It's not to

24  realize value for the buyer.  They're on the other side of

25  the table.  It's not to realize value for Fox.  They're the

1   counterparty.  It's to realize value for the estate.  Again,

2   Bankruptcy law 101.

3        I don't think Your Honor really needs expert

4   testimony on this particular point, although we will be

5   prepared and we made clear in our papers that we're prepared

6   to provide it with the two Blackstone witnesses who submitted

7   declarations in support of the marketing procedures.  And so

8   we're prepared to do that if Your Honor thinks that will be

9   helpful.  They will certainly be here.  Again, don't really

10  know if its -- I mean I think the point is pretty obvious.

11       Now, rather than recognize the Dodgers proper

12  purpose in maximizing value for the estate, Fox is trying to

13  divert attention by focusing on what's going to happen to the

14  money after the sale of the team, you know, when it

15  ultimately gets distributed.  And what will happen is this.

16  Creditors will get paid their allowed claims in full.  And

17  then the rest of the money will go to the equity holders

18  meaning Mr. McCourt.  Now this isn't improper.  This is the

19  distribution scheme that's under the United States Bankruptcy

20  Code.  This is what Congress said.

21       Now the Third Circuit recognized in Integrated

22  Telecom, I want to come back to this case, that maximizing

23  value for the estate is proper even where a Debtor is

24  solvent.  And by the way, I promised I wouldn't -- well I

25  didn't promise I wouldn't do this, but talk just for a second

1   about <u>Integrated Telecom</u>.   That was a case that wasn't about

2   maximizing value.   That was a case where there was a $105

3   million dollars in cash, a business that was no longer

4   operating, and a litigation among securities plaintiffs that

5   they were trying to jam.

6          THE COURT:  Right.

7          MR. LEVINSON:  And so there was no financial

8   distress in that case.  I don't know how you can possibly

9   compare that circumstance to what we faced in this case when

10  we came to Your Honor.  We filed on June 27th, came to Your

11  Honor on June 28th and literally had to have DIP financing,

12  which we could only obtain through DIP financing, in order to

13  make a payroll on June 30th that had we not made would have

14  been catastrophic for this franchise.  I don't know.

15         And by the way Fox knows that we had liquidity

16  issues.  How did they know that?  Because a) they loaned us

17  or they loaned, not us.  They loaned Mr. McCourt $30 million

18  dollars so he could make payroll in April.  Be they advanced

19  $25 million dollars under the 2011 agreement, you know,

20  months before it was due, so --

21         THE COURT:  And they were trying to do a deal.

22         MR. LEVINSON:  And they were trying to do a deal.

23  So they certainly -- I don't think there's any serious

24  dispute as to financial distress in this particular

25  circumstance, and we'll talk a little bit about that again in

1   the context of whether we should even be scheduling anything

2   on the motion to dismiss, but we'll get to that in a moment.

3        So what we're really talking about here is monies

4   that will come into the estate through a sale and ultimately

5   will be distributed pursuant to the Bankruptcy Code and

6   because it's a solvent Debtor.  We're not disputing that

7   we're a solvent Debtor.  We said that throughout the case.

8        THE COURT:  And pursuant to a plan as well as I

9   understand it.  This is all pursuant to the plan.

10        MR. LEVINSON:  Correct, pursuant to the plan;

11   absolutely.  That pursuant to the plan those distributions

12   are being made.

13        So no matter how many pejoratives Fox wants to throw

14   out at Mr. McCourt about his supposed lavish lifestyle or

15   he's lining his pockets or whatever else they want to throw

16   into their pleadings, none of that is relevant to the

17   question of whether marketing an asset to maximize its value

18   reflects sound business judgment in a Chapter 11 Bankruptcy

19   case.  Nor for that matter, Your Honor, is the evidence that

20   Fox apparently wants to offer.  Again, this is just from

21   reading the opposition they filed, regarding the Highbridge

22   DIP facility.  I just don't see how that's relevant.

23   Certainly, has nothing to do with telecast rights.  And Your

24   Honor has heard all that testimony anyway, so.  I think Your

25   Honor is well familiar with that from the DIP financing

1  proceeding.

2         THE COURT:  Well I'll ask you this question.  It may

3  be more properly put to Mr. Werkheiser, but there are

4  adversary proceedings now that are on file that the parties

5  will be prosecuting and isn't that when I will have an

6  opportunity to, if those proceed, an opportunity to hear the

7  evidence?

8         MR. LEVINSON:  I think that's absolutely right.  I

9  mean some of the evidence that they're seeking to present I

10 don't even think has anything to do with those adversary

11 proceedings.  For instance, the Highbridge DIP facility that

12 we just talked about --

13        THE COURT:  Right, right.

14        MR. LEVINSON:  I mean there are whole categories; or

15 the parking lots that are, you know, owned by a non-Debtor.

16 You know, what does that have to do with our agreement with

17 Fox or telecast rights.  I don't even think that has anything

18 to do with the lawsuit, but it certainly has less to do, if

19 possible, I don't know we can get less than zero, with the

20 procedures for which we'll be seeking approval on December

21 7th.

22        Again, the question is what we're doing designed to

23 maximize value for the estate.  The answer yes, it will.  Now

24 I think there's, now there is another question as a corollary

25 question with respect to the exercise of sound business

1    judgment and that's whether the marketing procedures that

2    have been proposed by the Dodgers will lead to a massive

3    unsecured claim by Fox that outweighs any benefit to be

4    received from marketing the telecast rights.  Now we didn't

5    think that was the case even under our original procedures,

6    which at that time it sought a ruling that the entire limited

7    right of first offer as drafted was unenforceable.  But

8    rather than fight about it, you know, we're always prepared

9    to fight where we need to, but we also are prepared to yield

10   where we need to and to try to come to solutions.  I think

11   we've proven that in this case over and over again.

12         I mean this morning's most recent example with FMI.

13   Your Honor heard where we were earlier in the case with FMI.

14   We were able to get to a settlement with them.  MLB, of

15   course, and other circumstances.  And in this case, we said

16   you know what -- I mean I went back and I looked at this

17   limited right of first offer and I, you know, as I read it I

18   said boy this really is limited.  There's really, you know,

19   frankly, not that much here so why don't we just give it to

20   them under our procedures.  Again, the only difference being

21   because we want to realize value now rather than after we've

22   sold the team when it's not going to benefit the estate at

23   all and only going to benefit the buyer, that we go through

24   the process now.  And that we do it, you know, in conjunction

25   with the sale of the team, and so we did.  And, but for that

1   one change I respectfully submit that the procedures match

2   up.

3           Now Fox claims that's not true.  I don't really

4   think Your Honor needs an evidentiary hearing on that point.

5   I think what needs to happen is --

6           THE COURT:  On whether this is a rejection or not,

7   you mean?  Is that basically what you're talking about?

8           MR. LEVINSON:  Well it's not even a question of

9   whether it's a rejection.  The question of is what we've

10  proposed as our marketing procedures different than what's in

11  the agreement.  And to do that, it really is just a matter of

12  looking at our procedures and then looking at the Fox

13  contract.  I think you can look at those two and Your Honor

14  can reach conclusions with respect to that based on the

15  language and what we provided in both.

