1   expectation that they would be here.  I don't know what sort

2   of world Mr. Levinson practices in, but if a Court issues an

3   order and says I expect so and so to be there, as far as I'm

4   concerned they're there if it's my witness.

5           THE COURT:  But that had nothing to do with Fox at

6   that point.

7           MR. WERKHEISER:  Well it did, Your Honor, because at

8   that time they had teed up.  As Mr. Levinson pointed out they

9   teed up the original marketing procedures motion.

10          THE COURT:  Right, but my concern in having Mr.

11  Selig and Mr. McCourt in Court was the best interest

12  analysis.  And but that's a separate matter.

13          MR. WERKHEISER:  Respectfully, Your Honor, best

14  interest ties back into exactly where we are now which is, is

15  this really in the best interest of the Dodgers.  And it ties

16  into the motion to dismiss which is, is there a valid

17  Bankruptcy purpose to them continuing to be here.  So, you

18  know, on that front, Your Honor, I think we do need the

19  opportunity to make our case.  We do need to hear from the

20  witnesses who are able to speak to these very important

21  issues.

22          And just to, again, go back to the timing of things,

23  Your Honor.

24          THE COURT:  Yes.

25          MR. WERKHEISER:  There was apparently a mediation

1    process of which Fox was unaware and had not been invited to

2    going on in September.  Well really starting back in July

3    based on the order that was entered.  It continued through

4    August, I guess, and then through mid September.  I think we

5    now understand the hindsight that it stopped.  And then there

6    was this sort of convulsion of pleadings getting filed in mid

7    September.

8          THE COURT:  Isn't there an issue whether Fox was or

9    wasn't aware of the mediation?

10          MR. WERKHEISER:  Well there are disputed positions

11    Mr. Levinson has put in the declaration stating his position

12    and Mr. Warren for Fox has put in the declaration stating his

13    position.  But there is a dispute as to whether, in fact, Fox

14    was invited to have settlement discussions not really I don't

15    think to be a part of this mediation process.  So and our

16    take on that, at least, is that that the invitations were

17    only shaded in such a way that to disincentivize Fox to want

18    to have a discussion.  They were brought up in the middle of

19    a contested hearing.  They were brought and said in such a

20    way you should be the stalking horse for the process.  I'm

21    hesitant to sort of go here because the argument is

22    settlement discussions.

23          THE COURT:  Understood.

24          MR. WERKHEISER:  But you should be the stalking

25    horse for the process.  And that's something that is, because

1  we're here today, I think Your Honor appreciates is just

2  offensive to Fox and offensive to the rights that it has

3  under its agreement.  So it's not as though the parties were

4  saying hey come meet with us and Judge Farnan.  We're having

5  this discussion.  We can hammer out a business deal.  That

6  type of conversation we don't believe ever occurred.

7          So, you know, mid September, September 16th I think

8  it was all these papers start getting filed.  They filed

9  their original procedures motion.  Baseball responds with

10  objections and with its motion to terminate exclusivity.  Fox

11  objects and joins the motion to terminate exclusivity.  And

12  as Your Honor noted reserves its right to pursue that, to

13  pursue its positions.  And, in addition, then files a reply

14  in support of the motion to terminate exclusivity because the

15  Debtor in objecting to it began to attack Fox's contract and

16  its position.

17          So that's all going on for awhile.  We're originally

18  scheduled to have a hearing on October 31st on those items --

19          THE COURT:  Right.

20          MR. WERKHEISER:  Among other things.  And people

21  file their replies around October 25th and they file their

22  witness list at that time in a time that Fox thinks it's

23  aligned with Major League Baseball.  And then October 26th

24  Your Honor enters an order, a scheduling order.  That simply

25  says the hearing is moved to November 29th.  And Fox not

1   having been privy to what's going on in the mediation process

2   doesn't know what all this is about.   Then a few days later

3   on November 1st, there's a joint statement issued that says

4   hey Major League Baseball McCourt and the Dodgers had a

5   settlement word to come later.   And then nothing for 11 days.

6   And then this motion is filed on a Saturday that this new

7   marketing procedures motion is filed on a Saturday.

8          Then you'll recall that we responded and asked the

9   Court to adjourn the hearing.   There were some scheduling

10  issues related to that motion to adjourn itself that resulted

11  in the teleconference held on November 20th.   We thank Your

12  Honor for making that time.   I know that was hard to take

13  that time away on a weekend given how busy your schedule is

14  during the week.   And as a result of that Your Honor stays

15  the litigation generally, says all litigation is stayed in

16  paragraph nine in an order that was issued the next day but

17  says we should still show up on November 30th.

18          THE COURT:   And my intention was stayed so that the

19  parties could talk and negotiate.   That was really the

20  purpose.   And that stay frankly will be lifted, but --

21          MR. WERKHEISER:   Correct, no understood.   So I just

22  -- I wanted to give Your Honor the overview because this is

23  not a question of Fox not being diligent or not being lazy,

24  or being lazy, excuse me.   It was a question of Fox not being

25  under the tent.

1         THE COURT:  Well I know that Fox has the hardest

2 working lawyer I know so I don't think they're lazy at all.

3         MR. WERKHEISER:  Thank you, Your Honor.  So, you

4 know, the fact that we're trying to clarify now that we

5 intend to call these additional witnesses is not, I don't

6 think anything that should offend anybody.  We, again, feel

7 these folks are relevant to the issues that need to be

8 addressed at the hearing on our motion to dismiss and on,

9 more importantly, the procedures motion.  Well I shouldn't

10 say more importantly, but more directly relevant to the

11 discussion we're having now the procedures motion.  And we,

12 you know, provided the Court a number of reasons why we

13 thought these folks were relevant which is in paragraph 79 of

14 the objection that we filed.

15         But, you know, look many of the people from the

16 Debtors; Ingram, Wilhelm, McCourt, they all certainly have

17 information we think would be relevant to the exercise of

18 their business judgment and the decision making process that

19 resulted in taking this course.  We, you know, think they can

20 talk to the statements about value and why they think that

21 doing this to us is going to produce more value for anyone

22 certainly other than Mr. McCourt.  And, you know, we think

23 these issues about the lack of financial distress now and

24 both back in June are extremely relevant.  And they can speak

25 to those sorts of issues as well.

1          And then, finally, there's the Blue Landco situation
2  where, again, I think you can't come to a Bankruptcy Court
3  and say use the equitable powers of this Court to benefit me
4  as Mr. McCourt has done being a non-Debtor and come here with
5  unclean hands.  And if, in fact, as we think is the case this
6  transfer was for no consideration and improper.  That's a
7  relevant consideration, I think for invoking the powers of
8  this Court and for whether they should remain in Bankruptcy.
9          As to Major League Baseball's representatives they
10 are certainly percipient witnesses to the question of whether
11 things were concealed from Major League Baseball and whether
12 the Debtor was proceeding in bad faith.  They are able to
13 speak to what the secret parameters are that are governing
14 the Debtors' conduct that in turn affects Fox.  And on that
15 front, we think we ought to be able to have the settlement
16 agreement as part of the record.  We think it ought to be
17 presented to the Court and approved before the Court does
18 anything with procedures, but and all events it has to be
19 part of the record and accessible to us.
20         They are also relevant to how this is going to
21 affect Baseball.  And Baseball itself this is not us
22 injecting this issue, but Baseball itself stated in its, I
23 believe it was in its motion to terminate that having an
24 owner of a solvent MLB club with substantial equity value
25 using Bankruptcy to breach a telecast agreement with Fox

69

1   Sports is harmful to the League and 29 MLB clubs.  We didn't

2   put that at issue.  They put that at issue.  So I mean these

3   are very relevant considerations given the process that the

4   Debtor wants to embark on.  And we ask for the opportunity to

5   make our record on these points.

6          Briefly on the issue of the revised witness list

7   that Fox sent around.  I wasn't at the mediation.  I can't

8   agree with or disagree with Mr. Levinson's assertion that

9   Judge Farnan said don't send the notice.  But it was nothing

10  more than putting people on notice this is who we expect to

11  call.  And all it did is foreshadow the discussion that we're

12  having today.  So I'm not sure how anybody was harmed by

13  that.  That is inconsistent with the carve out that the

14  parties had that said we can all subpoena witnesses that we

15  thought we needed to have to appear at the hearing and

16  everybody could object to those.

17         THE COURT:  Do I have your witness list somewhere?

18  Is it in the papers?  And I just --

19         MR. WERKHEISER:  We served it, Your Honor, but did

20  not get filed with the Court, but I can represent who is

21  going to be on it.

22         THE COURT:  If you would for me that would be

23  helpful.

24         MR. WERKHEISER:  Sure, Your Honor.

25         THE COURT:  I know you mentioned Mr. McCourt.

1          MR. WERKHEISER:  Yes, Your Honor.

2          THE COURT:  And Mr. Wilhelm and Mr. Ingram from the

3    Dodgers.

4          MR. WERKHEISER:  That's correct, Your Honor.  Our

5    principle witnesses, our experts will be Mr. Thompson.

6          THE COURT:  Right.

7          MR. WERKHEISER:  And Mr. Desser.  And then in

8    addition it's Mr. McCourt, Mr. Ingram who has testified

9    previously in front of this Court; Mr. Wilhelm which I

10   believe is the Dodgers' CFO; Mr. Selig and Mr. Manfried who

11   has been a principle decision maker for MLB in connection

12   with these issues.  Those are the witnesses that we've asked

13   for, Your Honor.

14         THE COURT:  Okay.

15         MR. WERKHEISER:  Briefly on preservation of our

16   ability to press forward with the motion to terminate

17   exclusivity.

18         THE COURT:  Yes.

19         MR. WERKHEISER:  That's not our first choice.  You

20   know our first choice is we prefer the case out of Bankruptcy

21   at this point.

22         THE COURT:  Right.

23         MR. WERKHEISER:  Or at least them to abandon the

24   media rights process.

25         THE COURT:  You know you don't have to bashful about

1  mentioning the Sante Fe case because I'm well aware of that

2  case of course too.

