# TAB 11

1

                    UNITED STATES BANKRUPTCY COURT
2                        DISTRICT OF DELAWARE

3    IN RE:                      )  Case No. 11-12010 (KG)
                                 )  Chapter 11
     LOS ANGELES DODGERS LLC, et al. )
4                                )  Courtroom No. 3
                                 )
5              Debtors.          )  824 Market Street
                                 )  Wilmington, Delaware 19801
6                                )
                                 )
7                                )  December 7, 2011
                                 )  1:00 P.M.
8
                       TRANSCRIPT OF HEARING
9              BEFORE HONORABLE KEVIN GROSS
               UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtors:           Young Conaway Stargatt & Taylor, LLP
12                              By:   ROBERT S. BRADY, ESQ.
                                The Brandywine Building
13                              1000 West Street, 17th Floor
                                Wilmington, Delaware 19899
14                              (302) 571-6600

15
                                Dewey & LeBoeuf LLP
16                              By:   BRUCE BENNETT, ESQUIRE
                                      SIDNEY P. LEVINSON, ESQ.
17                              333 South Grand Avenue, Suite 2600
                                Los Angeles, California 90071
18
     ECRO:                      GINGER MACE
19
     Transcription Service:     Reliable
20                              1007 N. Orange Street
                                Wilmington, Delaware 19801
21                              Telephone:  (302) 654-8080
                                E-Mail:  gmatthews@reliable-co.com
22

23   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
24

25

2

| | | |
|---|---|---|
| 1 | For The Office of the | White & Case |
| | Commissioner of Baseball | By:    GLEN KURTZ, ESQUIRE |
| 2 | d/b/a Major League | 1155 Avenue of the Americas |
| | Baseball: | New York, New York 10036-3787 |
| 3 | | |
| | For Prime Ticket: | Morris Nichols Arsht & Tunnell |
| 4 | | By:    GREGORY WERKHEISER, ESQUIRE |
| | | DAVID TEKLITS, ESQUIRE |
| 5 | | 1201 North Market Street |
| | | Wilmington, Delaware 19899 |
| 6 | | |
| 7 | For Creditor, Official | Morrison & Foerster LLP |
| | Committee of Unsecured | By:    LORENZO MARINUZZI, ESQUIRE |
| 8 | Creditors: | 1290 Avenue of the Americas |
| | | New York, New York 10104 |
| 9 | | (212) 468-8000 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                        Page

NOTICE OF AGENDA MATTERS:
3  For the Debtors, by Mr. Levinson                        7
   For Prime Ticket, by Mr. Werkheiser                    10
4  For the Debtors, by Mr. Bennett                        12
   For Prime Ticket, by Mr. Werkheiser                    27
5  For the Committee, by Mr. Marinuzzi                    66

6                                                      Further

| WITNESSES FOR THE DEBTORS: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| Timothy Coleman | 72 | 125 | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| D1 - Fox Contract | 96 | 96 |
| D6 - Amended Marketing Procedures | 96 | 96 |
| D7 - Amended Motion | 125 | 125 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          THE CLERK:  Please rise.

2          THE COURT:  Good afternoon everyone.  Thank you, and

3  please be seated.  It's a pleasure to see everyone, and I am

4  ready to proceed when you are.  Any introductions by the way,

5  Mr. Werkheiser, I think perhaps on your side of the table.

6          MR. WERKHEISER:  Yeah thank you for the opportunity,

7  Your Honor, for the record it's Gregory Werkheiser, on behalf

8  of Prime ticket also known as Fox Sports.

9          THE COURT:  Yes.

10         MR. WERKHEISER:  Your Honor, today I'm joined at

11 counsel table by Mr. Richard Stone and --

12         THE COURT:  Welcome, Mr. Stone.

13         MR. WERKHEISER:  -- Kent Kline both from

14 (indiscernible) and Block firm --

15         THE COURT:  Welcome to you sir.

16         MR. WERKHEISER:  -- who are co-counsel case, and

17 have been admitted for *pro hac vice* previously --

18         THE COURT:  Wonderful.

19         MR. WERKHEISER:  -- and of course Mr. Paul Laurin,

20 who has been here previously for hearings is with us and part

21 of the team --

22         THE COURT:  Yes.

23         MR. WERKHEISER:  -- today as well.

24         THE COURT:  Mr. Laurin, good afternoon.

25         MR. WERKHEISER:  Thank you, Your Honor.

5

1           THE COURT:  Thank you.  Mr. Bennett.

2           MR. BENNETT:  Good afternoon, Your Honor, before I

3    begin I think on the first item of agenda will move very

4    quickly which is the exclusivity extension.  I think Mr.

5    Levinson would like to read in terms of dealing with, for

6    dealing with that.  And then I've been asked to cede the

7    podium to Mr. Kurtz which I ordinarily would not do, but

8    because he's neutral today I will do.

9           THE COURT:  Okay.

10          MR. BENNETT:  And he wants to bring up an issue

11   first that frankly may well make sense to deal with.

12          THE COURT:  Thank you.  Mr. Kurtz, good to see you

13   again.

14          MR. KURTZ:  Thank you, Your Honor, very nice to see

15   you.  I believe the Court would have received from us a

16   letter yesterday requesting that Your Honor consider an

17   application for protective orders striking the notices that

18   were served by Fox for certain discoveries from Major League

19   Baseball and for the depositions that Commissioner Selig and

20   the Executive Vice President, Rob Manfred.  We have reached

21   sort of an arrangement so to speak, Your Honor, where Fox

22   would agree not to pursue any discovery Commissioner Selig,

23   and would withdraw the subpoena's in exchange for our arguing

24   on our -- well I mean technically they'll reconsider whether

25   they're going to try to pursue.

1          Mr. Manfred we will not produce him for a

2    deposition, he's been subpoenaed to appear on December 14th,

3    and so we need to address that with Your Honor sometime

4    before then.  And we have agreed that we would put that

5    application off, if Your Honor was able to accommodate us on

6    a day other than today.  That would allow for a resolution

7    before December 14th, if that's the case then we at least have

8    an arrangement as far that goes.

9          THE COURT:  All right, I will certainly make every

10   effort to accommodate you, and I'll check the schedule at one

11   of our breaks.

12         MR. KURTZ:  Thank you very much, Your Honor.

13         THE COURT:  Thank you.  Mr. Werkheiser.

14         MR. WERKHEISER:  Yes, Your Honor, Gregory Werkheiser

15   again for Fox, that basically reflects our interim

16   understanding.  I think just to clarify we're not withdrawing

17   the Manfred deposition that you issued a subpoena, but if

18   Your Honor can accommodate us on scheduling, and get us heard

19   before the 14th then we understand everybody's rights and

20   reserves, and we will not proceed forward with that in the

21   interim.

22         THE COURT:  Okay, we will do that, as I said on

23   break I will check the schedule.

24         MR. WERKHEISER:  Thank you, Your Honor.

25         THE COURT:  And I'll make certain that it's -- that

7

1  we have time well before the 14th.

2          MR. WERKHEISER:  Thank you, Your Honor.

3          THE COURT:  Mr. Levinson.

4          MR. LEVINSON:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. LEVINSON:  Sidney Levinson, for the Debtors.

7  Your Honor, the first motion on the calendar is the Debtors'

8  motion to extend the exclusive periods --

9          THE COURT:  Yes.

10          MR. LEVINSON:  -- for filing of a plan and

11  solicitation of acceptance for a period of six months.  The -

12  - I think it's fair to say that the Debtors have made

13  tremendous progress in this case.  Even since filing the

14  motion on October the 24th, and have achieved what I think at

15  one time looked like a very daunting goal which is to reach

16  an agreement with Major League Baseball.  That agreement was

17  announced on November 2nd, and since then many of the terms

18  have been disclosed in one form or another in connection with

19  pleadings filed with Your Honor.  The debt --

20          THE COURT:  And I see there's been a motion to

21  approve that somewhere.

22          MR. LEVINSON:  -- yes, and yesterday the Debtors and

23  MLB, or I should say the Debtors filed a motion which

24  attaches the agreement between the Debtors and Major League

25  Baseball.

8

1         THE COURT:  Yes.

2         MR. LEVINSON:  We've set that for hearing on

3 December the 27th.

4         THE COURT:  Good.

5         MR. LEVINSON:  And seeks the Court approval to

6 proceed.  I don't think I'm going to belabor the Court with

7 going through the key terms of it I know, again a number of

8 them have been discussed, but they're set forth in the

9 agreement.  And the agreement also describes special terms

10 regarding the sale of Los Angeles Dodgers LLC, that's

11 referenced in the agreement.  This is a -- these are terms

12 that relate solely, they're agreements by MLB.  MLB required

13 as a condition of the settlement that those terms remain

14 strictly confidential.

15         We worked very hard with Judge Farman to come up

16 with the right mechanism to accomplish that, again it's not

17 the -- it's the Debtors don't have an opinion one way or

18 another.  I mean we would perfectly content to have them

19 publicly disclosed, but MLB has taken a very strong position

20 that they should not be in.  So we were -- we were able to

21 reach a resolution as to dealing with that issue and that's

22 reflected in the agreement that's been filed with the Court,

23 and for what which we've sought approval.

24         And based on that I think we've really achieved a

25 very significant landmark in this case, which again this is

1   the first request for extension of exclusivity that's been

2   filed in the case.  We're only -- I'd say only five months

3   into the case, I know it feels like a long time.  But you

4   know as Chapter 11 cases go I think we've been able to make

5   tremendous progress.  And I think that's reflected in the

6   position that the Committee has taken both initially and how

7   it's evolved.  Initially the Committee had filed a limited

8   objection, and what they which was supportive of the

9   settlement that had been outlined with MLB and the approach,

10  but just wanted to make sure that we would stay on track.

11          THE COURT:  Yes.

12          MR. LEVINSON:  And by virtue of the filing of the

13  motion last night and the agreement with MLB, I'm delighted

14  to report that the Committee, that that resolves the

15  Committee's limited objection and that that limited objection

16  will be withdrawn.  And as a result there are no objections

17  to our motion.  The only filing was the reservation of rights

18  by Fox.  I'll let Mr. Werkheiser speak to that, but he did

19  advise me just prior to the hearing that Fox would be

20  prepared to allow the motion to be granted that's before Your

21  Honor, subject -- they want it to be without prejudice to

22  their ability to pursue the relief at the hearing on the

23  December 27th with respect to the motion to dismiss and the

24  motion --

25          THE COURT:  And their motion to terminate

1    exclusivity.

2              MR. LEVINSON:  Yeah.

3              THE COURT:  -- that's fine.

4              MR. LEVINSON:  And our position is that's fine with

5    the one caveat that we want to make clear that, to the extent

6    Your Honor grants our motion to extend the exclusivity

7    period, and their seeking to terminate exclusivity the burden

8    will be on them, not on us with respect to their motion to

9    terminate exclusivity consistent with 1121.  And with that

10   caveat again I'll let Fox speak for itself, but I'm hopeful

11   that that will fully address the pleadings that were filed in

12   connection with the motion, and that Your Honor will be in a

13   position to grant that motion.

14             THE COURT:  Thank you.  Mr. Werkheiser.

15             MR. WERKHEISER:  Good afternoon, Your Honor, Gregory

16   Werkheiser again for Fox.  Your Honor, we did advise Mr.

17   Levinson that we would not pursue what we believe was an

18   objection.  And I think that, Your Honor, indicated was

19   sufficient to preserve our opposition at the prior hearing

20   based on the understanding that the status quo would be

21   preserved pending December 27th when our motion to dismiss is

22   on for hearing.  And the motion to terminate exclusivity is

23   on, and Your Honor, that is just consistent with I think the

24   discussion we had at the November 30th hearing.

25             On page 123 of the transcript I'm indicating that at

1   the very minimum, anything that happens with respect to the

2   extension motion should be completely without prejudice to

3   prosecution, excuse me, prejudiced to prosecuting the motion

4   to terminate, and I think that and then Your Honor says, oh

5   clearly that's the case.  After that, Your Honor, there's

6   some dialogue, and then Your Honor states on page 24 -- 124

7   at line 7, that's right, all right, so we will proceed with

8   the motion to extend exclusivity with the clear understanding

9   that it is completely without prejudice to Fox's motion to

10  terminate exclusivity.

11          So, Your Honor, we are relying on that dialogue, and

12  based on that will not oppose the extension, and I think I

13  agree with Mr. Levinson in so far as we are prosecuting a

14  motion to terminate exclusivity, it is our burden, but the

15  burden shouldn't be different than when that motion was filed

16  initially.

17          THE COURT:  All right.

18          MR. WERKHEISER:  Thank you, Your Honor.

19          MR. LEVINSON:  Your Honor, I have a proposed form of

20  order if I may approach.

21          THE COURT:  I am prepared to, I am prepared to grant

22  the motion to extend exclusivity given the record in the

23  case.  Please come forward, sure Mr. Levinson.  My

24  familiarity with the case, the complexity of the case, and

25  the progress that has been -- that has been made, and I find

1  that the Debtors have met their burden.

2        MR. LEVINSON:  Thank you, Your Honor.

3        THE COURT:  Mr. Bennett.

4        MR. BENNETT:  Good afternoon, Your Honor.

5        THE COURT:  Good afternoon.

6        MR. BENNETT:  Bruce Bennett, on behalf of Debtors in

7  particular, the Los Angeles Dodgers Entity.  Your Honor sent

8  an e-mail to counsel this morning proposing a specific format

9  for opening statement which wasn't exactly what I was

10  planning for, but --

11        THE COURT:  And I was just -- I was just concerned

12  that the parties might be sort of crossing you know like

13  ships crossing in the night, I wanted to make sure that we

14  were directly oppositional on the issues that are being

15  presented today.

16        MR. BENNETT:  Well and that Your Honor has touched

17  on a problem that is going to be reflected in my

18  organization.

19        THE COURT:  Okay.

20        MR. BENNETT:  And I'm trying to deal with it, and to

21  just foreshadow it it's that we believe there are certain

22  things that we are required to show in order to get the

23  relief that we requested period, full stop.  And I think the

24  opposition is more of you're not allowed to be in Chapter 11

25  anyway.  And because you're not allowed to be in Chapter 11

1  anyway you can't use that provision, and there's other

2  provisions that we say are applicable really the 363 and

3  provisions 365(m), 363(f).  So there are many, many more

4  issues and therefore facts that are raised in the opposition

5  than we think are actually at issue today.

6        THE COURT:  Okay.

7        MR. BENNETT:  So what I'm going to do is I will

8  touch on some of the facts that are raised by the opposition,

9  but do not assume that I'm going to cover all of those.  I

10 think that's really --

11       THE COURT:  Yes, certainly.

12       MR. BENNETT:  -- all right.  What I'm going to cover

13 more completely with only some commentary on the other issues

14 are the facts we think we need to show to prevail today to

15 the extent that we think there are any actual factual issues,

16 there aren't very many.  And what we think the critical legal

17 issues are as we have framed our motion, there will be some

18 commentary, but not a, not -- I'm not going to anticipate and

19 prepare a complete response with respect to all of the other

20 things that I'm sure we will hear when the next speaker

21 reaches the podium.

