1   Q.   Okay or, for instance, if the decision was made to do 100

2   games by cable and 50 games over the air, even after 2013?

3   A.   Right.

4   Q.   As an example, okay.

5   A.   Correct.

6   Q.   Is there anything in Section (a) that is inconsistent

7   with the negotiation rights under the Fox agreement?

8   A.   I'm sorry would you repeat that?

9   Q.   Sure, is there anything in Section (a) that you

10  understand to be inconsistent with the negotiation rights

11  under the Fox contract?

12

13  A.   Not to my knowledge.

14  Q.   Okay.  Let's take a look at Section (b) that's the one

15  entitled Team Sale.  What is being provided here?

16  A.   This associates selling the team, and the telecast rights

17  together and that is something I spoke about earlier, which

18  is a part of the MLB agreement, and that we have -- that

19  Dodgers have struck with MLB, which allows that it would --

20  which requires the team and the rights to be sold together.

21  That doesn't mean that you couldn't have a group that wants

22  to buy the telecast rights, and somebody wants to buy the

23  team and you marry them together, and they have different

24  ownerships, but they would be part of one control group, so

25

Coleman - Direct                                    101

1    that's very different than what we had in the original

2    telecast motion.

3    Q.  And is there anything in this Section (b) that is

4    inconsistent with the negotiation provisions under the Fox

5    contract?

6    A.  Not to my knowledge.

7    Q.  Okay I'd like to go to Section (c) Disclosure to

8    Perspective Team Owners; if you could describe the purpose

9    and function of this Section (c)?

10   A.  C is just to provide the perspective team owners with

11   what the terms of any telecast rights agreement would be, so

12   it's a relatively simple paragraph.

13   Q.  So this consistent with the notion of being able to

14   maximize value by creating a -- creating certainty with

15   respect to an agreement, and then being to provide that to

16   potential buyers.

17

18   A.  Right, one thing I didn't mention in B is the language

19   about entering into this telecast rights transaction shall be

20   in the sole and exclusive discretion of the buyer, or group

21   of buyers that purchases the team.  So this setting that up

22   so they can look at this and make a decision about whether

23   their interested in this deal.

24   Q.  Okay, and again anything in Section (c) that is in your

25   view inconsistent with the negotiation provisions under the

1  Fox contract?

2  A.  No.

3  Q.  Okay, if we could look at Section (d) the exclusive Fox

4  negotiation period, and if you could describe what is being

5  provided here?

6  A.  This is the 45 days we've spoken about previously.  This

7  is where Fox and the Dodgers would enter into a 45 day period

8  of trying to negotiate a deal, and see exclusively negotiate

9  a deal nobody else would be able to be contacted, or be part

10 of that negotiation.

11 Q.  And during right, -- so during this 45 days there would

12 be -- the Debtors would not be soliciting or negotiating with

13 any other potential licenses?

14

15 A.  That is correct.  The only thing that could happen here,

16 is if, in fact, the deal was struck during that period of

17 time, the Dodgers would go to their perspective team owners

18 because there could be at the point in time than one.  And

19 see if they had an interest in the deal that was on the table

20 as part of the overall team sale.

21 Q.  Okay, and again the ability of the buyer of the team to

22 approve this was part of the MLB consent?

23 A.  Right, that if you want to be consistent with the Fox

24 contract, the Fox contract had MLB approval.  MLB's approval

25 is on the settlement agreement that was filed.  MLB insisting

1   that the buyer's have to be able to have choice, that they

2   don't have to be stuck with whatever the Dodgers negotiate

3   during this period of time.  And so their consent is

4   contingent on a perspective buyer's consent, which is why I'm

5   answering yes.  It's consistent because that's how you get

6   around to it; that's what MLB is requiring.

7   Q.   Okay.  Now the period of time when this going to take

8   place which would be from November 30th to January 14th at

9   11:59 PM of 2012.  That's a different period than is

10  providing under the Fox contract correct?

11  A.   Right, that's obviously the biggest difference.  We --

12  the old contract that exists starts as everybody knows on

13  October 15th of 2012, this one would begin as of December 1st

14  of this year.

15  Q.   Do you view that as a material change?

16  A.   I really don't.  I don't think it's still in negotiation.

17  You're still talking about at the contract taking effect at

18  the end of 2013, going effective with 2014 baseball season,

19  so I don't see why there's a very big difference between

20  those.

21  Q.   Had there been circumstances where Fox is negotiated with

22  the Debtors with respect to the same telecast rights that are

23  now being sought to be marketed?

Coleman - Direct                                104

1   A.   Well, I -- yes obviously the one this summer in an

2   attempt to strike a deal with the Dodgers that was put forth

3   that MLB rejected.

4   Q.   Let's take a look at Section -- oh another than, I'm

5   sorry other than shifting the 45 day time period from the end

6   of 2012 until now, is there anything in Section (d) that is

7   inconsistent with the negotiation provisions of the Fox

8   contract?

9   A.   No, I don't think so.

10  Q.   If we could look at Section (e) the Team Final Offer, if

11  you could describe for me what is provided here?

12  A.   So this is that period that we just described, it's a

13  five -- just to start the 45 days were 45 days not business

14  days.   These are five business days, so these are the five

15  business days where there has not been an agreement during

16  the 45 days between Fox and Dodgers, and so the Dodgers have

17  the ability to go out and speak to anybody they wish to in

18  the marketplace about sort of market testing, their thoughts

19  about what kind of offer their going to put on the table, and

20  at the end of the period of the five business days than they

21  would put a final offer to Fox on the table.

22  Q.   Is five business days long enough to get a sense of what

23  the marketplace is like?

A.   Yeah, I think it's a it's a very good question, in many

ways you would say no, but I think in this market with all

that's going on with the Dodgers there's a gaggle of

reporters back there.   There's almost nothing that isn't

known about this team.   Everybody knows everything, and so

and I think people like Time Warner are obviously, I don't

know this, they don't call me, but they must be aware of

what's happening.   So I have to believe based on working with

my colleagues and my own experience that if you go out in

something that's this visible and starting talking to people

that are knowledgeable about this phase, that it would be a

very helpful thing to do.

Q.   Again there's language in this in Section (e) that talks

about the provision -- the perspective team owners

provisionally approving the team final offer, what's the

purpose of that language?

A.   This is the same issue.   It stems from the approval of

MLB; MLB's requirement that any new perspective owner would

have the right to make this approval if they were interested.

Q.   In your opinion would Fox's position be better or worse,

or the same if the team final offer were made in early

December 2012 versus earlier January of 2012?

A.   I don't think there's a difference.   I've seen Mr.

Desser's rebuttal, and I know he thinks there's a squeeze

1   period, if you will, that because it's later in the contract

2   period closer to the end of the contract and, therefore,

3   close for the season.  It might be difficult for somebody to

4   bid on this, and you know I don't personally agree, but since

5   we know that one of the parties that seems to have an

6   interest from all the skuttle that we hear in the marketplace

7   is Time Warner, and Time Warner is putting together it's own

8   RSN for basketball, but I don't think that would be a

9   limitation.  So if that's not a limitation than you have at

10  least one very viable, probably the most viable buyer sitting

11  there already with a RSN, already open.  They open it with

12  the beginning of the basketball season, assuming there's a

13  beginning of a basketball season, you know, in 2012, you

14  know, in the Fall.  And so from the perspective of date for

15  instance, where the party that would do -- buy the team, or

16  be part of the group and buy the telecast rights, they would

17  already be up and running with an RSN.  They are one of the

18  largest pieces of that RSN in terms of the contract rights

19  out to other parties.  They're out to themselves.  I think

20  its something like 60%.  So that the ability of them to

21  accomplish that I think is pretty high.  Therefore, the

22  concept that there would be some kind of limited time by

23  waiting until October 15th and having this go through and

24  there would only be 15 months for the winner to actually put

25

1   together then their own RSN, their own telecast situation.   I

2   don't think it's accurate because I think that ship has

3   already sailed.   The media business, the technology business

4   all these things are moving at a very, very different pace.

5   So when this deal was originally negotiated I think that

6   might have been true.   I don't take that to be true today in

7   almost any industry.

8   Q.   With respect to section E other then the timing of when

9   the team final offer will be made, do you view anything in

10  section E as inconsistent with the negotiation provisions of

11  the Fox contract?

12

13  A.   No, I don't.   Again our goal is to try to make this be

14  identical to the Fox deal, but for the movement of the dates.

15  Q.   If we could move to section F, the right to match less

16  favorable offers and if you could describe what is happening

17  here?

18  A.   This is, I described it a little bit earlier, but this is

19  where the team goes and makes a final offer.   Fox determines

20  that that's not a good enough offer.   The team goes into the

21  marketplace with that offer.   They attempt to go find

22  somebody who will take them up on that offer and this is part

23  of the sort of the check and balance I think of the process

24  because if the Dodgers could just put a gigantic number on

25  then there would never be a deal.

Coleman - Direct                                    108

1    The difference is if they put a gigantic number on it and

2    they fail then they have to take the best of those bids that

3    are below the final offer and make that offer available to

4    Fox.  So there is a limitation that keeps I think the check

5    in balance in the negotiation.

6    Q.  And again none of this would prevent the Debtors from

7    going forward with their own RSN under 2CII?

8    A.  Correct.  The Debtor at any time could decide I don't

9    like any of this.  I don't like this lower offer for

10   instance, it's to low.  I went out.  I went to high.  I went

11   whatever, you know, nobody came back, the market changed,

12   9/11 hit, something dramatic hit.  If they don't like the

13   offer they can say well I'll move forward and set up my own

14   RSN.

15   Q.  Now there's a discussion in section F about a cash

16   determination to be made by Blackstone, can you explain what

17   that's all about?

18   A.  We're trying as much as possible to follow the Fox

19   agreement.  In the Fox agreement its actually the Dodgers

20   that have the job of determining if there are any parts of

21   any of the agreement which are not as tangible so that, you

22   know, the example I saw was that there going to start

23   mentioning, you know, if its NBC, Universal that buys it or

24   Comcast that they'll start mentioning every night on Jay Leno

Coleman - Direct                                        109

1    or something that the Dodgers games are playing.  I'm not

2    quite sure.  It will be something like that, but would be out

3    of the ordinary.

4         That has to be valued so that if Fox wants to match this

5    offer they can do it with cash because presumably Fox

6    couldn't get Jay Leno because he works for NBC so you would

7    have to determine what that value is.  And that's the Dodgers

8    job.  We at Blackstone would be doing it on behalf of the

9    Dodgers making a determination of what that value is.  I

10   can't imagine it would be large, but you never know.  That

11   would be a piece of the pie.

12

13        And then to the extent that, by the way, they have the

14   ability to match that obviously once we've given that amount.

15   IF they don't like the way that we've done it and they feel

16   it hasn't been commercially reasonable then they have the

17   right to bring it to Your Honor.  And then you get to make a

18   determination of whether we've been commercially reasonable.

19   If we had not been commercially reasonable then they are

20   considered to have rejected the offer.  So there is a risk to

21   them and if we haven't been commercially reasonable then you

22   get to set what the amount would be and then they can make

23   their determination of whether they would match that or not.

24        So we've tried to deal with the appraiser concept which

25   is in the contract.  You're sitting right here, you've gone

Coleman - Direct                                    110

1   through just a couple evaluation hearings in your life so our

2   view was that this would be the better place to be because

3   we're in the Bankruptcy Court to begin with.

4   Q.   So you referenced an appraiser, is this the appraiser

5   that would be jointly under the Fox contract jointly selected

6   by the parties?

7   A.   That's correct.

8   Q.   And instead Judge Gross would step into the shoes of that

9   appraiser?

10  A.   That's correct.  It just seems logical to us, we're in a

11  Bankruptcy Court, this is where everything is being decided

12  so Bankruptcy Courts are used to valuing all sorts of things.

13  I'm sure in your time on the bench you have probably valued

14  more things then we can imagine.  Clearly you value big

15  companies, but a lot of the time when we're doing sales we

16  have different pieces to those.  You know, maybe it's a

17  gigantic company that is prior to the slow approved one party

18  wins over another party.  They have a higher and better offer

19  to show all these pieces that are perhaps intangible or

20  something different and we explained how we had valued those.

21          They are different valuations then maybe a part from the

22  overall large company valuation.  And those kinds of things

23  are brought into the Bankruptcy Court and the Judge makes

1   that decision.  So our view is the Judge should be able to do

2   that here also.

3   Q.  And again if I understand your testimony correctly the

4   role of Judge Gross initially would be to evaluate whether

5   Blackstone's cash determination was commercially reasonable

6   as opposed to actually doing the determination?

7   A.  That's correct.  That's what I said.  He will determine

8   whether we have done a commercially reasonably job based on

9   the evidence that we would present.

10  Q.  Okay and it would only be if he concluded that Blackstone

11  had not done a commercially reasonable job that Judge Gross

12  would be called upon to do his own determination?

13  A.  That would be a very disappointing day for our firm, but

14  that is correct.

15

16  Q.  Is there any reason to think that the Bankruptcy Court

17  will not provide an impartial determination on those issues?

18  A.  I think its the right party.  They obviously are by

19  definition the most impartial.  So even if you were to go out

20  and pick an appraiser people would always wonder whose side

21  is the appraiser on, whose hiring the appraiser next or

22  something like that.  This is somebody who has obviously

23  complete impartiality.

24  Q.  Should Fox be concerned with respect to having Blackstone

25  on behalf of the Dodgers perform and determine the cash

1    determination?

2    A.   Because of we look with the Dodgers?

3    Q.   Correct.

4    A.   I've been at Blackstone 20 years.  I have testified in

5    more courts then I would I would like to add up so have my

6    partners.  And from our perspective the only way that we ply

7    our trade is if we have an honest and direct reputation with

8    judges.

9        We don't win, we could fool you once possibly probably

10   not, but we can only think of once, but the likelihood that

11   we could do that again because the Judges get to see the

12   results of the valuation.  You get to see the results of

13   whatever it is we brought forward to you.  So we don't stand

14   to benefit from that as a firm.  We wouldn't do it as a firm.

15   I again can't imagine that this thing we're talking about

16   frankly is the lions share of the value so its even smaller.