16          I don't think that on December 7th you're going to

17  need any witnesses to help you conclude that Fox and its

18  expert witnesses have taken liberties with the language of

19  the Fox contract as its written in the submissions that they

20  made to Your Honor in connection with the objection.  You

21  know, for example, the way they continually use the word

22  binding.  They underline it.  They put it in bold, but it's

23  not in the provision.  It was in the original Fox contract

24  provision.  That got amended.  It got deleted as part of the

25  2004 amendments.  So, if anything, I think that highlights

1   the point that it's not there.  But, again, Your Honor can

2   read the contract.  Your Honor can read the procedures.  This

3   is not a subject that requires much more than maybe a

4   magnifying glass to be able to read the print.  But, again,

5   we're prepared to we have our two expert witnesses.  We're

6   prepared to put them on and, again, to the extent that Your

7   Honor thinks that that's necessary.

8           Now on the question whether allowing the marketing

9   and the negotiation to occur during the Bankruptcy case is

10  going to lead to a damages claim.  Again, I don't think Your

11  Honor really needs to hear any evidence on this point to

12  approve the marketing procedures.  And I have at least four

13  reasons why I think that's the case.

14          First, as a matter of law no shop provisions are not

15  enforceable in Bankruptcy and they're not enforceable under

16  Delaware law.

17          MR. WERKHEISER:  Your Honor, I'm going to object

18  because I understand he wants to make a statement, a short

19  statement in support of his position we don't need an

20  evidentiary hearing.  And Mr. Levinson is actually arguing

21  the merits of the motions now.  And that is not what today's

22  hearing is about.  If Mr. Levinson wants to have oral

23  argument of the motions, we can have oral argument of the

24  motions.  We can delay the evidentiary hearing at his

25  request, but that will not count against Fox's time under any

1    procedures if or when they're approved.

2         MR. LEVINSON:  May I respond, Your Honor?

3         THE COURT:  As I understand this goes to the issue

4    of witnesses and evidence at the hearing.

5         MR. LEVINSON:  Precisely.

6         THE COURT:  Okay.

7         MR. LEVINSON:  I mean everything I said goes to

8    whether or not you need to hear evidence and the extent to

9    which you need to hear it.

10        THE COURT:  Right.

11        MR. LEVINSON:  And that's my focus.  And on the

12   issue of the no shop, I mean the law is there.  I mean my

13   point there is it's an issue of law.

14        THE COURT:  Of law.

15        MR. LEVINSON:  It's an issue of law.  Second, you

16   know, the shift in time from of when these procedures will

17   take place from the end of 2012 to now it's not material.

18   Again, for reasons that are undisputed: a) there's no dispute

19   Fox negotiated with the Dodgers in early 2011, so you don't

20   need to hear evidence on that.  It's just an undisputed fact.

21   And so is the testimony of their experts which they can't

22   really run away from at this point.  Their own experts said

23   that the value of the telecast rights is going to necessarily

24   increase over time.  So that by the time we get to the end of

25   2012, they'll be worth even more.  So, again, I don't think

1    Your Honor needs to hear evidence as to whether Fox is going

2    to be damaged.   By their testimony of their own experts,

3    they're not going to be.

4              You know, third, California law, issue of law,

5    Dodgers can mitigate damages.   And, finally, and I think most

6    importantly because we decided to build this in as a failsafe

7    and I know it was certainly -- I don't know if it's

8    necessary, but I decided it was an important fail safe to

9    have.   We built in the procedures, the ability to have an

10   estimation hearing so that Fox can, at that hearing, present

11   evidence with respect to what it says the damages are.   And

12   if Your Honor were to conclude that the procedures to the

13   extent that they ultimately result in an agreement with

14   another party or even with Fox have led to damages, we can

15   determine at that time whether or not to go forward.

16             So, again, the focus here is are we exercising our

17   sound business judgment in moving forward.   And, you know,

18   there's surely no material harm that could occur before a

19   deal is done and consummated with a third party.   And I

20   think, again, as our papers make clear, you know, to the

21   extent that there is a non-material -- even if a non-material

22   breach is demonstrated it can be cured as part of the

23   assumption of the agreement under the plan.   And it is our

24   intention to assume the agreement with Fox in connection with

25   any plan.

24

1          So the Committee --

2          THE COURT:  And is a 45-day -- in effect, there's a

3     45-day hiatus here while you're negotiating with Fox, is that

4     correct?

5          MR. LEVINSON:  Well yes, yes in a sense that it is

6     absolutely a hiatus that during that period of time there

7     will be no solicitation, no negotiation with any other party.

8     It's an important 45 days because we'll be engaged in

9     exclusive negotiations with Fox.

10         THE COURT:  Right.

11         MR. LEVINSON:  And so and that will -- we will

12    devote the attention that's required and we hope Fox will do

13    the same in connection with that process.  So I don't want to

14    dismiss the importance of it, but there's certainly no harm

15    to Fox.  And I think that's demonstrated -- I mean it's sort

16    of self-evident.  I think Your Honor has already made that

17    point.  But the fact that they've already had these

18    negotiations in the past shows that there's not going to be

19    any harm that's going to result from going through that

20    process.

21         And, likewise, there's not going to be harm that

22    results even after that.  Even after that process as we move

23    into the procedures, but, again, they'll be an estimation

24    hearing so that before the point in time that we, you know,

25    ultimately, consummate a deal.  And we've proposed that the

1  hearing be held, you know, on or before February 15th.   The

2  way that the procedures are designed February 23rd would be

3  the date by which Fox would need to decide whether or not to

4  accept the team final offer.  So, you know, we would propose

5  to have that hearing even in advance of that date.

6          So, again, you know, the Committee which, you know,

7  has not always taken the same positions as the Debtors in

8  this case.  I think that would be a fair statement.  They had

9  their own views.  They've been very, you know, independent in

10  their views with respect to this process.  But they've

11  reviewed what's been proposed here.  And it satisfied their

12  concerns and they filed the statement to that effect.

13          THE COURT:  Yes.

14          MR. LEVINSON:  And I think that that again getting

15  to the question of does Your Honor really need to, you know,

16  hear evidence with respect to, you know, is maximizing value

17  an appropriate thing to do in Bankruptcy.  I think the fact

18  that the Committee has endorsed what we proposed is really

19  sort of the icing on the cake.

20          Now another sort of evidentiary issue that Fox is

21  seeking to raise is the argument that all of the terms of the

22  settlement agreement between the Debtors and Major League

23  Baseball are relevant somehow to this proceeding.  You know,

24  including those that baseball wants to keep confidential.

25  And I will tell Your Honor, I mean we're working very hard

1   with Baseball and we now involved Judge Farnan to try to

2   address the concerns that you heard directly from Mr. Lauria

3   because this is not our issue.  I mean we're not the ones who

4   are insisting on confidentiality.  This is Baseball.  And so

5   -- I mean you've heard directly from Baseball --

6           THE COURT:  Yes.

7           MR. LEVINSON:  -- it's concerns.  And we have Judge

8   Farnan now involved too, assist us in working through those

9   concerns so that issue can get presented to Your Honor.  But

10  the settlement is not relevant to these procedures.

11          THE COURT:  That issue would go to whether or not

12  Fox has, if you will, some interest in how an owner is

13  selected, is that right?

14          MR. LEVINSON:  It's not clear to me because I mean,

15  again, in terms of the procedures themselves.  I mean we have

16  presented marketing procedures and we've asked Your Honor to

17  approve those marketing procedures and those marketing

18  procedures are in black and white.  I mean they are what they

19  area.  If it's in the procedures, it's part of the

20  procedures.  And if it's not in the procedures, it's not part

21  of the procedures.  And there was only one term that in

22  connection with the procedures themselves that needed to be

23  revised in connection with the MLB settlement.  And we fully

24  disclosed that in the amended motion, and that was the

25  provision that any agreement that's reached by the Debtors

27

1   has to be conditioned on the approval of the buyer of the

2   team.