3          MR. WERKHEISER:  Yes, Your Honor.

4          THE COURT:  And the Third Circuit's decision.

5          MR. WERKHEISER:  Yes, Your Honor, I assumed you were

6  which is why I didn't dwell on it.  But on that discreet

7  issue I mean its, you know, I preferred really I think would

8  be to have the case dismissed because at this stage whatever

9  needs to happen can happen outside of Bankruptcy.  And in the

10 absence of that then, yeah we think exclusivity should be

11 terminated because we think this process that they're

12 pursuing and the plan that they contemplate is not going to

13 be for the benefit of the estate generally.  It will be for

14 Mr. McCourt's benefit only if anyone's and we think that's

15 not consistent with them continuing to have exclusivity.

16         So and I mean I've given you the background on the

17 joinder issue.  We filed that.  We adopted most of Major

18 League Baseball's positions other than we didn't think the

19 Dodgers should be kicked out of baseball.  And then we filed

20 our reply, so we think we have, being this is not a case

21 where we sort of just tossed it in and waited for somebody

22 else to see what happens.  And then at the eleventh hour said

23 well we want to do it.  We were, you know, operating in what

24 we thought was a common interest situation.

25         On our response to the motion to extend exclusivity,

1   Your Honor, and again I realize this is for next week, but

2   comments have been made about it and I do feel compelled to

3   respond briefly.   We filed a reservation of rights because

4   the motion was on file and had an objection deadline of

5   November 7th.   And that objection deadline fell between the

6   period that there had been a public announcement by MLB and

7   the Dodgers and McCourt that yes there was a settlement, but

8   prior to us seeing the procedures motion.   So rather than be

9   overreact, we filed a response that says essentially we

10  incorporate or positions and the position is taken in the

11  motion to terminate exclusivity.   We reserve our rights to

12  respond further and reserve all of our rights in connection

13  with any media, the rights issue.   So, you know, it was not a

14  waiver.   It was us trying to be measured in the face of

15  uncertainty.

16           On the question of Mr. Desser testifying for us,

17  it's not clear to me what, if anything, is improper about

18  that.   I'm not sure that, I don't think there's been any

19  allegation at this point that he's misused any information.

20  He is a known expert in the field and has been, is probably

21  essentially in the state of the art in terms of addressing

22  these types of issues.

23           THE COURT:   And what issues, help me out with that,

24  Mr. Werkheiser.   His expertise is in what?

25           MR. WERKHEISER:   The types of media rights

73

1   transactions.

2          THE COURT:  Okay.

3          MR. WERKHEISER:  So, you know, that is the context

4   in which we've asked him to be involved.  I'm not sure where

5   MLB would view that in having made him privy to any

6   information that would in any way disqualify anybody, let

7   alone counsel.  But on that front I think, you know, we can't

8   be sandbagged with a motion on December 6th.  So, you know, I

9   understand that there have been menacing statements made in

10  that regard, but, you know, if they have a position they're

11  going to certainly need to hear it; otherwise, we need to be

12  able to proceed and make our case.  And since MLB now has

13  taken the position that they are neutral in this whole

14  process, I'm not sure why they have an ox to be gored here.

15         I think that is everything that I have, Your Honor.

16  I know we have some folks who are on the telephone for Fox --

17         THE COURT:  Yes.

18         MR. WERKHEISER:  Who may wish to chime in, but at

19  this point if Your Honor doesn't have further questions for

20  me, I'll cede the podium.

21         THE COURT:  Thank you, Mr. Werkheiser.  I think this

22  might be a good opportunity.  We've been going at it a couple

23  of hours, maybe for about a 10 minute recess and then come

24  back.  And I have sufficient time today so we're not pressed.

25  And people can stretch their legs or whatever they need to

74

1  do.  All right, see you in about 10 minutes.

2       (Recess 11:58:35 to 12:14:49)

3            THE CLERK:  Please rise.

4            THE COURT:  Thank you, everyone; please be seated.

5  I have to be careful because this is one of those cases where

6  I start to feel sorry for myself.  All right.  How should we

7  proceed now?  Mr. Levinson I know wants to speak.  Oh I'm

8  sorry, Mr. Capuzzi.

9            MR. CAPUZZI:  If you wouldn't mind my co-counsel Mr.

10  Goren from Morrison & Foerster would like to address the

11  Court.

12            THE COURT:  Absolutely, thank you; certainly.  Good

13  afternoon.

14            MR. GOREN:  Good afternoon, Your Honor, thank you;

15  Todd Goren from Morrison & Foerster on behalf of the Official

16  Committee of Unsecured Creditors.   I just wanted to take a

17  brief moment to respond to a couple of points that Mr.

18  Werkheiser had made.

19            At some point during this they seemed to question

20  the motivation of the Committee in supporting the Debtors'

21  relief.  I just want to reiterate to the Court, I'm sure you

22  know that the Committee takes its fiduciary duties very

23  seriously.  I did as this in case and will continue to always

24  act in the best interest of unsecured creditors.  At this

25  point in time, the Committee believes that pursuing the

1    amended telecast rights motion is likely to maximize value

2    and ensure a hundred percent distribution to unsecured

3    creditors.  You know, there's obviously if some of the

4    objections Fox has raised turn out to be true, we envision

5    that those issues will come to a head next week.  And it may

6    not be in the best interest, but that will come to a head and

7    that will be decided next week.  But on balance, the

8    Committee believes that pursuing the amended telecast rights

9    motion will maximize value in this case.

10            Those are points that Mr. Werkheiser raised and I

11   just wanted to take a moment to speak to was these potential

12   claims against Mr. McCourt, fraudulent conveyance type claims

13   relating to the parking lots or otherwise.  The Committee has

14   considered those claims.   We haven't spent any significant

15   time researching or analyzing those claims because all

16   indications are this is going to be a hundred cent case.  And

17   it's unclear what value pursuing those claims would have the

18   estate or its creditors.  It would just appear to be a waste

19   of time and money to look at those claims.  If something

20   happens and it doesn't turn out to be a hundred cent case,

21   the Committee will very closely review and analyze those

22   claims and would seek authority from this Court to pursue

23   those claims if, you know, the result in this case is not as

24   we all expect it to be.

25            But, you know, in general we support MLB and the

1  Debtors here that the hearing next week need not be a lengthy

2  evidentiary hearing.  We think most of the issues that this

3  Court has to decide.  There's a reasonable exercise of the

4  Debtors business judgment, its responsibly entitled to

5  specific performance would the breaches created by the

6  amended procedures be material thus rendering the contract

7  unenforceable.  We think those issues are at their core legal

8  issues.  That maybe there's a limited amount of evidence that

9  needs to be adduced, but we think for the most part this

10 could be largely accomplished with argument.

11         So, you know, we would like to get this done as

12 efficiently and cheaply as possible because, you know, the

13 Committee's goal as is set forth in its papers is to move

14 this process along as quickly as possible and get the Debtors

15 out of Bankruptcy and back to the business of baseball.

16         THE COURT:  All right thank you, Mr. Goren.

17         MR. GOREN:  Thank you, Your Honor.

18         THE COURT:  Mr. Levinson.

19         MR. LEVINSON:  Your Honor.  I'm going to respond to

20 a number of the points.  I don't think I'm going to respond

21 to all of the points.  So the extent that I don't respond to

22 a particular point, please don't treat it as a concession or

23 waiver with respect to that point.

24         THE COURT:  Never.  I understand that, Mr. Levinson.

25         MR. LEVINSON:  Thank you, Your Honor.  I think we

1   ought to maybe start because the Committee's counsel just

2   chimed in and go back to the Committee's support for what it

3   is that we've now proposed to do.

4         I mean the Committee consists of entities that

5   unquestionably have an interest in the value of the Dodgers,

6   of the reorganization value of the enterprise that we're

7   talking about the Dodgers that will continue to exist.  It

8   consists of the players.  It consists of broadcasters.  It

9   consists of trade vendors.  Now it even consists of two

10  Dodger fans.  And the Committee supports what it is we're

11  trying to accomplish.  They see the benefit of being able to

12  market an asset in order to try to maximize its value.  And

13  in the process, and I think this is a very important point,

14  to improve to do so by improving the reorganization and the

15  going concern value of this particular company and the

16  enterprise, which will enable.  And, in particular, for

17  example, higher rights fees.

18        The ability for the team to obtain higher rights

19  fees going forward is obviously going to have benefits.  To

20  the extent that a purchaser of the team knows what those

21  rights are going to be now as opposed to having to wait to

22  determine what those rights are going to be it's going to put

23  them in a financial position to do more things sooner than

24  what otherwise would be the case, to go out and look at free

25  agent alternatives.  You know, knowing what it is that

78

1  they're going to have going forward and that improves value

2  for everybody; for fans, for players, for vendors, and for

3  the creditors in this case and equity as well.

4       What Fox is, I mean what they're really seeking to

5  do here is enforce a no shop provision and we shouldn't lose

6  sight of the fact that really kind of turns Bankruptcy on its

7  head.  I mean what we're proposing to do is exactly what our

8  fiduciary duty is which is to go out and market things and

9  maximize value.  And in the notion that they could somehow

10  get specific performance to prevent that from happening, well

11  no they can't.  I mean we cited to the case law in our reply

12  brief that makes that clear.  To the extent they have a

13  remedy -- and I'm not suggesting they're entitled to any

14  damages, but to the extent they do, that's the remedy.  You

15  don't get to enforce that kind of specific performance and

16  prevent a Debtor from marketing its asset.

17       Now what is the asset that we're talking about

18  because I think it's again important to keep in mind the

19  distinction between on the one hand the sale of telecast

20  rights versus the license of telecast rights.  We are now in

21  a position where we are selling the team.  Based on a, you

22  know, as a result of a settlement based on a motion that they

23  joined.  This is the end result that they asked for.  In

24  fact, I'm going to read from their limited joinder:

25  "terminating the Debtors' exclusive periods to file a Chapter

1    11 plan and solicit votes thereon is the best way to advance

2    these cases in accordance with the Bankruptcy Code and

3    applicable non-Bankruptcy law." So they got exactly what

4    they asked for. So we're going to have a sale of the team.