22       THE COURT:  That's what I would expect, Mr. Bennett,

23 that you would proceed this as you've suggested.

24       MR. BENNETT:  Okay.  The first fact is that the

25 Debtors are Debtors, and Debtors in Possession in Chapter 11

14

1  cases which have been pending since late July.  They're

2  entitled to all -- to exercise all rights and powers afforded

3  to them unless the case is dismissed, or a Trustee is

4  appointed.  Now I want to make a few comments about that

5  because I think that this fact is readily apparent from the

6  record.

7         First of all no party interest even Major League

8  Baseball, and it was not many months ago where the relations

9  between the Dodgers and Major League Baseball were, could be

10  described as vigorous adversaries to put in most polite

11  terms.

12         THE COURT:  The dancing partners have definitely

13  changed here.

14         MR. BENNETT:  Filed any motion to dismiss, or

15  convert the cases, or for the appointment of a Trustee.  Fox

16  did, but only after they supported the idea that this case

17  ought to be concluded by the filing of a plan of re-

18  organization by Major League Baseball's presumably would have

19  included the support of Fox.  Thus, Fox has already asserted

20  before Your Honor in final argument, I'll point to the right

21  places, so we'll get it into the record, asserted that the

22  exercise of Chapter 11 powers indeed the most powerful

23  Chapter 11 powers for this Debtor is entirely appropriate.

24  They just changed their mind about that after certain

25  agreements were made.

1       So this dismissal -- the dismissal motion which is

2  on for the 27th has to be seen as a tactical move to try to

3  delay this motion, to complicate this hearing, to distract

4  attention from what we think are the essential issues.  I'm

5  not going to discuss all the facts showing that this is a

6  good faith filing, as again that issue's not before you

7  today, but I just want to say two things.  Again they're

8  shown by the record in the case, they have to be determined

9  as facts.

10      Number one, even balance sheet solvency was not

11 always a foregone conclusion in this case.  As Your Honor

12 will remember, MLB asserted that it had the right to throw

13 the Dodgers out of Major League Baseball, and if they were

14 right the Dodgers would not have been solvent.  And again Fox

15 joined in a pleading where that was asserted, and so when you

16 join in a pleading you've got an obligation to believe that

17 it's well researched, and you believe what it says.  Have

18 good basis to believe what it says, as they said Major League

19 had that right, and that was something that the Debtors had

20 to contend with.

21      The second point is that it's not exactly true that

22 we've achieved the state of bliss that Fox attributes to us.

23 First of all, and they always talk about the relevant test as

24 being solvency, and of course Your Honor knows the test is

25 solvent and not confronting financial difficulties, the later

1    words having a lot of significance.

2          THE COURT:  Sure.

3          MR. BENNETT:  But let's take a couple of prongs of

4    that for a second right now.  No financial difficulties, Fox

5    likes to point out that we have Debtor In Possession

6    financing, and forgets that that matures next year, and that

7    right now we don't have the ability to pay that debt.  They

8    also point to the long term contract with Mr. Kemp, but that

9    is a long term contract that has to be funded over many

10   years, and it creates part of the deficit that of course the

11   Debtor In Possession financing was designed to deal with, so

12   it's kind of a apples and oranges comparison.

13         The second part is that while we have a sale process

14   just starting, and we're optimistic that it will get to the

15   point that creditors will be paid in full, and that equity

16   will receive a distribution, and we say it all the time.

17   We're not done yet, so even if the test were today you know

18   where -- could we file today and be in good faith which

19   frankly the test is when we filed and things were

20   traumatically more dire back then.

21         We actually haven't quite reached the goal line, I

22   am thrilled that Fox is confident that we will get there.

23   We're confident too, but the fact remains we're not done,

24   we're not close to done, we're kind of -- we hope we're

25   climbing the last mountain range, and we think we're climbing

1   the last mountain range, and I hope we'll be able to say we

2   got over it successfully and there wasn't another one at the

3   other side.

4        Okay, so to summarize with respect to this part,

5   unless and until there is an order of the Bankruptcy Court

6   dismissing the case, the Debtors In Possession are entitled

7   to exercise their rights and powers, and we also have to

8   perform our responsibilities under the bankruptcy code.

9        Okay, second part and I think this is the most

10  important part, after we modified the relief requested by the

11  filing of the supplement, we dramatically narrowed the relief

12  that we are requesting before this Court, and I'm going to

13  come back to this again when we talk about issues, but I want

14  to zero in to the most important part.

15       What have we asked for?  We've asked for the right

16  to initiate exactly the same process, Fox differs with that

17  we'll have I'm sure testimony and argument about it, exactly

18  the same process that's specified in the contract ten and

19  half months earlier.  So what are we doing by that?  Well I

20  think the most important way to look at that, and the most

21  important thing I'm probably going to say all day, is that

22  the ten and half months between now and October 15th of 2012

23  is a classic, no shop period.

24       Under the contract as Fox reads it, I don't think we

25  have a tremendous disagreement with them on this point, the

1   Dodgers can't talk to other people anybody and have no right

2   to force Fox to talk to us. Fox can if they want to about

3   media rights, and of course whenever I talk about media

4   rights unless I specify otherwise I'm talking about 2014 and

5   out.

6          THE COURT:  Yes.

7          MR. BENNETT:  Not the other two years, we'll come

8   back to that where we need to.  So what we're really doing is

9   we are cutting out the kind of term that the cases suggest is

10  most anathema in bankruptcy, which is no shops.  We are not

11  changing the need for an exclusive negotiating period, a

12  requirement to make a final offer, and if the final offer

13  isn't accepted an obligation for some kinds of offers, not

14  all kinds of offers.  Some kinds of offers to give them -- to

15  give Fox a right of first refusal thereafter.

16          So we will show, I think this is a factual question

17  I'm not quite sure, but I'll put it in that category for the

18  time being, that the relief we are showing is that really

19  narrow kind of relief, and when I get to the law part we'll

20  talk about the fact that it's right, in the core of

21  provisions that Bankruptcy Courts find anathema because they

22  prevent the Courts achieving, prevent parties from achieving

23  the fundamental goals of Chapter 11.

24          THE COURT:  You also pointed out that there's no

25  time of the essence provision in the contract.

1        MR. BENNETT:  We definitely did, and I'm

2   intentionally not going over everything in the brief --

3        THE COURT:  Okay.

4        MR. BENNETT:  -- because you said be short.

5        THE COURT:  Yes.

6        MR. BENNETT:  But yes I'm assuming your familiar

7   with the briefs, and we absolutely point that part out.

8        THE COURT:  Okay.

9        MR. BENNETT:  Okay.  Now I need to just pause to say

10  one -- talk about one of the issues here because it's the

11  reason why I talk about the next part, which is applicable

12  state law looks at these rights, and I call all of Fox's

13  rights just for ease of convenience the negotiation terms.

14  I'm going to call it the negotiation terms, and Court's have

15  confronted breeches of negotiation terms lots of times, turns

16  out there's lots of cases on this area we don't have a lot of

17  gaps.  And California law is probably applicable, but I'll

18  tell you it doesn't matter because we've looked at Delaware;

19  it's the same, we've looked at New York; it's the same.  I'm

20  pretty sure it's the same in every jurisdiction that's

21  confronted it.

22        Is that damages that can be recovered for a total

23  breech, a total disregard of a exclusive negotiating

24  provision are very limited.  And I'm going to -- the cases

25  sometimes use different words, but there are only two

20

1   categories that are, that you can get.  One is cost incurred

2   in the negotiating process, and the reason that comes up is

3   where one party is in a negotiating process acting in good

4   faith, and the other one isn't.  The first party may have

5   hired consultants, attorney's, and whatever, spent time

6   that's compensable when you were beating your head against

7   the brick wall.  We're not doing that here, so that category

8   may not ever be an issue.

9           And the second issue is, opportunities that were

10  foregone because you were participating in an exclusive

11  process that you thought was working out.  And here the you

12  know, Fox is already talking to the Angels and doing all the

13  other things there doing in their business, I don't think

14  they're going to forego a single opportunity by reason of

15  anything that we are doing here.  Okay, so that's the law.

16  So why did I want to start there?  We'll come back to the

17  legal part.

18          Fox contends, kind of everywhere, in their pleadings

19  they have filed with you, in the declarations they filed with

20  you, in the declarations of the witness that they inherited,

21  or took over from Major League Baseball was presumably they

22  adopted by hiring him.  That telecast rights are a unique

23  asset, they only go up, and they're only going up between now

24  and 2012 that's their story, and I hope they're sticking to

25  it.  We hope they're right, because as a factual matter we

1   can assume, even if we assume which is by no means assured

2   that Fox would be successful in negotiating extensions next

3   year, and successfully in negotiating extensions now, that

4   they will get them for less today than they would get them

5   for next year, which says that even if there are significant

6   damages that would somehow -- that could be awarded even or

7   are eligible damages that could be awarded in this case there

8   are none.

9        So to some rights with respect to this part on the

10  fact issue there are no, or no material damages as a matter

11  of applicable state law that Fox could recover by reason of

12  shifting the negotiation terms from next year to this year.

13  Now again if this is, I'm going to pause here and say I

14  regard the first two topics that we talked about as strongly

15  inter-relating with each other because part of the decision

16  of a Bankruptcy Court where it says I'm going to validate a

17  no shop which we've shown happens, is well is this the kind

18  of right that the State Courts are really elevating to

19  extremely high significance or not.

20       And I think we're showing to Your Honor, that number

21  one, the State Court's don't give it that much significance

22  at least in the dollars and cents perspective.  And number

23  two, in this case because there's admissions made not once,

24  not like gotcha in the corner, but a central theme of

25  everything Fox has ever told you is inconsistent with the

22

1  damage theory that they would espouse.

2       Next fact, all of what we're doing here is intended

3  to and will benefit the estate.  It improves the business and

4  financial condition of LAD, remember, we talked about the

5  current business and financial condition of the entities that

6  we're trying to sell here is they cannot pay their debts and

7  they become due, we're still not there yet.  And they also

8  show until you know what the cash flow characteristics are

9  going to be in 2014 and beyond, there is tremendous amounts

10 of uncertainty as to exactly what these things are worth, and

11 exactly what they should be able to do with respect to

12 expenditures, capital planning, player contracts going

13 forward.

14      So we will show, we think it's obvious, that this

15 procedural step will improve the business of the Dodgers.

16 Now, it is absolutely true that you improve a business just

17 like you improve a house or a building, if someone else comes

18 along and buys it, the owner's going to get more for it.

19 We're not conceding that, we're not failing to concede that,

20 we're not running from that consequence it's a consequence of

21 being better.  And frankly, my criticism with the Fox briefs,

22 is they always skip that first step, and they always say that

23 this is, but all we're doing is to extract money to hand it

24 to Frank McCourt, and that's actually not what's happening

25 here, we are maximizing value and liquidity of an asset owned

1  by the Dodgers.  It will make the Dodgers better, it will

2  make the Dodgers more valuable.  It may, and we concede hope,

3  that it will cause third parties to pay more for it, but

4  they'll be getting something that is better, there are two

5  steps.

6         Now the very best evidence just about you know facts

7  of why it is that this is something about improving the

8  business that is you know also going to improve the purchase

9  price is, Your Honor, we've been at this since the very first

10  day.  As Your Honor will remember that was a time when we

11  said this team is not for sale.  We have been looking at

12  doing this if -- whether Mr. McCourt was going to continue to

13  be the owner, or was not going to be an owner we never

14  waivered.  It was in this Courtroom on the very first day as

15  part of the Highbridge financing they pointed out, I don't

16  need to.

17         Okay, so I think those are the facts I think to

18  summarize in light of the modest relief sought, the zero or

19  near zero damages that would be suffered by Fox in any event

20  if the terms were still enforceable.  The benefit to be

21  achieved for the estate, and yes the improved value of the

22  overall enterprise, this is a reasonable business judgment,

23  this is something that benefits the estate, I think we're

24  done on facts.

25         I want to reach to one more fact that is really

1  their list of facts, and then I'm going to ignore the rest of

2  them at least until Your Honor wants me to come back to them.

3  And that is assets of non-Debtors, and I'm referring here to

4  the parking lots.  That number one, were never assets of the

5  LAD entity, not ever okay.  Number two, the only entity that

6  Fox contracted with is the LAD entity, the media rights

7  contract we're talking about is not a contract of the entity

8  that originally held the parking lots.  Of course, it didn't

9  sneak up on Fox as a surprise that the entity that they

10  contracted with didn't have the parking lots, or the stadium

11  for that matter because they were always in a separate

12  entity.

13       Why, because Fox contracted with a separate party to

14  sell them to, so you've got Fox contracting with an entity

15  that they know doesn't have them.  The reason they know it

16  doesn't have them so there is no real dispute about that, is

17  because it was Fox itself that sold the parking lots and the

18  stadium to a different entity.  That entity by the way has no

19  creditors, and no one in this case has said that that entity

20  has a fraudulent transfer claim, they've just said well will

21  look at it if we ever think it's important, but not right

22  now.

23       Okay, so that is a fact that I'm listing as

24  completely inconsequential.  And lastly I will say that

25  there's this, there's this now assertion that there's a clean

25

1  hands inquiry that spreads to every affiliate, and that's

2  like clean hands that an affiliate doesn't want to contribute

3  assets.   I would think that Fox is the last organization in

4  the world that wants a clean hands inquiry throughout all of

5  its corporate structure right now.

6       Legal issues, our no shop provisions in particular,

7  no shop provisions that state law doesn't give much credit to

8  enforceable in bankruptcy cases.  The cases say no by

9  narrowing the relief as we have, we have really gone directly

10  into the core of those cases, and not ask to expand or extend

11  them in any way.  We are just collapsing the ten and half

12  month period no shop provision.  Whether or not no shop

13  provisions are enforceable is in the Debtors reasonable

14  business judgment, and in the best interest of the estate to

15  start the negotiation of terms now.  We've discussed it, we

16  clearly think it is. That's it.

17       Now one more important issue that we have to talk

18  about because it kind of lurks over everything, and a lot of

19  the rhetoric in this case, and that's the whole issue of

20  mitigation of damages.  Fox response to all of this isn't to

21  dig into what the cases say about recoverable damages, what

22  the consequences of their admissions and assertions are, but

23  instead to say whatever LAD does that the Los Angeles Dodgers

24  do, they will make a big mess of the situation and there will

25  be enormous damages.  And this is exactly what a party to a

1   breach of contract in bankruptcy or out of bankruptcy no

2   matter how material can do under the law of California, under

3   the law of Delaware, or under the law of any state that I've

4   ever been exposed to.