17   You know, its not something that we would do.

18       We are a firm that will absolutely not put a valuation

19   that is anything other then what is acceptable to us and our

20   standards.  So would I be concerned and work for the Debtors

21   I guess that's a natural reaction, but anybody that knows our

22   firm and knows me would not have that reaction.

23   Q.   Let me ask this to talk about the Debtors.  The Debtors

24   that are seeking in this process to maximize value, I mean do

25

Coleman - Direct                                   113

1   the Debtors have an incentive to overly inflate the amount of

2   the cash determination?

3   A.  Well, you know, you can make that argument.  I don't

4   think so is the answer, but I think you could make the

5   argument that, you know, again this is the lower number so

6   this is the match.  This is determining what the value is of

7   the match.  So that if we put a very high number on out lets

8   say something that is really 10 million dollars we put 100

9   million dollar number on it.  And therefore Frank should be

10  and then the owner should be getting all this money.

11        The likelihood that Fox would match that I think would be

12  very low by grotesque example because they would say its

13  obviously not worth 100 million dollars, we're not going to

14  do that.  I don't think you would accept it either.  They'd

15  come in and say it's not commercially reasonable.  Well let's

16  say you didn't do that.  So the consequence that Fox turns it

17  down or if they turn it down that just means we get the lower

18  offer.  And if the lower offer was really only worth 10

19  million dollars of that component is all we're getting.

20        So, you know, I don't normally see what the benefit is to

21  us of creating this very high number because it just ends up

22  backfiring in our face.  Then we get this thing that, you

23  know, is a significantly lower number.

24

25

Coleman - Direct                          114

1    Q.  Now there are a few, there are some black line changes at

2    the bottom of section F.  This kind of walks through what

3    happens if and I think you described this to some extent

4    depending on whether the Bankruptcy Court were to conclude

5    that it was a commercially reasonable offer or not a

6    commercially reasonable offer.  Is it your understanding that

7    what's set forth in the black line is consistent with what's

8    set out in the Fox contract?

9    A.  We're trying to be as consistent as possible so I would

10   answer that, yes.

11   Q.  Let's take a look at section G the rights of perspective

12   new owners that do not approve of proposed telecast rights

13   agreement with Fox if any and if you could describe the

14   function of this particular section?

15

16   A.  This obviously shows what rights perspective owners would

17   have and this is assuming they're not agreeing to the

18   proposed telecast rights agreement with Fox that's been

19   negotiated.  So that would presumably be either the final

20   offer or the lower offer through the right of first refusal.

21

22       And this spells out I think a few things.  One, is the

23   perspective owner can just say no, buy the team with the

24   contract as it is and it will forward into 2012 and take

25   their chances at the time of October 15th when the contract

     would have the same exact procedure go forward.  That would

Coleman - Direct                                      115

1    be one thing, or two, is they could decide that they want to

2    set up an RSN.  They have the right to do that.  And they

3    have the same restrictions that the Dodgers have which is

4    they can't sort of fake sell a company.  They have to be the

5    highest percentage owner of this and they can't have as an

6    equity partner Comcast, Time Warner or ESPN.  So this ignores

7    that procedure.

8    Q.   IF we could take a look at on again section G anything in

9    section G that is inconsistent with the negotiation

10   provisions of the Fox contract?

11   A.   Because of the perspective new owner issue which falls

12   out of the MLB approval its different then the contract

13   obviously, but we tried to mirror it exactly off of whether

14   it's the Dodgers or the new owner it would be the same.  So I

15   would say its essentially the same even though there's sort

16   of a methodology in how you get there.

17   Q.   In other words the condition which is always a condition

18   of MLB approval and the need for --

19   A.   Transfers to the newly perspective owner.

20   Q.   Right.  So this provision is simply consistent with that

21   condition?

22   A.   That's correct.

23   Q.   Section H where it says interpretation consistent with

24   contract ROFN and contract ROFR provisions, what is the

25

1   purpose of this provision?

2   A.  This is a clean up provision.  This is saying that

3   everywhere we can we're doing everything possible to put

4   forth the same rights that Fox has now, that they would have

5   today with the primary difference being that the dates are

6   moved through the first part of that negotiation and for all

7   that follows from October 15th, 2012 to December 1st, 2011

8   which is 10 and a half months.

9   So all this is saying is we think we've accomplished that

10  under the circumstances of moving those dates, under the

11  circumstances of the requirements that are in the settlement

12  agreement with MLB which requires perspective owners to have

13  a voice in whether they accept this or not.  Other then that

14  this is saying we think we've tried and we think we've

15  achieved trying to mirror what is there today.

16

17  Q.  And finally Section I estimation of cure payments if any

18  what is the purpose of this particular provision?

19  A.  This obviously is very important to the Committee.  Its

20  very important to the company because it is important to know

21  what the size of this claim might be.  As was said earlier by

22  the Committee the goal here would be, you know, no later then

23  December 15th to put forth a motion for Your Honor to make a

24  determination that if there are any damages what the size of

25  those damages are and therefore what the cures would be.

1  Which would allow the company to make a determination and a

2  buyer to make a determination if these claims are gigantic

3  and people are going to understand that then its not to late

4  to consider what to do at that point in time.  So the goal

5  would be to go forward and make a very early decision on what

6  if any damages there are.

7  Q.  And would it be fair to say that in fashioning the

8  current procedures that you and others at Blackstone took

9  into account the risk of whether or not damages might be

10  incurred as a result of those procedures?

11  A.  We spent a lot of time thinking about this.  You know one

12  could say we would be casual about it because you could say

13  well who cares what the damages are, but this isn't one of

14  those kinds of estates.  This is an estate that we believe is

15  solvent the proof is in the pudding.  We'll see what the

16  offers are, but assuming it is solvent every penny that comes

17  in as a claim is a penny against the owners.

18

19      You know in some estates when it appears the equity is

20  very clear, when the equity is wiped out it makes it a little

21  easier on some of those companies to say well lets let the

22  claims come in, we'll reduce these liabilities dramatically

23  and it will be easier for us to go forward, you know, what

24  does it matter.  I don't think that's the right attitude, but

25  that's I think sometimes how people think.

Coleman - Direct                                    118

1    This is a different circumstance.  Every penny that would

2    be in claim estimation could affect the Committee, obviously

3    they would hope not.  But if it doesn't affect the Committee

4    then its going to affect the owner.  So this really matters a

5    lot to the company.  So as a consequence we spent a lot of

6    time thinking about it, thinking it with counsel, thinking

7    about it among ourselves and trying to determine whether we

8    thought this was actually damaging Fox.  And while I don't

9    work for Fox so I'm sure they're not going to take my advice,

10   but we don't see this as damaging them.

11       All this does is move the date for 10 and a half months.

12   And then there's this bid option where, you know, maybe the

13   buyer couldn't have worked fast enough in order to put the

14   RSN together, in order to televise the games in 15 months

15   which I've testified I don't think that's true.  So I don't

16   see there being a big damage claim here.  I don't think its

17   greater then them.  I think that they're getting the same

18   rights that they have, but nevertheless we have gone through

19   this very thoroughly because if we thought it was a gigantic

20   claim then we would be making a mistake going down this path.

21   Q.  You've testified that as part of the sale of the team

22   under the MLB agreement the buyer of the team will acquire,

23   the control group or the buyer will acquire the Dodgers

24   existing future telecast rights?

25

1    A.   Correct.

2    Q.   Is it possible, is it possible to sell the future

3    telecast rights with the team without attempting to reach an

4    agreement to license the future telecast rights during the

5    bankruptcy case?

6    A.   Leaving them as they are with the October 15th date

7    intact?

8    Q.   Right.   Would that be possible?

9    A.   Of course.

10   Q.   And how would Blackstone go about doing that?

11   A.   We would do it the same way we're selling the team.   We

12   would put forth a forecast for the team.   We put forth a

13   forecast for those telecast rights.   What we think is going

14   to happen in the negotiation of those telecast rights and

15   therefore, what a buyer could look at in terms of the value.

16   Its really no different in some ways then if some of the

17   parts valuation.   When you look at the different pieces of a

18   company when people come in and say I valued these five

19   things in this way.   So we would be doing our best job at

20   trying to prove to buyers that this was a very valuable

21   asset.

22        To go back to my example of the empty building we would

23   be trying to say if you take this building and you lease it

24   up in two years or three years at these rates its going to

25

Coleman - Direct                    120

1   have this kind of cash flow, you discount the cash flow back

2   and do some other valuation techniques and you end up with a

3   value and you try to get them to bid on it.  Obviously that's

4   not as good a process, but that's how we would do it.

5   Q.   When you say it's not as good a process, why is that?

6   A.   Well unless somebody has such a dream about what these

7   things could be worth that it's outrageously high and much

8   higher then what's rational.  And therefore they would bid on

9   this empty thing on their own which they still could do by

10  the way because they can turn this down as part of the MLB

11  conditional process.  Unless somebody has that the likelihood

12  is people will bid less versus more because they will be

13  questioning.

14

15       You know if you bid hundreds of millions or billions of

16  dollars for this asset and you get there and you actually go

17  and try to create this asset and you find out the contracts

18  are much smaller then you were expecting then as a buyer

19  you've made a very big mistake a very visible by the way and

20  big mistake.  So I think by definition you would see people

21  lowering their bids out of fear.  There could be some that

22  would think this is a great value and I'm going to make a

23  fortune off it so let me bid, but I think the greater

24  instinct would be that they would lower their bids because

25

1   they would be concerned about what they're getting, when they

2   actually have this negotiation.

3   Q.   In connection with the potential buyers who have

4   expressed an interest are there buyers who do not at least at

5   first blush appear to have a lot of familiarity or knowledge

6   of the value of the media rights?

7   A.   You mean the people that we're contacting right now?

8   Q.   Correct.

9   A.   I think the people that we obviously are not releasing

10  this list right now, Your Honor, but the people that we are

11  contacting and talking to and having interest in some of them

12  are somewhat public and well known.  I think they have a

13  decent amount of knowledge.

14

15           THE COURT:  Yes, Mr. Teklits.

16           MR. TEKLITS:  I think this is unfair testimony, Your

17  Honor.  You can't say you're not going to disclose the

18  relevant evidence to us, but then he's going to go ahead and

19  testify to it in court.  You either got to give us the

20  discovery so that we can examine it or he can't testify to

21  it.

22           MR. LEVINSON:  The question really was just

23  generally speaking.  I wasn't asking for specifics, just

24  generally among the group, but I'll withdraw the question.

25           THE COURT:  All right.  Thank you.

Coleman - Direct                             122

1   BY MR. LEVINSON:

2   Q.  Now as you said one option would be simply to just let

3   the contract stay as is and the buyer purchases the team and

4   then would proceed forward with the process at the end of

5   2012?

6   A.  When the buyer would purchaser the team and the existing

7   telecast rights?

8   Q.  Yeah and the existing telecast rights and would wait

9   until the end of 2012?

10  A.  Right.

11  Q.  Why not just simply let the buyer realize whatever value

12  exists in those marketing rights at the end of 2012 rather

13  then trying to realize that value now for the Debtors?

14  A.  That's just a shift of who gets the value.  This value

15  wouldn't go to Fox.  It would go to the new owner.  If the

16  new owner took over the telecast rights and had to set up

17  their own RSN or whatever they did they would get the benefit

18  of that new contract.  So the amount that would have gone to

19  the seller, in this case the Dodgers I think would be lower.

20  Its lower because their not willing to pay for it.  Assuming

21  that they could put together a good contract which I think is

22  very possible in a year just like its possible now they

23  would, therefore, reap the benefits of having bought

24  something.

25

1       It would almost be like buying a distressed asset in the

2   sense that you buy it low, you get the people moving into

3   your building and then guess what the buildings worth a lot

4   of money and then you make money.  So this is just a shift of

5   value away from the Dodgers and to the buyer, not to Fox, not

6   to MLB, but just from one party to another and its just not

7   logical to me.

8   Q.   In terms of the Debtors, their management and the

9   professionals is it their job to maximize value for the

10  buyers or to maximize value to the estates?

11  A.   Always to the estate.

12  Q.   And putting aside and I think you touched upon this at

13  the beginning of your testimony, but putting aside a question

14  of whether or not there's a sale or whether this was done as

15  a re-organization which was what Debtors were originally

16  proposing.  In either event is there a benefit to the

17  enterprise to the business as a result of moving forward with

18  this process now?

19  A.   Definitely; the way that the contract right would be set

20  up.  If you look at the deal that was put on the table that

21  MLB rejected the deal that the Dodgers and Fox did in the

22  early part of the summer that had a much higher payment to

23  the team then is being made now.  So a substantially higher

24  amount, so the team would have more cash flow coming to it

Coleman - Direct                             124

1   through those amounts and obviously through an overall great

2   telecast agreement you would argue that more people would

3   follow the team and it would have fan reaction and more

4   attendance.  You could go all the way down the path.  It

5   would definitely have a great impact on the Dodgers.

6   Q.  So it's fair to say in the objective of the Debtors now

7   it's no different than what the objective of the Debtors was

8   at the beginning of this case?

9   A.  The same objective.  And that's our objective which is we

10  always come in and try to figure out how to fix the company

11  in order to figure out how to maximize value.  That's what we

12  do for a living.

13

14  Q.  Is it your opinion then it would be in the best interest

15  of the Debtors to implement the amended marketing procedures

16  as proposed to this Court?

17  A.  Yes.

18          MR. LEVINSON:  Just a minute, Your Honor.

19          THE COURT:  Certainly.

20          MR. LEVINSON: No further questions, Your Honor.

21          THE COURT:  All right thank you, Mr. Levinson.

22          MR. LEVINSON:  Your Honor, may I move Exhibit 7 into

23  evidence?

24          THE COURT:  Oh thank you.  Any objection?

25          MR. TEKLITS:  No objection, Your Honor.

Coleman - Cross                                      125

1          THE COURT:  All right it is admitted.

2      (Debtors' Exhibit #7 received into evidence)

3          THE COURT:  Mr. Teklits, it's good to have you here.

4          MR. TEKLITS:  Thank you, Your Honor.  Before we

5   start, can I hand up an Exhibits Binder?