3           THE COURT:  Yes.

4           MR. LEVINSON:  Yes.  That's something that MLB

5   required.  Now by the way, everybody knows that any agreement

6   with between a baseball team and media has to go through the

7   baseball consent process.  We've obviously, you know, we have

8   our own views as to, had our own views to what that should

9   look like.  We resolved those issues with Baseball.  But for

10  purposes of what matters here in the procedures, we've

11  disclosed the particular aspect of that agreement that gets

12  incorporated into the procedures.  And Fox has had an

13  opportunity to object.  I mean they raised that issue in

14  their papers.

15          They said that creates an issue because then the

16  team final offer is not binding, underlined, bold.  Of

17  course, we pointed out in our reply that the contract

18  actually says something very different then they'd like it to

19  say.  But, again, that's a contract issue that Your Honor can

20  resolve looking at the procedures, looking at the contract.

21  You don't need to have full blown discovery or an evidentiary

22  hearing on the terms of the Baseball settlement.  That will

23  be dealt with, you know, when it gets filed.  To the extent

24  parties have objections, those will be dealt with in

25  connection with that process.

1          So, in summary, I think here's really the facts and

2     the law that you need to decide the marketing procedures

3     motion:

4          One, Dodgers want to market the telecast rights to

5     maximize value and obtain the highest possible sale price for

6     the team.  They want to do so now.  I don't think that's

7     disputed.

8          Two, because the Debtors are solvent, any excess

9     after Creditors get paid in full will go to the equity owner.

10    We don't dispute that.  It will be under a plan, but we don't

11    dispute that will be the case.

12         Three, as a matter of law it's still proper to

13    maximize value of an estate under those circumstances.

14         Four, the Dodgers have established that the

15    marketing procedures mimic the back end rights of the Fox

16    contract, you know, other than with regard to the timeframe

17    when it's going to occur.  Again, that's just a question of

18    reading the documents.

19         And, five, entry of the order approving the

20    marketing procedures isn't going to lead to a large damages

21    claim for all the reasons, undisputed fact, and law that I

22    identified.  But in any event, there's going to be an

23    estimation hearing to determine whether or not any such claim

24    is going to arise from it.

25         And so if Your Honor is going to hear from any

29

1   witnesses, they should be limited to the experts.  Our two,

2   they have two experts: one, Mr. Thompson and the other one

3   Mr. Desser who they borrowed.  And to the extent Mr. Desser

4   is testifying on issues that, you know, relate to the amended

5   motion, you know, they can bring him into testify.

6           THE COURT:  Would it be your request to depose the

7   experts?

8           MR. LEVINSON:  No.

9           THE COURT:  Okay.

10          MR. LEVINSON:  No because the deadline for that was

11  long ago.  This kind of gets me to my final point which is

12  and I'm sure you'll hear from Fox on this issue, but it's

13  really their eleventh hour attempt to add new witnesses to

14  the list that were exchanged by the Debtors and Fox and Major

15  League Baseball on October 25th.  Now among the witnesses that

16  they now want to have appear at the hearing are Commissioner

17  Selig and Frank McCourt.  This is nothing but an improper

18  delay tactic by Fox that should be rejected forcefully by

19  this Court.

20          As Your Honor will recall, the evidentiary hearing

21  that Your Honor scheduled on September 30th on the telecast

22  rights motion, on the motion to terminate exclusivity that

23  MLB is withdrawing, that was set for October 31st.

24          THE COURT:  Correct.

25          MR. LEVINSON:  It was going to be a week long

1   hearing.  And Your Honor ordered the parties to exchange

2   witness lists on October 25th.  I was in Court that very day

3   when that was said which the Debtors, Fox and Baseball all

4   did.  They exchanged them that day.

5         I want to recall, Your Honor, the dispute that

6   existed at that time between the Debtors and Baseball

7   required a far broader scope of evidence than anything

8   relating, you know, even in the adversary proceeding, but

9   certainly in the procedures motion between us and Fox under

10  the Fox contract.  You know, and that's really, that was a

11  function of the nature of the disputes that existed between

12  the Debtors and Baseball.  I mean there really were there

13  were questions regarding the exercise of discretion under

14  agreements by the Commissioner.  That was really, I think, at

15  the core of that dispute and how that discretion could be

16  exercised.  And, of course, the course of dealings that had

17  occurred, all kinds of other issues with respect to exercise

18  the discretion, whether or not they had the right or didn't

19  have the right to do.

20         THE COURT:  And best interest of the Debtor versus

21  Baseball's best interest, so to speak?

22         MR. LEVINSON:  Right, which, again was really the

23  function of the contract between the Debtors and Baseball.

24         THE COURT:  Correct.

25         MR. LEVINSON:  And what I'll call baseball law.  I

1   now consider myself an expert on baseball law.  I didn't at

2   the beginning of the case, but I do now.

3        Moreover, Mr. McCourt was a party individually not

4   just as in his capacity as an officer or member of the team,

5   but individually to that contract with Baseball.

6        THE COURT:  Right.

7        MR. LEVINSON:  Now all of those issues, Your Honor,

8   were subsumed in the list of the nine issues that were

9   provided by this Court in the September 30th scheduling order.

10  In order to address those questions, the Debtors and Baseball

11  had multiple witnesses on their witness list including -- and

12  this is really a very important point -- including adverse

13  witnesses.  The Debtors included the Commissioner.  In fact,

14  the Commissioner was witness number one on our list.  And

15  Baseball included Frank McCourt on their witness list.

16       THE COURT:  Yes.

17       MR. LEVINSON:  And both specifically included them

18  on the list with the understanding that they were required to

19  do so if they wanted to call them as witnesses.  So, in

20  short, both sides were prepared to engage in an extensive

21  hearing to address the nine issues that Your Honor had

22  raised.

23       Now in contrast to the Debtors and Baseball, Fox

24  only had one witness on its list: Robert Thompson.   He's one

25  of the declarants who they've offered in support.

1          THE COURT:   Correct.

2          MR. LEVINSON:   And it's notable that Fox limited

3    that list to just one witness even though in its original

4    objection is the one that they filed on October 11th, it

5    argued that the marketing procedures were a bad faith abuse

6    of the Chapter 11 process; made that argument, but only

7    offered one witness.  In fact, Fox didn't even reserve the

8    right in its witness list to call witnesses on other lists.

9    Instead, it only reserved the right to examine and cross

10   examine witnesses that were called by other parties.

11         Now, shortly after these lists were exchanged, the

12   evidentiary hearing was adjourned and ultimately a settlement

13   agreement was reached between the Debtors and Baseball.  I

14   will say this, I mean one huge factor in the willingness of

15   the Debtors and I'm quite confident in Baseball to settle was

16   the benefit of avoiding the litigation slug fest that was,

17   otherwise, going to occur between the Debtors and Baseball.

18   That battle would have been very expensive.  It would have

19   been very distracting, not just for us, but for Baseball and,

20   in particularly for us, to management's efforts to maximize

21   the value of assets.

22         In making our settlement with Baseball, the Debtors

23   relied on the fact that by reaching an agreement with

24   Baseball we weren't going to have to do that; relied on the

25   fact that Fox, despite having had the opportunity to do so,

33

1  had not pursued any discovery what so ever.  They have not

2  served document requests.  They hadn't sought at the October

3  12th hearing to have witnesses heard.  And the fact that they

4  had only listed one witness and that they just simply weren't

5  proposing to put on the same kind of case as Baseball.