5        And part of the sale of that team, one of the

6    assets, is the telecast rights. They don't belong to Fox.

7    They belong to us beyond 2013. And those rights are going to

8    be something that's going to be purchased by a buyer of the

9    team. Now the question is how do you go about maximizing the

10   value of those rights. And that's where the ability to

11   market the licensing of the rights comes into play. So that

12   potential buyers understand from the market what is going to

13   be available rather than buying the team without having that

14   knowledge. And it's that ability to market that's central to

15   the need for the relief now so that we can maximize the value

16   of this estate for the benefit of its constituents.

17        THE COURT: Just to make it simpler, a little bit

18   simpler it's as if a Debtor had, for example, a long term

19   lease and wanted to sell its business. And that lease was

20   very, very significant and, therefore, the Debtor was, in

21   effect, renegotiating the lease so that it would be more

22   attractive and, therefore, the sale of the company would be

23   more attractive. It's somewhat comparable to that sort of a

24   situation.

25        MR. LEVINSON: That's exactly right. I mean the

1  analogy that we've talked about is, you know, you're selling

2  an office building.

3          THE COURT:  Yes.

4          MR. LEVINSON:  That's not leased yet.

5          THE COURT:  Yes.

6          MR. LEVINSON:  And so entering into a lease tells

7  your buyer what that cash flow is going to be.  There are

8  bottom feeders out there who are willing at a steep discount

9  to go ahead and take the empty building.  But there are

10 others who are looking for a specific cash flow so that they

11 know what it is that they're buying.  And that's really what

12 we're trying to accomplish here because it's our view, and we

13 don't know who ultimately the potential buyers of this team

14 are going to be.  One thing, I mean -- we've seen from

15 experience that media companies are selling teams as opposed

16 to buying teams.  That's certainly been the trend even here

17 in this area.

18         THE COURT:  Sure.

19         MR. LEVINSON:  Most recently.  And so those buyers

20 aren't going to have necessarily the expertise familiarity

21 with the value of this asset.  And let's face it, there's

22 nothing like being able to demonstrate to them in a very

23 tangential way here's what's available to you.  Here's what

24 you will know you have so that when you want to go out and

25 sign x, y, and z, here's what you're going to have at your

1   disposal.  And so that's what we're trying to accomplish.

2   And that benefits the enterprise.  That benefits the Dodgers

3   being able to do that.  And it also ultimately, you know,

4   that higher value.  And, of course, ultimately leads to a

5   higher sale price as well, but in that context it's

6   absolutely beneficial.  So, no I think Your Honor's analogy

7   is very apt in this circumstance.

8           A little bit on the -- and I am going to skip around

9   a little bit.  I apologize.  But on the scheduling of the

10  mediation and sort of the whole rug, you know, their sort of

11  suggestion somehow the rug got pulled out from under them.

12  And I just don't accept that, Your Honor, especially under

13  the facts we have here, which are as follows.  First, Your

14  Honor issued the order that disclosed the mediation on

15  October 5th.  This was five days after the scheduling order

16  that Your Honor had entered that, in effect, opened the door

17  for discovery.  So Fox knew that there was a mediation no

18  later than that date.  They may have suspected something

19  before, but they certainly knew it as of that date.  And

20  mediations can lead to settlements.  There's just no question

21  about that.  And, of course, they did here.

22          We've had good success so far with our mediations in

23  leading to settlements including we heard SMI this morning.

24          THE COURT:  Yeah.

25          MR. LEVINSON:  By the way, Fox was not objecting to

1   our agreement with FMI which we think creates value and

2   benefits the estate.  You know, achieving exactly the same

3   objectives that we're trying to achieve in connection with

4   this procedures motion; there is certainly, nothing

5   objectionable about doing that in Bankruptcy trying to

6   maximize value.  But Fox knew that that mediation was going

7   forward, and they also knew because -- and I set this forth

8   in my declaration.  It's really not disputed in Fox's counsel

9   declaration that I wrote to them.  I called them.  I said my

10  phone was always open, that they should feel free to call.

11  We invited them.  We tried to schedule meetings in New York.

12  And we were told just thanks, but no thanks.  They made their

13  bed with MLB.  They didn't want to talk to us.

14          If they really wanted to participate in that

15  mediation, there are plenty of ways to get that to happen.

16  One, they could have come to Your Honor and said Your Honor

17  we'd like to be a part of that mediation.  After all, you

18  know, we filed this limited joinder.  We'd like to be a part

19  of it.  They never did that.  So the suggestion that, you

20  know, somehow they were excluded is absolute nonsense.

21  That's a choice that they made.  But to say now that based on

22  that and based on the fact that they didn't follow the rules.

23  They didn't follow the scheduling order, that they listed one

24  witness, that they decided to pursue a different course.  For

25  them to be able to say oh well, never mind.  We don't have to

1   follow any of those rules and we're able to now turn this

2   hearing into something that we didn't tell you at a time when

3   you were busy negotiating with Baseball and relying on our

4   positions that we didn't tell you before, but now we want to

5   bring in a whole host of witnesses is just not appropriate to

6   do and to suggest it should be done especially in the context

7   of this procedures motion.  And to say that, you know, their

8   new list is to clarify would be, is I think quite a bit of an

9   understatement between having one witness versus a whole host

10  of witnesses.

11          THE COURT: do you agree with my suggestion that they

12  can't subpoena these parties at the hearing?

13          MR. LEVINSON:  I do.  I do.  You know the question

14  on the testimony on the meeting of the contract, that really

15  goes to the estimation hearing that we've proposed.  And I

16  want to say something about the estimation hearing.  I mean

17  this is not an uncommon process.  We use estimation hearings

18  all the time in bankruptcy in order to cap claims in order to

19  create certainty going forward, whether it's in connection

20  with the plan and whether or not you know it's ultimately

21  going to be feasible or in any number of other contexts.

22  They've asserted claims, they must think they have claims,

23  they filed a lawsuit after all, they amended the lawsuit.  So

24  they must assert, and they know exactly what it is that we're

25  proposing to do here.  So it's not an advisory opinion, it

84

1   rather is an effort by us to cap the claim.  And what we've

2   done and again this is responsive to concerns that they've

3   raised.  We've said we'll deal with this issue sooner rather

4   than later.  We'll set up the estimation hearing so that we

5   can have it before we get to the end of this process.  I

6   think that's again trying to be responsive.  And then the

7   suggestion is well that doesn't give us enough time.  Well

8   we're faced with a limited amount of time that we have to

9   accomplish everything that we need to, and all of the

10  parties, you know, including Fox have urged that every, that

11  this case ought to move forward as quickly as it can.  We

12  have agreed that we will consummate a sale by no later than

13  April 30th, and that creates a number of deadlines to having

14  to confirm a plan and the like.

15         And so I think what we have proposed here is a very

16  reasonable solution that preserves and protects everybody's

17  position and rights so that we can move forward with the

18  procedures.

19         THE COURT:  But, don't I have to know the value of

20  that claim, the potential value of that claim in assessing

21  the sound business judgment standard?

22         MR. LEVINSON:  Well, no, I don't think that it has

23  to be fully determined before doing that, because I think by

24  having established that process we've effectively set up a

25  failsafe so that --

1          THE COURT:  Okay.

2          MR. LEVINSON:  -- so that you don't have to reach

3    that decision now.  If you did have to reach that decision

4    now, there are plenty of grounds that we've set forth in our

5    papers on how you could reach that decision on the 7th.  I

6    mean there's no question that you could.  I mean you could

7    find the provision to be unenforceable, it's a no shop

8    provision in a bankruptcy case or any number of other of the

9    grounds that we've offered.  Their admission that the rights

10   are going to be worth more at the end of 2012 during this

11   process, I mean I could pick and choose. But again, what we

12   were trying to say is look, this is a procedures motion,

13   let's get the procedures going so that we're not deprived of

14   the ability of what we want to do so that effectively we have

15   a status quo situation and then we can deal with the

16   estimation hearing later.  So that was our suggestion.

17          I want to talk a little bit about Blue Landco,

18   because I have to say, we've dealt with a lot of allegations

19   that have been thrown around in connection with this case,

20   and we've, what I've always tried to do, what we've always

21   tried to do is address them with evidence, with law, with

22   facts.  I think that's the best way to deal with allegations.

23   When somebody makes an allegation, you know, you can throw

24   out allegations, it's another thing to have to prove

25   allegations or suggest that you know somehow something

86

1   improper.  Well let's take Blue Landco.  Because when Fox

2   sold the team to Mr. McCourt --

3              THE COURT:  Yes.

4              MR. LEVINSON:  -- the transaction was structured to

5   have two different sales to different entities.  And the

6   capital structure of the Dodgers was set up as such there was

7   the sale of the team, that was Los Angeles Dodgers LLC, and

8   then there was the sale of the land.  And that was to Realco

9   and those entities.  And those are separate entities, they

10  have a common parent company, but you know, the creditors of

11  the Dodgers aren't creditors of the other entities.

12             THE COURT:  Right.

13             MR. LEVINSON:  I mean we dealt with this issue a

14  little bit in connection with the fans, you know, and that

15  motion.  But Fox, that's how they sold the team to us.  So

16  now, they want to suggest that somehow separating the land

17  from the team it was improper.  Now, it's worth noting that

18  when you go back through the pleadings that MLB filed, a MLB,

19  you know, Mr. Kurtz, he's a fearsome advocate.  I mean that

20  very much as a compliment.  But if you go through their

21  papers, even at the most aggressive point of what they were

22  asserting in their papers with respect to this particular

23  transaction, not once did they ever assert that this was

24  somehow an avoidable transfer under bankruptcy law, because

25  it's just not.  I mean there just aren't creditors of those

87

1   entities, for one.  For two, it happened, you know, many,

2   many years ago.  And for three, it was the way that the deal

3   was structured, it's what he bought.  I mean it was the

4   separation.  And so --

5           THE COURT:  And this wasn't a sale from a third

6   party, this was a sale from Fox itself.