5        Everyone, in all circumstances no matter what they

6   think of their counterparties have an obligation to mitigate

7   damages, and mitigate damages means minimizing damages.  And

8   we've said lots of things in this Courtroom about lots of

9   topics, we've said lots of things out of this Courtroom about

10  lots of topics.  One thing we have never said is that Fox

11  will not be permitted to continue broadcasting games in the

12  2012 and 2013 seasons, not ever.  When Mr. Stone gets up here

13  maybe he's going to say that Fox is going to choose not to.

14  I doubt it, because if he does say that Fox is going to

15  choose not to, and not withstanding their obligation to

16  mitigate damages, Los Angeles Dodgers is going to contract

17  with someone else to do it.

18       And when you look at the difference between what Fox

19  has to pay LAD under the contract, and what Fox was willing

20  to pay LAD under some of the amended contracts before the

21  bankruptcy filing date, there are tens of millions of dollars

22  per year difference.  We'd be thrilled, but they're not going

23  to do that, they have an obligation not to do that.

24       So in closing with respect to this part, the law

25  can't prevent one from damaging itself, but it can and does

27

1   prevent someone who damages itself from recovering from

2   anyone else.  That's mitigated damage, mitigation of damages

3   in a nutshell, and I think it forms, it informs much of the

4   Fox response.  Obviously, there is much that could be

5   conceivably be said about the all of the arguments that Fox

6   wants to raise that we think are not a part of it, we reserve

7   on that.

8          THE COURT:  Okay.

9          MR. BENNETT:  And when Your Honor is ready for it

10  we'll talk.

11         THE COURT:  All right, Mr. Bennett, thank you.

12         MR. BENNETT:  Thank you.

13         THE COURT:  Mr. Werkheiser.

14         MR. WERKHEISER:  Good afternoon, Your Honor.

15         THE COURT:  Good afternoon.

16         MR. WERKHEISER:  Your Honor, we are going to be

17  somewhat ships passing in the night because I think what you

18  heard from Mr. Bennett was an attempt to redirect the Court

19  away from some of the Court issues here that are going to be

20  dispositive of this motion, and frankly it could require that

21  it be denied as a matter of law without even a need to take

22  evidence today.  This was a debate that Mr. Levinson and I

23  had last week about whether we needed evidence at all, and

24  you know certainly I think if we get the evidence we are

25  entitled to put on our full case, but there are several

1   reasons why Your Honor can decide this motion just on the

2   law, and the facts as undisputed.

3          Your Honor, I think the first starting place is this

4   issue of the MLB settlement, and as Your Honor noted it was

5   filed yesterday, and we've been screaming for over a month

6   now where is it?  Why can't anybody see it?  Why does it have

7   to be secret?   How can we run a process of a settlement when

8   their motion says on its face that it's founded on this

9   settlement that they haven't disclosed to anybody, and Your

10  Honor hasn't had a chance to review and approve.

11         Your Honor, they first announced this settlement on

12  November 2nd, 34 days I believe went by before they filed the

13  motion last night before the hearing.  And Your Honor, what

14  they filed isn't even the complete settlement.  It's the

15  skeleton of a settlement less what's their term, the special

16  terms that nobody can see.  But it's these special terms that

17  control what media right bids can look like, what team bids

18  can look like.  Now they say in the settlement agreement that

19  team buyers can go look at them, can't take a copy with them,

20  can't show them to anybody else, subject to some

21  confidentiality agreement that nobody's seen.

22         Creditors can't look at them, Your Honor can't look

23  at them.  Your Honor can't exercise his judgment as required

24  in Third Circuit precedent to review the settlement based on

25  those.  That's the process they've set up, Your Honor, and

1    that's the process that they're asking these procedures to go

2    forward on the basis of.  I think they acknowledged that

3    there's a problem with what they tried to do, passively, at

4    least, by filing this settlement agreement last night, less

5    than sixteen hours before the start of this hearing.  They

6    want it both ways, they want to put the motion out there and

7    have Your Honor put a stamp of approval on it later, after

8    they've started this marketing process has started down the

9    road, and quite likely have incurred irreparable breaches of

10   our agreement.

11          But they don't want to put it out there now when the

12   Court and others might see things that give them pause, about

13   this process.  And I know when we were here last Mr. Levinson

14   was trying to convince Your Honor that this settlement just

15   wasn't relevant, but I think we can be disabused of that idea

16   fairly quickly.  The settlement agreement itself contains in

17   section called other provisions, are required that the

18   Debtors shall modify the media rights motion to conform to

19   their relief requested in this agreement.  Not sure what that

20   means, the agreement itself really doesn't describe, that is

21   the settlement agreement, doesn't really describe what relief

22   is requested, but the Debtors had to exercise their judgment

23   in some manner that was influenced by the commitment that

24   they made, and the settlement that isn't really disclosed to

25   anybody.

1          It's not clear whether the Debtors are going through

2    this process because they want to, because MLB is obligating

3    them to, or why.  We don't know, Your Honor doesn't know.

4          THE COURT:  Well MLB has represented that it's

5    remaining neutral as to the sale of the telecast rights.

6          MR. WERKHEISER:  And as to Fox I think, Your Honor,

7    they've indicated that their remaining neutral.

8          THE COURT:  Yes.

9          MR. WERKHEISER:  As to issues involving Fox.

10         THE COURT:  Okay.

11         MR. WERKHEISER:  The settlement and the secret terms

12   of the settlement also undermine the purported reason why

13   they're here today, Your Honor, they say we're all about

14   maximizing value.  But you know how much of a discount is

15   going to be applied in this process because people don't

16   really know what they're bidding against, and because people

17   are confused by the uncertainty of the process.

18         Your Honor, there are other questions of the

19   settlement, and perhaps there not directly relevant for

20   today, but they give one pause.  It includes releases for Mr.

21   McCourt and his entire family.  It's not clear whether it's

22   just Major League Baseball giving the releases, or if the

23   Debtors are giving releases to or what, but they're

24   referenced, although the releases themselves are not provided

25   with the documents.  And the settlement also says that Mr.

1   McCourt will keep the parking lots out of the sale process.

2   And it says, what I think is fairly extraordinary language,

3   any decision to sell or no sell the parking lots and

4   surrounding land shall be made solely Mr. McCourt, in his

5   sole and absolute discretion without regard to any duties and

6   responsibilities he may have for any of the Debtors, it's on

7   the first page of the settlement.

8         Now what that presumes is something that Mr. Bennett

9   argued to you, but there's no evidence of, which is that

10  these transactions were completely legitimate.

11        THE COURT:  When you say these transactions, do you

12  mean when they were purchased?

13        MR. WERKHEISER:  They were transactions involving

14  the parking lot, Your Honor.

15        THE COURT:  Okay.

16        MR. WERKHEISER:  So, and I'm not here with evidence

17  today because I haven't been able to take discovery, we've

18  been prevented from doing that.  Nor can I make a record on

19  any of that today because we don't have fact witnesses for

20  MLB and the Debtor here.  But we've looked at documents and

21  they'd certainly raise questions about the lack of

22  consideration for the transfer of those parking lots.  They

23  also raise questions about the fact that before that

24  transaction the Los Angeles Dodgers LLC, this Debtor, leased

25  the parking lots, if I understand the corporate structure

1   correctly, and I think Mr. Bennett will disabuse me of any

2   mistakes, but lease the parking lot from LA Real Estate LLC

3   another Debtor under a lease.  After the transaction, and

4   that was part of the Debtor group, and part of I think what

5   Major League Baseball has called you know the baseball

6   entities, or the baseball assets.

7         After the transaction that property moves out of

8   that group of Debtors, or baseball entities and into Blue

9   Landco, the McCourt controlled separate entity.  And a new

10  lease, or an amended and restated lease is entered into, then

11  that result of which is that hard cash now starts flowing out

12  of the Los Angeles Dodgers LLC to Blue Landco.  So maybe the

13  transfer is fraudulent as to LA Real Estate LLC, nobody has

14  had a chance to explore that, you heard last week from the

15  Committee that they hadn't looked at it very closely.

16        It's also very plausible that the transfer was

17  fraudulent as to the Los Angeles Dodgers LLC because they may

18  have had a lease that was on significantly more favorable

19  terms that was terminated collusively without adequate

20  consideration, and replaced by a lease now where they have to

21  pay hard cash that flows to Blue Landco.  I don't this for

22  sure, haven't had the discovery, haven't had a chance to make

23  a record of it.

24        THE COURT:  And this -- does this go more to your

25  motion to dismiss?

1          MR. WERKHEISER:  It goes somewhat to the motion.  I

2    mean Mr. Bennett is right; there are some over arching issues

3    that trap this motion and the motion to dismiss.  You know

4    the basic principle they operate on is that we are a Debtor

5    In Possession, and we have a duty to maximize value come hell

6    or high water, no matter what whether we're solvent or not,

7    we have to maximize value.  And it doesn't matter that it

8    goes to one individual Mr. McCourt, but it does matter

9    because there is an issue of unclean hands, and there is an

10   issue of violating contract rights of a creditor to benefit

11   an equity holder in a situation where the equity holder is at

12   minimum likely guilty of some unclean hands, and very

13   possibly the recipient of a fraudulent transfer.

14          Your Honor, we're quite concerned about the way this

15   has been set up because it does essentially force Your Honor

16   to pass on the settlement without passing on the settlement.

17   The two are linked, they said so from the beginning although

18   when they get to the podium they deny it, but the two are

19   linked.  The procedures have always integrated and been based

20   perimeters that are contained in the MLB settlement which

21   they've had to acknowledge again with the filing of the

22   settlement, but they still haven't told us what those are.

23          And, Your Honor, I mean I won't go into the law

24   we've cited it in our papers.  It was Judge Walrath's Alterra

25   decision where she goes on about the need for transparency,

34

1   and there's the Third Circuit's Nutraquest decision which

2   indicates that the Court has to carefully examine

3   settlements.   Again, they put Your Honor in a position where

4   I don't think those two things can be accomplished.

5         Your Honor, the -- moving on from the settlement and

6   I guess before I do I think really the right result for today

7   given the fact that they had this settlement in hand since

8   November 2nd, and if Your Honor looks at the settlement it's

9   actually dated November 2nd, and waited until last evening to

10  file it.

11        The right way to do this is for them to withdraw

12  this motion.   They will have a hearing on their settlement

13  motion.   Your Honor may approve it that you may not, and then

14  we can come back and do this again.   And they'll say oh but

15  the delay, the delay is so horrible and we're so prejudiced

16  by the delay.   But Your Honor, you know where the delay comes

17  from, Mr. McCourt signed the divorce settlement on -- he

18  actually signed it on October 11th, it's in our exhibit binder

19  it's Tab 4 I believe, he signed it on October 11th, it wasn't

20  filed publicly with the Los Angeles Superior Court until

21  November 3rd.   And the divorce settlement says Frank must pay

22  Jamie $131 million dollars by guess what date, April 30th,

23  2012.

24        And what happens if he doesn't?   And then subsequent

25  to that he was supposed to confess a judgment for that

35

1  amount.  And has agreed in that document that if he doesn't

2  pay her by April 30th, 2012 she can 1) commence enforcement

3  proceedings; 2) he'll become responsible for attorney fees,

4  cost of collection; and, 3) he has to sell the team.  So all

5  this talk about we have a fiduciary duty, and we're doing

6  this to maximize value, its hooey.  This is Mr. McCourt has

7  created a timing issue in his personal life.  He has made a

8  personal financial commitment.  Mr. McCourt's not the Debtor,

9  and it's that personal financial commitment that he is in

10 turn whiplashing the Court, and everybody else into a

11 schedule on.

12      So when Mr. Bennett stands up and says this is

13 unfair, we will never be able to accomplish what we need to

14 accomplish in the time frame we set for each other, that's

15 the under current that I hope Your Honor will be thinking

16 about.  Let's talk about what will happen with these

17 procedures, Your Honor, and what Fox's contract really says

18 because they make the quite extraordinary statement that we

19 are changing nothing other than accelerating the schedule for

20 the exclusive negotiation period, and for the team final

21 offer, but the procedures do much, much more than that.

22      And if we need to we will get the evidence today,

23 and you'll hear from Mr. Desser and Mr. Thompson, and they

24 will explain why these provisions are so significant and how

25 the hundreds of these deals that Mr. Desser has done these --

1   some versions of these back end rights appear at almost every

2   deal, and how useful they are both to the networks and to the

3   sports teams that are parties to them, because the whole

4   concept here is it is a substantial capital outlay, it is

5   substantial investment in resources, it's a relationship of

6   trust and confidence where people are essentially building a

7   brand together, and for that reason it is for everybody's

8   best interest to have a long term relationships here.

9         And so what these provisions are designed to do is

10   promote that and then create incentives that promote that,

11   but at the same time have safety valves and market checks

12   that while limited, ensure that no one is getting taken to

13   the cleaners.  So in our contract, these appear in Section

14   2(b) and 2(c) of the first amendment and, Your Honor, just

15   the back story on that, that was re-negotiated and in

16   connection with the sale of the team.  The reality is that

17   Fox owned the team before and then had to negotiate with a

18   third party and so the rights look different than they did

19   before them, but they are still very much valid, enforceable,

20   and valuable to Fox.

21         So the way the agreement works is that the Los

22   Angeles Dodgers have a limited right to test the market.

23   Before they do that there is a period of exclusive

24   negotiation where they talk only to Fox.  The contract right

25   now contemplates that will be October/November of 2012 in a

37

1   forty-five day period.  At the conclusion of that period, the

2   Dodgers must make a final team offer to Fox, which must be

3   held open for thirty days.  Now the concept there is to

4   incentivize the Dodgers to make an offer that is reasonable

5   because if they price it too high, Your Honor, what will

6   happen next is Fox will say no, we're not interested at that

7   price.  The Dodgers than go out to the market, and let me

8   back up, they actually have a brief market check before they

9   actually make the team final offer.

10          But then the Dodgers will go out to the market and

11  then talk to other people, and they'll find out that nobody

12  else in the market wants to offer that number either.  And

13  then they'll have to come back to Fox with a lower offer, and

14  Fox will be able to match it.  So what it does is it protects

15  both parties and it says that the Dodgers be reasonable but

16  it doesn't restrict value because the Dodgers at the same

17  time if they put out an offer that is reasonable, may be a

18  little high, then the incentive is there for Fox to accept

19  it.  Because if they go out for a market test and somebody

20  else offers more than there's not a matching right under that

21  factual scenario, and then Fox is at real risk that they lose

22  the rights forever.

23          So you know broadly speaking that's how they work,

24  Your Honor, and that's how they ensure that both the parties

25  are incentivized to stay together while at the same time

38

1   having the opportunity to maximize value.  So let's talk

2   about what the procedures do versus what the agreement says.

3   So they acknowledge, they accelerate the schedule, which in

4   and of itself is material, because the way it's intended to

5   happen -- it's intended to happen near the end of the term of

6   the contract where there is more time pressure, both parties

7   to resolve these issues and come to an agreement.  They

8   shifted that dynamic.