6          THE COURT:  You bet; yes.  Anyone in need of a break

7   including the witness?

8          MR. LEVINSON:  There is one right next to the

9   witness.

10          MR. TEKLITS:  All right.

11                    CROSS EXAMINATION

12   BY MR. TEKLITS:

13   Q.  Good afternoon, Mr. Coleman.  My name is David Teklits.

14   I'm one of the attorneys for Fox Sports and I'm going to ask

15   you some questions.  You testified a lot on direct about the

16   contract, the telecast contract between the Dodgers and Fox.

17   I'm correct, am I not, that you have had no previous

18   experience with telecast contracts before this case?

19   A.  That's correct.

20   Q.  And you've never negotiated such a contract?

21   A.  Correct.

22   Q.  Never reviewed such a contract before this case?

23   A.  I think that's probably right.  I've been involved in a

24   lot of media deals and some of these things have a lot of

25

1  similarities, but an actual contract like this I'd say that's

2  probably right.

3  Q.  But on your direct here you went through the contract,

4  you gave a lot of testimony as to what the provisions means,

5  your understanding.  You had never seen such a contract

6  before this?

7  A.  That's correct.

8  Q.  You never advised a client with regard to negotiating a

9  contract?

10  A.  Correct.

11  Q.  And you really have no background in what types of

12  provisions are included in those types of contracts?

13  

14  A.  I wouldn't agree with that.  I think a contract is a

15  contract and one has to read it and figure out what it says.

16  And I have obviously looked at that contract very carefully,

17  so while I may not be a media person and it's not that hard a

18  contract to understand.

19  Q.  I think you even said on your direct, you're not a media

20  expert?

21  A.  Correct.

22  Q.  And if there's special understandings or concerns in the

23  media or telecast area, you wouldn't be aware of those types

24  of concerns?

25  A.  Repeat the question?

Coleman - Cross                    127

1   Q.  Sure.  If there are specific concerns for topics in that

2   specific field, media or telecast that people that negotiate

3   those contracts are concerned about, you wouldn't be aware of

4   that because you don't operate that tier?

5   A.  That's not correct.  We have a very large team on this

6   with a full media contingent.  I'd like to --

7   Q.  I said you --

8   A.  Could I please make please--

9   Q.  I said you, you would not be --

10          MR. LEVINSON:  I'm sorry, the witness should be

11  allowed to answer.

12          THE COURT:  Yes.  The witness should be entitled to

13  answer; yes if we could.

14          MR. LEVINSON:  Thank you, Your Honor.

15  BY MR. TEKLITS:

16  A.  Very large team.  We work together as a team.  We

17  obviously work very carefully with the Debtors.  And we've

18  gone through this in great detail.  So unless I'm not capable

19  of learning anything or applying all of the other contracts

20  I've ever negotiated or studied or reviewed in my life, I

21  believe I have a great ability to look at this contract and

22  understand it.  Do I have the depth of other people, no.  I'm

23  not going to pretend otherwise, but I believe very much that

24  the team that I have assembled here company and Blackstone is

25

1    very thorough and gives me great insight, so I think I do

2    have some ability there.

3    Q.   My question was you --

4    A.   That's it --

5    Q.   You personally --

6    A.   I just answered it.

7    Q.   No, you personally do not have experience in this field?

8    A.   I answered that question.   That wasn't your question.

9    Q.   And you personally are the person here today testifying

10   as to the contract.   We're not talking that someone else from

11   Blackstone getting up on the stand and saying what these

12   provisions mean.   You are up here as our expert or the

13   Debtors' expert testifying, correct?

14

15   A.   I am testifying.

16   Q.   And I assume you read the declarations of Mr. Dresser

17   [*sic*] and Mr. Thompson?

18   A.   I read Mr. Desser's.   I don't recall Mr. Thompsons.

19   Q.   And you agree Mr. Dresser on the other hand has a lot of

20   experience in this field?

21   A.   Extremely impressive resume; congratulations.

22   Q.   Now when you started your assignment here as I think

23   you've testified to this, it was contemplated that the

24   Debtors were going to sell the media rights and then use the

25

Coleman - Cross                               129

1   proceeds to reorganize and come out of bankruptcy, is that

2   right?

3   A.   That's correct.

4   Q.   That was the original assignment.  And that was the

5   context in which you gave your original declaration in this

6   case?

7   A.   That is correct.

8   Q.   And I think you testified at that time you and Blackstone

9   were considering ways you could extract value from Debtors'

10  assets?

11  A.   I'm not sure I said it quite that way but obviously I

12  talked about trying to figure out how to raise liquidity and

13  capital for the company.

14  Q.   And at the time you didn't see any need to pursue a sale

15  of the team?

16  A.   Repeat that if you don't mind.

17  Q.   At the time you surveyed that first declaration you did

18  not see any need to pursue a sale of the Dodgers?

19  A.   I still don't see a need.  The MLB has decided and we

20  have obviously negotiated and settled with them, but I don't

21  see a need to sale this team today.  I think and for the fact

22  that MLB obviously would like to see an owner change here.

23  Q.   You aren't recommending a sale of the team at the time?

24  A.   That's correct.

25

Coleman - Cross                          130

1   Q.  And at the time that you put in the initial declaration

2   all of the I believe the immediate liquidity concerns had

3   been answered by the MLB loan, is that right?

4   A.  By the Debtor in Possession loan, that's correct.

5   Q.  And now since you submitted that initial declaration now

6   there's been a settlement agreement, right?

7   A.  That's correct, with MLB.

8   Q.  And with Mr. McCourt?  Mr. McCourt is a party to that

9   settlement agreement, is that right?

10  A.  It's a witness between the Dodgers and MLB.  I don't

11  recall who signed it.  Perhaps, he's a party to it, but I was

12  there on behalf of the Dodgers negotiating with MLB.

13  Q.  And was somebody there on behalf of Mr. McCourt

14  negotiating?

15  A.  Yes.

16  Q.  So Mr. McCourt was a separate party, right?

17  A.  He had his own counsel there.

18  Q.  I guess I should have covered that up front.  Blackstone

19  represents the Debtors, correct?

20  A.  That's correct.

21  Q.  You don't represent Mr. McCourt?

22  A.  That is correct.

23  Q.  And to the extent there's any conflict between preserving

24

25

1   assets for the Debtors or maximizing assets for Mr. McCourt,

2   your interests are to the Debtors?

3   A.  I'm not sure I draw the difference that you just stated.

4   I think maximizing value for the estate is maximizing value

5   for the estate.  And as it was said earlier by the UCC, for

6   instance, they want to make sure we maximize enough value,

7   for instance, to pay them off.

8   Q.  You can't imagine a situation where Mr. McCourt's

9   interest may be different than the Debtors?

10  A.  I didn't say that.  I think the way you phrased the

11  question just seemed a little confusing.

12

13  Q.  You can't imagine a situation where something may put at

14  risk the assets for the creditors even though they paid an

15  opportunity for Mr. McCourt to make more money?

16  A.  I'm not sure I follow.  You're doing a hypothetical and

17  it's pretty hard for me to answer.

18  Q.  All right we'll get there.  Now you're aware, I assume,

19  that telecast agreement typically provides that they're

20  assigned when the team is sold?

21  A.  One more time?

22  Q.  Are you aware -- maybe you're not aware because you

23  haven't seen many telecast agreements or anything.  Are you

24  aware or has somebody told you, somebody at Blackstone told

25

Coleman - Cross                    132

1    you that telecast agreements typically provide that they get

2    assigned with the team when the team is sold?

3    A.   I'd like you to ask that question again.   The humor part

4    threw me off; sorry, go ahead.

5    Q.   Okay I'll ask one more time.   Are you aware today that

6    telecast agreements typically provide that they get assigned

7    with the team when the team is sold?

8    A.   Yes.

9    Q.   And isn't it true that in every deal in which an MLB team

10   has been sold, the telecast rights contracts got signed with

11   it?

12

13   A.   I don't know the answer to that question.

14   Q.   Are you aware of any instance where it didn't get signed

15   with it?

16   A.   I'm not aware of that.

17   Q.   And absent some relief from the Bankruptcy Court here

18   today, as far as you understand, the Fox contract, the

19   currently pending contract, would be assigned with the sale

20   of the team?

21   A.   It would be sold with the team.   I don't know what you

22   entirely mean by assigned, but the team would be sold with

23   that contract.   There would be value obviously associated

24   with that contract, but the actual contract would go with the

25   team.

Coleman - Cross                                      133

Q.   And the provisions of that contract would be honored by

the new owner?

A.   I assume so.   You'd have to ask the new owner.

Q.   Well isn't that your understanding that absent some

relief from the Court today, that contract would go along

with the sale of the team and Fox's rights would be

completely honored?

A.   I think it actually could happen even with this deal as

we stated, the perspective buyers could make a determination

not to go along with the sale of the telecast rights as its

presented.   So if there were a Fox deal, for instance, this

party could decide, whoever the perspective buyer is, could

decide to go forward and let the contract run until those

provisions kick in October 15th.

Q.   That raised a question.   In the settlement, does it

provide that the Dodgers have to assume the contract?   Cannot

reject that contract?   Are they obligated to assume the

contract?

A.   I don't recall.

Q.   You recall that being discussed?   They didn't discuss

that in negotiation?

A.   We're not rejecting the -- the team is not rejecting the

contract.   Let me just say it that way.   I couldn't really

follow your question.   But the team is not rejecting the

1   contract.   In fact, we're leaving the contract in place.   The

2   only thing we're trying to do is amend a piece of it which is

3   the thing that we're putting forth here today, but I don't

4   see us rejecting that contract.   So if that's your question,

5   we're not doing that.

6   Q.   My question is does the settlement agreement provide that

7   the Dodgers are obligated to assume the contract?   They are

8   not permitted to reject it.

9   A.   I'd be happy to read the settlement agreement.   I don't

10  recall.

11  Q.   Could that be in the special terms that, hasn't that been

12

13  disclosed?

14  A.   I said I'd be happy to read whatever you have.

15  Q.   I don't have the special terms.   So my question is could

16  it possibly be memorialized in the special terms?

17  A.   I don't know.

18  Q.   Now with the MLB financing facility in place, the Debtors

19  will not experience any liquidity crisis between now and the

20  time the team is sold?

21  A.   One more time.   I'm having trouble hearing you.

22  Q.   Let me move this a little closer.

23  A.   That would be great.

24  Q.   With the Debtor in possession financing in place, you do

25  not expect that the Debtors will have any liquidity crisis or

Coleman - Cross                        135

1   issues between today and the date that the team is ultimately

2   sold?

3   A.   I think that's right.   There are always issues that come

4   along in the case that could change that.   But as of right

5   now, the projection is they should be okay from a liquidity

6   perspective.

7   Q.   And it's your understanding as of today that once the

8   team is sold, the Dodgers will have enough cash to pay off

9   that Debtor in Possession financing?

10  A.   That is our understanding.   One thing I just want to

11  correct on the other answer.   Not correct it, but just want

12  to clarify it.   The terms of the MLB agreement that are made

13  public say the team has to be sold obviously by April 30th.

14  And so I think you're asking me if it makes it to April 30th

15  because that is the term of the settlement.   It won't go

16  further than that.

17  Q.   While we're on that April 30th date, that's dictated by

18  Mr. McCourt's divorce agreement?

19  A.   No that was part of the settlement with MLB.

20  Q.   Can you turn to it's Exhibit 4 in the large binder.

21  A.   I'm having trouble finding 4.   This is a very thick book.

22  Is it way in the back or where is it?

23          MR. TEKLITS:   Your Honor, can I hand up another

24  copy?

Coleman - Cross                                136

1  A.  I see, one and then a lot of letters.  Thank you very

2  much.  That's very different.

3         THE COURT:  I do have it in front of me, Mr.

4  Teklits.

5  BY MR. TEKLITS:

6  Q.  Have you seen this document before?

7  A.  No.

8  Q.  If you turn over to the second page --

9         MR. LEVINSON:  Just anticipating whatever question

10  may be asked, I would object on foundation.

11

12        THE COURT:  Ask a question I guess and then we'll

13  figure out what to do.

14        MR. TEKLITS:  Never had an anticipatory objection,

15  but.

16  BY MR. TEKLITS:

17  Q.  You see in the first line of the binding term sheet, it

18  says on or before April 30th, 2012 Frank will pay Jamie $131

19  million in cash?

20        MR. LEVINSON:  Objection, Your Honor.  The witness

21  testified he's never seen this document.  I don't think

22  there's any foundation to be asking this witness questions

23  about this particular document.

24        MR. TEKLITS:  Right now I just have to be read the

25  line, but I'll ask the next question.

Coleman - Cross                                137

1   BY MR. TEKLITS:

2   Q.  Having seen that, did anybody tell you that in the

3   settlement, those settlement negotiations you were

4   participating in?

5          MR. LEVINSON:  Same objection, Your Honor.

6          THE COURT:  I'll sustain the objection here.  The

7   document speaks for itself, I think.

8          MR. TEKLITS:  I'll ask the question unconnected to

9   the document.

10          THE COURT:  Okay.

11  BY MR. TEKLITS:

12  Q.  Did anybody tell you or did you ever hear anybody talk in

13

14  those settlement negotiations that Mr. McCourt had a large

15  cash payment due by April 30th, 2012?

16          THE COURT:  Mr. Levinson?

17          MR. LEVINSON:  I am going to object to the extent

18  that he's asking the witness questions about discussions that

19  may or may not have taken place during the course of the

20  mediation.  Both would be privileged and confidential.

21          THE COURT:  Mr. Teklits?

22          MR. TEKLITS:  I don't know how we can explore this

23  area without getting into this.  I mean we weren't included

24  in the discussions, although we could argue over whether we

25  should have been.  But I think I'm entitled to know what the

Coleman - Cross                               138

1    basis of the provision in the settlement agreement as to the

2    date was.

3           MR. LEVINSON:   Your Honor, I think the settlement

4    agreement speaks for itself.   It's been filed with the Court.

5    They see the date.   They know the date, and I think that's

6    all that needs to be said with respect to that.