6          Now Fox as I respectfully submit they're trying to

7  add to their witness list at this late date in an obvious

8  effort to delay the hearing on a telecast rights motion and

9  distract the Dodgers from their effort to sell the team and,

10  ultimately, be able to market the telecast rights.  And

11  they're even trying to drag Commissioner Selig into this.  I

12  mean one of the things I found it almost astonishing in the

13  objection that was filed by Fox is that one of the issues

14  that they say they need to seek information on is information

15  about sales and deals involving the other 29 teams.  We've

16  been down that road.

17          THE COURT:  And they opposed that at that time.

18          MR. LEVINSON:  I don't remember what their position.

19  I don't know if they took a position.  I will say that they

20  will firmly on MLB's side in all litigation with respect to

21  those issues.  Your Honor may be remembering better than me.

22  They may have supported that.  But what is certainly the case

23  as I think Your Honor has made the point loud and clear and

24  yet here they are asking for why.  Again, I think it comes

25  down to delay and improper use of that process.

1     If Fox legitimately thought that it needed to call

2   these witnesses or obtain the discovery to prove its case for

3   the October 31st hearing, it would have done so then.  It

4   would have done so when it had the opportunity to do so and

5   it wouldn't have waited until now because nothing has changed

6   between then and now except for two things.  One, we reached

7   an agreement with Baseball.  And try as they might, that

8   doesn't impact them other than the fact that they used to

9   have Baseball, you know, leading the charge and now they

10  don't.  That's a litigation decision that, you know, they

11  have to live with.  And the other thing that's changed is

12  that we worked very hard to, I think gone more than halfway

13  to try to address Fox's concerns about the marketing

14  procedures by bringing in this, you know, what I consider to

15  be a very limited right of first refusal, but, nonetheless,

16  to try to do so.  That doesn't provide a basis for Fox to now

17  expand the scope of this trial when we relied on the

18  scheduling order and the other orders of this Court in

19  reaching an agreement that we did with Baseball.

20     Now to just two, I think just two more final points.

21  First, Fox now takes the position that Your Honor's

22  scheduling order that was issued on September 30th was an

23  order for both Mr. McCourt and Commissioner Selig to appear.

24  That's not actually what the order says.  What the order says

25  is I'm going to quote, "The Court expects the Commissioner

1   and Mr. McCourt to testify -- expects, that's an important

2   word.  The Commissioner and Mr. McCourt to testify in person

3   at the hearing to enable the Court to better understand their

4   testimony, ask questions, and maintain control of the

5   questioning.

6           Now that expectation, I again look to the scheduling

7   order.  Your Honor obviously can speak best to what your

8   expectation was, but I think it was to "enable the Court to

9   make decision based upon facts, rather than the harsh

10  allegations and innuendo of the antagonist."  And those

11  antagonist were the Debtors and Mr. McCourt and Baseball, the

12  Commissioner.  And, again, it was premised on the list of the

13  nine issues that Your Honor wanted to focus on which, again,

14  were really focused on the dispute between Baseball and the

15  Debtors.

16          By virtue of the settlement between the parties and

17  the resulting amendment that has now been made to the

18  telecast rights motion, those issues are no longer

19  applicable.  And we doubt very much that the Court maintains

20  any expectation that the Commissioner or Mr. McCourt need to

21  appear based on what was set forth in that scheduling order.

22          Here's the last point.  On Monday evening of this

23  week, just less than two days ago, Fox tried to fix the

24  failure in its, you know, it's in its witness list.  The fact

25  that it only had one witness, by serving a brand new witness

1   list to include a whole bunch of other witnesses including

2   Commissioner Selig, you know, including Mr. McCourt and

3   others.  Now putting aside the fact that the witness list was

4   more than a month late, it was sent after the parties had

5   agreed to the standstill that went into effect at the

6   mediation.  And as Judge Farnan advised Fox, that standstill

7   applied to the service of the witness list.  So I don't think

8   that should give them any assistance in what they're trying

9   to accomplish.

10          So, in summary, we don't think this Court should

11   hear any of that other testimony.  We don't think this

12   procedures motion should be turned into a side show.  We're

13   certainly prepared to put on our two experts.  To the extent

14   that Your Honor thinks it will be helpful to hear from their

15   experts, we're prepared to cross examine them, but that there

16   shouldn't be any other witnesses.  And in terms of the

17   scheduling that's going to go forward, you know, that we

18   ought to be taking into account a hearing of that schedule.

19          So I think I'll let Fox respond and then maybe we

20   can, you know, separately address the question of when the --

21   I'll address it right now and then I can give them a chance

22   to sort of address everything.  The motion to dismiss.

23          THE COURT:  Yes.

24          MR. LEVINSON:  Because as I understand it, Your

25   Honor has stayed the adversary proceedings.  The one that we

37

1   brought against Fox and the one that Fox has amended; the

2   lawsuit they've amended against us.  Your Honor stayed those

3   in their entirety, so we don't need to file pleadings or seek

4   discovery in connection with those proceedings right now.

5       THE COURT:  And that was in connection with the

6   mediation that was proceeding.

7       MR. LEVINSON:  Correct and in the order that Your

8   Honor --

9       THE COURT:  Yeah.

10      MR. LEVINSON:  The motion to dismiss Your Honor had

11  indicated that we could talk about that today in terms of

12  scheduling.

13      THE COURT:  As well as the motion to terminate

14  exclusivity about which I guess there's a lot of overlap.

15      MR. LEVINSON:  Well with respect to that issue I

16  mean certainly it's our position that MLB's withdrawal of

17  that will take it off calendar.  A joinder does not

18  constitute the bringing of a motion.  I think Mr. Brady could

19  probably speak to this better than I can, but I think other

20  Judges in this Court have made that specific ruling in

21  connection with different kinds of procedural issues.  And so

22  --

23      THE COURT:  I got caught once on that myself where I

24  filed a joinder, but.  I went back and looked at their

25  joinder and it looked like they had also reserved certain

1    rights.  That it was more than just we join.  That's my

2    question.  It's a question still in my mind.

3          MR. LEVINSON:  Yeah I read it differently.  I read

4    it to be that it was, you know, they called it a limited

5    joinder.

6          THE COURT:  Yes.

7          MR. LEVINSON:  It wasn't even a full joinder.  It

8    was a limited joinder.  And that the point they were making

9    in the joinder was it was, you know, because Baseball was

10   opposed to a media rights deal and because and that Baseball

11   wanted a sale.  And that, therefore, because no media rights

12   deal could occur that the only path to salvation was a sale.

13   And you know what, they got that.  The Dodgers are going to

14   be sold.

15          And so in that sense, you know, to the extent that

16   they were, you know, limiting their joinder I think that

17   issue has been addressed, so I don't think there's any need.

18   And I don't think they have any basis to go forward with that

19   motion.  I mean we can certainly address that issue, you

20   know, further in briefing or, again, I can let Mr. Brady

21   address law, but I think Your Honor is already familiar with

22   it with respect to the context of joinders.  I don't think

23   that joinder certainly doesn't constitute a separate motion

24   that would entitle them to seek that relief.  Once MLB has

25   formerly withdrawn its motion which, of course, it's agreed

39

1  to do and pursuant to our agreement.