7           MR. LEVINSON:  This was a sale from Fox itself.

8           THE COURT:  Yeah.

9           MR. LEVINSON:  Exactly.  And so to now suggest that

10  this is going to be the basis on which they're going to delay

11  the hearing on the telecast rights is, you know, what they're

12  trying to do is make this as broad and as complicated as they

13  can.  Their goal here is to work on the clock and to run out

14  the clock.  And Your Honor doesn't have to adopt or endorse

15  that strategy.  You don't have to play that game, and neither

16  should we be forced to play that game, we should be able to

17  move forward with our procedures without seeing allegations

18  that they really weren't making until you know just before

19  Thanksgiving.  I just don't think that's proper.  And I

20  particularly don't think it's proper to be making general

21  allegations or throwing around you know Mr. McCourt this, Mr.

22  McCourt that.  I mean clearly the strategy here is if we say

23  Mr. McCourt enough, we're going to get some traction.  And I

24  hope that that's not going to be the case, because again,

25  we've tried to address every single issue that's been raised

88

1   with facts, with documents, and to the extent that they think

2   that's a ground to dismiss the case, even though they

3   previously filed a joinder that said the best way to proceed

4   was to get a plan done, to the extent that they now say

5   that's the case then there is a very different proceeding to

6   deal with that issue.   It is certainly not in connection with

7   the telecast rights.

8          THE COURT:   I have never had any evidence before me

9   to make any finding of any impropriety on the part of Mr.

10  McCourt.   So I'm very careful not to, there's been a lot in

11  papers submitted to me, but the issue has not been presented

12  to me in Court here.

13         MR. LEVINSON:   The financial distress point.

14         THE COURT:   Yes.

15         MR. LEVINSON:   Again, this is not before Your Honor.

16  This is in connection with the motion to dismiss.   But the,

17  again the suggestion that this case is anything like the

18  other cases that have been cited is misplaced.   The Dodgers

19  came to bankruptcy without enough money to make payroll.   And

20  the fact that we were ultimately able to reach an agreement

21  on DIP financing and ultimately able to do with MLB, doesn't

22  change the fact that there's still a liquidity issue.

23  There's two ways to solve that liquidity issue.   And way

24  number one, which is the way that we were proceeding has

25  been, is no longer available, and that was to reorganize

1   through a telecast rights agreement.  So now we're proceeding

2   on way 2 which is the sale of the company.  We still need the

3   DIP financing to make expenses to get us to the sale.  We

4   still have creditors who, you know, in the absence of the

5   ability to preserve value.  Again, one of the objectives, one

6   of the proper purposes of bankruptcy in defining good faith

7   is preserve going concern.  That and maximize value in our,

8   the Intercom case, the Integrated Telecom case.

9            THE COURT:  Yes.

10           MR. LEVINSON:  Perfectly appropriate thing to do.

11  We're moving toward a sale and we're on a very tight

12  timeframe.  The suggestion that somehow we could just like

13  throw everything out the window and do this outside of

14  bankruptcy is nonsense.  I think the creditors themselves who

15  will be getting a distribution pursuant to the plan to be

16  submitted are certainly going to want the certainty of

17  knowing that this process is moving forward in the Bankruptcy

18  Court.  And we're going to continue to need the liquidity

19  that we have in order to get to the finish line.  So any

20  suggestion that we're not properly and necessarily before

21  this Court is just nonsense.  Again, that can get dealt with,

22  you know, if and when Your Honor hears the motion to dismiss,

23  which again should be put way back.  Why?  Because; a) they

24  waited to file it until the very end; and b), they were

25  proposing before and said that it was better to go down the

1   plan route.  So but certainly a suggestion we should stop the

2   marketing procedure for the telecast rights in their track

3   while we decide an issue that's really already been decided,

4   the financial distress issue.  And I do want to take factual

5   issue. I mean I know Your Honor heard this testimony, so I

6   apologize for repeating it, because we had a whole day of

7   testimony.  Maybe counsel wasn't here in the courtroom in

8   terms of the Debtors' efforts to obtain other financing.

9   Maybe he wasn't here in the courtroom when I actually stood

10  up here and argued the evidentiary points so that Your Honor

11  could hear that Mr. McCourt went to Major League Baseball in

12  the days right before filing the bankruptcy, and the response

13  he got was you're going to have to sell the team.  Maybe he

14  wasn't here, but Your Honor heard lengthy testimony about all

15  of the efforts, everything that had been done to try to get

16  that money.  And I can tell you from our firsthand

17  experience, we were involved in the case for a week before it

18  filed.  There were no other options besides Highbridge.

19  Highbridge wasn't doing a deal unless it was a DIP, unless

20  they got, you know DIP protections.

21          THE COURT:  Sure.

22          MR. LEVINSON:  That was it.  And so I just don't

23  know where that comes from, and that's part of the

24  frustration of you can't just say things.  I mean you really,

25  before you say things, you should have a very good sense of

1    what the record is and what you can say to support it.   And

2    that's one of the fundamental problems with the objection

3    that's been filed by Fox, and I think one of the fundamental

4    reasons why those issues should be put to the side and us

5    able to focus on the question of will we maximize value by

6    marketing the telecast rights and going forward with the

7    procedures on December 7th with the limited witnesses that

8    we've proposed.   Just give me a moment, Your Honor.

9           THE COURT:   Of course.

10          MR. LEVINSON:   Just one point on the damages, or on

11   rather this whole notion that somehow there's this great

12   benefit under the contract by there being only 16 months that

13   Mr. Desser's offered.   I don't know if we're going to hear

14   from Mr. Desser.   I wasn't aware that there was this

15   potential ethical issue until Mr. Kurtz raised it during

16   today's hearing.   But to the extent that, to the extent that

17   Mr. Desser is going to be their witness, I mean he's going to

18   have to concede that; a) the Lakers deal got negotiated in

19   less than two months when Time Warner wasn't even in Los

20   Angeles yet; and b) and I think this is really a point that

21   occurred to me after we filed the reply brief, our process is

22   proposing a very compressed timetable to try to get done what

23   we're trying to accomplish.   It's not, we're not proposing

24   that we're going to have 16 months to negotiate deals.   And

25   so if they really think that you know having a short amount

1  of time to do something is somehow gives them some fabulous

2  leverage, well, then they ought to be jumping up and down in

3  thanks over what we're proposing because it is going to

4  provide a very short amount of time under these particular

5  circumstances.

6         I think I've covered the main points that I wanted

7  to cover.  I was trying to remember if I talked about the

8  specific performance point and I did.

9         THE COURT:  Yes, that you did.

10         MR. LEVINSON:  So I'm just going to very, I'm going

11 to summarize to say this.  That we're just trying to maximize

12 value.  That's what this is about.  And that's a perfectly

13 proper thing to do, and that ought to be the focus of the

14 hearing.  We really don't even think Your Honor has to hear

15 testimony.  To the extent it thinks it needs to hear any

16 testimony, it ought to be very limited to the experts, and

17 that ought to be the scope of the hearing going forward on

18 December 7th.

19         So unless Your Honor has any additional questions.

20         THE COURT:  Does it matter if a substantial portion

21 of the benefit goes to Mr. McCourt directly?

22         MR. LEVINSON:  I don't think it does.  To the extent

23 that the, the suggestion that's been made is that once you've

24 paid the creditors in full and you're now into the first

25 dollar, that somehow duties to maximize value, duties to

1  shareholders, duties to preserve going concern, and duties to

2  do what you can to improve the enterprise disappear, and that

3  is just not the law.  I mean bankruptcy provides for equity

4  to benefit.  I mean that's why we have an exclusive period so

5  that equity can negotiate with its creditors to try and come

6  up with an arrangement to preserve their value.  Equity very

7  much has a place at the table.  The requirement here, of

8  course, is the creditors need to be paid in full.

9          THE COURT:  Of course.

10          MR. LEVINSON:  We need to be doing everything we can

11  do.  We represent, we don't represent Mr. McCourt.

12          THE COURT:  Right.

13          MR. LEVINSON:  We represent the Dodgers.

14          THE COURT: That's right.

15          MR. LEVINSON:  And the Debtors.  We need to do

16  everything that we can do to maximize value and to put as

17  much on the table as possible.  That's our job.  Our job is

18  not to leave value on the table for a buyer.  Our job is not

19  to leave value for Fox, a counterparty.  If we did that, we'd

20  be criticized for doing it.  We would, it would be suggested

21  that somehow we were serving the interest of another party

22  rather than the estate.  I come back to what is the safe

23  harbor, what is the lighthouse.  Maximizing value.  And if

24  that's the objective, if that's what's being served, it is

25  absolutely appropriate.  And it's certainly appropriate under

94

1　these particular circumstances.

2　　　　THE COURT:　Thank you, Mr. Levinson.

3　　　　MR. WERKHEISER:　Your Honor, may I be heard?

4　　　　THE COURT:　Of course, Mr. Werkheiser.　Yes.

5　　　　MR. KURTZ:　Your Honor, Glenn Kurtz. I don't know if

6　you would rather hear the supportive side before the reply.

7　　　　THE COURT:　That's how we've done it.　Yes, Mr.

8　Kurtz.　And I'm you know I'm a little bit confused about the

9　Mr. Desser testimony and whether you're going to be pursuing

10　an objection or not.

11　　　　MR. KURTZ:　Sure Your Honor.　Just so you understand

12　the facts.　Mr. Desser was retained as an expert by Major

13　League Baseball.　He worked with us.　We worked with him to

14　develop his opinions, to produce his report, which was

15　submitted, we were representing him in connection with the

16　discovery that was going to go forward.　And we were just

17　shocked to find last week that Mr. Desser had been retained

18　by Fox now, and had put in papers.　And we're evaluating

19　that.　Fox made the statement, maybe Prime Tickets made the

20　statement, that you know there's no suggestion Mr. Desser was

21　privy to any of the information from Major League Baseball.