9       Here under the procedures now there will still be an

10  exclusive negotiation period of sorts, but you know what

11  happens at the end of the exclusive negotiation period, Your

12  Honor, there's no binding agreement under any scenario, and

13  the procedures contemplate that what will happen at the end

14  of the exclusive negotiation period is no matter what, they

15  take the offer back not to a committed buyer of the team, but

16  to all the prospective buyers of the team.

17      And the procedures are very explicit in saying they

18  reserve absolute discretion to reject it, and what that

19  translate into that's absolute discretion to re-trade the

20  deal.  So we have a negotiation once with the Debtor, which

21  in of itself doesn't make a lot of sense because the Debtors

22  under their prior commitment to sell the team is not going to

23  be around so why should they be the first one to negotiate

24  the value of these rights, or the terms of these rights when

25  they're not going to be here.  And we cut sort of a deal with

1  them, and then, they shop it to everybody else whose looking

2  at the team and all those folks will say yeah or nay

3  depending on whatever suits their personal agenda, and these

4  are smart people, their sophisticated people.  They'll see

5  the opportunity to re-trade the deal, and they'll surely do

6  it.

7          So in effect, Your Honor, the exclusive negotiation

8  period under the procedures as proposed becomes

9  (indiscernible); team final offer.

10         THE COURT:  But wouldn't that be the same under the

11  present contract?

12         MR. WERKHEISER:  The only contingency under the

13  present contract, and I should have touched on this, is -- is

14  Major League Baseball approval.  And -- and I don't mean this

15  in a pejorative way, but it's sort of the devil you know.

16         Fox does a lot of contracts with Major League

17  Baseball.  They know who they're dealing with, what their

18  motivations are.  And so, yeah, that -- there is an approval

19  process contemplated, but it's one they've been through many

20  times before, and they can develop expectations around that;

21  can't do that with the world of unknown potential team

22  bidders that is out there.

23         The team final offer concept that's in the

24  agreement is -- is something that is very explicitly defined

25  within the terms of the Fox contract.  And -- and what it

   says is that the team final offer basically has to have three

1  components.  And one, it must be for exclusive table -- cable

2  television rights, and that's a defined term within the

3  contract.  As I understand it, and Mr. Desser and Thompson

4  will probably explain it better than I can, but it means that

5  it'll encompass all means and distribution other than

6  standard over-the-air pay-per-view and interactive media.  So

7  I -- I understand that to be, you know, antenna broadcast

8  pay-per-view, which is self-explanatory, and Internet.

9          THE COURT:  Right.

10          MR. WERKHEISER:  It will require them to air a

11 comparable number of future games.  Fox currently airs, I

12 think, a hundred games.  And third, it will require them to

13 commit to a subsequent term of at least five years.

14          The procedures don't say that.  The procedures say

15 don't believe that Los Angeles Dodgers shall, "make a final

16 written offer to Fox setting forth the terms and conditions

17 on which Fox may then" -- there's the subject to absolute

18 discretion of everybody else in the world language -- "enter

19 into a telecast rights transaction."  So they've gutted that.

20          And, you know, lest there be any doubt about where

21 they're headed, Your Honor, and -- and in the amended motion

22 itself, they say that they are reserving the right, "to

23 pursue licensing and the telecast rights as a single package

24 or may pursue licensing of some subset of the telecast

25 rights, e.g., less than all games, less than all permitted

41

1   distribution platforms, and/or less than all permitted

2   languages."

3           THE COURT:  Well, there are 162 games in a season,

4   so they were already -- Fox was already broadcasting through

5   within all of the games, I -- I believe.

6           MR. WERKHEISER:  That's my understanding.  And I'm

7   not terribly versed in why that's the case.  But I think

8   there are some that are broadcast nationally.

9           THE COURT:  I see.

10          MR. WERKHEISER:  And -- and that may account for

11  the shortfall.  But I think Mr. Desser and Thompson could

12  explain that better when we hear from them.

13          The -- the team final offer concept, of course, is

14  itself [indiscernible] because, again, that language of

15  absolute discretion for potential team buyers appears at that

16  level, too.

17          So -- but let's assume that we get this far in the

18  process.  In theory, Fox has a right to match the less

19  favorable offer.  So, you know, this is where the Los Angeles

20  Dodgers have gone out for the market and they've gotten an

21  offer that is less attractive than the offer that they made

22  to -- to Fox before doing that.  And what they've done there

23  is changed a couple of the important elements, as well.

24          One is that the parties specifically contracted for

25  evaluation of non-cash consideration.  And there are things

    that certain media outlets might do, because they have other

42

1   programming, for instance, that they can provide promotional

2   opportunities for the teams, or things like that, that are,

3   you know, not paying cash, or something that was easy to

4   value.

5       The parties that contracted have an independent

6   third party appraiser do that, sort of akin to an arbitration

7   process, to determine the value of -- of that type of

8   non-cash cash contribution.  They want to substitute

9   Blackstone for that.  And I'm not trying to directly impugn

10  anybody at Blackstone, but they've got a kind of stake in

11  this process that, in our view, is inconsistent with that

12  role.

13      And then the safety valve is that Your Honor will

14  be called upon to review those.  And -- and I know this court

15  does valuation work all the time.  Although, typically, I

16  think what gets valued here are office buildings and

17  occasionally going concern businesses and things like that.

18  I don't know that we have too many opportunities to -- to

19  value, you know, what -- what is the value of an appearance

20  on the Today Show or something like that.  So it's not that

21  Your Honor can't do it, but I think it is outside of the

22  realm of normal things that we do.

23      The last piece of this is that if we -- we -- we

24  utilize that process, that valuation process of the Court,

25  then we're penalized.  We would normally have 10 days to --
    to respond to whatever the result of that valuation process

1   was.  So once Your Honor says, "I think this is worth X under

2   the contract" -- well, the appraiser would do that under the

3   contract, but under the contract there would be a 10-day

4   period to react, that's been reduced to five.

5          And this is the kicker.  This is actually what I

6   found a little amusing in reading through this.  We go

7   through all this, and then they say in the procedures -- and

8   these, I think, are in, Your Honor, the revised procedures

9   that they tended as an amendment to their exhibit books a day

10  or two ago.  It's in paragraph -- or Section F.  "Then, if we

11  accept the less favorable offer, then the provisions in the

12  second paragraph of Section E above, governing Fox's

13  acceptance of a team final offer, shall also apply to Fox's

14  acceptance of the -- the least favorable offer."  I think

15  that's code for its subject of the absolute discretion of any

16  potential team buyer, because that appears to be the prep --

17  the paragraph that they're cross referencing.

18         So, that, in a nutshell, is how I read the

19  procedures, and I think how anybody who's being objective

20  about this would have to read the procedures.  But -- and --

21  and, obviously, they're doing a little bit more than just

22  accelerating the schedule.  We think there's no real debate,

23  that this is material, this is all very material.  Thee were

24  negotiated provisions, they are in virtually every telecast

25  agreement.  You'll hear that, within the industry, these are

44

1    incredibly important.   There's no real debate to be had about

2    the materiality of these.

3            But, yet, Mr. Bennett stands there and argues to

4    Your Honor this is inimical the bankruptcy process and you

5    should invalidate these provisions without giving it a second

6    thought.

7            Let's talk about what authority or lack of

8    authority there is to do that.   I'm just sort of going to

9    tick through the ipso facto type provisions of the Bankruptcy

10   Code, Your Honor.

11           So there -- there's Section 541(c)(1).   And that

12   deals with ipso facto type provisions that are designed to

13   keep property from becoming property of the estate.   And as

14   one court read it, I think, accurately, it says, "A faithful

15   reading of Section 541(c)(1) discloses that this -- this

16   section deals only with the concept that in interest of the

17   debtor and property becomes property of the estate,

18   notwithstanding such protective provisions."   It has nothing

19   to do with transfer of property out of the estate.

20           So it is not designed to deal with a provision that

21   says before you can sell this piece of property, you must do

22   X.   No job or right of first refusal or anything like that.

23           Well, we might next look at Section 363(l).   And

24   again, that is dealing explicitly with ipso facto clauses.

25   It says that it negates a provision of the contract that

     relates for applicable law, that is conditioned on the

1 insolvency, financial condition of the debtor, or commence

2 with a bankruptcy case, et cetera.   So that provides them no

3 support.

4          Then, I think, we get into the territory where

5 they'd like there to be support for them, but there isn't.

6 And it's 365(F)(1).   And the cases they've cited in their

7 paper suggest that, largely, they're -- they're relying on

8 that provision.

9          But that only comes into play, Your Honor, when

10 it's time to assume and assign a contract.   They're not doing

11 that.   They're saying, "We're not going to assume it."   And

12 they say this explicitly in paragraph 3 of the motion, "We're

13 not assuming it right now, we're not rejecting it.   We kind

14 of want to hang out.   But, meanwhile, we want you to approve

15 all these procedures, let us remarket the asset in a way that

16 violates the explicit terms of the agreement.   And we'll

17 figure out a month or two from now whether we're going to

18 assume it or not, after we have done all of this, and after

19 we've probably taken steps that render the thing

20 non-assumable as a matter of law.

21          365(F)(1), as I said, applies only when they want

22 to assume and assign.   It has no application in a situation

23 like this.   And so, for instance, Mr. Grocer, that's 77 B.R.

24 349, that's a case they rely on.   And that's a case that says

25 I'm not going to enforce a right of first refusal, because I

1  think it'll have a chilling effect and it's basically an ipso

2  facto clause in violation of 365(F)(1); doesn't apply here.

3       And, for that matter, even if they were talking

4  about assuming and assigning the Fox agreement, if they were

5  doing it cum honore, as they're required to, we wouldn't be

6  objecting to an assignment to any team owner that was buying

7  the team -- potential team owner that was buying the team,

8  and was taking the contract intact and was going to honor its

9  rights.  In fact, I think the agreement says essentially that

10 that we will not object to transfer of the contract, so long

11 as it's going with the entire team.

12      The Mr. Grocer court does go on at some length

13 about its perception of the chilling effect, of that

14 particular right of first refusal, which, of course, was,

15 unlike this one, an absolute unconditional right of first

16 refusal.  But, Your Honor, I'd ask you to read the opinion.

17 It -- it makes it clear that it's doing so in dicta.  It's

18 basically saying even if I were to get to this, as you, I

19 would still rule the same way.  But the Court has made clear

20 that it doesn't need to get to that issue, it's not going to.

21 Excuse me.

22      You know, compare this to the decisions that have

23 issued on rights of first refusal from this court and from

24 the district court, Judge Barnett, actually, issued the IT

25 group decision some years ago where he -- he fundamentally

   accepted the propriety of right of first refusal there.  He,

1   in turn, cited, I think, the EZ Serve Convenience Store

2   decision, which, likewise, validates rights of first refusal

3   and [indiscernible] they're all soundly decided, and

4   particularly appropriate here, where they're talking about

5   valuing the media rights as a discreet asset.  Not

6   necessarily in sort of a you-have-to-take-it-all or not.

7           So, that leaves them without any explicit basis in

8   the Code to do what they want to do, Your Honor.  And I

9   assume that, although it's not stated explicitly, that the

10  fallback is going to be 105(a).  But we know, because the 3rd

11  Circuit says so, that it doesn't authorize bankruptcy courts

12  to create any substantive rights that are otherwise

13  unavailable under the law, or constitute -- I think the

14  Combustion Engineering court's words were at 391 F.3d 236, a

15  roving commission to do equity.  That echoed something that

16  the 3rd Circuit said a few years earlier, where it said "the

17  fact that a bankruptcy proceeding is equitable does not give

18  the judge a free-floating discretion to redistribute rights

19  in accordance with his personal view of justice and fairness,

20  however, enlightened those views may be."  And basically says

21  you can't mess with people's contracts rights unless the Code

22  gives you specific authority to do it.

23          So, I think where that gets us to under the 3rd

24  Circuit case law, and that's now Joshua Slocum and the

25  Fleming decision, it's at 499 F.3rd 300, is whether they're

    making any material change to our agreement.  And I --

48

1    obviously, I -- I bored Your Honor with sort of the

2    dissection of the procedures in our agreement, and -- and I

3    won't go back over them again.  But I do want to just point

4    out how the -- the Fleming court articulated the -- the

5    concept of materiality, because I think it's particularly

6    important here, where we're talking about something that is

7    not an explicit economic term of an agreement.

8         And what the 3rd Circuit says in Fleming is the

9    following: "The resolution of this dispute does not depend on

10   whether a term is, 'economically material,' rather the focus

11   is rightly placed on the importance of the term within the

12   overall bargained for exchange, that is whether the term is

13   integral to the bargain struck between the parties (its

14   materiality) and whether the performance of that term gives

15   the party the full benefit of its bargain (its economic

16   significance)."

17        And the situation in Fleming was, just to give some

18   color, the debtor had a -- a contract with Albertsons to

19   supply their grocery stores, and it was, under the contract,

20   supposed to supply them from a facility that it had in Tulsa.

21   It sold its right in the various warehouses and in -- and

22   tried to assign its rights in its contract to a bidder

23   through the bankruptcy process.  But in -- in the context of

24   doing that, it closed down the Tulsa facility.  And the

25   bidder wanted to take an assumption of assignment of the

     contract and service it from a facility in Kansas City, if I

49

1    remember correctly.   And the court looked at the language of

2    the contract and said, Well it says explicitly here from

3    Tulsa.

4              And there was evidence put on that this would be

5    harmful, but there was not specific quantifiable evidence of

6    damages put on.   And the argument from Albertsons perspective

7    was, you know, this used to be our warehouse.   We agreed to

8    this arrangement because they have the same sorts of systems

9    there that we do, and this is a good fit for us.   If you

10   close this warehouse, yeah, they'd be able to deliver the

11   canned goods to us at the same cost and we'll be economically

12   and relatively the same position, but it'll be a lot less

13   convenient for us than it would have been to have this done

14   from Tulsa.   And the 3rd Circuit accepted that.

15             Here, by comparison, I think we have both the

16   prospect of massive economic harm, and the fact that these

17   were specifically bargained for rights that they just want to

18   shed.   But, just the fact that they are specifically

19   bargained for rights and that they are important in contracts

20   of this type, I think, gets us there.