7           MR. TEKLITS:   I think this door's wide open, Your

8    Honor.   You have this April 30th deadline that they've imposed

9    and I think we're entitled to explore; that's a real

10   deadline, where it came from, why we're all being put to this

11   test today because of April 30th.

12

13          MR. BENNETT:   This is a transparent effort to pierce

14   the mediation privilege.   As I think Mr. Levinson very

15   clearly indicated the terms of the document that have been

16   filed are clear.   Where it came from and why it got there is

17   precisely the kind of things that ought to be protected by

18   the mediation privilege.   We shouldn't be opening the door to

19   permit more investigation into that area.   About the only

20   question that I think could be asked is whether Mr. Coleman

21   heard anything from anyone outside the mediation about the

22   purpose of the April 30 date.   That's the only question that

23   could be asked.

24          MR. TEKLITS:   Can I just respond to that.   I think

25   they opened the door wide open to this on direct.   They asked

Coleman - Cross                                    139

1   this witness about the settlement negotiation.  They brought

2   out that he participated in them.  They brought out some of

3   the reasons why the provisions are drafted the way they are

4   because of that settlement.  I don't think you can have it

5   both ways.  I don't think you can say we did certain things

6   because of the settlement.  I participated.  This is why this

7   was drafted this way and then not let us explore the

8   settlement.

9            MR. BENNETT:  Your Honor, the testimony was this was

10   the outcome of the settlement.  The outcome of the settlement

11   is, of course, not privileged.  How it got there is.

12

13            MR. TEKLITS:  But he didn't need to testify he

14   participated.  We were just talking about the outcome.  He

15   testified I participated and that's why this is the way it

16   is.

17            THE COURT:  The mediation is off limits.  It's

18   clearly confidential.  What was said or heard at the

19   mediation is not appropriate for questions.  I do not recall

20   Mr. Coleman testifying about the mediation on his direct

21   examination.  And I will sustain the objection.

22   BY MR. TEKLITS:

23   Q.  Outside of what you heard at the mediation, do you know

24   why the April 30th date was chosen?

25

Coleman - Cross                                    140

1   A.   You're asking me again on the terms of the settlement,

2   the MLB settlement; I don't understand your question.

3   Q.   Well doesn't the April -- where does the April 30th date

4   come from?

5   A.   It's -- which one --

6           THE COURT:  Well I think that's what the witness was

7   confused about, Mr. Teklits; whether you were talking about

8   the agreement with Major League Baseball or the settlement

9   agreement which is Exhibit 4.

10          MR. TEKLITS:  Right now I'm talking about -- well

11  let's back up a second.

12  BY MR. TEKLITS:

13  Q.   You're here telling us right that the sale has to occur

14  by April 30th.

15  A.   I don't believe -- that is correct.  You can see that in

16  the results of the settlement negotiations that were released

17  I gather last night.

18  Q.   And you're aware, are you not, that teams have been sold

19  in bankruptcy's before, right?

20  A.   Yes.

21  Q.   The Cubs have been sold, right?

22  A.   Correct.

23  Q.   The Texas Rangers have been sold?

24  A.   Correct.

Coleman - Cross                        141

1   Q.   Those took place during the season, right?

2   A.   I don't recall.

3   Q.   You don't recall the Cubs took place in the summer and

4   the Rangers took place in the summer?

5   A.   I don't recall that.

6   Q.   But there's no reason connected to this bankruptcy per

7   say that would prevent the sale or require the sale to occur

8   by April 30th?

9   A.   I don't understand your question.   I don't hear a

10  question.

11

12  Q.   We'll come back to that.   I think we'll move on.   I

13  assume that Blackstone has done certain valuations of these

14  assets?

15  A.   We have looked at these assets.

16  Q.   And I assume as of today you would agree and we covered

17  this already that with the sale it's anticipated that the

18  Debtor in Possession loan will be paid off?

19  A.   I would be very disappointed if the sale did not produce

20  enough money to pay that Debtor in Possession loan off as

21  with the Unsecured Creditors' Committee as with the team.

22  Q.   And I assume your valuations that you've done today show

23  that it's anticipated that the proceeds from the sale will be

24  more than sufficient to pay off all the creditors?

25

1   A.   I don't think that we have any doubt that this should pay

2   off all the creditors.

3   Q.   And there's going to be a substantial amount of money

4   left over to pay Mr. McCourt, is that what your valuations

5   show?

6   A.   I think when this process finishes we think they'll be

7   enough value to pay all the creditors in full and, therefore,

8   the owners would receive whatever the difference is.

9   Q.   Well Mr. McCourt is the only owner ultimately, right?

10  A.   Honestly I haven't looked at that chart in a very long

11  time.

12

13  Q.   Well we can look at it again.

14  A.   If you like me, I'm happy to.

15  Q.   If you turn to it's Exhibit 3 in the large binder.  Have

16  you seen this chart before, I assume?

17  A.   Oh yes.

18  Q.   And you see Mr. McCourt's at the top, right?

19  A.   I see the McCourt Company and I see Frank McCourt.

20  Q.   Yeah and you understand that -- okay Mr. McCourt owns 90%

21  and the McCourt Company owns the other 10% at the ultimate

22  top structure?

23  A.   It says he owns 90%, and the company owns 10.

24  Q.   And you understand that Mr. McCourt is the sole equity

25  holder of McCourt Company too?

Coleman - Cross                                    143

A.  I'm not aware of that.

Q.  You didn't know that.  Now the only entities here in

bankruptcy are L.A. Holdco, LLC and the companies below that,

is that right?

A.  I think that's right.

Q.  And this whole chart this captures, these entities

capture all of the assets relating to the team, is that

right?  All the assets of the team are somehow owned by this,

these 20 various entities here?

A.  I think this includes the team, the stadium and the land

under the stadium.

Q.  And the team is owned by Los Angeles Dodgers LLC down on

the left hand side?

A.  I think that's right.

Q.  And the stadium is owned by L.A. Real Estate LLC, it's

down sort on the bottom on the right side --

A.  I think that's correct.

Q.  And the parking lots and the land and the surrounding

land is owned by Blue Landco LLC, is that right?

A.  The -- just a minute.

        MR. LEVINSON:  Your Honor, I think I'm going to

object here.  I don't recall asking any questions about Blue

Landco during my direct examination.  I think this is outside

the scope of the cross.

Coleman - Cross                            144

1      MR. TEKLITS:  It goes to the assets that are going

2 to be included in the sale, Your Honor.  I think he did ask

3 about what's included and what's not included.

4      MR. LEVINSON:  The assets that are going to be

5 included I don't think I asked about Blue Landco or what

6 wouldn't be.

7      THE COURT:  Here I'll overrule that objection, Mr.

8 Levinson.  I'll allow the question.

9 BY MR. TEKLITS:

10 Q.  And just so it's clear the parking lot and the

11 surrounding land is not going to be included unless Mr.

12 McCourt consents to that, is that right?

13

14 A.  They are not a Debtor entity.

15 Q.  And it's stated right in the settlement agreement any

16 decision to sell or not sell the parking lots and surrounding

17 land shall be made by Mr. McCourt and his sole and absolute

18 discretion without regard to any duties or responsibilities

19 he may have to any of the Debtors, do you recall that?

20 A.  Sure.

21 Q.  And if the goal was to maximize the value of the Dodgers,

22 you'd want to include the parking lots and the surrounding

23 land in the sale that's being sold, wouldn't you?

24 A.  I'm not sure of the question.  The Dodgers don't own

25

1  those things so how that would be maximizing the value of the

2  Dodgers doesn't make a lot of sense to me.

3  Q.  Well isn't it correct that somebody is more likely to bid

4  or pay more for the Dodgers if they can also at the same time

5  buy the parking lots and the surrounding land?

6  A.  I think anytime somebody can buy something that doesn't

7  belong to something it would be more value.  They are not

8  owned by the Debtors and so I don't understand the question.

9  You know it's, the team owned what I've described.  You know

10 it, you just described it yourself.  They do not own the

11 parking lots so that's not part of the sale, but it's also

12 not owned by the company.  If it was owned by the company and

13 we were selling the company, we let that out I think your,

14 the answer to your question would be of course.  But it's not

15 owned by the company so it doesn't change the value of the

16 transaction at all.

17 Q.  Yeah I'm not, a much simpler question.  I'm not attaching

18 ownership.  I'm just saying if you had -- if you're trying to

19 maximize the value of the Dodgers, what the Dodgers are

20 worth, wouldn't it be worth more if you could sell that along

21 with the parking lot and the surrounding land?

22 A.  I can't get to your hypothetical.  They don't own it.  So

23 if they don't own it, I don't understand how you can -- I'm

24 not trying to be difficult.

25

Coleman - Cross                                146

1   Q.  Well let's say somebody owned both of them.  I mean as

2   Mr. McCourt does at the top of this entity, would he make

3   more value if he sold them together?  The Dodgers would be

4   worth more if it was sold together with the parking lots and

5   the surrounding land?

6   A.  It just depends on what -- I'm sorry.

7        MR. LEVINSON:  Yeah I was just going to object.  I

8   think a) we're again beyond the scope; b) I think there's a

9   lack of foundation assumption that there's been any attempt

10  to determine the value of an asset of a non-Debtor in

11  connection with the sale of assets of the Debtor.  I don't

12  think counsel has established any foundation with respect to

13  whether that analysis has ever been performed.

14

15        MR. WERKHEISER:  Your Honor, I'm sorry, for the

16  record, Gregory Werkheiser.  I wanted to note we did file a

17  witness list and we designated Mr. Coleman as a witness now.

18  I guess we can let him get off the stand and then call him

19  back when we put our case in chief on, but that seems

20  inefficient.

21        MR. LEVINSON:  He's our expert, Your Honor.  I mean

22  they can designate him for fact testimony, but he's our

23  expert.  They don't get to cal him as their expert.  So

24  putting him on a list doesn't make a wit of difference.  It's

25  outside the scope and, again, there's just no foundation.

Coleman - Cross                    147

1      THE COURT:  When I overruled the objection I thought

2  it was going to be, you know, a one or two minute

3  questioning.  This is non-Debtor so I don't think that Mr.

4  Coleman or Blackstone would have any basis upon which to

5  render a value, but, an opinion value but.

6      MR. TEKLITS:  I thought we were here talking about,

7  you know, I heard about 20 times on direct the purpose here

8  is to maximize value.

9      THE COURT:  Of the Debtors?

10     MR. TEKLITS:  Of the Debtors, but one way, when you

11 have a joint, you know, somebody that owns the Debtor and

12 presumably has fiduciary duties to the Debtors and they're in

13 a settlement negotiation.  I know we put that to the side,

14 but I think it's a fair question why this was to the side and

15 certain other things like the Fox contract are thrown into

16 the thing to maximize value.

17     THE COURT:  Well, --

18     MR. TEKLITS:  I mean we weren't included in the

19 negotiation I know it's part of the settlement agreement is

20 off limits, but I think it's a fair question.  There is

21 multiple ways in which somebody could argue you could have

22 maximized value of the Debtors.  I think this was another way

23 that you could have maximized the value and just explain why

24 this one wasn't considered.

25

1       MR. WERKHEISER:  Your Honor, just before you -- I'm

2  sorry to interrupt, but I did want to highlight one provision

3  in the settlement agreement that does attach some more

4  relevance to this issue.  And they've agreed, notwithstanding

5  the foregoing, the Debtors shall provide due diligence

6  information to any perspective purchaser who requests such

7  information and potential purchasers may submit bids that

8  include the purchase of the parking lots and surrounding

9  land.  So they evade this relevance in the process currently,

10 Your Honor.

11      THE COURT:  Mr. Levinson?

12      MR. LEVINSON:  Again, Your Honor, the issue is

13 they're asking questions with respect to valuation for which

14 they haven't established any foundation what so ever.  The

15 fact that there may be built into the process the ability for

16 somebody to submit a bid is very different from suggesting

17 that Blackstone is somehow in charge of selling an asset that

18 doesn't belong to the Debtors.  And, again, there is simply

19 no foundation as to whether or not that valuation of the

20 asset that's owned by a non-Debtor that is not going to --

21 whose sale is not going to result in dollars to the Debtor or

22 improve the enterprise value of the Debtors in any way

23 relevant to this proceeding.

Coleman - Cross                                    149

1        THE COURT:  I'll allow some further questioning on

2    this for purposes of the record.  To me, it's a foregone

3    conclusion that you can get parking lots for nothing.  It

4    makes the transaction more valuable, but you may proceed.

5    BY MR. TEKLITS:

6    Q.  Are you aware that certain potential bidders have said

7    they might not bid if the parking lots and land are included,

8    might not bid for the team?

9    A.  I've not heard that.

10   Q.  Now when the scope of Blackstone's role here changed

11   somewhat when you now took on the job of auctioning the team,

12   is that right?

13   A.  Well obviously, we went from a reorganization of the

14   Debtors to a sale of the Debtors.

15   Q.  And you, I think you said before you, at least initially,

16   weren't recommending a sale of the team and didn't anticipate

17   that the team would be sold, is that right?

18   A.  I said that we were not -- whether it would be sold or

19   not one never knows.  I don't know that in any case I go into

20   whether the Debtor can be reorganized, excuse me, whether it

21   can be reorganized or whether it will be sold, but that was

22   not the goal or the anticipation.

23   Q.  Has Blackstone's engagement letter been amended or

1   changed in any way now that you've taken on the role of

2   auctioning the team assets?

3   A.   No.

4   Q.   Have there been any discussions or understandings on that

5   subject?

6   A.   There have been no understandings of changing that.

7   Q.   Have there been any discussions about additional

8   compensation to Blackstone from taking on this role?

9   A.   We certainly talked about it.  It's a different role, but

10  we haven't gone anywhere with that.

11

12  Q.   Is that still open for discussion?

13  A.   It is in our mind, but it's always in the banker's mind.

14  Q.   And if you -- well strike that.  Those discussions, I

15  assume, center around Blackstone's getting some kind of

16  success fee or contingency on the sale of the assets?

17  A.   You're drawing a distinction, a conclusion that there are

18  a bunch of discussions, there aren't a bunch of discussions

19  going on.