2          With respect to the motion to dismiss the Bankruptcy

3  cases, this is -- first of all, I mean a little bit of an

4  inconsistency between on the one hand, you know, asking to

5  terminate exclusivity presumably so Fox can file a plan of

6  reorganization versus dismissing the Bankruptcy cases in

7  their entirety is sort of different paths.  And I think they

8  really probably need to choose which one they want to go down

9  here.  But with respect to the dismissal, this was filed

10  very, very late in this case given everything that's gone on.

11  And, again, it's clearly tactical and designed to impact what

12  Your Honor is going to do with respect to the procedures.

13          It's our position that Your Honor shouldn't even

14  entertain putting together a schedule on that motion until

15  after we've had the hearing on December 7th.  And at that

16  time, Your Honor can consider, you know, if and when that

17  motion should be heard.  Again, I think if you look at the

18  case to which they cited that -- now I'm blanking on the name

19  of it -- the Integrated Telecom case.  I keep wanting to call

20  it the Intercom case.  But the Integrated Telecom case and

21  the standard under that case: a) we're trying to maximize

22  value; and, b) there was financial distress, so, c) they

23  lose.  I mean that's it.  And I really don't think the idea

24  of having to have an extended hearing with respect to all of

25  that is appropriate.  And so I don't think anything should be

1   scheduling with respect to that today.  I think that, you

2   know, any scheduling with respect to that should be deferred

3   until after Your Honor's had an opportunity to address the

4   procedures motion.

5          And in any event, we'll certainly, you know, be

6   addressing on December 7th the Debtors' motion to extend

7   exclusivity.  That's a motion to which they filed a

8   reservation of rights.  They didn't file an objection,

9   although Your Honor correctly points out they had joined this

10  other motion to terminate.  The Committee did file a limited

11  objection, but, importantly, the Committee supports what the

12  Debtors are seeking to accomplish here.  Their point was

13  simply they wanted to have some mechanism to make sure that

14  things moved quickly.  We can address that issue on the 7th.

15          THE COURT:  Yes.  All right.

16          MR. LEVINSON:  Thank you, Your Honor.

17          THE COURT:  Thank you, Mr. Levinson.

18          MR. KURTZ:  Your Honor, this is Glen Kurtz of White

19  Case on behalf of MLB.  If you think this would be an

20  appropriate time, I have probably 60 seconds worth of

21  comments.

22          THE COURT:  Mr. Werkheiser, would you prefer to hear

23  from Major League Baseball and that way you can address all

24  of the arguments?

25          MR. WERKHEISER:  Sure, that's fine, Your Honor.

1          THE COURT:  All right, yes, Mr. Kurtz, good morning

2     and you may proceed.

3          MR. KURTZ:  Good morning, Your Honor, and thank you.

4     I don't want to burden the Court with repetitive argument and

5     so, you know, I will just stress mostly to ensure nobody

6     thinks that I waived anything here.  That we joined in the

7     objection to the effort to untimely amend the witness list,

8     and the indication that ultimately through some kind of

9     process they would seek the testimony of Commissioner Selig

10    and Rob Manfried.  And in addition to the fact that you know

11    we settled out and part of the settlement resolves any issues

12    that we really have here is that they clearly have no

13    relevant information.  I realize that there will be a time to

14    deal with this if there's ever a real effort to bring any of

15    these witnesses, but I do want to stress that.

16         The Commissioner's good faith in connection with

17    decisions that are no longer relevant obviously has nothing

18    to do with Fox's pending objections.  So I wanted to make

19    sure as he's mentioned that we don't believe that any MLB

20    witness can be called or we have any relevant information.

21    And then along the same lines of making sure I've raised an

22    issue and are not accused later of waiving it or avoiding it.

23    We were just absolutely stunned when we saw that Fox's

24    objection included a declaration from Major League Baseball's

25    expert witness Ed Desser.  As far as I know, we had

42

1   absolutely no prior notice of that.  And we're looking into

2   it.  We'll decide what, if anything, we want to do about

3   that.  But that is totally improper and, in fact, I think

4   would give rise to grounds to disqualify Fox's counsel in

5   this matter.

6          And as I said, it's not on today before the Court,

7   but I also don't want to be accused of having that raised as

8   the first instance and a serious concern of ours that Fox

9   went exparte to the Major League Baseball expert witness and

10  had them submit an objection without giving us any notice and

11  without getting any permission.  And those are really the

12  only two remarks that I wanted to make, Your Honor.

13          THE COURT:  All right, thank you, Mr. Kurtz.

14          MR. KURTZ:  Thank you very much.

15          THE COURT:  Mr. Werkheiser.

16          MR. WERKHEISER:  Good morning, Your Honor, Gregory

17  Werkheiser for the record on behalf of Fox Sports Net West 2,

18  LLC.

19          Where to begin; we covered a lot of territory.

20          THE COURT:  Yes, we have.

21          MR. WERKHEISER:  In the hour so that Mr. Levinson

22  has been speaking.  This new marketing procedures motion and

23  Fox's motion to dismiss this case I think they raise a couple

24  of fundamental issues that we should touch on because with

25  all due respect to Mr. Levinson, I think his take on them is

1  dead wrong.  And they, in turn, establish why there is a need

2  for an evidentiary hearing.  And while Fox which has not had

3  an opportunity to conduct discovery and I understand Your

4  Honor has ruled on that and has stayed discovery in other

5  litigation, but has not at least had the opportunity to make

6  its case at the hearing when it goes forward.

7       The fundamental issue that is raised by both of

8  these motions is whether there is a valid Bankruptcy purpose

9  either to this process or to this case.  And where the case

10 is now, it's not a question of benefit or value to the

11 estate.  It's a question of benefit and value to one man, Mr.

12 McCourt.  What you didn't hear and what you will never hear

13 out of them is that the team won't be solvent and that the

14 team won't address any procedural liquidity issues with

15 simply a sale of the team and not modifying Fox's property

16 and contract rights.  They can sell the team tomorrow and the

17 team would pay off any debts, the DIP, anything else, and

18 would be fine.  Nobody's disputed that.  Nobody can dispute

19 that.  This is all about Mr. McCourt.  And this is all about

20 Mr. McCourt addressing his personal liabilities and his

21 personal situation with his divorce.  That is not about a

22 valid Bankruptcy purpose.

23      As you know, Your Honor, I'm familiar with some of

24 these issues of bad faith in Bankruptcy.  We've been down

25 this road before and taking Integrated Telecom for a second

1    that was a different case.  It was a solvent Debtor.  What it

2    had in common in this case is no valid Bankruptcy purpose.

3    In Integrated Telecom, the issue was the Debtor had no

4    financial distress that could be addressed by Bankruptcy.

5    Yeah it was bleeding cash.  Yeah it had its securities

6    lawsuit.  But the Court there looked at the Debtors'

7    situation and said I can't help you.  All you're doing is

8    harming one creditor.

9         Here, we had a situation where the Debtor came

10   screaming into Bankruptcy saying I have a near term liquidity

11   issue.  I can't make payroll.  And what did we find out and

12   this is why the Highland DIP stuff is relevant, Your Honor.

13   What did we find out in the hearing on the DIP financing

14   motion, we found out that: 1) they never went to Major League

15   Baseball and asked them for money.  Your Honor recognized

16   that in your ruling and that was a key part of Your Honor's

17   decision to deny the DIP; 2) they never went to anybody else

18   except to ask for DIP financing in Bankruptcy.  They never

19   asked for unsecured borrowing.  There was testimony from Mr.

20   Ingram at that hearing -- I'm sorry I can't cite you the

21   specific provisions because I didn't know we were going here

22   today.  But there was testimony at that hearing from Mr.