22　But of course he was privy to all of it.

23　　　　THE COURT:　Sure.

24　　　　MR. KURTZ:　I mean I sat down with Mr. Desser and I

25　spoke to him and we worked together to formulate the expert

1 report, and he was privy to all of our thoughts, and all of

2 our work product.  And it's improper, I mean it's just

3 frankly improper for Prime Tickets or Fox to have reached out

4 to our expert witness with no prior notice and to have hired

5 him somehow.  And so we're going to evaluate that.  And we

6 don't have a position on the underlying motion.  The reason

7 I'm really speaking is because we have a position on the

8 testimony.  And, you know, while talking about the testimony

9 I have a direct position on, which is the Major League

10 Baseball witnesses, it occurred to me I comment on our

11 surprise to see our expert witness contacted sort of behind

12 our back and retained.

13         THE COURT:  Did you ever designate him or placed --

14         MR. KURTZ:  Yes.  We not only designated him, we

15 submitted in connection with our reply in support of our

16 motion to terminate exclusivity and an opposition to the

17 media rights sales motion, an expert declaration by Mr.

18 Desser.  So there's no dispute that he was our expert.  So

19 we're trying to figure out how that fits in.  I mean it sort

20 of just, it just concerns me that something like this could

21 happen and how it could impact work product and matters like

22 that.  And so we're evaluating that.  It would be an easy

23 call if we were taking a position on the motion, but we're

24 not, so we're trying to work through that.

25         THE COURT: I've never seen anything quite like it.

1   But --

2          MR. KURTZ:  You know, I flirt with saying that in 22

3   years of practice I've never seen anything like it, and then

4   I thought, well there are some cases where this was addressed

5   and counsel was disqualified.  So I won't say that.  But I

6   have never seen anything like it personally.

7          THE COURT:  Yes.

8          MR. KURTZ:  So, you know, I still walk around

9   talking about, can you believe this happened.  And maybe

10  that's half the reason it's on my mind and I brought it up.

11  But we're looking at it and deciding what to do about that.

12  But the real issue we're concerned about obviously is this

13  motion about calling Commissioner Selig and Rob Manfried.  And

14  initially I just want to note that Your Honor of course is

15  right, there's a hundred mile rule, and both of these

16  witnesses work and reside outside of 100 miles from the

17  courthouse.  And so there's no ability to serve them.  But in

18  any case, Fox and Prime Tickets haven't tried to serve them,

19  and so that's why I had mentioned it was sort of premature

20  whether they would actually press as opposed to putting the

21  notice out maybe with the intent of getting an affect.

22          But while we're on the subject, I thought, you know,

23  they're obviously not relevant.  When Your Honor wanted to

24  hear testimony at least form one of those witnesses,

25  Commissioner Selig, it was in connection with the way that

1  you and the parties had trained the issues that we were going

2  to be trying.  And specifically it related to Major League

3  Baseball's position that this was not permitted under the

4  Major League Baseball documents and that they weren't going

5  to permit it and --

6          THE COURT:  And some bad faith issues.

7          MR. KURTZ: I'm sorry.

8          THE COURT:  And to bad faith issues.

9          MR. KURTZ:  And, yeah, but I was going to get to

10 that, and bad faith, and also to, or lack of good faith, it

11 was going to be addressed as.  And then also the fact that

12 even if this was sort of done over the objection of Major

13 League Baseball whether that would mean that the Baseball

14 documents couldn't be assumed and assigned and what was

15 Baseball doing about that.  So there was a whole host of

16 issues, and Your Honor reflected them and identified them in

17 your order.  Those issues have gone away because we have --

18 so there's no material information that any of the Major

19 League Baseball witnesses could provide in connection what

20 the pending motion, after which they take no position.  And

21 so when Fox says that they want the information relating to

22 the transfer of certain assets, we've already heard from the

23 Creditors Committee as to why that's not going to be a proper

24 claim.  But in any case, that has nothing to do with Major

25 League Baseball.  Major League Baseball's constitution, they

98

1  may have violated perhaps Major League Baseball's

2  constitution, but that's been set.  And likewise the

3  settlement agreement which would be available from anybody

4  from the Debtors, a party to the motion, not from Major

5  League Baseball, a nonparty effectively, that settled that

6  matter.  But again, the settlement is not relevant, just like

7  the transfer is not relevant to the Fox issues, which is

8  whether or not their rights of first negotiation or

9  exclusivity are enforceable in bankruptcy.  They're either

10  enforceable or unenforceable in bankruptcy irrespective of

11  whether there's been a settlement with respect to Major

12  League Baseball's issues concerning the sale of the team.

13         And then the third area that was raised by Prime

14  Tickets was how the sale of the media rights would affect

15  Major League Baseball and the other 29 teams, and Fox said

16  that's a Major League Baseball issue, not ours, they raised

17  it.  And that is a Major League Baseball issue, not theirs,

18  and we did raise it and we did settle.  So that's not

19  relevant in any way, obviously, Fox doesn't have a defense to

20  any of this based on what happens with Major League Baseball,

21  they're a broadcaster, they're not a team and they're not a

22  league.

23         And so I just want to stress again that it's

24  premature to the extent that we don't have anything that

25  resembles a subpoena and some obligation to respond in some

99

1   venue, albeit I don't think Delaware.  But also that you know

2   whatever the purpose of this is, it's clearly not in order to

3   introduce evidence that could be relevant to any pending

4   motion.   Everything they've identified as potential evidence

5   in connection with any motions were related only to the

6   settle dispute with Major League Baseball.  None of this

7   relates obviously to Fox's position as to the enforceability

8   of its restrictive governance.

9             THE COURT:  Thank you, Mr. Kurtz.

10            MR. KURTZ:  Thank you, Your Honor.

11            THE COURT: Mr. Levinson, you're back.

12            MR. LEVINSON:  I am, Your Honor.  Because you could

13   probably tell I was struggling to remember something I wanted

14   to say and thought I had.

15            THE COURT:  Yes.

16            MR. LEVINSON:  And I remembered when Mr. Kurtz

17   started talking, because it's an issue that relates to MLB.

18   And it's actually I would say a third issue of concern to

19   Baseball with respect to what's been proposed here, and

20   that's the suggestion that the agreement between us and

21   Baseball should be somehow produced and be a part of this.  I

22   want to reiterate that that agreement contains a

23   confidentiality provision.  We have, and this was pursuant to

24   a court ordered settlement with a mediator, or court order

25   mediation I should say with a settlement.  We're going to

1  comply with that obligation.  And so to the extent that Fox

2  seeks that, it really should be on full notice to Major

3  League Baseball with an opportunity for Baseball to object.

4  And I just want to make sure that Baseball has that

5  opportunity so that we are not at all criticized, you know,

6  depending on how Your Honor may ultimately address that

7  issue.

8        THE COURT:  All right.  But just to be clear, no one

9  is relying upon that settlement agreement in support of the

10  amended, the motion on the amended telecast rights, nor are

11  they asserting that -- okay, I do understand.

12        MR. LEVINSON:  Yes.  Exactly.  Yes, to the extent

13  relevant, I think I've already gone through sort of the one

14  change we've made to the procedures based on that motion, a

15  term that's been fully disclosed in the amended motion.

16        THE COURT:  Yes.  Thank you.  There you are, I was

17  looking for you.  I'm sorry.

18        MR. WERKHEISER:  Thank you, Your Honor.  I just

19  wanted to get out of the way so others could say their peace.

20  For the record again, Gregory Werkheiser for Prime Tickets.

21  And I'll try to be brief here, I know we're dragging on.  In

22  response to Mr. Levinson's comments.  The suggestion was made

23  that doing the process this way is going to somehow improve

24  the viability of the go forward business.  And as we see it,

25  it's just the opposite.  What they've done is set up a

1   process that facilitates the ability of McCourt to take value

2   out of the team now.  They are trying to monetize those media

3   rights right now, so value gets paid to McCourt.  If they

4   left things alone, the sophisticated buyers of the team who

5   would buy the team and the media rights and then when the end

6   of the Fox contract rolled around, subject to the terms, they

7   would do a new deal with Fox or not.  And that means they

8   would control their own destiny.  Mr. McCourt would not

9   control their destiny.  And this is all backwards, and this

10  is not going to make the team more valuable, it's simply

11  going to line Mr. McCourt's pocket.  And for that reason, I

12  think the owners will place a premium on essentially the

13  freedom of choice they will have going forward, and the

14  ability to realize the ever increasing licensing revenues

15  from deals as they've increased over time.  And I'm sorry,

16  some of this is going to jump around --

17              THE COURT:  I understand.  Don't worry about that.

18              MR. WERKHEISER:  On the Desser issue --

19              THE COURT:  I think that they're going to have to

20  make a decision promptly, that's one thing that I will be --

21              MR. WERKHEISER:  Well, and I'm concerned that some

22  of these statements might color your perception of Fox's

23  conduct and --

24              THE COURT:  No, no.

25

102

1          MR. WERKHEISER:  -- Mr. Desser's testimony, because

2    he had a hard stop on that MLB engagement of October 31, and

3    we're not aware of any contractual restriction on him being

4    able to work with us.  And he is not an attorney.  So it's

5    wrong to suggest that the same rules apply to him as would

6    apply to an attorney.  And even if he was an attorney, this

7    would be a former client issue, not a current client issue.

8    And then finally I just want to make clear that you know what

9    I said was not what that we thought Mr. Desser had not

10   obtained any confidential information from MLB.  He may have

11   or he may not, I have no idea.  What I did want to make clear

12   is we're not utilizing that information, and he's not

13   accessing that information in connection with our engagement

14   with him to the extent he has it.