21             Other -- I -- I think what Mr. Bennett is relying

22   on ultimately here in -- in suggesting that the No-Shop

23   should be invalidated, is a case that they cite in their

24   reply.   And I think they cite it elsewhere, but they -- they

25   mentioned it in their reply again.   And -- and puts an

     emphasis on it there, because it's one of the few that they

50

1   cite for this proposition.  But, any rate, Big Rivers
2   Electrical Corporation, 233 B.R. 739.  And it's used to
3   support the proposition that No-Shop clauses are, per se,
4   invalid.  And you need to read the case to really appreciate
5   how vastly different the situation there is from the one
6   that's now before Your Honor.
7          The contract at issue was a contract to effectively
8   lease all the facilities and many assets of this power
9   generation enterprise.  And the counterpart of the contract
10  hadn't entered into the contract in the ordinary course.
11  They had figured out, about a month before the company filed
12  for bankruptcy, that the company was, in the court's words,
13  well, the court's words, "Recognizing Big River was in dire
14  straits, they entered into this contract."  And it included a
15  No-Shop provision, but the No-Shop specifically contemplated
16  that there was going to be a bankruptcy process, and that,
17  essentially, they were going to get the benefits of this
18  contract through the bankruptcy process without subjecting it
19  to any sort of other bid or auction or any other things that
20  we we normally see in a situation like that.
21         The bankruptcy court found -- and these were not
22  findings that were distributed on appeal -- that it was not
23  an executory contract, because it was expressly subject to
24  court approval.  And, therefore, the debtor wasn't obligated
25  to anything with it until it was approved.  And we've all, I
    think, seen that decision come out in this court one way or

1  the other.   In Penn Traffic, [indiscernible], Judge Walsh

2  issued that ruling a couple of times, and I was on the losing

3  end of that recently in front of Judge Sontchi.

4        The other thing notable here is that there's --

5  there's no indication that the estate was -- was solvent in

6  -- in that particular decision.   So I -- I don't see how it's

7  on any way on all fours, or on all ones, with our situation

8  here.

9        Quickly, I just want to touch on a couple of other

10  decisions, because I think they seem, again, to be resting a

11  large portion of their argument on the idea that they can do

12  this under the applicable law, or the applicable prudence of

13  Bankruptcy Code.

14        They cite a decision called Chapin Revenue Recycle

15  [sic] Management, 343 B.R. 728.   Again, they cite that for

16  the proposition that they don't need to cure non-recurable

17  [sic] faults, that's -- I mean, as a proposition, there's

18  nothing wrong with that.   The case just doesn't have anything

19  to do with our case.   What happened there is the debtor had a

20  software license and the employee who was responsible for all

21  of their IT needs quit after they filed for bankruptcy and

22  they -- to grant a hiring process, and they were trying to

23  hire somebody else.   And they interviewed a couple of people,

24  who signed confidentiality agreements, and showed them

25  segments of the source code, not the whole thing, not enough

   to -- to do anything material with.   And the licensor argued

1   that was a historical fact, the non-monetary default that was

2   material, they couldn't assume the contract.

3          The court rejected the licensor's position, but it

4   did so opine a substantial economic detriment standard.  And

5   as we just discussed, that's not the standard that is applied

6   in the 3rd Circuit.  This was an 11th Circuit decision at a

7   Florida bankruptcy court.  I'm sorry -- I don't -- the

8   decision itself is a bankruptcy court decision within the

9   11th Circuit.

10         And, of course, what we have at issue here goes

11   well beyond a simple confidentiality breach.

12         Another decision they rely on is Calpine, 365 B.R.

13   392.  That's a Southern District New York decision, 2007.  At

14   issue there was not a No-Shop clause, but a provision called

15   a no-call.  And it said you can't prepay the debt.  And the

16   court, I think, correctly, said that's silly, because debtors

17   need to be able to restructure their debts, and you're

18   getting the economic equivalent of what you would get under

19   your contract if they repay the debt.  And, by the way, the

20   lenders there actually had provisions in their contract that

21   said if you file bankruptcy, all the debt is accelerated,

22   anyway.  So it's really not at all relevant to our situation.

23   But I didn't want the Court to be left with the -- the --

24   perception that it was.

25         They go after a couple of cases that we -- we rely

on, Your Honor.  We cited Empire Equity Capital Corporation

53

1  as an example of an incurable default case.  There was, in

2  that case, time-is-of-the-essence language.  Those precise

3  words do not appear in the Fox contract.  But I submit that

4  the contract, when you read it, is ambiguous in terms of the

5  importance of deadlines, and the need to adhere to those

6  deadlines, and the materiality to those deadlines through the

7  overall bargain.

8      And California law on that subject, Your Honor, is

9  -- is fairly clear, that one way to say that a deadline is

10  important is to say time is of the essence.  But the other

11  way, according to Johnson v Alexander, 63 Cal. App. 3d 806 at

12  813, is by very nature of the contract.

13      The other interesting thing about the Johnson

14  decision is they -- in the very next sentence, they go on to

15  say that, "when no time is specified for the doing of an act

16  other than the payment of money, a demand for performance is

17  necessary to put the promisor in default."  So if our

18  contract was silent about when they -- we had to have the

19  exclusive negotiation, or when they needed to make the team

20  final offer, presumably we'd have to ask them to do it before

21  it would be material.  But it's not silent.  It says those

22  things have to happen at specific times.

23      So, Your Honor, for -- for all those reasons, I

24  don't think the marketing procedures work.  They just -- they

25  will produce breaches of our contract that are both material

   and incurable, that will prevent assumption, and thereby

54

1   create damages.  And we can argue about the issue of

2   litigation, about broadcasting teams from -- broadcasting

3   games 2012 and 2013.  But what I don't think, at the end of

4   the day, they're going to be able to argue about, is the

5   materiality of the damages from the loss of the back-end

6   rights.  And the negative impact that that's going to have on

7   -- on Fox's RSN here, and the massive damages that the estate

8   could be subjected to as a result of that.  And we'll have

9   testimony on that and create the record on that later.

10         Your Honor, moving on -- and I'm sorry, I'll try to

11  speed things up, but -- another element of their procedures

12  is this idea that they're going to have an estimation

13  proceeding, and I think --

14         THE COURT:  Right.

15         MR. WERKHEISER:  -- in the latest iteration of the

16  procedures, they're going to file that motion in a week.  And

17  the idea, if I understand it correctly, is that they will

18  start this process of marketing, the telecast rights, in

19  violation of the express requirements of our agreement.  And

20  then once they think they have pegged, sort of, the deal that

21  they want to go forward with, with somebody else, they'll

22  come to Your Honor and ask you to give an advisory opinion

23  about whether they've breached or not, and they slant the

24  language, they say we'll ask the Court to determine that

25  there's no -- no breach and no damages.  But -- and -- and

55

1    then presumably make their decision from there whether to go

2    forward with that deal or not.

3          The problem with that structure is that they'll

4    have already incurred the breach by then.  And so there'll be

5    at least some damages by that point and then it's a question

6    of how much, if they proceed.  And -- excuse me -- and the

7    other problem with it is that it's a misuse of this

8    provision.  Section 502(c) says it's for fixing or

9    liquidation of a claim that would unduly delay the

10   administration of the case.  Well, as -- as we've heard,

11   team's going to be sold no matter what.  There's a deadline

12   that they've agreed to in their MLB settlement and there's a

13   deadline, and Mr. McCourt has agreed to in his settlement

14   with his wife.

15         So it's not going to delay the administration of

16   the case.  Team's going to get sold.  Presumably, there will

17   be a plan that is either the vehicle for selling the team, or

18   that would be a plan of liquidation filed later.  And the

19   plan will simply distribute the assets according to

20   priorities -- or the proceeds of the assets according to

21   priorities.  I hope that we'll have another discussion if we

22   get to that point.

23         So, I don't see any theory on which they can argue

24   that they need this estimation proceeding for any legitimate

25   bankruptcy purpose.  The -- the 3rd Circuit in -- in

     [indiscernible] want to make clear that they need to do it

1  for a legitimate bankruptcy purpose, if they're going to do

2  it, and the Kool, Mann decision, 300 F.3d, 340 at 347, which

3  is also 3rd Circuit, says it's got to be -- the principle

4  reason to do an estimation is in connection with formulating

5  a plan of reorganization.   It's not this case, because

6  they've already said our plan is to sell the team.

7           THE COURT:   You don't want me to give an advisory

8  opinion on whether or not they should grant their motion,

9  though; is -- is that right?

10           MR. WERKHEISER:   I'm sorry, Your Honor?

11           THE COURT:   Are you asking me -- they haven't filed

12  their motion yet for estimation.

13           MR. WERKHEISER:   Well, that -- that's right, but --

14  but I think it's -- it's baked into their procedures.  And so

15  you're going to -- basically, what's going to happen is that

16  if you grant the procedures today, Your Honor, you're going

17  to authorize them, potentially, to go out and start this

18  process, incur breaches, and then they're counting on the

19  fact that they'll have this estimation proceeding.   And we

20  talked tentatively about a holding date from February last

21  time, that they will use as a vehicle to try to have a

22  premature determination that they've incurred no liability by

23  reason of those breaches.

24           So, I agree.   We'll -- we'll -- you know, if we get

25  to that point, we reserve our rights and we want to contest

   it.   But -- but I think we have to at least preview it today

1    before a determination can be made whether to approve the

2    procedures.

3            And -- and I -- and I -- just -- just on that same

4    point, Your Honor, I -- there's Judge Sontchi's opinion, RNI

5    Wind Down 369 B.R. 174, 191, where he says very explicitly

6    that Section 502(c) is not a mechanism for reducing the

7    amount of the debtor's liability.  And -- and those are the

8    only two -- the -- the only concepts I can see for having

9    that estimation process here are they want to foreclose a

10   full claims process, either through arbitration, which we

11   think is our contractual right and our right under the Act,

12   or through a full claim litigation process, which, I think is

13   -- presumptively, we're entitled to.  Or they just want to

14   hurry up and get money out to Frank McCourt.  And neither of

15   those I -- I don't think are -- are valid purposes.

16           Your Honor, I just want to touch on a few things on

17   -- and I'm going to try and confine my comments on the lack

18   of good faith issue, because I do realize we have our motion

19   pending. But I --

20           THE COURT:  Well, I -- I have to ask you this

21   because --

22           MR. WERKHEISER:  Yes, Your Honor?

23           THE COURT: -- you're -- you're making an excellent

24   argument.  But the whole time you're arguing, there's this

25   tremendous irony that it -- that it -- that I can't stop

     thinking about.

1        MR. WERKHEISER:  Okay.

2        THE COURT:  And it's this.  We would not be here

3    today had the commissioner approved the terms of a new

4    agreement that Fox negotiated with the Dodgers well in

5    advance of the timeframe that you're talking about, was

6    prepared to advance hundreds of millions of dollars --

7        MR. WERKHEISER:  Uh-huh.

8        THE COURT:  -- to the very person you are now

9    complaining about as not being a good person.

10        MR. WERKHEISER:  Yes, Your Honor.  So --

11        THE COURT:  It's -- it's -- I'm not sure if it's

12   more -- I think it may be more than just ironic and more than

13   interesting that Fox is taking this new position.

14        MR. WERKHEISER:  Respectfully, I don't think we're

15   taking a new position, Your Honor.  Because -- let's look at

16   what was going on at that time.  One, it was entirely

17   consistent with our contract, because as far as we know, Mr.

18   McCourt and the Dodgers were negotiating exclusively with us.

19   There's nothing in the agreement that says the parties can't

20   talk to one another and amend things if they deem it

21   appropriate.

22        So, from our perspective, we think we were being

23   entirely consistent.  And he approached us, he wanted to do

24   this, we were amenable to having a discussion.  Had he

25   approached us and said, "We'd like to talk to you, we'd like

to talk to ESPN, we'd like to talk to Time-Warner, and we'd

59

1   like to talk to Disney," well, that wouldn't have worked,

2   from our perspective.

3          And so -- and as far as, you know, our views of the

4   way Mr. McCourt has conducted himself and the way the Debtors

5   are conducting themselves now, this is not a plight we asked

6   for.   I mean, part -- part of what we've been criticized for

7   is not being more proactive in moving to dismiss and not

8   getting out ahead of Major League Baseball and other people,

9   that, you know, started to set an agenda in this case early

10  on.

11         And the fact of the matter is, we didn't want to

12  fight.   All we want to do is broadcast -- or telecast

13  baseball games.   And -- and so, you know, but nobody wanted

14  to leave us alone.   So we're here.   And, you know, we'll be

15  here and we'll be defending ourselves until we've exhausted

16  all the opportunities to do that.

17         But, you know, we -- again, at the end of the day,

18  I think, fundamentally, we just want to be able to telecast

19  baseball games and we just want to [indiscernible] pursuant

20  to our deal.

21         Your Honor, just a -- a couple of thoughts on -- on

22  the question of -- of solvency.   It's curious at this late

23  hour to see the Debtors back away from their many, many

24  statements.   Over the course of the case, that they were, in

25  fact, solvent throughout, and as I recall, Mr. Bennett stood

    up on, I think, at the first day of hearing, and said, "We've

60

1   got a short term liquidity issue.  We think we've got that

2   licked," or words to that effect, because at that time they

3   had the [indiscernible] deal in place.  And everything else

4   is hunky dory.  And -- and here we are now, you know, less

5   than six months later, and -- and the song has changed quite

6   a bit from what it was at that point.

7           So, how might they not be solvent?  Yeah, I suppose

8   if they had breached the baseball agreements and Major League

9   Baseball had kicked them out of baseball, I concede that.

10  They wouldn't have been solvent at that point.  But that's a

11  self-created issue.  They -- they weren't being threatened to

12  be kicked out of baseball before they were in bankruptcy.

13  That was not a source of financial distress that got them

14  here.

15          THE COURT:  Aren't you arguing in favor of the

16  settlement, then, if you're saying that they would be

17  confronting tremendous problems if Major League Baseball had

18  continued with --

19          MR. WERKHEISER:  Well --

20          THE COURT:  -- their argument, that -- that they had

21  breached?

22          MR. WERKHEISER:  But the settlement is ultimately a

23  product of Mr. McCourt's, in our view, unwillingness to do

24  what was best for the team.  And so, you know, the -- the one

25  option that is best for the team is the sale.  And another

    option might have been had he tried to proceed with the

61

1   contract that we negotiated before the bankruptcy.  And I'm

2   sure there are other options out there.

3         But -- but if there were lots of different

4   scenarios that didn't involve them breaching the baseball

5   agreements and being kicked out of Major League Baseball, I

6   think, is -- is the takeaway, Your Honor.

7         As far as liquidity issues, the team's going to be

8   sold, and if I understand the deal with Major League Baseball

9   correctly, and I'm sure others will tell me if I'm wrong,

10  it's not a requirement that they market the media that the

11  team -- for the team to be sold.  Major League Baseball, I

12  think, has said give it a shot.  But it's going to be sold no

13  matter what.  And I don't think anybody can stand up and say

14  that if we sell the team without marketing the media rights,

15  that we're not going to generate proceeds sufficient to pay

16  off all creditors and produce a healthy return for Frank

17  McCourt.

18        Your Honor, on -- on this idea, which seems, I

19  think, to be the undercurrent of most of the Dodgers'

20  arguments today, that -- that their duty to maximize value

21  exists and is impermutable no matter how solvent they are,

22  and no matter who the equity holder is, I think you just need

23  to look at the authorities that they cite to see how

24  problematic the proposition is in -- in the context of this

25  case.