20  Q.   Well the discussions you have had, you said there were

21  some --

22  A.   I said we've thought about it.  We've addressed it.

23  Right now, there is nothing happening on that front.

24  Q.   With the discussions that took place, did they center

25  around Blackstone's having some kind of success fee or

Coleman - Cross                                    151

1   contingency fee?

2   A.   Well we have a back in fee already in the letter.

3   Q.   Well as a set fee of $7 million dollars, right?

4   A.   Correct.

5   Q.   My question is have you had discussions about changing

6   that or adding to that and giving you some kind of

7   contingency or success fee based upon either the sale of the

8   team or the sale of the marketing records?

9   A.   I would say in a very light way, I don't want to draw any

10  suggestion that we're out there negotiating a new agreement

11  or anything like that, because we are not at this point.  We

12  have had discussions and those have gone at this point

13  nowhere.

14

15  Q.   And with those discussions, in those discussions have

16  they included a discussion about Blackstone getting a success

17  fee or a contingency fee based upon the sale of the or the

18  auction of these telecast rights?

19  A.   I'm sorry, you're going to have to do that one again

20  please?

21  Q.   Sure.  The discussions that have taken place --

22  A.   You had the mike in front of you and then you moved it

23  away.

24  Q.   I apologize.  The discussions that have taken place, have

25  there been any discussions on the subject of Blackstone

Coleman - Cross                              152

1    getting a contingency or success fee based upon the sale of

2    the telecast rights, then?

3    A.   No.

4    Q.   Can you turn to Exhibit 18?  Have you seen a copy of the

5    press release that was issued by the Debtors and Major League

6

7    Baseball?

8    A.   I've seen the statement, yes.

9    Q.   You see in the press release, it says that the -- there's

10   been an agreement and then they say in the second line, to

11   sell the team and its intended media rights in a manner

12   designed to realize maximum value for the Dodgers and their

13   owner Frank McCourt, do you see that?

14

15   A.   I do.

16   Q.   Is that your understanding of what you're doing, you're

17   trying to maximize the value for the Dodgers and their owner

18   Frank McCourt?

19   A.   I didn't put the words quite that way.  This is a press

20   release.  It's not a legal document.  Our job is to work for

21   the team and try to create as much value as possible for the

22   team.

23   Q.   And I think we covered that, Blackstone's obligations or

24   interests run to the team, not to Mr. McCourt?

25

Coleman - Cross                              153

1   A.   That is correct.  We do not work for Mr. McCourt or any

2   of those other entities.  We work just for the Debtors.

3   Q.   Now we've talked a little about the settlement agreement.

4   That settlement agreement included some terms or certain

5   deals dealing with the future telecast rights, is that right?

6   A.   I'd be happy to look at that, the document.  Frankly, I

7   haven't looked that much.

8              MR. TEKLITS:  Can I hand up a copy of the --

9              THE COURT:  You bet --

10             MR. TEKLITS:  -- settlement agreement.

11             THE COURT:  Yes, sir.

12             MR. WERKHEISER:  Does Your Honor get a copy?

13             THE COURT:  Yes if you have it right there.  I

14  didn't bring in with me to Court.  Thank you, Mr. Werkheiser.

15

16  BY MR. TEKLITS:

17  Q.   Have you seen a copy of this document?

18  A.   I have.

19  Q.   And if you turn over to page 2 there's a heading that

20  says Sale Terms, do you see that?

21  A.   I do.

22  Q.   And on the second paragraph it says, MLB has agreed to

23  confidential terms governing certain media right transactions

24  that a buyer may enter into and which become effective at any

25  time prior to April of 2014, do you see that sentence?

Coleman - Cross                                    154

1   A.   I do.

2   Q.   So in the settlement agreement, there were certain terms

3   agreed to with respect to the media rights, is that right?

4   A.   I see what's written here.

5   Q.   And those terms if you keep reading those terms are set

6   forth in what's identified as the special terms?

7   A.   I see that.

8   Q.   Now, I assume you agree that those special terms do

9   affect the Fox's rights that it has in the existing contract

10  it has with the Dodgers?

11  A.   I'm not sure I can answer that.

12  Q.   In any event, Fox was not included in the mediation that

13  led to that settlement agreement, was it?

14  A.   I don't recall seeing Fox there, no.

15  Q.   And as far as you know Fox is not -- these special terms

16  have not been shared with Fox?

17  A.   Not to my knowledge, but I don't know that I would have

18  that knowledge.

19  Q.   And the terms that were reached between Mr. McCourt --

20  let me back up on sec just to clarify something for the

21  record.  You see on page 1 that this is an agreement that was

22  entered into between Major League Baseball, Mr. McCourt and

23  the Debtors?  Do you see that in the top paragraph?

24  A.   I do.

25

Coleman - Cross                                    155

1  Q.  And I think you testified on direct; disagreement

2  provides that any buyer of the team will have the right to

3  accept or reject whatever the result of this procedure that

4  you're advocating here today?

5  A.  I did testify to that, yes.

6  Q.  Now, the primary basis upon which I think you testified

7  on your direct for advocating for these procedures is you

8  want to provide information to potential bidders as to the

9  value of the rights?

10 A.  I'm not sure I said that.

11 Q.  Well you gave your analogy of the empty warehouse or

12 empty building?

13 A.  Right.  I didn't really follow the question.

14 Q.  Well as I heard it the primary reason why you're here

15 today advocating for why the Court should grant Debtors'

16 motion and allow these amendments to Fox's contract is by

17 going through the procedure that you've been advocating for,

18 it will provide certain information as to the value of those

19 rights to potential bidders for the team, is that right?

20 A.  I think what it would do is allow the potential bidders

21 to make a determination if they would like to go forward with

22 that contract.  They would see the contract.  They could make

23 a decision what they think of it and make a decision overall

24 as to how they want to buy the team and all of its assets.

25

Coleman - Cross                          156

1   Q.  And to go forward with this procedure you agree certain

2   changes are going to have to be made to the existing contract

3   with, between the Dodgers and Fox?

4   A.  And the ones that we're talking about that I testified to

5   earlier in terms of moving the date and a couple of other

6   changes as required by MLB, yes.

7   Q.  And I think you gave your analogy to the empty building

8   where somebody would want to show what you could do with the

9   empty building, is that right?

10  A.  I did give an empty building; an unleased building

11  example, yes.

12  Q.  But the Dodgers are not a -- that's not a very good

13

14  analogy to the Dodgers, is it?  I mean I think you later on

15  testified that everybody knows everything about this team.

16  A.  I said I think a lot of people know a lot of things so

17  they could make determinations about it relatively quickly.

18  They haven't seen numbers and so somebody would have to see

19  those numbers to make their own judgment as to what they

20  think, but that was really in the context of the five

21  business days as opposed to the 45 day negotiating period;

22  that I thought there was enough information out there that

23  people weren't starting from scratch.  So if you're Time

24  Warner and you have your own RSN and you know the Los Angeles

25  market and, you know, see what you see about the Dodgers and

1    whatever is out there publicly and obviously all the things

2    that are being discussed in this Courtroom and elsewhere, it

3    would be relatively easy for one to make a determination as

4    to general thoughts, or maybe even specific thoughts very

5    different than if we called somebody else up about some other

6    company they never heard of and said I'm selling this

7    company.  I've got five business days to think about this,

8    what do you think of it.  And they'd say I don't even know

9    the industry or something like that.

10            This is an industry people know.  This is a team

11   people know.  This is a market people know and some of those

12   people are actually in that market already doing the same

13   things.  So from that perspective, that's what I was

14   testifying to.

15   Q.  And I assume you reviewed the declaration that your

16   colleague Mr. Cohen filed?

17   A.  I did.

18   Q.  And somebody that wanted to try to put a value on these

19   future telecast rights could look at the telecast agreements

20   for various other baseball teams, is that right?

21   A.  Well they'd make whatever judgments they make because

22   some of those, you know, contracts are contracts.  Some were

23   made recently, some were made a long time ago, so they would

Coleman - Cross                                    158

1   do whatever -- they could obviously use whatever comparables

2   they could get their hands on.

3   Q.   But there's a lot of information out there for comparable

4   teams, is that right?

5   A.   I think there's a lot of information in the marketplace

6   about baseball, baseball assets and everything else.   You

7   were drawing a different conclusion.   I can't just jump from

8   one to the other.   If you see one person's media contract

9   does not necessarily mean that's what the Dodgers have.

10  Q.   I'm not trying to be that close of analogy, but I'm just

11  saying, for example, you could look if somebody wanted to try

12  to value what the future telecast rights were for the Dodgers

13  they could look at the recent contract of the Rangers and the

14  Astros and the Brewers and Anaheim and the Yankees and the

15  Mets and the Cubs.   There's a lot of other teams that have

16  recently negotiated these types of contracts.

17  A.   There are a lot of other teams that have negotiated these

18  contracts and whatever they could find in the public domain,

19  they could use.

20  Q.   And they can also look at the deal that Fox and the

21  Dodgers reached in, I guess, June of last year?

22  A.   They can.

23  Q.   That's information is available to people.

Coleman - Cross                     159

1  A.   That obviously whatever information came out as part of

2  the process of trying to get that approved, that's correct.

3  Q.   And from that information somebody could put together a

4  bid for the team, they'd have a pretty good idea of the value

5  of the telecast rights to put together a bid of the team, is

6  that right?

7  A.   I'm not so sure they have a good view of the value, but I

8  think they'd have a lot of information and, obviously, one

9  could put a bid together with no information.   They would

10  have more information using your description.   That doesn't

11  mean they have everything they need, and it would certainly

12  be better to have a fully negotiated contract in our view.

13  But they would have information that they could use obviously

14  to make their judgments.

15  Q.   I think you even mentioned on direct that somebody may

16  actually over value the rights in making their bid and put

17  more value than they're actually worth?

18  A.   I didn't say I thought they could.   I said somebody might

19  have the dream and go the other direction.   That certainly

20  happens sometimes when things are in a bubble.   If we think

21  back to real estate in 2006, there were a lot of dreams back

22  then and now they're all sitting empty in Miami, and Las

23  Vegas and a few other places.   So you never know whether

24  somebody might have a dream in any auction where they get so

25

1   excited and they don't care, but I didn't testify that I

2   thought that that's what's going to happen.

3   Q.   And people could go and consult with somebody like Mr.

4   Desser that's been involved in a lot of these contracts, is

5   that right?

6   A.   I would think so based on that resume, they should.

7   Q.   And he can give t hem a lot of information as to the

8   value of the telecast rights and what somebody could do with

9   those rights in the future.

10  A.   He would give them whatever information he has.  By the

11  way, allowed to have.  I mean some of this information is

12  private, so he'd obviously have to, you know, abide by

13  

14  whatever confidentiality agreements he signed.

15  Q.   And, in fact, the Dodgers have valued the team at various

16  points recently, is that right?

17  A.   I don't know what you're talking about.

18  Q.   All right, well can you turn to -- have you seen various

19  presentations and other information in connection with your

20  work that the Dodgers have done in the last year?

21  A.   Are you asking me if I --

22           MR. BENNETT:   I want to caution the witness not

23  anything used in a mediation.

24  BY MR. TEKLITS:

25

Coleman - Cross                                    161

1   Q.  Can you turn to Exhibit 6?  Have you ever seen this

2   document before?

3   A.  No.

4   Q.  Are you aware that the Dodgers did projections with

5   regard to the value of the future telecast rights -- I mean

6   the revenues that would be received from the future telecast

7   rights?

8           MR. LEVINSON:  Objection, Your Honor; the witness

9   said he had never seen this document.  Other than that I

10  think that lack of foundation.

11          THE COURT:  Well I guess are you aware could include

12  other than --

13

14          MR. LEVINSON:  If that's the question, then I

15  withdraw it.

16  BY MR. TEKLITS:

17  Q.  That's the question.  I mean are you aware that at

18  various times the Dodgers have done projections as to the

19  value of the future telecast rights?

20  A.  No.

21  Q.  Those were not shared with you?

22  A.  You're asking --

23          (audio stops at 4:53:49; resumes at 5:13:23)

24          THE CLERK:  Please rise.

25

Coleman - Cross                          162

1          THE COURT:  Thank you, everyone; please be seated.

2   All right, Mr. Teklits.

3          MR. TEKLITS:  Thank you, Your Honor.  May I proceed?

4   BY MR. TEKLITS:

5   Q.  I think you testified on direct that it would be possible

6   to conduct a sale of the team leaving intact the Fox

7   contract, is that right?

8   A.  That's correct.

9   Q.  And the new buyer would simply assume that contract and

10  would comply with the obligations under it for the future

11  telecast rights?

12  A.  That would be the theory, yes.

13

14  Q.  And you, Blackstone, could prepare projections relating

15  to the value or the potential revenue cash stream that could

16  be realized from the future telecast rights after 2014?

17  A.  I think with the help of the company yes.

18  Q.  Have you already prepared those forecasts?

19  A.  I haven't, no.

20  Q.  Do you know if anybody else at Blackstone has prepared

21  those forecasts?

22  A.  I don't know.  I'm not sure I know the answer to that

23  question.

24  Q.  But you testified on your direct about all of these

25  auctions and sales processes you've been involved in.  That's

Coleman - Cross                           163

1   what Blackstone does, you prepare projections of the cash

2   flows and you go out and sell it to people.  You say this is

3   what this is worth.  This is what you should pay for it.

4   A.   Is that a question?

5   Q.   Yeah I mean that's your expertise, right?

6   A.   Well I like to think there's a few other things that we

7   do, but we do sell companies, that's correct.

8   Q.   And you have a lot of experience in doing that?

9   A.   I've been at it for a long time.

10  Q.   And you have a lot of experience in preparing potential

11  cash flow projections and convincing a person to pay a lot of

12  money for that asset?

13  A.   Thank you.  But we have a lot of experience in working

14  with companies in trying to put the company on the market

15  with the best possible face, let me say it that way.

16  Q.   And if you did that here if the Debtors did that here,

17  there'd be no potential damage claim from Fox, right?

18  A.   You're asking me if we just abided by the terms of the

19  agreement and let the buyer buy what exists in that contract

20  and assume that contract?