23   Ingram, the Debtors' officer indicating that yes there were

24   parties willing to provide unsecured financing outside of

25   Bankruptcy and yes there were parties willing to contribute

45

1  equity, but all of those proposals were rejected by Mr.

2  McCourt.

3          So, you know, fundamentally, there is a question of

4  whether they were ever in financial distress that only came

5  to light after the DIP financing process was litigated.  And,

6  fundamentally, there's a question of whether they're in

7  financial distress now.  Your Honor, we cited in our motion

8  to dismiss the case a decision called In re Dune 245 B.R.

9  492.  It's a District Court decision out of South Carolina.

10         It has a lot in common with this case because there

11 was a Debtor which owned a hotel and came screaming into

12 Bankruptcy as the Dodgers did here saying I have this huge

13 problem.  I'm facing foreclosure from the lender on the

14 property.  And to make a long story short over the course of

15 the case, there was a deal struck where the Debtors' equity

16 agreed to pay off that lender by essentially acquiring his

17 claim.  And notwithstanding that, the Debtor pressed forward

18 with the process where they were going to try and invalidate

19 the contract of Hyatt which operated the hotel for the

20 Debtor.  They brought an avoidance action and invoked the

21 equitable powers and the Bankruptcy powers of the Court in

22 order to free themselves what they perceive to be a

23 burdensome contract.

24         And the Court looked at that and was just offended

25 by the conduct because there was no Bankruptcy need for that

1   at that point.  And there was no benefit to anyone in the

2   case at that point other than the equity holder.  And that

3   parallels in many respects what we have here.  What we have

4   here is an attempt to use this Court's powers to use the

5   offices of this Court to modify Fox's contract to benefit one

6   person Mr. McCourt.  And nobody can stand up and say that

7   there is a Bankruptcy need for the Los Angeles Dodgers.  They

8   just spent a $160 million dollars to re-sign Matt Kemp to do

9   this deal with respect to the media rights to benefit the

10  team.  The team will be fine.  No one can dispute that.

11          So, Your Honor, that's one of the fundamental issues

12  that will need to be decided by this Court both in connection

13  with our motion to dismiss and in connection with this

14  marketing procedures motion or media rights motion, whatever

15  name you put on it.

16          THE COURT:  The team will be fine, but don't I also

17  have to consider whether the team will be better with the

18  sale of the telecast rights?  In other words, that the value

19  will be maximized by that sale?

20          MR. WERKHEISER:  That's a relevant consideration I

21  think, Your Honor, if the team is in financial distress.  But

22  remember the value generated here -- if just selling a team

23  is going to create enough value to pay off the team's debts

24  and then the team is going to be owned by a new owner who

25  everyone expects will be better capitalized than Mr. McCourt,

47

1  in better position to operate this team successful going

2  forward that's not an issue.  What we're talking about is

3  incremental value that they want to create by breaking the

4  Fox contract and conducting an auction process.  And the

5  incremental value here flows to one person, not to the team,

6  not for the Creditors.

7       And they're doing that, putting at risk everyone

8  else in the case.  So, you know, this process puts at risk,

9  recoveries to everyone else because of Fox's right.  And I

10  think the exact number is sealed, but it will have a massive

11  damage claim based on the violation of its specifically

12  negotiated contract rights.  And if it's ripe, that's going

13  to reduce recoveries to everybody and may actually pass

14  solvency in doubt which has never been in doubt in this case.

15  Everybody's admitted the teams never been insolvent.  That is

16  not the issue.  That's never been the issue driving the case.

17       Your Honor, the other fundamental issue here with

18  this process is the context of having a sale process and a

19  marketing process that is founded on an agreement between a

20  Debtor and Major League Baseball that has never been

21  presented to this Court or disclosed to the Creditors, or

22  parties in interest in general.  We always seen are certain

23  select terms that the Debtor claims are in the agreement that

24  they reference in their procedures motion.  No one has seen

25  it.  Your Honor's not seen it.  Your Honor has not had a

1 chance to pass on it pursuant to 9019 and conduct a search

2 and inquiry into the appropriateness of the settlement that

3 the Third Circuit says we have to do.  None of that's

4 happened.

5     And yet it's this very agreement that is the

6 foundation of the marketing process that they want Your Honor

7 to bless.  And it's this very agreement that dictates the

8 parameters by which Major League Baseball will or will not

9 approve a team deal or a media rights deal.  I don't know how

10 that could be.  Your Honor, if I -- I'm going to put my

11 Debtor hat on for a second.  If I came to Court as a Debtor

12 in possession and I said Your Honor I want you to approve DIP

13 financing for me and it has all these milestones in it and it

14 has, and it requires me to sell some of the most valuable

15 assets of the company, but I don't need to tell you what they

16 are.  And the lender has veto rights and has sole discretion

17 subject to certain parameters that we've negotiated, but I

18 don't need to tell you what they are, you'll laugh me out of

19 Court.  This is not any different.

20     So I just don't see how we can go forward with this

21 process without addressing those two fundamental issues.  And

22 so, you know, the question of valid Bankruptcy purpose and

23 good faith that's a factual inquiry.  And that means, you

24 know, we're entitled not only to test the assertions that

25 their experts have made, but we're entitled to test through

1    testimony of other percipient witnesses whether there is

2    financial distress, whether the Debtor is acting in

3    subjective good faith or not.  Certainly, Mr. McCourt is

4    relevant to that.  And that, Your Honor, extends to the issue

5    of Blue Landco and the parking lots.

6         And the issue there, Your Honor, is that Mr. McCourt

7    subsequent to buying the team from Fox many years ago took

8    real estate assets that are now the parking lots that

9    surround Dodgers Stadium --

10        THE COURT:  Yes.

11        MR. WERKHEISER:  -- move them out of a Debtor entity

12   and into Blue Landco.

13        THE COURT:  Yes.

14        MR. WERKHEISER:  And as far as we can tell, and we

15   don't obviously have access to all the information on this

16   subject, for little or no consideration back to the Debtors.

17   Now this happened in 2006.  On our review under California

18   Fraudulent Transfer Law and Section 544 of the Bankruptcy

19   Code and especially given the allegations that MLB has made

20   during the case that this was hidden from them and that these

21   were Baseball assets, that couldn't without their permission

22   be moved outside the Baseball team group of entities.  That

23   could be avoidable.  And that means if that is avoidable,

24   that's money that comes back into the estate.  It makes it

25   even more clear that there is no valid Bankruptcy or business

50

1   purpose for the Debtor.  Not for Mr. McCourt, but for the

2   Debtor to do what they propose to do or to continue these

3   cases.

4            So, you know --

5            THE COURT:  Wouldn't they owe a lot, a lot, a lot of

6   money from the profits on the parking over those many years?

7            MR. WERKHEISER:  I think that's right, Your Honor.

8   I mean the Debtor entities have paid rent to Mr. McCourt and

9   Blue Landco to use those parking lots over the years and

10  that's likely revenue for the last five years that would have

11  been realized by the Debtor entities.  You know, on the one

12  hand they say oh we're definitely in financial distress and

13  we definitely ought to be here and we definitely need to

14  pursue this process because it will benefit the estate.  And

15  then on the other hand, they say don't look behind the

16  curtain.  It really doesn't matter that you strip these

17  valuable real estate assets out of the company.  That's all a

18  red herring.  Both statements can't be true at the same time.

19           THE COURT:  And that goes to your motion to dismiss,

20  correct?