15          There's been a lot said about Fox's motives and that

16   what we're really about here is running out the clock.  But

17   it's not even clear to me why there is a clock.  This April

18   30th deadline derives from an as yet undisclosed settlement

19   agreement that, and I'm sorry to be repetitive, but has not

20   been presented to the Court or approved by the Court.  And

21   it's not clear to me why April 30th is relevant.  It's, the

22   season will have already started, it starts on April 4th.  I

23   checked, it starts on April 4th when the Cardinals and the now

24   Miami Marlins will play in Miami in the new stadium.

25          THE COURT:  All right.

103

1      MR. WERKHEISER:  That's a full three and a half

2  weeks before that.  And which means functionally it's going

3  to give the new owner no chance to do anything for the 2012

4  season, so it's not clear to me why April 4th versus, or April

5  30th versus June 30th or whatever is relevant.  And then we

6  also did a little looking, and we looked at the timing of

7  other baseball team deals over the last few years, and as you

8  know there have been several professional sports franchise,

9  professional sports clubs that have filed for bankruptcy in

10  the last few years.  And we know the Texas Rangers were sold

11  out of bankruptcy in August 2010.

12      THE COURT:  Yes.

13      MR. WERKHEISER:  The Chicago Cubs were sold out of

14  bankruptcy in August 2009.  That's of course in the --

15      THE COURT:  Tribune.

16      MR. WERKHEISER:  Now we know the Rangers went to the

17  World Series two years in a row.  They didn't win, maybe the

18  bankruptcy had something to do with that, I don't know.  And

19  the Cubs didn't go anywhere, and I don't think anybody would

20  say that bankruptcy had anything to do with that, because

21  they've never gone anywhere.  So to suggest that this

22  deadline means anything is just, I just don't know where that

23  comes from.

24      Mr. Levinson suggested that people cannot market the

25  team, excuse me, not value the team without this process.

1    But there's a robust market for teams and teams are almost

2    always sold with their media rights contracts in place.   And

3    you know the testimony that we've submitted in support of our

4    position from Mr. Desser and Mr. Thompson, they make that

5    clear and that's actually how both those people make their

6    living now, they are consultants, and they advise people in

7    these transactions and they assist people with valuing these

8    types of assets.   And there's no reason to assume that any

9    likely buyer of this team is not going to have access to the

10   same sort of resources and be able to make their own

11   determination of what media rights are worth.

12          Blue Landco, they'll be able [indiscernible], I

13   understand it's one or the other, either the company's in

14   financial distress that's traceable in some way to the Blue

15   Landco transaction, or it's not in financial distress.

16          THE COURT:   It goes to your motion to dismiss.

17          MR. WERKHEISER:   It does, but it also fundamentally

18   goes to whether there's a bankruptcy purpose to the

19   procedure.   So and it goes to unclean hands.   And to the back

20   story of that transaction, yes, there were separate

21   agreements for real estate when Fox sold the team to McCourt

22   in 2004.   But after that, those assets were put into an

23   entity that is now, or at least under the control of an

24   entity that is now a Debtor entity, and then they were

25   subsequently moved out.   So this is not Fox saying, you know,

1   we directly personally were harmed by this so much as the

2   larger body of creditors may have been harmed if in fact it

3   turns out the company's insolvent or was left with

4   unreasonably small capital as a result of that or other

5   activities of Mr. McCourt.

6       On the issue of liquidity, certainly one way to

7   address that is a sale.  Why that sale has to involve media

8   rights, I don't know.  Another way to address that, which

9   this Debtor could have pursued through bankruptcy was, or

10  otherwise, was the deal that Fox had proposed, just prior to

11  the bankruptcy which would have created nearly $400,000,000

12  in liquidity in the front end of that.  And they chose not to

13  go forward with that.

14      As for whether I'm just spouting about people's bad

15  acts and whether there's any support for any of the positions

16  that were taken, I mean given where we are in the case, we do

17  have the benefit of a record that has been created, Your

18  Honor, and we have the benefit of MLB's motion to terminate

19  exclusivity and the research that was done and the record

20  developed in connection with that.  I realize those issues

21  haven't been adjudicated, but I'm not making this stuff up at

22  a [indiscernible].  I direct Your Honor particularly to

23  paragraph 31 of the motion to terminate exclusivity, which

24  details with citations through the record, much of which is

25  under seal, the support for this transaction and why it was

106

1    improper.  And I would suggest, Your Honor, we read the

2    motion in its entirety, because it also hits on other

3    misconduct of McCourt prior to bankruptcy, the misconduct in

4    connection with the financing that was proposed.  And by the

5    way ,Your Honor found there, Your Honor, respectively you

6    suggested that you never made any findings that Mr. McCourt

7    had done anything wrong.  But in connection with the

8    financing, Your Honor made a finding that he was conflicted

9    because he has this $5,000,0000 issue with respect to the

10   loan to his personal properties.  And he was on the hook for

11   the commitment fee.  So --

12           THE COURT:  I remember that.

13           MR. WERKHEISER:  -- you know, this is not a clean

14   slate, there's a history of that sort of stuff, and there's a

15   record that is nicely distilled in MLB's motion to terminate

16   exclusivity and in our opposition to the original marketing

17   procedures motion as well as our papers.  So we're not making

18   anything up.  This is for real.  I'm sorry, there was just

19   one more point.

20           On the issue of getting a witness or witnesses for

21   MLB here, I don't know how MLB at this stage characterizes

22   themselves as a nonparty.  They were the most aggressive and

23   omnipresent party in the case beside from the Debtor.  And

24   they injected themselves in the case because they wanted to

25   assert control over what was going on here.  they cannot now

1   just simply wash their hands of being an active participant

2   in the case and say, you know, because of a rule of civil

3   procedure that was not drafted in the bankruptcy context, we

4   can't force them to attend a trial through managing

5   representatives of the MLB enterprise.  So I don't know where

6   they come from on that.  I understand there's a hundred mile

7   rule. I just don't see how in the context of a bankruptcy

8   proceeding, they've been an active participant all along,

9   they can evoke that for the benefit and for the same reason

10  nor can the Debtors.

11          Thank you, Your Honor.  I think that's everything I

12  have for right now.

13          THE COURT:  thank you, Mr. Werkheiser. Mr. Levinson.

14          MR. LEVINSON:  [indiscernible]

15          THE COURT:  I have a mind, I think I've said this so

16  many times because I'm thinking while you're talking, you

17  know, and I'm listening too though, Mr. Levinson.

18          MR. LEVINSON:  Thank you, Your Honor.

19          THE COURT:  Go ahead.

20          MR. LEVINSON:  I will be brief.  First, the freedom

21  of choice of the buyers, actually that's built in the process

22  now.  Buyers will have the right to approve, and as we

23  demonstrate in our reply brief, in a manner completely

24  consistent with the right of, the very limited right of first

25  offer that exists because it is a condition, MLB approval is

1  a condition, and likewise this is a condition that will apply

2  not only to this particular, you know, to the team final

3  offer, but will apply to any competing proposal or I should

4  say if the team final offer were not accepted, that condition

5  would come into play with respect to other potential buyers.

6  It would be subject to them too.  So in that sense, it's

7  apples to apples.  We're just following what the contract

8  provides.  But the benefits there for the enterprise of the

9  team, what can't be disputed is that being able to do a deal

10 now will generate the knowledge as to what those additional

11 rights fees are going to be and enable the team to move

12 forward much more quickly than if it has to wait until the

13 end of 2012 to go through this process.  That will improve

14 values and it'll also improve the team.  It's good for

15 everybody.  And of course the Committee supports it and I

16 think that's indicative of that fact.

17         THE COURT:  Fox will argue it's not good for Fox.

18 So --

19         MR. LEVINSON:  I understand Fox argues it's not good

20 for Fox.  But for Fox to try to argue our side of the case.

21         THE COURT:  Right.

22         MR. LEVINSON:  They're on the other side.

23         THE COURT:  Right.

24         MR. LEVINSON:  They have their own interest, they

25 have self interest.  That's what's driving Fox, the self

109

1   interest under the contract.

2        THE COURT:  Sure.

3        UNIDENTIFIED SPEAKER:  [indiscernible]

4        MR. LEVINSON:  I'm sorry.

5        UNIDENTIFIED SPEAKER:  I apologize, Your Honor.

6        THE COURT:  All right.  You can make it afterwards.

7   Okay.

8        MR. LEVINSON:  The April 30th deadline.

9        THE COURT:  Yes.

10       MR. LEVINSON:  This is a term, and it's a fully

11  disclosed term of the agreement with Major League Baseball,

12  and that the team, that the sale of the team be consummated

13  by April 30th.  And so we're going to meet that obligation,

14  and we need to meet that obligation.  We've made no secret of

15  that particular obligation, and the timeline that's driven

16  here  is consistent with that.  I would note that the

17  Committee which opposed to a limited extent, they filed a

18  limited opposition on our exclusivity motion, on the very

19  basis that they want things to move even quicker.  They'd

20  like to see everything done by the start of the season.

21  We'll talk about that on the 7th.  There's just so many things

22  that have to happen to make sure that the marketing process

23  works right.

24       THE COURT:  You bet.

25       MR. LEVINSON:  But the point being everybody is

1   interested in moving this process forward, it's in

2   everybody's best interest, and so to suggest that somehow we

3   should wait until August is I just don't think; a) it's not

4   realistic; and b) it's inconsistent with what we agreed to do

5   in an effort to resolve very significant disputes that we had

6   with Major League Baseball.   Disputes that, and I would note,

7   and I've said this to Your Honor before, we had a preferred

8   course, these Debtors, that they were pursuing in connection

9   with this reorganization.   Parties such as Fox urged that the

10  Debtors should take a different course, and that was to sell

11  the team.   That's the course that the Debtors are now on.

12  And to suggest, or you know, to interject you know, I wasn't

13  objecting in the middle of my argument.   You know to

14  interject Mr. McCourt.   Well what's Mr. McCourt done here.

15  Let's look at the objective criteria of what's happened in

16  this particular case: a) his preference was to keep the team.

17          THE COURT:   Yes.

18          MR. LEVINSON:   That's not the direction this case is

19  going.   He's acted in the best interest, what he believes to

20  be in the best interest of these Debtors.   And we're now on a

21  different course, a course to sell the team.   That's

22  objective criteria as to how this case is proceeding.