1        So they -- in their reply, they rely on three

2   cases.  One is a 3rd Circuit decision called Mushroom

3   Transport, it's 382 F.3d at 325.  The court says there's a

4   duty to maximize value.  That's a basic proposition we don't

5   dispute.  But it's not talking about maximizing value for a

6   sole shareholder in a context where there's already been a

7   decision to sell the team and, under any conceivable

8   scenario, creditors will get paid in full.  It's talking

9   about a duty to maximize value where there's been a faithless

10  fiduciary where the lawyer for the Chapter 11 debtor

11  absconded with the proceeds of asset sales that were done in

12  bankruptcy, and the trustee for the debtor that was appointed

13  subsequently wanted to sue him and other defendants.  And the

14  bankruptcy court said you can't, because, essentially, the

15  debtors breaches of fiduciary duty are going to be imputed to

16  you as the trustee in this situation.

17        And -- and it was a response to that where they

18  said the debtor had a duty to maximize value, and the court

19  equated this duty -- let's see, they say, "The bankruptcy and

20  district court essentially equated a fiduciary duty to

21  safeguard assets with the duty of reasonable diligence and,

22  finding a breach of the former, therefore found the latter."

23  So that's what the case is all about.  Has nothing to do with

24  this case.

25        General growth Properties is the second case they

    rely on for the proposition that there's a duty to maximize

63

1   value when the debtor's insolvent.  What is truly amazing
2   about this citation is the word "maximize," or the phrase
3   "maximize value" doesn't appear anywhere in the decision.  It
4   -- they use the phrase a couple of times, that the filings
5   were designed to preserve value for the debtors' estates and
6   creditors.  They never say "maximize value" and they never
7   talk about maximize value for equity specifically.

8           And again, it is factually very different than what
9   we had today in the sense that you had 400 affiliated SPE's
10  that held real estate properties, and some of them were
11  arguably very much in financial distress, and some of them
12  were not. And they all filed together.  And the argument was,
13  well, can I make an enterprise argument that they all need to
14  be in bankruptcy, even though some of the individual entities
15  maybe don't have to be in bankruptcy, and the bankruptcy
16  court accepted that proposition, applying the 2nd Circuit's
17  bad faith standard, which is a bit more debtor friendly than
18  the 3rd Circuit, it required both subjective and objective
19  bad faith before you can dismiss.

20          The third case they -- they cited to in their reply
21  that, I think, does not help them and, in fact, probably
22  demonstrate why this is wrong to go forward with this
23  process, is Philadelphia Athletic Club, 15 B.R. 60,
24  bankruptcies in District Pennsylvania, 1981.  And they cite
25  it for the proposition that they have a duty to maximize
    value, even though they may be solvent.  And I think they

1    rely primarily on the following quote.  And the court says,

2    "Although the primary purpose of the bankruptcy court is

3    preserve the debtor's estate in order to protect his

4    creditors, where it is true the rights of all creditors are

5    fully protected, it is incumbent upon the Court to seek to

6    protect the interest of equity holders, as well."

7          But you've got to dig into the case a little bit

8    and understand what the Court was talking about.  One, talk

9    about preserving [indiscernible] says maximizing.  And two,

10   it had nothing to do with maximizing value for one equity

11   holder at the expense of a specific creditor, i.e. Fox, or if

12   there were going to be breaches, that will threaten the

13   solvency of the estates, other creditors, generally the case.

14   It had to do with the fact that there was one shareholder

15   that was in a control position, and two minority

16   shareholders.  And that one shareholder had engineered the

17   bankruptcy filing to try and eliminate their interest in the

18   debtor, which basically held an office building, and had

19   proposed a plan under which he was going to buy the building

20   back for an amount sufficient to pay off all creditors, but

21   not to pay anything to the other shareholders, and was going

22   to do that with any sort of auction process and so on.

23         And it was in those contexts that the Court cited

24   the need to protect the other equity interest holders from

25   one of them that was improperly using his control position to

     -- to benefit himself at their expense.

1           So, I think where that leaves us is -- is where we

2    started before Mr. Bennett got up, and that is, yeah, there's

3    a duty to maximize value.  It certainly runs to creditors, I

4    think in some cases it can run to equity holders.  But they

5    haven't made the case and they can't make the case that it

6    runs to equity holders when, to do that, you've got to

7    violate the contractual rights of the creditor and, to do

8    that, you have to put at risk recoveries to other creditors

9    because of the likelihood of breaches that will either --

10   that will one, make that contract unassumable, and then

11   threaten enterprise value; and two, create massive breaches

12   that, in and of themselves, could make the estate insolvent.

13           That, of course, takes us to the issue of business

14   judgment, or, in our view, entire fairness.  And -- and we

15   don't think they can make the case today, because one, I

16   think you will hear that the process is not going to create

17   value in the way that they would like Your Honor to believe

18   that it is; two, it's going to create claims against the

19   estate that wouldn't otherwise be there, or at least the risk

20   of claims; and three, it's -- I don't think they're going to

21   be able to implement it the way they -- they contemplate.

22           So I don't think they can meet their -- their

23   business judgments standard.  And if I could just take a

24   second with Mr. [Indiscernible], I just want to make sure I

25   haven't missed anything.

             THE COURT:  Sure.

66

1          MR. WERKHEISER:   Your Honor, I should note one

2   other issue ,I think, that ties back, sort of ties it back

3   altogether, and these are very fundamental breaches.   They go

4   to the heart of the contract.   And they're going to force the

5   issue on assumption and rejection, probably sooner rather

6   than later.

7          Our agreement calls for us to make another royalty

8   payment in January.   And -- which I don't have the exact

9   number at my fingertips, but it's, you know, seven digits,

10  eight digits, perhaps.   And we were not going to be able to

11  sit around and wait to see whether we're being injured in the

12  process, and then cough up a large sum of money when we're

13  not getting the benefit of our bargain.   So, you know, one

14  way or the other, this issue is going to come to a head

15  sooner rather than later.   We think the better choice is

16  sooner, because later means, then, there's going to be more

17  substantial claims against the estate that they're going to

18  be in the duchy with everyone.

19          Thank you, Your Honor.

20          THE COURT:   Thank you, Mr. Werkheiser.

21          MR. MARINUZZI:   Good afternoon, Your Honor;

22  Lorenzo Marinuzzi, Morrison and Foerster, on behalf of the

23  Official Committee of Unsecured Creditors.

24          I'm going to try to be brief, Your Honor.   We're

25  here on a motion asking authorization approval to conduct the

    sale process for media rights.   Various times this afternoon,

1   I've become a bit confused as to whether we're here on the

2   settlement with Major League Baseball, whether we're here on

3   a motion to terminate exclusivity, or some other matter.

4           Let me -- let me back up and explain where the

5   Committee started in this process.  When this case filed,

6   Committee was told and everybody was told everybody was going

7   to get paid in full, it's -- it's a "solvent debtor," there's

8   a lot of value here.  It's our job, as the Unsecured

9   Creditors Committee, to make sure that happens. And when the

10  Debtors initially filed, they told the world they intended to

11  try to sell the media rights.  And Fox Sports objected, as

12  did Major League Baseball.  And ultimately, the Debtors filed

13  their motion.  And when the Committee evaluated the motion,

14  and where the case was and where the case was headed, we said

15  -- filed an objection.  We said, Judge, unless the Court

16  finds that they can effectuate this sale and still become a

17  franchise that plays in Major League Baseball's franchise --

18  let's -- with Major League Baseball teams, then what's the

19  point of the exercise?  Because we're going to wind up with a

20  franchise that has no value and this is all for nothing.

21          And, as we proceeded down that path, fortunately,

22  there's been a settlement with Major League Baseball, which

23  eliminated what we viewed as the biggest hurdle to come out

24  of bankruptcy.  And -- and that settlement agreement was

25  filed yesterday, and as a result of the filing, we've

    withdrawn our objection on exclusivity and what was our

1    rights on the settlement.  But we're glad we at least got
2    past that point.
3            So what we have now is a motion to sell the media
4    rights after the termination of the current agreement.  And
5    -- and I -- I started by saying we're supposed to be paid in
6    full.  It's our job to make sure we maximize value. I'm sure
7    Your Honor has seen many cases where people think they're
8    getting a hundred cents and they don't, or people think
9    they're getting 25 cents, and they wind up with 50 cents,
10   pleasant surprise.
11           We're not here to put more money in Mr. McCourt's
12   pocket.  We're here to maximize value and make sure that the
13   unsecured creditors get their one hundred cents.  And -- and
14   so once we got past Major League Baseball's objection, and we
15   looked at the sale process, and -- and viewed it as a way to
16   protect this hundred cent recovery, or ensure that we're
17   going to have this hundred cent recovery, we said, okay, what
18   about the Fox agreement Fox's rights?  And, look, we
19   understand that Fox doesn't want this process to go forward.
20   You can understand why, if you're Fox.
21           And so what the Debtors put together was what we
22   viewed as a process that would give Fox the essence of what
23   Fox bargained for, and yes, it's a different time frame, but
24   they're getting their 45-day No-Shop.  And importantly,
25   because we didn't want to wind up with a process that
     resulted in the creation of hundreds of millions of dollars

69

1    of additional claims that Fox would assert, because then

2    we're probably worse off.

3            What the process also does is it gives everybody an

4    opportunity to decide whether there is, in fact -- well, Your

5    Honor has to decide, but Fox will assert, the Debtors will

6    oppose, the Committee will oppose, whatever assertion of

7    damages Fox has.

8            And so that happens before there's a sale.   It

9    happens a little bit after the exclusive negotiating curve

10   with Fox contemplated under these procedures expires, and

11   maybe we'll revisit that with the Debtors.   But Your Honor's

12   going to have the opportunity to tell us they have a big

13   claim or they don't.   And -- and if they would have a big

14   claim as the result of a sale, we're certainly going to go

15   back to the Debtors and say we don't think this makes sense.

16           And -- and if the result of all of this is a claim

17   that's the minimus, and we think ultimately -- and we'll --

18   we'll brief the claim when we get to the claim, we're not

19   there yet -- if that's the result of all this, then we've

20   ensured a hundred cent recovery for the unsecured creditors.

21   Okay if Mr. McCourt gets some value out of that.   Our job is

22   to make sure we get our value.

23           Now, questions that have been raised, issues that

24   have been raised by Fox, I think this process allows Your

25   Honor to answer these questions.   Is it a material breach?

     Your Honor will answer that.   Are there damages arising from

70

1    this material breach?  Your Honor will answer that.  Your

2    Honor will do it in a time that allows the Debtors to stop

3    the process.

4           As it relates to the Major League Baseball

5    settlement agreement, that's also being teed up.  And I

6    thought I heard some arguments that maybe we don't have the

7    sale agreement or the sale process start until Your Honor

8    decides that.  Our view on this is -- and the Debtors can

9    correct me if I'm wrong -- if Your Honor doesn't approve the

10   settlement with Major League Baseball, then as far as this

11   Committee's concerned, we're back where we were three months

12   ago where we said, whoa, let's not do this, because if we

13   don't have a deal with Major League Baseball, then what's the

14   point of having sale process, because you can't get out of

15   bankruptcy.

16          And so if Your Honor doesn't approve that

17   settlement, then we'd like to thin the Debtors would withdraw

18   the sale process and we figure out where to go from that

19   point on.

20          Let's see, I want to make sure I didn't miss

21   anything, Your Honor.  I'm not going to respond directly to

22   Fox's points.  I'm sure Mr. Bennett will do that.  But -- but

23   I think the important thing to remember, Your Honor, is -- is

24   this has been framed as a -- a Mr. McCourt issue.  It's not a

25   Mr. McCourt issue as far as we're concerned.  We're here to

     maximize value and we think the sale process does that.  We

71

1   want our hundred cents and we think this is the process to

2   ensure we get our hundred cents.

3            THE COURT:  All right.

4            MR. MARINUZZI:  Unless, Your Honor, has any

5   questions?

6            THE COURT:  No, I don't.  Thank you, Mr. Marinuzzi.

7            MR. MARINUZZI:  Thank you, Your Honor. Thank you.

8            THE COURT:  Thank you, sir.  Anyone else before Mr.

9   Bennett speaks?  All right, Mr. Bennett, the floor is yours.

10  Does anyone need a brief recess?  All right, let's take a 10

11  minute recess and then we'll resume.

12       (Recess 2:54:20 to 3:05:18)

13            THE CLERK:  Please rise.

14            THE COURT:  Thank you, everyone.  Please be seated

15  and please never hesitate to ask for a recess, I get caught

16  up in the arguments, and I forget sometimes.

17            MR. BENNETT:  Your Honor, this is really isn't the

18  response I just -- if there was ever any doubt if at the end

19

20  of the testimony the Court believes that we have missed at

21  reproducing the Fox procedures in any material way, hope and

22  praying, which I don't think we did, of course, we're going

23  to change it.  We're ready to begin evidence.

24            THE COURT:  All right, thank you, Mr. Bennett.  Mr.

25  Levinson, you may call your witness, sir.

Coleman - Direct                          72

1        MR. LEVINSON:  Thank you, Your Honor.  Your Honor,

2    the Debtors call Tim Coleman.

3        THE COURT:  Mr. Coleman.  Thank you, Mr. Coleman,

4    good afternoon to you; if you would just remain standing

5    while you're sworn.

6        TIMOTHY R. COLEMAN, DEBTORS' WITNESS, SWORN

7                    DIRECT EXAMINATION

8        THE COURT:  Thank you, Mr. Coleman.

9        MR. LEVINSON:  Good afternoon, Mr. Coleman.

10       MR. COLEMAN:  Good afternoon.

11   BY MR. LEVINSON:

12   Q.  Mr. Coleman, where are you employed?

13   A.  I am employed at the Blackstone Group.

14   Q.  And what is your position at Blackstone?

15   A.  I am a Senior Managing Director, and I run the

16   restructuring group there.

17   Q.  Can you describe the services that are provided by the

18   restructuring group at Blackstone?

19   A.  Sure, we work with all sorts of situations where

20   companies are in distress.  So we work for Debtors, we work

21   for non-Debtors, we work for Creditors, we work for people

22   trying to buy companies like that and sell companies like

23   that.

24   Q.  And how long have you been in the restructuring business?

Coleman - Direct                                    73

1    A.   I started in 1982.  I took two years off, and other than

2    that I've been in the business that entire time.

3    Q.   And how long have you been at Blackstone?

4    A.   I've been at Blackstone twenty years in February.

5    Q.   And during the period of time that you've been at

6    Blackstone do you have sense of how many engagements in the

7    restructuring area that Blackstone has been involved in?

8    A.   We've done approximately 300 assignments for about a

9    trillion dollars of liabilities.

10   Q.   Can you identify some of Blackstone's and your

11   representative engagements?