21  Q.   Yes.

22  A.   I assume there would be no -- you tell me.  You're Fox.

23  I don't hear a claim there, but.

Coleman - Cross                                        164

1   Q.  All right so if you followed the procedure that I'm sort

2   of laying out here.  You just leave the contract in place.

3   You go ahead and sell the team.  Blackstone prepares the cash

4   flow projection in conjunction with the Dodgers, touting how

5   valuable these assets are, and you go out there and try to

6   sell the asset.  You go through that procedure.  You have no

7   damage claim from Fox, right?

8   A.  I'm not a lawyer.  I don't think I'm aware of one.  I

9   don't - I think you're also trap me to this.  I'm not aware

10  that there would be a damage claim.

11  Q.  And under those valuations that you've done under those

12  scenarios, there'd be enough money, at least the current

13  expectation, to pay off all the creditors?

14  A.  I didn't mention any valuation so I don't know what

15  you're talking about.

16

17  Q.  I thought you said that Blackstone had prepared

18  valuations of the asset assuming?

19  A.  I don't think I testified to that.

20  Q.  You haven't prepared any valuations of the Debtors?

21  A.  No.  Not in any way that would be in, that I could

22  testify to.

23  Q.  Maybe I misheard you, but I thought you earlier testified

24  that if you assume that the sale of the team happened leaving

25

1  the Fox contract in place, the current expectation was you'd

2  have enough money to pay off the --

3  A.  No I did not testify to that.  I hope I didn't because

4  that's not what I intended to say.

5  Q.  Well isn't that your expectation?  You'd have enough

6  money from that sale to pay off the creditors?

7  A.  I don't know.  I haven't considered it.

8  Q.  Well some people have already made bids for the team, is

9  that right?

10  A.  In what context are you speaking?

11  Q.  Well can you turn to Exhibit 17 in the binder?  Have you

12  seen that letter before?

13  A.  I have.

14  Q.  And at least that party thought they had sufficient

15  information to make an offer for the team assets, is that

16  right?

17  A.  I see the offer.

18  Q.  And with an offer in that range I assume there'd be

19  enough money to pay off the creditors?

20  A.  What this says is they're prepared to pay $1.2 billion

21  dollars in cash for a variety of things and if they, in fact,

22  were able to do that -- but by the way this is not for the

23  team necessarily.  This says cash for the team and all real

24  estate and media and other assets included in that land the

25

Coleman - Cross                          166

1  residential real estate in Los Angeles and Malibu.  I assume

2  it doesn't mean our residential real estate.  I have to

3  believe that must mean the McCourt family, though I don't

4  know that from this.  So I don't know what's being

5  apportioned where, so I can't tell from this what the team

6  would be receiving.

7  Q.  But that offer was made with the assumption that the Fox

8  contract would remain in place?

9  A.  I have no idea.  You'd have to ask these people.

10 Q.  You're aware that other third parties such as Forbes

11 values the company; I mean the Dodgers as well, are you not?

12 A.  I'm aware that Forbes does valuations as a business.

13 Q.  And they value the business based upon the existing Fox

14 contract in place?

15 A.  I don't work at Forbes.  I have no idea how they do it.

16 Q.  Are you aware the Debtors have cited to those Forbes

17 valuations in their papers in this case?

18 A.  Everybody looks at Forbes.  There's nothing wrong with

19 looking at Forbes.  I just don't know how they do it.  I

20 don't work there.

21 Q.  And with the values that Forbes reached should be enough

22 money to pay off the creditors, right?

23 A.  I don't recall.  I didn't look at that before coming up

24 here.

Coleman - Cross                                    167

1  Q.   How much is it required to pay off the creditors, your

2  current understanding?

3  A.   I think the debt is $599 million dollars.

4  Q.   That's all held at the Debtor entities?

5  A.   I think that's correct.

6  Q.   And is it anticipated that all that goes --

7  A.   Actually there's more debt beyond that.  There's club

8  debt and things like that.  I'd have to look at the balance

9  sheet.  It's in my declaration if you'd like me to dig that

10 up.

11

12 Q.   Is it anticipated that all that debt will be paid off

13 from the consideration received from the sale of the assets?

14 A.   What was the beginning of the question?

15 Q.   Is it anticipated that all of the debt is going to be

16 paid off from the sale of the assets or is some going to be

17 assumed?

18 A.   You know, it all would depend on each buyer.

19 Q.   But your current expectation is they'll be sufficient

20 sale proceeds to pay off the creditors?

21 A.   I think if we follow the procedure that we're trying to

22 get approved here today, I feel very confident that we will

23 be very successful in paying off all the creditors and there

24 will be money left over for the equity.

25

Coleman - Cross                                  168

1   Q.  Even if you leave this Fox contract in place, the

2   expectation would be there'd be sufficient proceeds?

3   A.  I didn't testify to that and I don't think that's the way

4   to sell this company.  So I haven't really done that

5   analysis.  I don't think it's a good idea to do it that way,

6   so that is not what I've testified to.

7   Q.  Well now I'm asking you a separate question to what you

8   testified in the past.  I'm asking you right here, point

9   blank, your expectation, you're the expert, is that if you

10  sold these assets leaving the Fox contract in place you'd be

11  able to get sufficient proceeds from that sale to pay off all

12  the creditors?

13  A.  You know I'm up here testifying under oath and the only

14  way I would testify under oath is if I've done that analysis.

15  I haven't done it so I can't give you a yes or no answer.

16  Q.  Do you know if anybody else at Blackstone has done that

17  analysis?

18  A.  Not that reports to me.

19  Q.  What's the source of the debt number, the $599 debt

20  number?

21  A.  I think we filed that in our first day papers as I recall

22  or somewhere in that range.

23  Q.  Now, you propose these marketing procedures that you say

24  you're advocating the Court allow, is that right?

Coleman - Cross                                    169

1    A.   Yes.

2    Q.   And you say and I think you testified you've reviewed and

3    you actually went through on your direct the existing

4    contract that Fox has with the Dodgers, is that correct?

5    A.   What we went through more on direct was the one that

6    we're proposing, but I have looked at the existing contract.

7    Q.   And you also testified to the existing contract?

8    A.   Pieces of it, yes.

9    Q.   And as you testified that, at least the existing contract

10   runs through the broadcast rights, runs through the 2013

11   season, is that right?

12

13   A.   That's correct.

14   Q.   And under what you're proposing today that the Court

15   adopt the Debtor will get the benefit of that.  Fox will

16   continue to broadcast the games through 2013 and the Debtor

17   will continue to get the payments that it's entitled to

18   receive under that contract?

19   A.   Right, there's no effort to reject the contract.

20   Q.   And although Debtor will receive all of the payments or

21   benefits it's entitled to under that agreement, what you're

22   proposing is to cut back or re-write some of the rights that

23   Fox has under the contract?

24   A.   You see what's here.  You're making an assumption and as

25   I've testified I don't really think its changing your rights

Coleman - Cross                    170

1   from a value standpoint, but we are attempting to change a

2   date and have it reflect MLB's wishes.

3   Q.   So you agree with me that the Debtor or the Dodgers will

4   continue to get all the benefits that they're entitled to

5   under the agreement, but Fox's benefits or contractual rights

6   are going to be changed if the Court adopts your procedures?

7   We'll get to, we can argue about how much they're going to be

8   changed, but they're going to be changed, right?

9   A.   I hope so.   That's what I'm doing up here.

10  Q.   Before you came here advocating for these changes,

11  wouldn't Blackstone have wanted to do the analysis as to

12  whether this was necessary or whether you could pay off all

13  the creditors just leaving the contract in place?

14  A.   You mean on a sale?

15  Q.   Yeah.   Once you've assumed a sale before you go

16  advocating these types of changes to Fox's contract, I would

17  have expected that Blackstone would want to okay this is the

18  existing contract.   Let's see if we just go forward with what

19  we have if all of the Debtors' creditors will be paid off

20  without reaching any contract with Fox or creating any

21  potential claims by Fox.

22  A.   I don't agree with that.   I personally believe that if

23  you're going to put something on the market you try to put

24  your best foot forward and you try to have it show as best

25

Coleman - Cross                          171

1    possible.  That's true of every company that we have sold in

2    the past and that's, you know, part of what we think our duty

3    is when we sign up for one of these deals.  So, why you would

4    put it on the market with an old contract and not be able --

5    that expires in a short amount of time and not let a buyer go

6    to see what that asset is worth is beyond me.  So, to me,

7    it's logical.  And, again, when I look at it, I just don't

8    see where your harm is, you know.  Other than moving a date,

9    you're still getting all of the same provisions that you had

10   before including the conditionality that MLB had in your

11   original contract, so I wouldn't do that.

12

13   Q.  It's not an old contract.  It's a pending contract,

14   right?

15   A.  The contract that is in place started in '01, was amended

16   obviously when Frank bought the team.  I think it was amended

17   one other time.  That's what I was referring to.

18   Q.  And it's your understanding that's a binding agreement?

19   A.  It's a contract.

20   Q.  Yeah.  And Fox paid consideration for the back end

21   rights.

22   A.  I'm not so sure that I would agree with that, but you're

23   making annual payments through nine months a year.  I don't

24   know what that is aimed for, and so I don't know whether

25   that's aimed for the rights that you're, you know, airing at

Coleman - Cross                     172

1   this point in time, or whether that's some back end deal.  I

2   don't see the back end deal, frankly, but I don't really

3   know.

4   Q.  You don't have an understanding that the back end rights

5   in these telecast agreements are vital to the agreement?

6   A.  I think the telecast rights are vital.  I would agree

7   with that.

8   Q.  And you don't have an understanding that people such as

9   Fox pay a lot of money to have these back end rights?

10  A.  I think they pay a lot of money now for those rights.  I

11  don't recall what Fox paid at the time of the acquisition for

12  those rights.

13  Q.  And you don't understand that parties such as Fox invest

14  a lot of money in programming based upon the or in reliance

15  upon the fact that they have these rights; these negotiation

16  rights?

17  A.  I don't work for Fox.  You know, you'd have to ask them.

18  I assume that they spend some money to get themselves in a

19  position to do that.  How they, how that relates to the rest

20  of Fox's business and when they did that and all of those

21  things, I have no idea.  I'm not privy to Fox's internal

22  projections or workings.

23  Q.  Yeah but you're here as an expert.  You're testifying or

24

25  advocating to the Court to change Fox's contract --

Coleman - Cross                              173

1   A.   I'm here --

2   Q.   You got to let me finish my question.

3   A.   You're right; fair enough.

4   Q.   And I'm saying you don't understand here as an expert

5   that in these types of contracts a party such as Fox that

6   entered into this agreement, this long term relationship,

7   invests a lot of money in programming during the term of the

8   agreement based upon or in reliance upon the fact that it has

9   back end rights.

10  A.   I think that the all the distinction, I am here as an

11  expert, but I'm not here as an expert about how Fox runs its

12  business okay.  Fox does whatever it does.  It spends

13  whatever it spends on programming, on all of the elements of

14  its business.  I am not your expert.  At that, I've never

15  been inside Fox.  I don't know anything about it from that

16  perspective, so I can't testify to say they do all of these

17  things, and they spend all this money, and they're relying on

18  all these back ends rights.

19  

20       The back end rights are not being changed in this

21  contract whatsoever.  The only difference is date.  It's the

22  exact same contract as there.  MLB has always had that

23  conditionality.  They have it today.  And they just --

24  actually I think you should feel lucky because they've come

25  out and said very plainly the conditions that we would

Coleman - Cross                    174

1    consider would include perspective buyers having the right to

2    accept or reject, so it's something actually helpful.

3            Obviously, MLB can decide to -- they rejected the

4    last contract as you know much to the disappointment of the

5    Dodgers and Fox and they could continue to reject other

6    contracts.  So I can't speak for you and your back end rights

7    or anything like that because I'm not inside your company.

8    Q.  And you can't speak at any other media companies with

9    respect to telecast rights either because you never have

10   helped them negotiate these types of contracts or advised

11   them on these types of contracts?

12

13   A.  I can look at the contract and I can see what the

14   contract does, and I can see whether we're changing that

15   contract or not changing that contract.  Frankly, I don't

16   think its relevant what those other media companies do.  This

17   contract runs through 2014.  It has provisions.  We're

18   abiding by those provisions, and I don't see how you're hurt

19   what so ever.  So whether I know media or don't know media is

20   really, frankly, irrelevant.  I happen to know a fair amount

21   of media, maybe not these rights and maybe not like Mr.

22   Desser who I apologize, Your Honor.  I've been calling Mr.

23   Dresser apparently and I met him at break and he corrected

24   me, so I apologize for that.  You can correct the record if -

25   -

Coleman - Cross                                    175

1          MR. LEVINSON:  Let me just clarify it was counsel

2    calling him Mr. Dresser, not the witness.

3          MR. COLEMAN:  Maybe we both did and I apologize --

4          MR. LEVINSON:  Our witness was correct.

5          MR. COLEMAN:  Oh, thank you.  Never mind, I withdraw

6    that apology.

7    BY MR. TEKLITS:

8    Q.   Let me ask you, you just referenced Major League

9    Baseball.  Major League Baseball is not requiring the

10   marketing of these telecast rights immediately?

11

12   A.   Major League Baseball is requiring the sale of the

13   company.

14   Q.   My question Major League Baseball is not requiring the

15   Debtors or the Dodgers to market the telecast rights

16   immediately, are they?

17   A.   I don't recall a requirement.

18   Q.   This is coming from the Dodgers or Mr. McCourt?

19   A.   It's coming from the -- obviously the Dodgers, the

20   management team of the Dodgers, which would include Mr.

21   McCourt and all of his advisors including Blackstone.

22   Q.   It's not coming from Major League Baseball?

23   A.   I don't think Major League Baseball insisted that we sell

24   the team and change these rights.

25

Coleman - Cross                    176

1  Q.  Major League Baseball didn't insist that you give the

2  owner -- well strike that.  We'll get to that in a second.

3  The rights, you keep talking about the rights that are being

4  changed here.  Let's just go through those provisions

5  quickly.  So the first provision is, there's a no-shop in

6  place until October, November of next year, is that right?