21           MR. WERKHEISER:  It does, but it also goes to the

22  procedures motion because essentially what they've done there

23  is they said Judge use your equitable powers and rely on

24  Section 365 or whatever of the Bankruptcy Code and deem

25  certain provisions of the Fox contract unenforceable.  And

51

1    disregard the fact that we do this, we'll render the contract

2    unassumable under Section 365 of the Bankruptcy Code.  And

3    let us go through this process because we'll create value for

4    Mr. McCourt.

5            So, I mean it's a fundamental issue that I don't

6    think we keep escape addressing.  Whether it's, you know,

7    done in the context of the procedures motion and the motion

8    to dismiss.  It can't be avoided from our perspective.

9            THE COURT:  Do you have standing to even assert that

10   claim?

11           MR. WERKHEISER:  Do we have standing to assert that

12   claim?

13           THE COURT:  Yes.

14           MR. WERKHEISER:  That's a good question, Your Honor.

15   I mean I think the Court would have to act to grant us

16   standing or, alternatively, the Court could appoint a Trustee

17   or an Examiner with special powers to investigate and bring

18   that claim if it warranted bringing.  So, you know, there are

19   ways to get there.  And, certainly, you know, the Examiner

20   route is a route that we had given some thought to on that

21   particular claim.

22           So, Your Honor, that fundamentally is where we're

23   coming from and I'll try to respond to Mr. Levinson's points.

24   Maximizing value it's far from clear from our perspective

25   that what they propose to do will maximize value.  Our expert

1  reports, you know, testify that, in fact, there is no need to

2  do any of this right now.  And that I think the numbers were

3  25 years, the value of media rights has increased.

4        So, but for zero reason to subject the estate and

5  Fox to this process right now because the value of the rights

6  will increase, and anybody who is buying the team will take

7  that into account in their buying team; regardless of whether

8  the Fox contract is broken.  And, in fact, breaking the Fox

9  contract in this context has every likelihood to hurt the

10 team values because it's going to create a precedent to other

11 media companies that says I can't be assured if I make all

12 this capital investment and this commitment to the team that

13 I'm ever going to get the benefit of my bargain.  They can

14 manufacture financial distress, go into Bankruptcy and then

15 invoke the power of the Bankruptcy Court to deny my rights

16 and I may not even get a claim for it.  So, it's far from

17 clear any of this is going to be a value maximization

18 exercise as opposed to a value destruction exercise.

19        Moving onto the question of damages to Fox, this is

20 important to Fox.  Fox values its relationship with the

21 Dodgers.  It has.  It's the reason that Fox was willing to

22 talk to Mr. McCourt before the Bankruptcy.  And Mr. Levinson

23 makes much of the fact that they would have that conversation

24 with Mr. McCourt, but it's because they value the

25 relationship with the team.  And it's not relevant here if

53

1   Fox had said oh never mind our contract.  Please go ahead and

2   talk to, you know, everyone else Time/Warner, ESPN, whomever.

3   Perhaps that would be relevant.  But the fact that we talked

4   to Mr. McCourt before the Bankruptcy and we're willing to

5   enter into a new contract with him without allowing him to go

6   out to the world and talk to everyone else is not relevant to

7   whether we think our rights are valuable specifically

8   negotiated and necessary to receive the benefit of the

9   bargain under the deal.

10          Damages to Fox, it is material that they're selling

11  in the process as Mr. Desser's testified.  The contract is

12  specifically structured so that this negotiation process will

13  occur at the end of the term of the contract, that it will be

14  relatively compact, and that it will result in a process

15  where Fox has a right of first offer and a right of last

16  offer.  And nothing in the contract as it exists now, Your

17  Honor, would allow them to take Fox's last best number and

18  then go back out and shop it to the world.  And then come

19  back to Fox and renegotiate.

20          And that's what is sort of fundamentally wrong about

21  these procedures, Your Honor, and I know this is for next

22  week, but it compels Fox to have a negotiation with the

23  Dodgers under time pressure, under threat that the Court is

24  going to invalidate their contract.  And then if that doesn't

25  result in a deal, they go out and market it to the world.

1  And we get a chance to come back in and match.  But even if

2  we match, even if we reach a deal early on, it's never a

3  final deal. It's always subject to MLB approval pursuant to

4  parameters that nobody knows what they are, but they have

5  been negotiated by the Debtor in possession who is a

6  fiduciary for the estate who wants to be in Bankruptcy.  And

7  it's subject to whatever the team buyer ultimately decides

8  that it wants, and we don't know that now.  That's a position

9  that Fox would never been in under its existing contract.

10         Your Honor, you asked a question about -- just

11  digressing for a moment, but about the adversary proceedings?

12         THE COURT:  Yes.

13         MR. WERKHEISER:  The problem there is that one, Your

14  Honor stayed them, but two, they're not going to proceed on a

15  timeframe.  And let me say why we think that's some of these

16  issues in terms of their efforts to invalidate Fox's rights

17  can only be adjudicated through an adversary process and,

18  perhaps, only by an Article Three Court. That's not going to

19  happen in this sort of timeframe that they're talking about

20  with their procedures motion.

21         THE COURT:  Right.

22         MR. WERKHEISER:  If we don't have an opportunity to

23  make our case here, we're not going to get it if you allow

24  the procedures motion to go forward.

25         THE COURT:  Well I was sort of asking that question,

55

1  Mr. Werkheiser.  What I had in mind was that through those

2  adversary proceedings Fox would have an opportunity to make

3  its case for damages.

4          MR. WERKHEISER:  It might.  That presumes something

5  that I don't think Fox has accepted which is that it's not

6  entitled to specific performance of its agreements under the

7  circumstances of this case.  And the only way it could, you

8  know, the only remedy it would have is a damages remedy.  But

9  even now under the procedures process, Your Honor, they're

10  not going to allow us to get that adjudicated through the

11  adversary process.  They want to have us do it through a

12  claim estimation process which is unlike any other claim

13  estimation process that I've ever seen.  What they're

14  essentially saying is that we're contemplating breaching your

15  contract.  And we're also contemplating assuming it so before

16  we decide to proceed with assuming it, can you give us an

17  advisory opinion as to, you know, what it's going to cost us

18  to assume it.  And that sort of turns the whole process on

19  its head compared to what one would normally see in a

20  Bankruptcy case and puts Your Honor in a position of

21  rendering an advisory opinion on damages which I'm sure then

22  would be used against us to estop us or at least to try to

23  estop us from litigating what our damages were through an

24  adversary process or as the Fox agreement contemplates

25  through an arbitration process.  So I mean that's where we

1    come from on that issue, Your Honor.

2         Let's see, I think we talked about why the timing is

3    material.  It is material to Fox because the contract

4    specifically contemplates a structured negotiation process

5    that will cure at the end of the term of the contract and it

6    is designed, and Mr. Desser has testified in his declaration,

7    it is designed to prolong the relationship that can be

8    prolonged because there is such an upfront investment and

9    such a commitment that both parties to the agreement made to

10   one another.

11        The no shop being invalid, I think that's something

12   we fundamentally disagree with.  They have cited some

13   Bankruptcy cases that dealt with the ability of no shop, but

14   not under any sort of back pattern like this and not where

15   there's an absence of the Bankruptcy need for Creditors or

16   the estate generally to do this.  And the state law of

17   Delaware cases they cite -- I know Your Honor had a former

18   life as a corporate litigator -- and I don't think any of

19   those cases involved a situation where it was argued that a

20   no shop was improper where the company had one shareholder.