23  Likewise with respect to other agreements and other things

24  that have happened in connection with this case.   Again,

25  objective criteria, moving the case forward.   Improving,

1    changing what was proposed in connection with the Fox

2    contract, and the procedures to address Fox's specific

3    concern with respect to the limited right of first offer,

4    again trying to move it forward, being able to reach mediated

5    settlements.   I think the objective criteria of what has

6    occurred in this case will demonstrate that this Debtor is

7    acting in the best interest of the Debtor, to the estate and

8    the creditors.   I just don't think there can be any serious

9    dispute about that in this particular context.

10            I was surprised to hear counsel say teams are always

11   sold with the media rights contract in place, because it was

12   interesting, Mr. Thompson said that in his declaration.   But

13   you know as we pointed out in his reply, it's like well yeah,

14   except of the very contract that we're talking about in this

15   particular proceeding, it's like whoops.   That one was

16   renegotiated, severely diluted the rights that Fox had.

17   Originally fox you know had you know an absolutely matching

18   right.   That went away.   A much longer exclusive negotiating

19   period, much later in the calendar.   All kinds of things that

20   went away.   What they get, they got a longer term, that's

21   what they got.   And actually they got something else.   I

22   forgot, I went back and I looked at the contract.   You can

23   never read a contract enough. Judge.

24            THE COURT: no.

25            MR. LEVINSON:   They got more baseball games too when

112

1  the deal was done.  So they got a lot of stuff, and they're

2  getting lots of stuff, and we're not taking away any of that

3  stuff from them.  But you know for them to somehow suggest

4  that these are always done in place, that's not the case.

5  And we want to be able to present the best possible asset as

6  a team with all of its assets to potential buyers so we can

7  do our job which is to maximize value.

8        And last, just sort of the you know bringing up all

9  of the, you know, going back to MLB's motion to terminate

10  exclusivity or the opposition, I don't know exactly what

11  brief counsel was looking at.  I think that falls into the

12  category of what Your Honor characterized in the scheduling

13  orders, the harsh innuendo and allegations, and not on the

14  fact-finding part that was going to be the subject of the

15  evidentiary hearing.  But I would also note, Mr. Brady

16  reminded me of this, that nowhere in their limited joinder

17  that they filed in connection with their motion to terminate

18  exclusivity did Fox make any mention of any of these issues

19  with respect to what the Debtors or Mr. McCourt had or hadn't

20  done.  Their focus was solely on the fact that they said a

21  sale is good because we don't see how a media rights deal can

22  go forward in the face of MLB objection.  And that's it.  So

23  try to not bring all of that in, particularly in the way

24  they've done where you know reading from pleadings is again

25  far afield.  Your Honor is right, if it's relevant at all,

1  it's only in the context of the motion to dismiss the

2  bankruptcy cases, certainly not relevant in connection with

3  these proceedings.  And that's all I have to say, Your Honor.

4         THE COURT:  All right.  Thank you Mr. Levinson.  Do

5  you have any final comment, Mr. Werkheiser?

6         MR. WERKHEISER:  Your Honor, just very, very

7  briefly.  I think the takeaway from today is that we all

8  agree on very little.

9         THE COURT:  Yes.

10        MR. WERKHEISER:  We all have different takes on

11 legal issues and factual issues.  Is the sale process going

12 to be good for the team, bad for the team, is it going to

13 harm Fox, not harm Fox.  All -- is there a bankruptcy purpose

14 to be here or not.  All of this stuff requires development of

15 a factual record.  And you know, just to put this

16 conversation back into perspective, what we're talking about

17 today is talking about having a record and having an

18 evidentiary hearing where we can have an airing of these

19 facts so that Your Honor can make findings and make a

20 decision on what should and should not happen in this case

21 going forward.  So I simply just rise to submit that we ought

22 to get an opportunity to present our case, they will get an

23 opportunity to present theirs, Your Honor will have,

24 unfortunately the difficult job of sorting all of that out,

25 but that's all we're talking about today, and we just simply

114

1   want to have the opportunity to be heard when we come back

2   here on the 7th, and put on the witnesses that we think are

3   necessary to do that.  Thank you, Your Honor.

4          THE COURT:  Thank you.  Anyone else?  This case

5   reminds me you know of the Oscar Wilde definition of the

6   truth is, what is it, it's rarely pure and never simple.  And

7   this case is rarely pure and never simple it seems.  And it

8   becomes more complicated over time with more motions being

9   filed and more issues being raised, and I've worked very hard

10  in this case to keep it on a fairly narrow road because it

11  could easily have exploded into an entire litigation over

12  baseball itself at some point, at one point.  And that would

13  have really benefitted no one.

14         So here's where I think we have to go.  First of

15  all, I would like to ask Mr. Kurtz to advise by the close of

16  business tomorrow whether or not there will be an objection

17  to Mr. Desser's either testimony or affidavit based upon his

18  prior relationship with Major League Baseball, so that then

19  Mr. Werkheiser will have an opportunity to respond by the

20  close of business on Monday, and I can make a decision, and

21  at least Prime Ticket will know whether or not it has an

22  issue.  So that's one thing that comes to the top of my mind

23  on this one, and I wanted to get that out of the way.

24         Secondly, as far as the hearing on the 7th and 8th is

25  concerned, you know, it is the Dodgers' burden of proof, and

1    they have proposed the evidence that they need to make for

2    the Court to make a decision, and I am not going to expand

3    that evidence by having witnesses or testimony or even

4    depositions of other people, other than the experts who

5    Baseball, I'm sorry, who the Dodgers are proposing in support

6    of the motion and who now Fox will have an opportunity to

7    rebut with their experts.  So I think that's important.

8            So the 7th and 8th, the hearing on the 7th and 8th will

9    largely be, I think, not largely be, it will be limited, the

10   evidence will be limited to the experts, I will ask the

11   parties to agree whether those experts are going to be

12   testifying in court or through the affidavits.  If either

13   party wants to cross-examine the other party's expert, then

14   they should obviously be in court.  And I think that that's

15   self-evident.

16           Now we also have Fox's motion to dismiss and motion

17   to terminate exclusivity and what section is that, 1129, no,

18   not 1129, I can't remember the section off the top of my

19   head.  I apologize on motions to dismiss --

20           MR. LEVINSON:  1112.

21           THE COURT:  1112, that's it.  Thank you Mr.

22   Levinson.  Section 1112 technically requires that I conduct a

23   hearing within 30 days.  Now I don't know when the 30 days

24   runs because I think it's been continued by agreement of the

25   parties, but it certainly should starting running as of

116

1 today.  And that puts us in a kind of a difficult position

2 because based upon my schedule and based upon the holidays,

3 you know, it gets a little bit complicated.  And I was

4 looking at my schedule, and I would, I'd be willing to share

5 it with anyone, there's nothing on here that is either

6 vacation you know or seminars or anything like that, but it

7 is really full.  And the dates that I have, we're on for the

8 27th of December.  Now, that's a Dodger hearing date, and I

9 guess we should try and do it on the 27th.  I don't know how

10 long a motion to dismiss would take.  You know, I still hold

11 out some hope that the parties will arrive at a business

12 resolution, but I don't know that that will happen.  So I

13 think the 27th will have to be our motion to dismiss.  And I

14 know and there will be, and then discovery will be permitted

15 on that motion to dismiss.  And so I will lift that, I'm

16 lifting the stay for proposes of that, for certain, of the

17 motion to dismiss.

18         The motion to terminate exclusivity, I would imagine

19 it so overlaps, it almost, I am ruling that you have not,

20 that Fox has not lost its right to prosecute that motion,

21 based upon the fact that they've filed a joinder.  There has

22 been a substantial change in circumstances for one thing.

23 For another, Fox did put in a reservation in its joinder, so

24 it can certainly proceed with that motion to terminate

25 exclusivity.  I would imagine that the evidence will be

117

1   virtually the same.  I don't know if that's the case Mr.

2   Werkheiser, but --

3           MR. WERKHEISER:  I can't say that to a certainty,

4   Your Honor, but I can see where it would overlap.

5           THE COURT:  Okay.  So that I guess we'll also

6   hopefully hear on the 27th.  Now we also, we next have the

7   estimation issue.  And I know that's an important issue that

8   has to be decided within the 45 days of November 30.  Is that

9   right, Mr. Levinson?

10          MR. LEVINSON:  I don't think so, Your Honor.  I

11  think that our view is that the estimation hearing should

12  occur before we get to the end of the process in March.

13          THE COURT:  Okay.

14          MR. LEVINSON:  And so we had proposed February 15th

15  which would give, you know, plenty of time, that would build

16  in some additional time in-between when we get to final bids

17  and the like.  So that was the date that was in advance.

18          THE COURT:  Sure.

19          MR. LEVINSON:  Provided to potential --

20          THE COURT:  I've got a trial on that date.  I have

21  you for the 22nd of February.  Is that going to be, is that

22  getting too late?  I also have a hold for you on the 8th of

23  February.

24          MR. LEVINSON:  Now I was trying to, do you recall

25  what day of the week the 22nd is on?

118

1          THE COURT:  I do, the 22nd is a Wednesday and the 8th

2    is a Wednesday.

3          MR. LEVINSON:  I would suggest the 22nd Your Honor.

4          THE COURT:  Mr. Werkheiser?

5          MR. WERKHEISER:  Your Honor, I just want to make

6    clear, we're just scheduling this as a holding date because

7    Your Honor obviously hasn't ruled on the procedures yet.

8          THE COURT:  That's right.  That's right.  Okay.

9    Let's do that then, but I, is the 22nd, dose that work for you

10   Mr. Werkheiser if we need a hold, or would you prefer another

11   date?

12         MR. WERKHEISER:  Your Honor, I'm sure I --

13         THE COURT:  Sometimes --

14         MR. WERKHEISER:  -- I can be there, but I have a

15   bunch of people I have to consult with.