12

13   A.   Sure, we've worked on Tribune.  We've worked on Delta.

14   We've worked on Enron.  We've worked on Flying J.  We've

15   worked on Sen Group.  We've worked on The Enterprises, a

16   whole number of them.

17   Q.   Did any of those engagements involve the media industry?

18   A.   Yes, Lee Enterprises, which is a company that's announced

19   that we're going to be filing a pre-pack within a week, is a

20   newspaper company.  Tribune, I think this Court is very

21   familiar with, is a media company.  Philly News we

22   represented Creditors; probably also familiar with that name.

23   Star Tribune where we represented the Debtors, so we've done

24   a high number of media companies.

25

Coleman - Direct                          74

1    Q.  And have any of the -- any of Blackstone's engagements

2    not limited to the media industry necessarily been, have they

3    involved representing Chapter 11 Debtors?

4    A.  Yes, a very high percentage of them.  More than 50% of

5    our business is Chapter 11.

6    Q.  And in those cases, were you involved in developing

7    strategies for those companies?

8    A.  Yes, every company we work with.  One of the first things

9    we do after we figure out whether the company is stable day-

10   to-day, week-to-week basis, is to work with the company on

11   its business plan to figure out what needs to be changed to

12   help the company turn itself around.

13   Q.  And generally speaking for these companies, these

14   distressed companies, what strategic objectives does

15   Blackstone seek to help those companies achieve?

16   

17   A.  You know we try to help them figure out how to -- if

18   they're not cash flow positive we try to figure out how to

19   help them become cash flow positive, work on the entire

20   income statement side of the ledger.  And then once we've

21   done that, we work with them on their balance sheets to have

22   the balance sheet actually match what the company is capable

23   of producing.  So that typically means a debt conversion, or

24   something like that so that the company can leave Bankruptcy

25   and go on and prosper.  And there are lots of examples of

1   companies that we have done that with that have gone on to be

2   a great companies today.

3   Q.   And what is -- is there sort of an ultimate objective in

4   connection with these companies?

5   A.   In every one of them through all of those things we're

6   trying to maximize the value of the company.

7   Q.   Have you been involved in engagements for distressed

8   companies where the companies made the decision to sell

9   either its assets, or its equity?

10  A.   I have.

11  Q.   And have any of your prior engagements involved advising

12

13  companies on how to implement an effective marketing and sale

14  process?

15  A.   Yes.

16  Q.   And can you provide any examples of that?

17  A.   Sure, Cable and Wireless we've sold the entire company

18  including it's enterprise rights; Williams Communications we

19  sold a very big piece of that business; Money Gram it started

20  out as actually somebody else trying to do a pipe, and we

21  ended up selling I think it was 85% of the company,

22  eventually the entire company.  Flying J, we sold the entire

23  company.  Enron, I think, we sold ten companies.  Sen, I

24  think, we sold eight companies.  We do this a lot.

25

Coleman - Direct                                      76

1    Q.  And whether a restructuring occurs either through a re-

2    organization, or in the case of the sale, does the objective

3    of the company and it's - and Blackstone advising the company

4    change as far the ultimate strategic objective?

5    A.  Not really, you know, to sell a company you want it to be

6    in the condition it can be in to reorganize a company, you

7    want to make it into the best condition it can be in.  So

8    they're really pretty similar up until that point of either

9    reorganization or sale.

10   Q.  Have you ever been qualified as an expert witness in the

11   area of financial restructuring?

12

13   A.  Many times including in Delaware.

14        MR. LEVINSON:  Your Honor, I'd move to qualify Mr.

15   Coleman as an expert in the area of restructuring.

16        THE COURT:  Any objection?

17        MR. TEKLITS:  We have no objection, Your Honor.

18        THE COURT:  All right, he is so qualified.

19        MR. LEVINSON:  Thank you, Your Honor.

20        THE COURT:  Yes.

21   BY MR. LEVINSON:

22   Q.  Mr. Coleman, when did Blackstone first become involved in

23   the Chapter 11 restructuring of the Debtors?

24   A.  We started working with the Dodgers in July of this year.

25

Coleman - Direct                    77

1   Q.   And prior to then did Blackstone provide any services to

2   the Debtors, or their affiliates, or to Frank McCourt?

3   A.   No, none.

4   Q.   What was your understanding at the, you know, back in

5   July of Blackstone's assignment when it became engaged by the

6   Debtors?

7   A.   What I've described which is like all Debtors we get in,

8   look at the company, figure out what the issues are, work on

9   the revenues, understand why, you know, obviously that

10  revenues were down from prior years, and obviously every

11  piece of that trying to maximize the value of that overall

12  estate.

13

14  Q.   So the scope of the assignment here wasn't different, any

15  different from the typical scope of assignments for a Chapter

16  11 Debtor?

17  A.   No they're all, they're all -- there's a general amount

18  of them that are all the same, and then, of course, each one

19  has its own unique qualities, but this was essentially the

20  same as most of them.

21  Q.   At the time that Blackstone was first engaged in early

22  July, can you describe generally the efforts that you and

23  others had Blackstone undertook to be in a position to

24  evaluate strategic alternatives for the Debtors?

25

Coleman - Direct                          78

1    A.  Sure, we have a large team of people that have been out

2    at the company working on the companies business, business

3    plan, looking at liquidity, looking at revenues, looking at

4    expenses, looking at every aspect of this company to figure

5    out how to find it in the best position for it to exit

6    Chapter 11.

7    Q.  You mentioned liquidity, what initial conclusions did you

8    reach with respect to the Debtors' liquidity situation?

9    A.  Well, initially I started prior to the Debtor in

10   Possession hearing, so one conclusion was we needed a Debtor

11   in Possession loan.  After that, obviously, the loan that was

12   put in place was very helpful.  It's $150 million dollars.

13   It eased the liquidity issues that the company had, but it's

14   a obviously a short term solution.  It isn't a, you know,

15   five year solution or something like that.  So while

16   liquidity is good and decent for the team, the team needs to

17   move along and figure out a long term solution.

18   Q.  And during your initial evaluation, what assets or

19   opportunities did you identify as available to address this

20   long-term need for liquidity?

21   A.  Well the most obvious asset would be the telecast rights.

22   Q.  And why is that?

23   A.  There are, first of all they are prior to the contract

24   that expires at the end of 2013 so that's something that's

25

Coleman - Direct                          79

1    coming up soon.  It's something that we can monetize.  There

2    had been an agreement which has already been mentioned today

3    with Fox that would have brought in a lot of cash into the

4    Debtor; $385 million dollars ultimately which would have gone

5    back to the Debtor as time went on.  It was sort of started

6    originally going elsewhere, but $385 million dollars and

7    another $45 million dollars that would have been spread

8    across 2012 and 2013.  So it's an obvious place to look for

9    liquidity and long-term stability for the company.

10   Q.  What strategy did the Debtors initially pursue in the

11   bankruptcy case to realize this potential liquidity source?

12   A.  Right, the goal was to maintain the same ownership of the

13   team, so we looked at the telecast rights and made a decision

14   to move forward and file a motion to sell those rights.

15   Q. And that motion was filed in mid September of this year?

16   A.  I think that's right.

17   Q.  Was it your opinion that from a financial standpoint the

18   Debtors could have successfully implemented that strategy?

19   A.  Yes, I think it was a very viable strategy.

20   Q.  And why do you say that?

21   A.  Well I think they are a lot of people interested in these

22   rights.  The motion would have had to been approved here in

23   Court, but assuming it was approved, it was a logical step.

24   There's a, you know, you can pick up any media source today

25

Coleman - Direct                                    80

1    and find a lot of interest in those telecast rights.

2    Recently, Time Warner just did a very large deal in Los

3    Angeles same market, obviously, with basketball not baseball,

4    but it seemed logical to us that somebody would be interested

5    in them including possibly Fox.

6    Q.   In terms of -- had that motion gone forward in that form

7    and been approved, what do you think what have been the

8    ultimate impact on the business?

9    A.   Well I think would have succeeded in either striking a

10   deal with Fox or selling to somebody else, and I think that

11   would have brought in a large amount of cash, depending on

12   how it was negotiated a large amount of liquidity and cash

13   which would have given the team the ability not only to

14   survive in the short-term, but it would have given it the

15   ability to pay of the Debtor in Possession loan and exit

16   bankruptcy on relatively expeditious, in a relatively

17   expeditious way.

18   Q.   Now how did -- under the original telecast rights motion,

19   what was the process that was contemplated to market the

20   telecast rights?

21   A.   It was based somewhat off of the existing Fox agreement.

22   There was a 45 day negotiating period with Fox between the

23   team and Fox, and then at that point Fox -- the team would be

24   able to use that agreement as a stalking horse, and go out

25

Coleman - Direct                          81

1    and test the market to see if there was anybody else that was

2    interested.

3    Q.   So and you've heard in the Courtroom during the opening

4    argument by counsel references to the Fox contract and the

5    different provisions, I think, what Mr. Bennett called the

6    negotiation provisions.  Did you take those provisions into

7    account in designing the original process?

8    A.   Yes.

9    Q.   And you reviewed the Fox contract at that time to

10   familiarize yourself?

11   A.   The entire team did including me.

12   Q.   Okay.  I'd like to direct you to Exhibit 1.  It's in the

13   binder that should be right in front of you; the small binder

14   and ask you if you recognize this as a copy of the Fox

15   contract with the various amendments that you've just

16   referred to?

17   A.   Yes, this is the telecast rights agreement which was put

18   in place in 2001, and there are several -- a couple of

19   amendments to it, and they appear to all be here.

20          MR. LEVINSON:    I'd like if I could, I put a yellow

21   sticky for your convenience, but it's a -- it's in the first

22   amendment page 2, so if you to page 35, and then you skip to

23   page 2.

24          MR. COLEMAN:  Okay.

25

Coleman - Direct                                82

1        THE COURT:   Thank you.

2    BY MR. LEVINSON:

3    Q.   This provision is from the first amendment that was put

4    into effect in February of 2004, do you see that?

5    A.   I do.

6    Q.   Okay and I want to direct your attention to the provision

7    toward the top where it says B end of term right of first

8    negotiation, do you see that?

9    A.   I do.

10   Q.   And can you describe generally what this provision

11   provides?

12

13   A.   This is an exclusive negotiating period between Fox and

14   the Dodgers.  It was set up to occur between October 15th in

15   2012 and November 30th of 2012, 45 days during, which

16   obviously, hopefully, an agreement would be reached.  It

17   would be for a term of at least -- the negotiation was for a

18   new deal that would have a term of at least five years.  It

19   would start with the 2014 season.

20   Q.   The -- just taking the existence of a 45 day exclusive

21   negotiation period that was in this contract, did that did

22   that aspect of the Fox contract concern you?

23   A.   Forty five days doesn't bother me at all, the timing of

24   it does in terms of the calendar, but in terms of length of

25   time of 45 days, no that doesn't that doesn't concern me.

Coleman - Direct                    83

Q.  And when you say calendar, you're referring to the

provision in that or the sentence at the bottom of the

provision that says there can be no solicitation or

negotiation prior to November 30th, 2012?

A.  Yes, if we want to sell the media rights it's obviously

this would prevent any discussions with anybody until

November 30th, which is quite a ways down the road, and it

really doesn't work for the team.

Q.  So I take it that was an issue of concern to you and

others at Blackstone?

A.  This was an issue of great concern.

Q.  Have you ever been involved in a bankruptcy case that

involved no-shop provisions similar to the one in this

contract?

A.  I don't recall any, you know, we put them in when your

negotiating with a new buyer; sometimes they want a no-shop

for a period of time.  You've probably approved those before

in bidding procedures, but I've not seen them like this that

would halt some bankrupt company from actually being able to

sell its assets or some of its assets.

Q.  So that would be equivalent of like the first -- the 45

day no-shop period?

A.  Correct.

Q.  But not beyond that?

1   A.   Correct.

2   Q.   And as such, a provision the extended no-shop period that

3   goes out to a year from now, has such a provision ever been

4   enforced in bankruptcy to the best of your knowledge?

5   A.   Not to my knowledge, nothing that we ever -- that I ever

6   been involved in, and I had not heard of any of my partners

7   either that have been involved in something like this.

8          MR. WERKHEISER:   Your Honor, I'm going to object to

9   this question.   I don't think he's a lawyer.   He's not going

10  to give legal testimony about precedent.

11         MR. LEVINSON:   My question went to his experiences

12  at Blackstone and --

13

14         THE COURT:   Yes.

15         MR. LEVINSON:   -- what's he's observed in those

16  cases.

17         THE COURT:   Yes, I don't think he was being asked to

18  reply on the legality of the no shop provisions, so I'll

19  overrule the objection.

20  BY MR. LEVINSON:

21  Q.   Mr. Coleman what would be the effect of being unable to

22  market the right to license the telecast rights until the end

23  of 2012?

24  A.   Effect on the team?

25  Q.   Yeah and the ability to market the assets.

Coleman - Direct                        85

1   A.   Well it would be very obviously damaging because we

2   wouldn't be able to enter into any of the negotiations with

3   really anybody.  Fox would not have any obligation to do so

4   either which would mean we could not go and seek the

5   liquidity that the team needs now for the term of the

6   bankruptcy and for the exit of the bankruptcy, so it would be

7   extremely damaging for the team.

8   Q.   Now I would like you if you -- I'd like to turn your

9   attention to the next provision on that same page, the one

10  that has right of first refusal at the very beginning.  It's

11  section, I guess, it's now the amended Section 2(c) of the

12  agreement, do you see that?

13  A.   I do.

14  Q.   Okay.  And can you explain your general understanding of

15  that provision and how it operates?

16  

17  A.   Sure.  This is the right of first refusal.  What happens

18  here is after the 45 days where the exclusive negotiation has

19  occurred if there is no deal between the two parties, Dodgers

20  have the ability over a five business day period to think

21  about or to actually put on the table a final offer one which

22  they would obviously love to have Fox accept.  Fox then has

23  30 days to determine whether they are interested in that

24  offer.  During that period of time both in the five days the

25  Dodgers are allowed to go out and speak to other parties in

Coleman - Direct                          86

1   the marketplace including the 30 days, so they can get a read

2   of the market during those five business days and then

3   continue to talk to people in the period when Fox was making

4   a decision about what they think of the final offer.

5       The way it works is if Fox accepts the deal then

6   subject to MLB and other conditions, then that deal would

7   move forward.  If Fox does not accept the deal then the

8   Dodgers have the ability to go into the market and look for

9   somebody who would top that offer.  If they find somebody who

10  tops it then that's the deal.  They can sign with those

11  people again subject to the same kinds of conditions, MLB

12  approval and things of that nature.  And if they don't they

13  find something that is lower, then they are supposed to come

14  back to Fox and make that lower offer available to Fox.

15

16  Q.  Now is there an a -- is there an exception in the in the

17  Fox contract in paragraph 2(c) to this right of first

18  refusal?