7  A.  Are you going through a contract or something?  What, do

8  you want me to look at something or what?

9  Q.  Well if you want to go to the contract, but you testified

10 to this on direct so I assume you're familiar with it.

11 A.  Okay sorry, try me again.

12 Q.  Yes.  The existing contract in place between Fox and the

13 Dodgers provides that the Dodgers can't talk to any potential

14 purchasers or contractual parties for the future telecast

15 rights until November of next year.

16 A.  October 15 to November 30th is when that period of

17 negotiation would occur and then post that.  You know how it

18 works.  You're right I have testified to that.

19 Q.  And the Dodgers can't talk to anybody before November

20 30th?

21 A.  I think that's correct.

22 Q.  I assume you'll confirm that the Dodgers have not talked

23 to anybody to date about the future telecast rights?

Coleman - Cross                          177

1   A.   We have not negotiated or talked to anybody.   Obviously,

2   a lot of people are calling about the sale of the team and

3   asking what's happening with those rights and our message to

4   them is that there's a nice hearing that's going to occur,

5   which is now occurring, and we'll see what results from that.

6   Q.   And do you know of anybody at the Dodgers has talked to

7   anybody about the future telecast rights?

8   A.   No idea.

9   Q.   And also I think you just mentioned the exclusive

10  negotiating period doesn't happen until under the contract

11  until October 15th to November 30th next year?

12
13  A.   2012.

14  Q.   And you're advocating that those two periods be pushed up

15  to today?

16  A.   I'm advocating that whole process be pushed up to today,

17  that's correct.

18  Q.   Well let's start with those two periods.   You're

19  advocating that those two periods be pushed up to today?

20  A.   It's one period, those two dates.

21  Q.   Okay those two dates.   And under which you're advocating

22  if Fox doesn't get the rights, it will learn that it doesn't

23  have the future telecast rights sooner than it otherwise

24  would under the contract potential?

25

Coleman - Cross                                    178

A.   You mean if we have the full 45 day negotiation and then we go through the final offer and we go through that whole process, is that what you're asking?

Q.   Yes.

A.   Okay.   And if through that process Fox fails to win the future and that's the question you're asking me?

Q.   Yes.

A.   Okay then that would likely occur beforehand.   As you know, there are certain provisions in here for the perspective buyers that they may choose not to go forward. The company may choose not to go forward after this process and let it ride through to the original dates.   So it's not a foregone conclusion, though obviously you would prefer it to happen that way.

Q.   Well it's a risk, right?   Fox is at risk now under your proposed procedure of learning that it doesn't have the future telecast rights before November of next year which is the earliest that otherwise it would have learned that.

A.   Yeah I wouldn't call it a risk, but I think if the process goes well and somebody outbids Fox then the answer is Fox will find out earlier versus later that they are no longer the ones to provide those telecast rights starting in the 2014 season.

Coleman - Cross                          179

1   Q.   And would you agree that if Fox and other parties learned

2   that the future telecast rights are going to go to somebody

3   else in the future that may affect profitability to sell

4   commercials and to realize other revenues presently?

5   A.   You mean in terms of the rest of their media, I don't

6   know why that would be.

7   Q.   If somebody else testifies to that, do you have any basis

8   to disagree with that?

9   A.   That's a big hypothetical.  Nobody's testified to it.  Do

10  you want me to start answering what everybody might testify

11  to?

12  Q.   Have you thought about that?

13  A.   I don't think it's an issue.

14  Q.   Have you thought about that?

15  A.   Yes.  I don't think it's an issue.

16  Q.   Now, under the agreement, the current agreement, at Fox

17  and the Dodgers reached an agreement during that exclusive

18  negotiating period that would have been a binding agreement

19  between the two parties, between Fox and the Dodgers,

20  correct?

21  A.   It would have been subject to the, all of the consent

22  rights including MLB's consent right.

23  Q.   It would have been a binding agreement between the

Coleman - Cross                      180

1    Dodgers and Fox subject to Major League Baseball approving

2    it?

3    A.   No because the Dodgers have the right to put the RSN in

4    if they choose.   The Dodgers have the right to go and let the

5    -- actually there's a disagreement.   The Dodgers have the

6    right to put the RSN in if they choose to.

7    Q.   My hypothetical is that you've reached agreement with

8    Fox, though.   I assume you've already decided the Dodgers

9    have reached an agreement with Fox during the exclusive

10   negotiating period next year.   That's a binding agreement

11   between the two of them subject to Major League Baseball

12   signing off.

13   A.   It's subject to all of the conditions that are in the

14   contract.

15   

16   Q.   And now you want to add another condition.   You want to

17   add a condition that says the buyer of the team gets to

18   thumbs up or thumbs down too?

19   A.   It's not just me.   Obviously, it's the Debtors' motion

20   and it's something that MLB has asked us to do.

21   Q.   But, again, I guess this is putting the cart before the

22   horse.   MLB is not driving this process?   MLB would be

23   perfectly fine if you just left the Fox contract in place and

24   sold the team?

25

Coleman - Cross                    181

A.   Those are two different things.  I think if we just

decided to sell the team as is, my guess is MLB would be

fine.  But since we are selling the team in the way we're

selling it with the media rights up front, assuming that the

Judge approves it, then MLB wants to make certain that all

perspective buyers have the ability to make a choice on their

own if they want to move forward with whatever contract is

put in front of them including do nothing.

Q.   In effect, what you've done is you want to make Fox's

binding contract which was subject to just MLB approval, you

want to make it a stalking horse bid for the new owner?

A.   First of all, I don't think its binding.  I think Fox

gave up binding after the first -- in the first amendment.

But, secondly, I don't see it as a stalking horse.  I think

the procedures, as I've testified to and I believe is

accurate, are essentially the exact same procedures Fox has

today.  So I don't think, other than dates; those two dates

October 15th and November -- sorry, I know I'm speaking too

fast -- and November 30th.  Other than moving those two dates

up I don't see where this contract is any different than the

one that's in existence today.

Q.   Well presently, a third party isn't going to give thumbs

up or thumbs down to any future agreement that Fox reaches

with the Dodgers?

Coleman - Cross                        182

1  A.  Well I actually wouldn't agree with you there.  I think

2  MLB has just told you that's what they would plan to do.  So

3  you see in the consent rights.  I think you didn't think, and

4  I have to assume that you didn't think MLB would reject the

5  last one, so we don't have to make the qualities either of us

6  as to what would happen with MLB in the approval process.

7  They have whatever right they have to make whatever judgment

8  they want to have.

9       In this case, they've made it very clear what they

10 feel.  I wish I could predict what MLB would do.  It would

11 have been easier earlier, but I don't see -- I don't agree

12 with what you're suggesting.

13 Q.  My question is much more simpler.  Just put MLB to the

14 side, put everybody aside.  You keep telling me that Fox's

15 rights are the exact same rights under your proposed

16 procedure as they currently have --

17 A.  To be --

18 Q.  Other than move the date up.  Let me finish my question.

19 Other than moving the dates up, you're saying Fox has the

20 exact same rights.

21 A.  I believe that we have made every attempt to make them

22 the same.  If they are not exactly the same, we have made

23 every attempt to make them the same and that's what the

24 document says.

25

Coleman - Cross                                        183

1  Q.  One way they're not the same, putting it aside why

2  they're not the same, but one reason they're not the same is

3  because your proposed procedures, a third party now, is going

4  to have thumbs up or thumbs down over whatever agreement Fox

5  reaches with the Dodgers.

6         MR. LEVINSON:  Your Honor.

7         THE COURT:  Mr. Levinson, yes sir.

8         MR. LEVINSON:  Objection.  I think it's getting

9  argumentative.  The questions I think sort of been over this.

10 And at this point I just think it's argumentative.

11        MR. TEKLITS:  I have to strenuously disagree.  I

12 mean he's opened it.  It's wide open.  He says that Fox's

13 rights are exactly the same under his procedures and the

14 contract other than timing.  And I just can't see how you

15 could ever reach that conclusion.  And I think he's being a

16 little evasive; he keeps saying that Major League Baseball.

17 But it's pretty clear that they're not the same, and I'm just

18 going over how they're different.

19        MR. LEVINSON:  And the reason I said it was

20 argumentative is because I thought the witness has already

21 answered this question a couple of times, so that's why I

22 thought it was argumentative.

23        THE COURT:  I think so as well, Mr. Levinson.  I

24 think the question has been asked and answered here.  And,

25

Coleman - Cross                                    184

1   obviously, you'll have testimony from your experts and

2   argument as well.

3            MR. TEKLITS:  I'll move on; that's fine.

4   BY MR. TEKLITS:

5   Q.  And after the exclusive negotiating period under the

6   current contract Dodgers, if there's no agreement reached

7   Dodgers are required to make the binding final offer, right?

8   A.  You keep using the word binding.  I don't believe there's

9   any binding in any of your documents, so I can't agree every

10  time you say that.  The Dodgers are obligated to make the

11  final offer according to what the contract says.  After a

12  five day period, five day business period, they go out and

13  can comb the market, do whatever they want to do.  Then they

14  may make that final offer.

15  Q.  And that offer has to be made under the current contract

16  consistent with Fox's existing rights?

17  A.  It's mandated under the current contract according to the

18  contract.

19  Q.  Well isn't it your understanding that under the current

20  contract it's required to be made consistent with Fox's

21  current rights?

22  A.  I don't know what that means.

23  Q.  Same number of games.

Coleman - Cross                                    185

1   A.   It's in the contract.  I don't know.  I can go through it

2   again if you want, but it's in the contract.  It talks about

3   a 100 games five year's minimum, all those pieces.

4   Q.  You're here testifying, if I'm correct, that your

5   proposed procedures do not change Fox's rights under the

6   contract in any way other than the time?  Is that your

7   testimony?

8   A.   I've testified at length about this.  I've testified to

9   the change of the dates.  I've testified to the fact that MLB

10  would like the perspective buyers to have their decision as

11  to whether they would move forward with that contract; and

12  otherwise, I think we tried to mirror as close as possible.

13  You keep using the word exact.  I'm trying as hard as

14  possible to get to that standard, but I'm not testifying that

15  it's exact.  I think its close as can be.

16  Q.   And you've assumed within that opinion you're giving is

17  the fact that you have a pretty good understanding of the

18  existing rights and a good understanding of the rights that

19  are being proposed?

20  A.   I think so.

21  Q.   Okay.  So focusing on the existing rights now, isn't it

22  your understanding that under Fox's existing rights that the

23  offer, the final offer, has to be to Fox for the exact same

24

25

Coleman - Cross                                186

1   rights that it currently has; same number of games, same type

2   of media?

3   A.   I'm not sure why we're going over this in this way, but I

4   would look at the telecast agreement and I would say that we

5   are sticking to this agreement.   So I don't see where looking

6   at the first and second amendments -- In those amendments

7   that is where Fox eliminated this binding concept you keep

8   talking about.   And now you have 2(B) this end of first

9   negotiation, you have 2(C) this right of first refusal and

10  within that you have the ability to set up an RSN which

11  obviously, therefore, cannot be binding.   So I'm really

12  trying to answer your question, but I'm a little lost as to

13  where we're going because it's all right here.

14  Q.   Well under your existing, no -- under your proposed,

15  let's go at it this way if you don't want to go at it that

16  way.   Under your proposed procedures the Dodgers are now

17  going to have the right to pursue licensing of some subset of

18  the telecast rights; less games, less permitted distribution

19  platforms, less permitted languages.   Remember that?

20  A.   I do.   I think that that's referring to the fact that

21  what it, it talks about at top is a 150 regular season Dodger

22  games, which Fox does not have.   Fox has a 100 games.   So I

23  believe that some of that is referring to those pieces.

24

25

Q.  But that would also allow you, for example, to offer if this was approved as written that would allow you to offer in this final offer 20 games to Fox?

A.  That's not what the -- in no way does that suggest this here.  We are trying to be living up to the contract.  So there's no attempt here to do something like that.

Q.  Well do you agree with me that that language could be read as permitting them?

A.  I don't think so, let me just read it a second.  You know, I'd have to go through this fairly thoroughly.  I cannot believe that we left it so that we could suddenly just sell 20 games.  That's not our intention in any way and the lead off paragraph suggests otherwise.

Q.  Have you attempted to calculate the potential damages to Fox if the Court later finds that its contract was breached because of these procedures?

A.  I have not attempted to calculate it.  I told you my view is that I don't think there is any real cost to Fox based on how the contracts are now written.

Q.  What if because of these procedures Fox loses the Dodgers?  Would that cause substantial damages to Prime Ticket?

A.  You mean as a consequence of following the procedures that are outlined here, somebody else takes over the --

Coleman - Cross                          188

1   starts a new contract and this one ends in 2013 and a new

2   company takes over, is that your question?

3   Q.   Yes.

4   A.   What's the question though?

5   Q.   The question, would that cause substantial damage to or

6   loss to Prime Ticket if it lost its rights to the future

7   rights to the Dodgers?

8   A.   I don't think -- I think it would be unfortunate for Fox,

9   but I don't think there would be any claim back to the

10  Dodgers that we would have followed the rights that you have

11  today.   And then it says a consequence of following those

12  rights other than by doing it ten and a half months early,

13  which is very hard for me to image that that causes any great

14  loss, otherwise, we would have followed your rights and you

15  would have had your shot.   And if you didn't win.   It's

16  unfortunate.   It would be unfortunate Fox results, but I

17  don't think there's any claim back to the Dodgers for that.

18  Q.   I assume you're not here as a legal expert, so for right

19  now I'm putting aside the legal question of whether your

20  procedures would breach the contract or not.   Right now --

21        MR. BENNETT:   Your Honor, on that basis I object to

22  the whole line of questioning.

23        THE COURT:   Sustained.

24  BY MR. TEKLITS:

Coleman - Cross                                    189

1   Q.  I'm not really sure what the basis of the objection.  I'm

2   just getting to the economic loss.  Wouldn't Prime Ticket

3   suffer a substantial economic loss if it lost the future

4   telecast rights of the Dodgers, putting aside any legal

5   question.