21   And the issue there was that, you know, management or a

22   majority shareholder was trying to protect their control

23   position to the detriment of minority shareholders who could

24   get more value.  That's not this case.

25        The parties see things very differently on whether

57

1   time is of the essence and the enforcement of those

2   provisions.   And, you know, we both submitted competing legal

3   arguments on that point.   On the question of contract

4   interpretation, Your Honor, because they make a lot out of

5   this idea that the word binding doesn't appear.   To the same

6   extent in after the first amendment as it did before.   You

7   certainly can't presume on the argument that has occurred

8   today that that is an issue that does not require evidence

9   and would not require testimony.   If anything the fact that

10  we have very different views on the meaning of that provision

11  suggests that there may be a need to go outside of the four

12  corners of the contract and have people testify on what it's

13  supposed to mean if there is an ambiguity there.   We don't

14  think there is.   We think that our reading is absolutely

15  correct.   But if Your Honor were to look at that and decide

16  that there is an ambiguity there that means yes we do need

17  evidence.

18        Your Honor, I know Judge Farnan attempt to invoke

19  the fact that the Committee has offered its support to this

20  process.   We need to think about who the Committee here is

21  and I'm not impugning anybody's motives, but this goes to the

22  issue of the team will be sold, the committee wants the team

23  sold because it's composed of player representatives,

24  broadcaster representatives and trade creditors primarily.

25  And we all know their motivations.   They like to see the sale

58

1   get done because they'll sell to the surviving company and

2   whatever happens happens from that point.  They can speak for

3   themselves, but, you know, they don't have a dog in this

4   fight over the media rights.

5          Let's talk, Your Honor, about the issue of witnesses

6   and how Fox has conducted itself during the case.  Fox was

7   very public about aligning itself with Major League Baseball.

8   They had every reason to believe that Major League Baseball

9   had its back.  The papers, if Your Honor goes back and looks

10  at them, objecting to the original marketing procedures

11  motion and the motion of Major League Baseball to terminate

12  exclusivity.  A significant portion of those motions is

13  talking about Fox's rights and the harm to Fox, and the

14  damages that it will create, and the systemic damages it will

15  cause to Major League Baseball and to other teams if the

16  Court endorses the process that they're talking about here.

17         So this is not sort of Fox willy nilly saying we're

18  lazy.  We're not going to try to make our own case.  It had

19  every reason to believe at that time that the arguments that

20  were being presented represented its position as much as

21  Major League Baseball's position.  And for that reason had

22  joined them and endorsed them, and endorsed them in so far as

23  they preserved our rights under the telecast agreement, and

24  endorsed them to the extent that they were terminating

25  exclusivity.  We did not endorse them to the extent that

59

1   Major League Baseball was seeking to kick the Dodgers out of

2   Major League Baseball.

3           THE COURT:  Right --

4           MR. WERKHEISER:  You recall part of the reason they

5   asked for --

6           THE COURT:  Yes --

7           MR. WERKHEISER:  -- was to compel assumption or

8   rejection of the baseball agreements.

9           THE COURT:  Understood.

10          MR. WERKHEISER:  And our situation, our, you know,

11  fortunes at least with respect to these broadcast rights are

12  tied to the team in many respects.  And something that would

13  have incredibly devalued the team was not something we would

14  support.

15          THE COURT:  Wasn't the central focus of your joining

16  with Major League Baseball though the position that it was in

17  the Debtors' best interest that a sale occur?

18          MR. WERKHEISER:  As compared to the options that

19  were on the table then I would agree with that statement.  I

20  don't think at that time we necessarily had a fundamental

21  problem with Mr. McCourt so long as he was leaving us alone.

22          THE COURT:  But clearly it would be in Fox's best

23  interest for the Dodgers to be a more successful franchise?

24          MR. WERKHEISER:  It is in Fox's best interest to

25  have the Dodgers be a more successful franchise because more

1  people watch the games, and more people go to the games, and

2  we sell more advertising --

3         THE COURT:  Right --

4         MR. WERKHEISER:  And all of that is very much true,

5  but that is really an issue sort of divorced from what's

6  going on here because the team will be sold now no matter

7  what and it will be sold to somebody who will operate the

8  team, we hope, in a way that will make the team more

9  successful.

10         THE COURT:  But that's an issue isn't it namely will

11  the team be sold no matter what without the sale of the

12  telecast rights?

13         MR. WERKHEISER:  We sure don't know that, Your

14  Honor.  I mean I guess that gets back to the secret

15  agreement.  And I don't know what that agreement says about

16  that.  But even if it says it couldn't, I don't know how that

17  agreement can bind us or Your Honor because it's just out

18  there in ether and it's never been presented to the Court to

19  be approved.  So you know all things considered, I think a

20  sale of the team is a good thing.  I think before all this

21  happened, Fox obviously was okay with continuing with Mr.

22  McCourt.  So, you know, if we can turn back time to, you

23  know, prior to the Bankruptcy we weren't itching for the

24  company to file for Bankruptcy.

25         So, Your Honor, just returning to the issue of the

61

1   witness list.

2          THE COURT:  Yes, please.

3          MR. WERKHEISER:  Sure.  So there was a direct

4   alignment of interests between Fox and Major League Baseball

5   in October when these witness lists were filed.  They were

6   filed on October 25th, I believe or served.

7          THE COURT:  For an October 31st trial, that's right.

8          MR. WERKHEISER:  Right.  And so the parties were

9   working together and Major League Baseball was calling as

10  witnesses Mr. McCourt, Mr. Ingram, Mr. Wilhelm because our

11  interests were aligned and we weren't perfectly percipient

12  about what was going to happen in the future.  We didn't

13  individually list all those people on our witness list.  We

14  called Mr. Thompson who is still on our witness list today.

15         THE COURT:  Your argument is you had the rug pulled

16  out from under you in connection with these proceedings?

17         MR. WERKHEISER:  We did, Your Honor.  I mean it does

18  come down to a question of fundamental fairness and

19  especially when the case is now to a point where we're really

20  just talking about can we put on our case in opposition to

21  what they're trying to do or in support of our motion to

22  dismiss.  And so and we did I think as Mr. Levinson conceded,

23  you know, reserve our rights to examine and cross examine all

24  other witnesses called by the parties which is very much

25  consistent with our view that Major League Baseball was

1  putting on witnesses that we wanted to hear from at that

2  time.  And the Debtors were putting on Mr. Selig at that

3  time.

4       THE COURT:  Now you can't compel them to appear

5  here, can you to testify?  The subpoena power of this Court

6  only extends 100 miles.

7       MR. WERKHEISER:  Well the Court can issue the

8  subpoena, but I think it would in the case of Major League

9  Baseball have to be served out of New York, so through those

10 attempts.  So I think we could.

11      THE COURT:  I once learned in a hard way that even a

12 party to a litigation, a defendant in a litigation who is

13 outside of the range of this Court subpoena power can't be

14 compelled to testify.

15      MR. WERKHEISER:  I mean they're both active parties

16 to this proceeding and they're both here invoking this Court

17 to accomplish something that they want to accomplish.  So you

18 know if I were a more adequate litigator, I could probably

19 quote chapter and verse from Rule 45, but I can't.  But what

20 I do know is that both parties are here in front of Your

21 Honor.  They are using this Court to try to accomplish

22 something that they want to accomplish.  It seems to me that

23 they cannot then take the position I don't have to show up.

24 And I think Your Honor recognizes much when you issued the

25 scheduling order on September 30th that, you know, stated your