16         THE COURT:  I understand.  All right.

17         MR. WERKHEISER:  So I will do that promptly.

18         THE COURT:  We'll talk about that next week.

19   That'll be soon enough.  And I think that I have addressed

20   all of the issues at this point.

21         MR. LEVINSON:  I think the one motion that is still

22   scheduled and that should be scheduled for the 7th is the

23   motion to extend exclusivity.

24         THE COURT:  Absolutely.  I apologize.  I overlooked

25   that, yes.

119

1           MR. LEVINSON:  Yes, because I do think I mean the

2    grounds on which they are seeking to terminate exclusivity,

3    you know, in order presumably for them to be able to file a

4    plan, I think are separate and apart from whether or not as

5    generally speaking, exclusivity is appropriately extended in

6    the way that we have proposed, and so I do think that hearing

7    should go forward on the 7th.

8           THE COURT:  Unless Mr. Werkheiser agrees to have

9    that heard at the same time as their motion to terminate

10   exclusivity, because there will be, there may be a difference

11   in witnesses.

12          MR. WERKHEISER:  Possibly Your Honor, I have a

13   different take than Mr. Levinson.

14          THE COURT:  Go ahead.

15          MR. WERKHEISER:  The issues are very much the same

16   with both, and with the motion to dismiss, which is you know

17   should they have an extension of exclusivity if they're

18   misusing the process for legitimate bankruptcy purpose among

19   other things, so I don't see how they're prejudiced in the

20   interim, Your Honor, know that they do get the benefit of the

21   bridge order.  We won't be proposing a plan pending a hearing

22   on that motion.

23          THE COURT:  Of course.

24          MR. WERKHEISER:  So I do need to rise just for a

25   couple other points relative to Your Honor's ruling.

120

1           THE COURT:  Let me just address this one so I won't

2    lose sight of it.

3           MR. WERKHEISER:  Okay.

4           THE COURT:  Is that acceptable to you Mr. Levinson?

5    In other words, that you would have in effect the bridge

6    extension or I would even enter an order extending your time,

7    your exclusivity to the December 27th date?  Does that create

8    an issue for you?

9           MR. LEVINSON:  Well, I mean our again, our

10   preference is we think it's, we think the grounds and the

11   general standards on which to extend exclusivity have been

12   well established.  There was a reservation of rights that

13   have been filed by Fox in opposition to that, but again, they

14   certainly didn't take advantage of that opportunity to raise

15   all the issues that they have sought to raise in connection

16   with their joinder.  It may, I prefer, Your Honor, to have

17   the opportunity to consider the issue on the 7th, and if Your

18   Honor then concludes that it would be better heard on the

19   27th.  But I think what we would like to have is the extension

20   subject to the hearing that would take place on a motion to

21   dismiss which itself would of course moot any motion in any

22   event.

23           THE COURT:  Of course.

24           MR. LEVINSON:  We'd rather have the opportunity to -

25   -

121

1          THE COURT:  All right.  I will, yes, I will --

2          MR. LEVINSON:  -- reserving the rights to change.

3          THE COURT:  I will permit that.

4          MR. LEVINSON:  Now, one last point, Your Honor, on

5   the date, on the February 22nd date.

6          THE COURT:  Yes.

7          MR. LEVINSON:  We would actually prefer the February

8   8th date.

9          THE COURT:  Okay.

10          MR. LEVINSON:  If we can hold that date.

11          THE COURT:  We'll hold the 8th instead.

12          MR. LEVINSON:  Thank you.

13          THE COURT:  Now Mr. Werkheiser, please.

14          MR. WERKHEISER:  Your Honor, I'm sorry, on this

15   issue of extending exclusivity again, I mean it's ironic that

16   Mr. Levinson is taking the position that this has to be on

17   for the 7th because he spent hours arguing to Your Honor that

18   we shouldn't be expanding what's on for the 7th.  And so he

19   wants to focus on his media rights procedures motion, we'll

20   be here and focus on that on the 7th.  But this idea then that

21   we're going to force everybody to potentially litigate

22   exclusivity on that day doesn't square with that.  So they're

23   not prejudiced in any way by having a bridge order until the

24   27th, Your Honor.  And we'll take that up then, and it'll be,

25   and there is overlap and it'll be ripe for a decision when

122

1  we're considering the motion to terminate as well.

2       MR. BENNETT:  Your Honor, this is Bruce Bennett.

3  I'm sorry for interrupting.  But this goes directly to

4  something that it was involved in.

5       THE COURT:  Yes sir.

6       MR. BENNETT:  The correct history is that we wanted

7  the exclusivity issue done today.  Of course our extension

8  motion, MLB did not object, the Committee did not object to

9  an extension, they just wanted it somewhat shorter.  And of

10 course Fox did not object, they filed a reservation of

11 rights.  Everybody knows the difference, even them.  We

12 wanted it resolved today.  It was at Fox's insistence that it

13 was pushed to the 7th.  So we shouldn't be prejudiced of

14 having this on the 7th what turns out to be the same day as

15 the other hearing, that was done as an accommodation to them,

16 not to us.

17      THE COURT:  Okay.

18      MR. WERKHEISER:  Your Honor, the difference though -

19 -

20      THE COURT:  Yes.

21      MR. WERKHEISER:  -- that what has transpired since

22 then is Your Honor has taken the motion to terminate

23 exclusivity and moved that further back.  And so I understand

24 Mr. Bennett's point, and yes that was what Your Honor's email

25 to the parties instructing as how things would proceed, said

1   yesterday is that everything would be moved to the 7th.

2          THE COURT:  Right.

3          MR. WERKHEISER:  There's been that material change

4   since then.  And my point is that these issues do overlap,

5   they should be decided together.  At the very minimum,

6   anything that happens with respect to the extension motion

7   should be completely without prejudice prosecuting the motion

8   to terminate.  And I think that --

9          THE COURT:  Oh, clearly that's the case.

10          MR. WERKHEISER:  -- what I hear is happening here is

11   that they want to get the extension and then they will argue

12   that the findings that Your Honor made in support of the

13   extension motion preclude us from seeking to terminate or

14   preclude us from moving to dismiss or getting any other

15   relief that would be heard later on the 27th.  And I'm just,

16   I'm trying to protect the record, Your Honor, because we have

17   these things that are further out in the scheduled based on

18   one of, the way Your Honor has ruled.

19          MR. BENNETT:  Your Honor, that's not what they're

20   doing.  They're trying to escape the record.  They don't have

21   an objection to the extension of exclusivity.  They now want

22   to mount a termination motion.  And by trying to have them

23   set together, they're trying to give themselves an

24   opportunity to redo an objection here which they didn't file.

25   That's all that's at stake.  Your Honor should hear it on the

124

1  7th, should have heard it today, but it's been moved to the

2  7th, it should stay there.

3       THE COURT:  I will, I understand your point, Mr.

4  Bennett.  I understand it may be, there may be some

5  redundancy, but I will hear it on the 7th assuming that we

6  haven't, the clock has not struck midnight yet on the 7th.

7  No, we have the 7th and 8th, I'm sorry, we have both.  That's

8  right.  All right.  So we will proceed with the motion to

9  extend exclusivity with the clear understanding that it is

10 completely without prejudice to Fox's motion to terminate

11 exclusivity.

12      MR. WERKHEISER:  Yes Your Honor. Your Honor, I just

13 wanted to just clarify one thing. On the ruling that you made

14 with respect to the Desser --

15      THE COURT:  Yes.

16      MR. WERKHEISER:  -- the ability of our witness

17 Desser to testify.

18      THE COURT:  Do you need something sooner?

19      MR. WERKHEISER:  No.  Unless any of the other

20 parties from Prime Ticket on the telephone think we do, but I

21 just wanted, would you like a letter brief, or how would you

22 like that?

23      THE COURT:  Let's do a letter.

24      MR. WERKHEISER:  Okay.

25      THE COURT:  I'm not looking to make your lives more

125

1  difficult than they already are.

2       MR. WERKHEISER:  Okay.  And Your Honor, I respect

3  your ruling.  I do have to protect the record because there

4  may be an appeal here or appeals eventually.

5       THE COURT:  Understood.  I take no offense Mr.

6  Werkheiser.

7       MR. WERKHEISER:  I do have to note for the record

8  that we do object to not having the motion to dismiss heard

9  at the same time, and I understand Your Honor has made the

10  ruling on that, as the procedures motion or the motion to

11  terminate at the same time.  And we do object to not having

12  the motion to dismiss adjudicated within 30 days.  Again,

13  understanding Your Honor has ruled on those issues and that

14  issue has been decided today.

15       THE COURT:  I hear you, you are certainly within

16  your rights, Mr. Werkheiser, and that is now noted on the

17  record, of course.

18       MR. WERKHEISER:  Thank you, Your Honor.

19       THE COURT:  Thank you Mr. Werkheiser.  Anything

20  further counsel?

21       MR. LEVINSON:  Nothing Your Honor.

22       THE COURT:  All right.  I appreciate the arguments.

23  It's not an easy situation, but we will proceed. I will see

24  you here on the 7th, and I think, let me just make sure we all

25  know what time it is on the 7th because --

126

1          MR. WERKHEISER:   Your Honor, I think we're starting

2    at 1:00.

3          THE COURT:   I think that is right.  And that is

4    right, 1:00 on the 7th.  Thank you all.

5          MR. LEVINSON:   Your Honor, what is the start time on

6    the 8th?  We should know this, I apologize.

7          THE COURT:   The 8th, we'll start, we'll see how we do

8    on the 7th, but I was figuring on starting around 9:00, and

9    maybe we'll finish at a decent hour that way.  All right

10   everyone.  We stand in recess.  And safe travel to all.

11         MR. LEVINSON:   Thank you Your Honor.

12   (Court was adjourned at 1:33 P.M.)

13

14                         CERTIFICATE

15   I certify that the foregoing is a correct transcript from the

16   electronic sound recording of the proceedings in the above-

17   entitled matter.

18   /s/Mary Zajaczkowski                    December 1, 2011
19   Mary Zajaczkowski, CET**D-531                  Date

20

21

22

23

24

25