19  A.  There is.

20  Q.  And what is that exception?

21  A.  It's quite a ways at the end.  It's C; I call it

22  Romanette 2.

23  Q.  That's on the next page, on page 3?

24  A.  Yes, it's on the next page.

25  Q.  Okay, and can --

Coleman - Direct                          87

1    A.   Two days, there's no obligation for the team to actually

2    accept the offer on the table number one; and, number two if

3    they so chose at the point in time they could actually go out

4    and set up their own RSN Regional Sports Network, you know,

5    of their choosing.  They would continue to own the highest

6    percentage of anybody that would be part that, and they would

7    not be allowed to have three different entities be in the

8    equity which are Comcast, Time Warner, and ESPN.  So other

9    than that, they could out and find other parties that might

10   join them in the RSN, but they could completely ignore all of

11   this and go off and do their own RSN.

12

13   Q.   Right and this would be even if Fox had accepted the team

14   final offer.

15   A.   That's correct.

16   Q.   How did the -- I want to talk about the original motion

17   again for a second, go back to September mid September.  How

18   did the marketing procedures under the original motion seek

19   to deal with the negotiation provisions of the Fox contract?

20   A.   They had to in terms of the 45 days there was a 45 day

21   period which was exclusive negotiation just like the first

22   one.

23   Q.   Okay, but with respect to the right of first refusal was

24   the procedures that you've described, were they incorporated

25

Coleman - Direct                              88

1    into the original marketing procedures?  The five day, the

2    team final offer.

3    A.  All right, no.  The way it works is that there was a 45

4    day negotiation period and whatever that deal that had --

5    assuming their was one struck with Fox then the team had the

6    right to go out and actually use that as a stalking horse bid

7    and see if they could top that bid.

8    Q.  Yeah, whether or not Fox was a stalking horse, did Fox

9    have certain rights that were given under the original

10   procedures, you know, right to participate in the auction

11   that was going to take place or anything along those lines?

12

13   A.  Well, I'm sorry, absolutely, Fox could be in that process

14   and if somebody bid then they also could bid.  Obviously they

15   would have a benefit because if they had bid protections,

16   which you were assume some of those would have to do with

17   perhaps a -- some kind of a break up fee, or something like

18   that.  That would be a benefit for each time somebody else

19   bid, they could obviously bid less -- they could bid more,

20   but effectively bid less because of the break up fee concept,

21   and it probably would have been, you know, some kind of

22   provision which would make the other parties perhaps bid in

23   larger increments or something like that.  Whatever those

24   protections would be Fox would be at a benefit from those

25   protections, but they could continue to bid all the way up.

Coleman - Direct                          89

1   So if somebody bid they could overbid and somebody bid they

2   could overbid.  There was no limitation of Fox's ability to

3   continue in this process.

4   Q.  So even if even if they weren't the stalking horse, they

5   still have the ability to participate in the auction and

6   overbid if they wanted?

7   A.  There was no limitation on them, or anyone else for that

8   matter, from having an opportunity to participate in that

9   auction.

10  Q.  In your opinion was granting Fox the right to participate

11  in the auction and perhaps become a stalking horse, better or

12  worse for Fox than negotiation rights that exist under the

13  Fox contract?

14

15  A.  You know we've had that debate.  I actually think it was

16  better for them because it gave them the ability to continue

17  to stay in the game.  If you assume Fox wants to be in this

18  situation, which I believe they do, or we wouldn't be here

19  today.  It gives them the opportunity to continue to bid.

20  The other process was a right of first refusal, but once that

21  was done if the final offer was put on the table and they

22  didn't accept it, which you know they didn't have control

23  over what that offer would be, then they would find

24  themselves in a position where somebody might go out -- the

25  team might would go out might find somebody else for a very

1  small amount above that and they would lose and have no

2  recourse to that.

3  Q.  And likewise with -- we looked at that provision (c)

4  Roman Numeral 2, how would Fox have faired under the original

5  procedures in terms of that particular provision?

6  A.  They would have been able to -- they would have been able

7  to buy.  They would have been able to participate in the

8  auction that was going to be a full stop auction.

9  Q.  Right, so there wouldn't have been this exception where -

10  -

11

12  A.  No, the RSN was dropped from the concepts, so they would

13  have been able to go forward and seal this deal if you would.

14  Q.  Now the telecast -- we've said the telecast rights motion

15  was filed in mid September, were there any objections filed

16  to that motion?

17  A.  There were some objections, yes there were.

18  Q.  And who filed objections?

19  A.  Pretty much everybody in this room except for the

20  Dodgers.  MLB filed an objection, the Committee filed an

21  objection, and Fox filed objections; the three largest

22  objections.

23  Q.  And what was the -- what was MLB's objection?

24  A.  MLB had been very clear they would like to see the team

25  sold and every part of their objection was sell the team, do

Coleman - Direct                                  91

1   not go out and market these rights and don't market these

2   rights separate from the team.

3   Q.   What about Fox?

4   A.   Fox wanted to see -- they didn't want to see this go

5   forward.   They wanted to keep the benefit of the deal that

6   they put on the table.

7   Q.   Did Fox also take the position that the team should be

8   sold?

9   A.   I don't recall that.

10  Q.   Okay and how about the Committee, what was their

11  position?

12  A.   The Committee was in the same boat, they wanted to see

13  the team sold, and that was what they -- the position they

14  took.

15  Q.   Did the Debtors ultimately change the original business

16  strategic plan to emerge from bankruptcy?

17  A.   We did.

18  Q.   And how did that come about?

19  A.   We have had a very lengthy negotiation with MLB moderated

20  obviously by Judge Farnan.   And in that process there was an

21  agreement finally to sell the team and all of its media

22  rights; the stadium and the land under the stadium.

23  Q.   Okay and you were you were involved in that mediation?

24  A.   Yes.

25

Coleman - Direct                          92

1  Q.  And are you familiar, you're familiar with the agreement

2  that was reached between Major League Baseball and the

3  Debtors?

4  A.  I am.

5  Q.  How did the agreement with MLB to sell the team impact

6  the relief that was sought by, or sought by the Debtors in

7  connection with the marketing procedures?

8  A.  I'm sorry could you repeat that?

9  Q.  Sure.  The agreement with MLB did it because Blackstone

10  to reevaluate the marketing procedures that were on the table

11  previously?

12  A.  Yes, yeah obviously we have different procedures here

13  

14  now.  If you're selling the entire team it's -- you're

15  selling the team.  You're selling the media rights; you're

16  selling all of that.  The agreement is to sell the media

17  rights and the team attached in a control person kind of way,

18  so it meant that we couldn't go forward with the other

19  option.

20  Q.  And did -- the fact that the, that there was going to be

21  now a sale process for the team, did that impact the thinking

22  on what the -- what procedures make sense in connection with

23  marketing the telecast rights?

24  A.  I -- we I think decided the auction concept wasn't going

25  to work as well.  We also obviously would like to see an

Coleman - Direct                              93

1    agreement with Fox on this topic, so we went back and altered

2    the terms to go back and try to as much as possible duplicate

3    what the Fox terms are in their existing agreement.

4    Q.  Now in the MLB agreement was there any prohibition on the

5    Debtors going forward with efforts to market the telecast

6    rights other than, other than the agreement that buyer that

7    the buyer of the team be able to approve any transactions?

8    A.   Yeah, there was there was no prohibition.  Obviously MLB

9    retained the right that they have to approve the buyer and

10   they insisted on a right that the buyer would have the right,

11   the perspective buyer would have the right to approve, or not

12   approve whatever deal was on the table for the media rights.

13   And that was their conditional agreement really is where they

14   pulled that from, so that they wanted to make sure buyers had

15   the absolute ability to do what they wanted to do.

16   Q.   The ability to go forward with marketing the telecast

17   rights, was that an important term of the agreement that was

18   to -- was that important to the Debtors in terms of the

19   agreement that was reached with MLB?

20   A.   Yes, it was essential.

21   Q.   And why is that?

22   A.   Well, we really firmly believe that the value of those

23   rights are better understood if there's a deal related to

24   those rights.  We would love to have a deal with Fox frankly.

25

Coleman - Direct                              94

1    The -- when one is selling an asset you look at that asset,

2    and you would like to have it have all of it's benefits shown

3    to everybody.  So as we look at it, it's sort of like an

4    empty building.  If you're selling an empty building you get

5    one price, and somebody has a dream as to what they think

6    they can lease that building out for, but their dream

7    typically is not the same dream that you have.  If you think

8    you can lease that building out for a lot of money, and you

9    do that and then they put the building on the market, it's

10   very different transaction than if you put an empty building

11   on the market.  We've seen that obviously in this market

12   quite a bit, and you can show lots and lots of examples of

13   those where somebody is selling something that is less

14   tangible, so our goal would be to have a more tangible piece

15   of the media rights.  These were expiring at the end of 2013.

16   It's too short.  We would very much like to see the contract

17   set up so that the buyers would have the option to consider

18   that contract and understand its value.  Also when the buyers

19   are looking at the acquisition they're thinking about debt

20   financing, and if they have a tangible offer sitting in front

21   of them that would help them in the capital markets to be

22   able raise money because a lender could see that they're, in

23   fact, was real cash flow to those contracts.

24

25

Coleman - Direct                                    95

1    Q.  I'd like to turn your attention Exhibit 6 in the small

2    binder.  And if you could tell what this exhibit is?

3    A.  These are the amended marketing procedures that were

4    followed, we'd like to follow.

5    Q.  And these marketing procedures, were you and others at

6    Blackstone involved in the sort of re-design of the

7    procedures that are now -- whose approval is now being

8    sought?

9    A.  Yes, obviously, we're the ones marketing the company

10   including the media rights, so we're very actively involved

11   with this.

12   Q.  And again, these amended marketing procedures, these

13   would have been to address, to conform to the MLB agreement,

14   and also to address the objections that Fox had raised about

15   --

16   A.  Yes.

17   Q.  -- about this.

18   A.  Yes, that was the goal.

19        MR. LEVINSON:  What I'd like to do is first, Your

20   Honor, move to admit Exhibit 1 and previously the Fox

21   contract, and then also move to admit Exhibit 6.

22        THE COURT:  Any objection?  Mr. Werkheiser or Mr.

23   Teklits?

24        MR. WERKHEISER:  Your Honor, no objection.

25

Coleman - Direct                              96

1          THE COURT:  All right, they are admitted then, and

2    as Debtors, obviously, Debtors' Exhibits.  We'll leave them,

3    they're numbering the same of course.

4       (Debtors' Exhibits 1 & 6 received into evidence)

5          MR. LEVINSON:  Yes, thank you, Your Honor.

6          THE COURT:  Yes.

7          MR. LEVINSON:  And if I could --

8          MR. WERKHEISER:  Your Honor, I'm sorry just one

9    question that I -- as Exhibit 6, I just want to confirm what

10   version of the procedures we're all working on.

11

12         MR. LEVINSON:  The version that's in the binder as

13   Exhibit 6.

14         MR. WERKHEISER:  Was this -- and I apologize there,

15   I think there was a supplemental -

16         MR. LEVINSON:  We just sent it yesterday.

17         MR. WERKHEISER:  -- just last night, and that's

18   what's in the binder at this point?

19         MR. LEVINSON:  It's in my binder.

20         MR. WERKHEISER:  Thank you.

21         THE COURT:  Is it in -- let me just ask him a

22   question; I'm sorry, is it in my binder or is that a document

23   that came over separately?

24         MR. LEVINSON:  It should be in your binder, Your

25   Honor.

Coleman - Direct                    97

1          THE COURT:  Okay, very well.

2          MR. LEVINSON:  But most importantly do you have an

3    Exhibit 7 in your binder, because that's where we're going

4    next.

5          THE COURT:  Okay, I don't have the 7, but I've got

6    something here.

7          MR. LEVINSON:  If not I can, Pat do you have that

8    copy?

9          THE COURT:  Yes, thank you; thank you, Mr. Levinson,

10   I have document that came over over later in the day; oh

11   thank you.  All right, I'm going to get rid of this one.

12   Thank you, sir.  Okay.

13

14         MR. LEVINSON:  And I actually -- I want to focus on

15   Exhibit 7.  This I'll just -- just to provide some context,

16   Exhibit 7 is a blackline that shows the changes between

17   paragraphs 22 through 33 of the motion that we filed on

18   November 12th; the amended motion versus what the current

19   marketing procedures are that were just admitted into

20   evidence as Exhibit 6, and I want to focus on Exhibit 7

21   because I think it would be a little more helpful just to be

22   able to the recent blackline changes that have occurred as we

23   go through this document.

24         THE COURT:  Very well.

25   BY MR. LEVINSON:

Coleman - Direct                                98

1  Q.  And Mr. Coleman you're familiar with Exhibit 7 as well?

2  A.  I am.

3  Q.  Okay, I'd like to start with Section (a) the assets to be

4  marketed, and if you could describe for me what this -- what

5  Section (a) provides?

6  A.  Okay.  What this talks about is the offering of

7  approximately 150 not approximately 150 regular Dodger season

8  games.  There was a discussion earlier about 162, 12 of those

9  are post season, 50 of those are produced by K-Cal right now,

10  and there are 100 that are produced by Fox.  So a 150 regular

11  season Dodger games, that would be for a term of least five

12  years beginning with the 2014 Major League Baseball season,

13  and as you can see it's telecast on cable television etc., in

14  the language over the air television, English, Spanish etc.,

15  etc.

16  etc.

17  Q.  Now just so on the term of at least five years beginning

18  with the 2014 MLB was including this an exhibit; I'm sorry in

19  Section (a) was is the intent that whatever agreement would

20  be entered into under these procedures would have those --

21  would have those particular terms?

22  A.  Yes.

23  Q.  Okay, so if it was team final offer whatever might come

24  down the road they would include that?

25  A.  Correct.

Coleman - Direct                                99

1  Q.   Okay.  Now I see that there's a reference to over the air

2  television, do you know whether or not over the air

3  television is subject to cable rights, or is that something

4  different?

5  A.   Well it's including all of the things that would not be

6  on regular television, so I understand it to be.  I'm not the

7  media expert as you know, but that's my understanding.

8  Q.   Okay.  And I see there's a provision in here, there's a

9  parenthetical I think it was referred to during counsel for

10 Fox -- Fox counsel's opening argument which says e.g., less

11 than all games, less than all permitted distribution

12 platforms, and are less than all permitted languages.  Was is

13 ever the intent of the Debtors to have a provision that would

14 be inconsistent with what the Fox contract would otherwise

15 require with respect to the package of rights that would be

16 sold?

17 A.   No this entire paragraph, the goal is to be identical.

18 Q.   Okay.

19 A.   I think the reason for less than all games is there are

20 150 games here.  Fox only gets 100 right now, so obviously

21 among other reasons you would say less than all games, but

22 this -- there's no attempt here to do anything other than to

23 mirror their contract.

24

25