6   A.  That's a very different question that you asked.  Prime

7   Ticket, if Prime Ticket does not succeed in following these

8   procedures and winning, there will be a loss for Prime

9   Ticket, but they will have lost the Dodgers.

10  Q.  And that will be a substantial loss?

11  A.  I have no idea.  It would be a big loss to obviously -- I

12  don't know maybe you're losing money on the contract, for all

13  I know.  I doubt it.  It's a pretty lucrative contract for

14  you, but it will be whatever loss it is.  But I don't think

15  that's a loss that comes back at the team.  That's a loss

16  that, unfortunately you lost the negotiation.  That's an

17  unfortunate thing, but that happens.

18  Q.  And okay let's take it a step forward now.  If a Court

19  later finds that this was a breach of the agreement, that's a

20  loss that potentially the Dodgers and their creditors will

21  have to bear.

22           MR. BENNETT:  Objection; that's a legal question.

23           THE COURT:  That is a legal question.  I'll sustain

24  that objection.

25

Coleman - Cross                              190

BY MR. TEKLITS:

Q.   Did you try to calculate?  I mean I see you set up this procedure that you want the Court to sort of give you an opinion on a potential loss.  Have you or anybody else at the Dodgers tried to calculate that potential loss?

A.   I can only speak for myself and as I testified to now several times, I don't see where there's a loss, we're changing ten and a half months worth of negotiating time and that's it.  So I don't understand what loss it would be and I wouldn't even begin to think about how to calculate a loss because I don't see it.

Q.   Well it's not just, I mean we can keep going over this not just ten and a half months, it's the fact that now they're going to have a third party that's going to approve or disapprove of the contract that's reached between Fox and Dodgers.

        THE COURT:  Mr. Teklits, we are going over the same questions.  You use the word damages.  You use the word loss. Let me tell you what's going to happen.  Your witnesses tomorrow are going to be the last witnesses and we're going to end tomorrow at 5:00 whether your witnesses are finished or not.  So if you think that this is a delay tactic, which it seems like to me, I must tell you.  Mr. Werkheiser's hour long opening instead of 20 minute opening seemed to me like a

1    delay tactic, it is not going to work, and it will work

2    against your client.

3          MR. TEKLITS:  I apologize, Your Honor, if it's used

4    as a delay tactic.  I haven't meant to delay.

5          THE COURT:  All right.

6          MR. TEKLITS:  I'll move on.

7    BY MR. TEKLITS:

8    Q.  Now I think you even testified in your opening that you

9    would rather have the money go to or to the equity holders of

10   the Dodgers than go to the buyer of the assets if it's

11   ultimately determined that the marketing rights are more

12   valuable than anybody would anticipate in the bidding

13   process.

14   A.  I don't know if that was quite my testimony, but what I

15   would like to see is to maximize the value for the Debtor

16   estate that I represent.

17   Q.  And that money, any additional consideration goes to Mr.

18   McCourt?

19   A.  It goes to the estate and it's a waterfall in the estate.

20   Q.  And if it went -- if we took your assumption that these

21   rights are more valuable than somebody would bid to go

22   through your -- if we didn't go through your procedure,

23   people would make bids based upon the existing information,

24   right?

Coleman - Cross                    192

A.   They'd make -- well I think they'd make bids on whatever

basis they made them.

Q.   And if it turns out that they may have underbid because

the rights were more valuable that additional value would go

to the purchaser of the Dodgers?

A.   If there's a consequence of running a process without the

ability to have a contract in place.  There's no contract.

The only contract that's there is the existing contract so

there's no new extended contract that they could look at.

And as a consequence of that, my empty building theory with

no leases they bid less.  And the winning bidder, and all of

the bidders bid less, than that would be less money for the

estate and, presumably, that would be money transferred to

whoever the successful buyer is, because when they went to

actually then renegotiate that contract or follow the

procedures as outlined, presumably they'd make a lot of

money, that's our view, and, therefore, that would be a money

transferred from the estate over to some random buyer that is

unknown at this time.

Q.   Well if you did an equity sale here at the end, if

somebody buys the equity that would be potentially money that

could be put back into like Dodger Stadium, the Dodgers team?

A.   I don't follow that question.

1   Q.   Well if you did this sale through an equity sale you sell

2   the equity of L.A. Holdco, right?

3   A.   Okay.

4   Q.   At your sale --

5   A.   If you're selling the company, I don't know if you're

6   into an equity sale.  I mean you're selling --

7   Q.   Well an asset sale, you're going to sell the equity of

8   L.A. Holdco.

9   A.   Well we're hoping to sell the entire company through a

10  plan of reorganization which is different, perhaps, than a

11  363 sale.  But even in a 363 sale you could probably do it

12  another way.  But I don't know what you mean by equity sale.

13  The entire team is for sale with all of its assets including

14  its media rights.

15  Q.   And the new owner of those Dodgers would potentially if

16  it did realize this money could invest that money back into

17  the team?

18  A.   Well they could do whatever they wanted to do based on

19  whatever they did.  They wouldn't have to.  The media could

20  very well be set up in a way that the money does not go to

21  the team, but it will be set up that way.  And the likelihood

22  that that money goes to the team is hardly a foregone

23  conclusion.  It could be a very nice payday for the buyer to

24  actually reduce their original purchase sort of like a

25

Coleman - Cross                              194

1    dividend recap.  The buyer buys it with the existing

2    contract, no new contract, and they go through the procedures

3    in October of 2012.  They have a big payday as a consequence

4    of the process and all this money floods in.  It could, it

5    would wherever their position is it could actually move not

6    into where the team would be housed, but into an RSN or

7    something like that and that money does not necessarily go to

8    the team.

9    Q.  But it could go to the team.  They could structure so

10   that money went into the Dodgers and would be available to

11   renovate the stadium or --

12

13   A.  Well a buyer could bring money out of their pocket.

14   Money could fall down from the heavens.  A lot of things

15   could happen, but I don't know if -- how you could do a would

16   of, could of, should of.  If they succeed at getting more

17   money that would normally have more money.  That's what I

18   would testify to.

19   Q.  Well under your procedure that additional money goes to

20   Mr. McCourt.  And if you didn't do your procedure, that money

21   goes to the buyer who could put it back into the team?

22   A.  And they're in a procedure, the team is for sale, and the

23   owners of the team get whatever that value is after the debts

24   are accounted for.  That's what exists.  I'm telling you that

25   my view is if we do it with the existing contract, the team

1   will sell for less and ultimately that value will go to

2   somebody else, not to Fox, not to MLB, not to Erin McCourt

3   Entity, but to somebody else; some new buyer and they would

4   be very excited about getting that value for themselves.  All

5   right but that doesn't mean that that money goes anywhere as

6   it relates to the team or to the stadium or to anything else.

7   With all due respect, I think you're completely wrong.

8   Q.  Well it could.  I mean the Dodgers are the entity that's

9   going to have the contract for the future telecast rights and

10  the money could flow into the Dodgers and they could use it

11  for the team.

12

13  A.  It depends on how this --

14      MR. BENNETT:  Objection; asked and answered and

15  argumentative.

16      MR. TEKLITS:  I'm just trying to get him -- I see

17  that we're talking by each other.  I didn't think it was a

18  very difficult question, but maybe.

19      THE COURT:  I think it was asked and answered

20  already, Mr. Teklits.

21      MR. TEKLITS:  I'll move on.

22      THE COURT:  I'll sustain the objection.

23  BY MR. TEKLITS:

24

25

Coleman - Cross                          196

1  Q.  I think as you testified under your proposed procedures

2  under your analysis or your opinion you're trying to create

3  more value you say, right?

4  A.  Always.

5  Q.  An opportunity, I mean there's not a guarantee.  You're

6  trying to create an opportunity that maybe more value, could

7  be created in the sale of the team?

8  A.  Everything we do in every Debtor estate we've ever worked

9  on is our goal, let me be on the record, is to maximize value

10 for the estate.  That's our job, so the answer is yes.

11 Q.  And the costs, I mean there's always a cost.  That's the

12 benefit, the opportunity.  The cost is you're breaching the

13 contract with -- potentially breaching the contract with Fox

14 and subjecting the Debtors to a damage claim?

15 A.  And that would be determined by the 502(c) motion that

16 would be put in by December 15th and people can make that

17 judgment.

18 Q.  Assuming the Court doesn't make that determination that's

19 a claim, there's a benefit.  It's an opportunity to maybe

20 realize more money.  The cost is you're breaching an existing

21 contract and subjecting the Debtors to a damage claim?

22 A.  I really don't think we're breaching the contract.  We

23 are asking to change the contract in this Court.  If we were

24 breaching the contract, I think you'd file a breach, a breach

Coleman - Cross                                    197

1   motion.  We're going to this Court and we are saying we'd

2   like to make a change to the contract, and I don't believe

3   that's a breach.

4   Q.  And another way of looking at this or stated differently,

5   what you're proposing is a set of procedures that create an

6   opportunity for more value to be realized by the ultimate

7   equity holder Mr. McCourt.  And the cost of that opportunity

8   is you're creating a claim by Fox for a potentially

9   substantial damage claim that they could bring against the

10  Debtors and might ultimately hurt the Debtors' creditors.

11           MR. BENNETT:  That's a legal question, again, Your

12  Honor.

13

14           THE COURT:  Well there are legal issues wrapped up

15  within the question, but I'll allow the witness to answer.

16  BY MR. TEKLITS:

17  A.  I'm happy to answer.  I think I've testified to it about

18  eight times.  I don't believe that there is a damage claim.

19  If there is a damage claim as a consequence of Your Honor

20  going through that motion, then the Debtor can make a

21  decision that this is too large and not go forward with it so

22  that that's a good question from that regard.  I think the

23  Committee would have an opinion about that.  I think Your

24  Honor would have an opinion about that. Certainly, the

25  company would have an opinion about that because the goal is

1    being maximized value.  So if there's a consequence of that

2    determination, the claim is so large that the determination

3    is that if even with all that new money that would come as or

4    new value that would come as a consequence of having moved

5    the procedures up by ten and a half months that the benefit

6    is overwhelmed by whatever claim was calculated, then

7    obviously the Debtor wouldn't go forward with it.  So I think

8    you actually have the best of all worlds here, which is that

9    we can go forward.  Hopefully, get approval for that.  And

10   then as a consequence of that approval, you'll get to measure

11   the claim, then the Debtor can make a judgment: good idea or

12   bad idea.  And that seems to me to be pretty simple frankly.

13   

14   Q.  But you would agree I guess from that question -- this is

15   my last question, Your Honor; I apologize.  If the Court

16   cannot or will not make this hypothetical calculation as to

17   the potential damage claim that this probably would not be in

18   the best interest of the Debtor because, although you may be

19   creating an opportunity for different values, that

20   opportunity is dwarfed by the potential costs from the damage

21   claim of Fox.

22   A.  I'm not so sure I follow you all the way, but I don't see

23   their being a -- look if at any point in time in the sale

24   process there's a determination made by the Debtor that there

25   is something that's going to cause a great loss in value as a

1   consequence of the process, the Debtor will reassess.

2   They're not stupid.  Obviously, the Committee will be with us

3   and they will assess, and they're not stupid.

4          So I don't see why anybody would go down that path

5   to make that mistake.  What we know today is we think this

6   creates a lot of value for the estate.  We don't think it

7   costs you anything.  You'll make that judgment and that case

8   in front of the Judge, but that's what we know.  And we think

9   it's the right thing to do.  We think it brings a lot of

10  value to the estate, a lot of clarity.  It works with MLB so

11  we think it's the right way to go.  And we have tried as much

12  as possible to mirror what was already in here with MLB

13  which, you know, is pretty simple to see it.  So I don't see

14  -- I really don't see damages.  I think that you find out

15  earlier what will happen, but I don't see the damages.

16

17         MR. TEKLITS:  Can I have one moment, Your Honor?

18         THE COURT:  Yes, of course.

19         MR. TEKLITS:  No more questions, Your Honor.

20         THE COURT:  All right thank you, Mr. Teklits.

21  Redirect?  Mr. Levinson?

22         MR. LEVINSON:  No redirect, Your Honor.

23         THE COURT:  All right, Mr. Coleman, you may step

24  down, sir.  Thank you.  I don't think it makes sense to start

25  with another witness or does it?  I can go a little while

200

1   longer.   The problem is budget crunch and we don't have CSO's

2   as long as we might want them anymore.

3          MR. BENNETT:   I wanted to clear a couple of pieces

4   of business.

5          THE COURT:   Okay.

6          MR. BENNETT:   I do -- I don't know whether Mr.

7   Coleman was planning to leave, but I assume he's free to go.

8   And you guys had him on your witness list that you thought

9   was inappropriate.   Do you have anything more that you want

10  him for?

11         MR. TEKLITS:   Free to go from our standpoint.

12         THE COURT:   Okay thank you, Mr. Teklits.   You're

13  free to go, Mr. Coleman.

14         MR. BENNETT:   Secondly, I'd like to think overnight

15  because it's possible that we will not even call Mr. Cohen.

16  I think we may have covered everything we needed to cover;

17  excuse me, Mr. Cole.   We may have covered everything we

18  needed to cover with Mr. Coleman.   And if we have, I will be

19  able to -- and I think that's how we're going to come out.

20  We will be done subject to the need for rebuttal if we have

21  to.

22         THE COURT:   Very well; okay, all right, thank you.

23         MR. BENNETT:   So it does make sense.

201

1          THE COURT:  Doors will be locked to the Courtroom if

2    you want to leave things here for the morning.  I know some

3    people are concerned perhaps about confidential documents.

4    But for the most part, they'll be very safe in the Courtroom.

5    And I think we should start tomorrow, we'll start tomorrow at

6    9:00 and hopefully we'll complete it all and maybe you'll

7    have an opportunity for closing.

8          MR. BENNETT:  Thank you.

9          THE COURT:  Thank you, counsel.  Good evening.

10      (Court Adjourned)

11

12

13                        CERTIFICATE

14   I certify that the foregoing is a correct transcript from the

15   electronic sound recording of the proceedings in the above-

16   entitled matter.

17   /s/Mary Zajaczkowski                    December 9, 2011
     Mary Zajaczkowski, CET**D-531                Date
18

19

20

21

22

23

24

25