Thompson - Cross                                    193

1   providers to be negotiated between now and 2013.

2   A.   Yes.

3   Q.   How many?

4   A.   I don't know.   I just know that Prime Ticket has in

5   excess of 200 affiliates and those deals are constantly

6   coming up.   That's why I specifically didn't put a value, you

7   know, against those deals.   I just know and there are always

8   negotiating deals, and I'm sure a number of them come up over

9   that time.   When you have 200 affiliates, I guess it's

10  expected that there will be some up.

11  Q.   So this is just a guess?

12  A.   I wouldn't call it a guess.   I would call it an educated

13  supposition based on 20 years in the business and knowing

14  affiliate right's deals on RSN's work.

15  Q.   I'll take supposition.   How many subscribers did you

16  suppose were affected?   Because if there are 200 of these --

17  A.   I -- go ahead.

18  Q.   My mistake, I interrupted.

19  A.   I didn't suppose a number of subscribers.   I know that

20  Prime Ticket has roughly 6 million subscribers which are

21  covered by in excess of 200 different, separate, distinct

22  affiliation agreements with cable distributors, satellite

23  distributors, etc.   I don't know that -- I have no idea how

24  many deals that come up, which I suppose deals do come up

25  given there's 200, I have no idea how many subscribers might

Thompson - Cross                           194

1    be covered by those supposed deals.

2    Q.  And some of those deals are pretty small, right?

3    A.  Yes, very small to very large, yes.

4    Q.  So we have no idea how big a factor this is or isn't?

5    A.  Not that I can put a number to.

6    Q.  Okay so now let's turn to your damages assertion.  You

7    said there were three kinds of damages.  Your first was this,

8    you expressed concern that if Fox loses the rights it will be

9    forced to conceive lower rates for renewals of Fox rights in

10   2012 and 2013, but actually you don't have any idea how many.

11   A.  Well that's what I said in my declaration, yes.  I also

12   mentioned in my cross that this could spread beyond just the

13   borders of Prime Ticket to other Fox channels.

14   Q.  I want to focus on Prime Ticket for the time being.  You

15   said that Fox would be forced to conceive lower rates in 2012

16   and 2013, but you just testified you have no idea how much

17   that would be because you don't know how many are rolling

18   over and how many subscribers are affected by deals with

19   cable distributors that have the right to negotiate for lower

20   rates, correct?

21   A.  Correct.

22   Q.  Okay so let's skip that one because it's completely

23   hypothetical so I can save a lot of time.

24   A.  Which is why I did not put a dollar figure to it.

25   Q.  Okay your second source of damages was the estimated 25%

1  devaluation of the consideration received over the term of

2  the agreement.   That was a 25% equaling $75 million dollars.

3  Could you tell me how you calculated that?

4  A.   The total right's fee paid over the course of the deal

5  were around $300 million dollars.

6  Q.   Right.

7  A.   Correct.   25% of $300 million is $75 million.

8  Q.   Well where do you get 25%?

9  A.   I've negotiated a 180 deals.   I've negotiated back end

10 rights in a 180 deals.   I know the value of back end rights

11 being there or not being there, and I know how I would have

12 approached this deal had I been involved on the negotiation

13 if the back end rights we're all sitting here arguing about

14 now had not been present in the deal.   I know in my mind,

15 based on my experience, that I would have discounted like

16 25%.

17 Q.   Okay so the fact that they've been undisturbed for eight

18 tenths of the term that didn't influence you?

19 A.   Look at the back end rights are only important at the

20 back end.

21 Q.   I see.   And there was no --

22 A.   Are most important, excuse me.

23 Q.   And the 25% was the discount or versus having back ends

24 rights versus not having back end rights, right?

25 A.   Correct.

Thompson - Cross                              196

1   Q.   So the fact that you're getting back -- you didn't do a

2   calculation for back end rights versus back end rights ten

3   and a half months earlier, did you?

4   A.   No.

5   Q.   Okay and it struck me that you decided to put the 25%

6   against revenue.  Revenue doesn't drop to the bottom line

7   automatically, does it?

8   A.   No, I did not put it against revenue.

9   Q.   I'm sorry, cost.  You did it just cost.

10  A.   Because that's what we pay, yes.

11  Q.   Okay but that's not, I mean -- you're saying that you

12  should have paid less but I mean --

13  A.   Right --

14  Q.   -- is that a measure of any actual harm or that's just

15  like kind of your idea of what you might have charged

16  differently if you had no back end rights?

17  A.   It's not what I would have charged differently.  It's

18  what I would have paid differently.

19  Q.   I'm sorry paid.

20  A.   Right.  Yes.

21  Q.   Okay.

22  A.   And I guess theoretically yes that would have dropped to

23  the bottom line.

24  Q.   Okay did you, when you -- just for future reference, did

25  you prepare like a schedule where you kind of looked at deals

Thompson - Cross                               197

1   to figure out that 25% or it was just feeling?

2   A.  Based on 20 years and a 180 deals, I have a pretty good

3   feel.  It was based on feel.

4   Q.  So you didn't pull comparables, you didn't try to compare

5   comparable transactions, look at differing values of

6   differing kinds of back end rights?  Just said if I didn't

7   have any, it would be 25% less?

8   A.  No I considered various types of back end rights and how

9   these back end rights compared to other back end rights and

10  then ascribed a percentage of the total value of the deal.

11  Some back end rights are stronger than others.  There are

12  rights stronger than this that I would ascribed a much higher

13  percentage.  And there are other rights that I would have

14  ascribed a lower percentage.

15  Q.  What percentage would you have ascribed to the rights

16  that were in the original Dodger deal?

17  A.  A higher percentage.

18  Q.  How high?

19  A.  Thirty.

20  Q.  So five percent difference for the, the months spread,

21  for all those things the total difference would be five

22  percent?

23  A.  I mean I'd have to look at all the specifics again, but

24  if you're talking about 2001 versus 2004 --

25  Q.  Yeah.

1   A.   -- that sort of went out of mind.  But I mean -- 30 is

2   probably not far off.

3   Q.   Okay so five points of difference for the difference

4   between the 45 -- excuse me, three month versus 45 day

5   negotiation period; the 17 month -- excuse me, 11 month

6   versus 17 month period before the end of the term; and for

7   the differences in the first right of refusal, that's worth

8   five points?

9   A.   Yeah and the words binding.

10  Q.   Oh the word binding is part of that too?

11  A.   Right.

12  Q.   All right, good.  Okay can I go to paragraph 22 of your

13  declaration please.  I want to remind you of your testimony

14  not too long ago that you have no idea whether the Fox and

15  the Dodgers will make a deal in their exclusive negotiating

16  period.  You have no idea whether they'll make a deal at the

17  time of the final offer.  You have no idea whether Fox will

18  actually ever get a chance to exercise limited rights of

19  first refusal.  You don't know whether the deal negotiated

20  would be profitable.  You don't know anything about the terms

21  of that deal.  How did you come to the conclusion you reached

22  in paragraph 22?

23  A.   Because I believe if the rights are breached, we have

24  less than a likelihood of doing the deal.

25  Q.   How do you calculate a less likelihood when you don't

Thompson - Cross                                    199

1   know what the likelihood is to start with?

2   A.   I don't know.

3   Q.   Paragraph 23; same question.

4   A.   Okay what's the question?

5   Q.   The question is if you don't know whether or not Fox will

6   and the Dodgers will make a deal in the negotiating period in

7   2012.   You don't know whether they will exclusive negotiating

8   period in 2012.   You don't know whether what the terms of the

9   final offer will be.   You don't know whether Fox will accept

10  it.   You don't know whether Fox will be able to exercise the

11  rights at the end, the rights of -- limited rights of first

12  refusal at the end.   You have no idea what the terms and

13  conditions of any of the deals that are going to be talked

14  about during that timeframe.   You have no idea whether it

15  will be profitable, how do you reach the conclusion in

16  paragraph 23?

17  A.   I know that if we don't do a deal, there will be harm.   I

18  don't know that we will do a deal, as well.   But I know if

19  there is no deal, these things will happen.

20  Q.   But there could be no deal --

21  A.   I realize that.   I just said that.   I said I'm not saying

22  that there's going to be a deal, and I'm not saying there's

23  not going to be a deal.   But if there is not a deal, these

24  things happen.

25            MR. BENNETT:   Can I have a minute to consult with

Thompson - Redirect                    200

1   my colleague?

2              THE COURT:  Sure.

3              MR. BENNETT:  Pass the witness.

4              THE COURT:  All right, thank you.  Mr. Klein, yes

5   sir.

6                    REDIRECT EXAMINATION

7   BY MR. KLEIN:

8   Q.  And you said on cross examination that you don't know if

9   there will be a deal if the 2004 agreement is in place and

10  the supposed marketing procedures are not approved, correct?

11  You don't know for sure if there's going to be a deal?

12  A.  Correct.

13  Q.  Okay now can you tell us is there a greater likelihood,

14  in your opinion, that there will be a deal between Fox and

15  the Dodgers if the 2004 amended agreement is in place as

16  opposed to if the marketing procedures that we're talking

17  about here today are in place?

18  A.  I think that the likelihood of Fox being able to reach an

19  agreement for a renewal of the 2004 agreement is more likely

20  under the existing rights and less likely under the amended

21  rights based on the last version I saw.

22  Q.  Now when you say its more likely under the 2004 amended

23  agreement as opposed to the marketing procedures agreement

24  before the Court today, are we talking about a little more

25  likely, a lot more likely, very, very substantially more

Thompson - Redirect                    201

1  likely?  Can you give some understanding of that?

2  A.  I would say significantly more likely.  It's not a

3  guarantee.  I mean as I mentioned there is no guarantee that

4  we'll have the rights at the end of either agreement.  But I

5  do believe that if we go through this process with the new

6  owners as is usually the case in a right's deal of a team

7  that's being sold that we can reach an agreement with the new

8  owner as has been our history in the past.

9  Q.  And that was the 95% number you gave before?

10 A.  Yes.

11 Q.  Now there was some talk about the fact that the word

12 binding had been removed from the 2004 amended agreement, do

13 you recall that?

14 A.  Yes.

15 Q.  And you negotiated a 180 of these agreements, right?

16 A.  Yes.

17 Q.  You're familiar with the wording of these agreements?  In

18 fact, you negotiate the wordings of these agreements, right?

19 A.  Well I try not to get down to specific words, but I'm

20 involved, yes.

21        MR. BENNETT:  Objection; relevance.  The cross

22 examination was limited to this agreement.  I didn't ask

23 about anybody else's agreements.  This is beyond the scope of

24 cross.

25        MR. KLEIN:  Your Honor, I think his experience in

Thompson - Redirect                    202

1  a 180 agreements certainly has relevance on his ability to

2  understand and read those agreements.

3          MR. BENNETT:  That was correct.

4          THE COURT:  Right, I'll sustain the objection.

5  BY MR. KLEIN:

6  Q.  Based on your background, your experience does the

7  absence of the word binding in the 2004 amended agreement

8  change the meaning of the agreement for you as if -- from

9  what it mean if the word binding was in there?

10          MR. BENNETT:  Your Honor this calls for an

11  assumption but this is also beyond the scope of cross.

12          MR. KLEIN:  Your Honor --

13          MR. BENNETT:  I didn't ask him what he thought.

14          THE COURT:  Well we went into the word binding on

15  cross and I'll overrule that objection.

16  BY MR. KLEIN:

17  Q.  You can answer.

18  A.  I'm not an attorney.  I never pretended to be one.  I

19  know that when someone makes an offer to us as part of a

20  right of first refusal, right of last refusal, whatever

21  refusal, an offer is put to Fox and we accept it we have a

22  binding deal.  Now, again, I'm not an attorney and I'll leave

23  that for others to argue, but my expectation at that point

24  just as much as when I shake somebody's hand is we have a

25  deal.

Thompson - Redirect                          203

1   Q.   Did you ever have a doubt in your mind when you did read

2   the 2004 amended agreement as to whether it was binding?

3   A.   No.   Well the deal is clearly binding.   The question is

4   whether or not the right of first refusal offer is binding.

5   And there was no doubt in my mind.   It was not something that

6   stuck out as a flare and said, you know, look out.

7   Q.   Now there was some talk about how much money the Dodgers

8   would make with respect, well how much money Fox would make

9   with respect to 2012 and 2013.   You were shown the $30 some

10  odd million dollar figure, do you recall that?

11  A.   Correct.

12  Q.   And you said, let me withdraw that.   In 2012 do you know

13  if Prime Ticket is expected to make money?

14  A.   Yes I do.

15  Q.   How much?

16  A.   Roughly $70 million dollars and change.

17  Q.   In 2013 do you know if Prime Ticket is expected to make

18  money?

19  A.   That's not a number I requested, but based on the fact

20  that these right's fees are only going up about, I don't know

21  it looks like 5% more or less and knowing where their other

22  right's agreements are in their term for Prime Ticket not Fox

23  Sports West, I would assume that they'll probably see a 5 to

24  7% increase in that as well.   The operating profit of Prime

25  Ticket so, go from $70 million to $73,500,000.00.

Thompson - Redirect                    204

1   Q.  And based on your knowledge and experience does the

2   Dodger -- having the Dodger contract for those years 2012 and

3   2013 play -- can I finish the question?  Does that play any

4   role in the expected profits for Prime Ticket in those years?

5              MR. BENNETT:  Objection, Your Honor; at least as

6   far as '13 this witness testified that he was making

7   assumptions, so there's clearly no foundation based upon the

8   past, the witness's past answer for anything about '13.

9              THE COURT:  Yes Mr. Klein.

10             MR. KLEIN:  Okay I'll just leave it for 2012,

11  Your Honor.

12             MR. BENNETT: He said '12 is also a forecast year.

13  He said he doesn't know anything about that either.

14             MR. KLEIN:  I'll do it 2011.

15  BY MR. KLEIN:

16  Q.  For 2011 how much did Prime Ticket make?

17  A.  $70 million dollars.  We have a fiscal year that runs

18  June to June so it crosses multiple years.  So 11, 12

19  whatever time you want to call it.  The current fiscal year

20  which expires June 30th, 2012 Prime Ticket will make $70

21  million dollars.

22  Q.  What part having the Dodger contract play in that?

23  A.  It's a significant part.

24  Q.  The most significant part?  Is there any other in single

25  sports team that --

Thompson - Redirect                           205

1   A.   There's no single other sports team that is that I would

2   say creates as much value that allows Prime Ticket to make

3   those profits as the Dodgers do.

4   Q.   And I just want to clear something up.  When you

5   testified on cross you talked about the fact that you, the

6   2004 agreement would have been worth less if and I think you

7   might have said no back end rights.  Were you talking about

8   just the back end rights that are now in the amended

9   marketing procedures?  If they had been in that agreement, is

10  that where you get the 25% less?

11  A.   Yes.

12  Q.   And you were also asked why didn't you try to pull some

13  comparatives to figure out if that 25% was the correct

14  number.  Why didn't you do that?

15  A.   I didn't feel it was necessary.  I've done enough of

16  these deals where I know the value of certain back end

17  rights.  And, you know, people can question my valuations all

18  they want, I'm going to stick by them.  I don't know anybody

19  who's done as many of them as I have.

20            MR. KLEIN:  Just one moment, Your Honor.

21            THE COURT:  Of course, Mr. Klein.

22            MR. KLEIN:  Thank you very much, Your Honor.  I

23  have no further questions for the witness.

24            THE COURT:  All right thank you, Mr. Klein.  Any

25  recall?

1          MR. BENNETT:  None.

2          THE COURT:  All right, Mr. Thompson, thank you,

3   sir.

4          MR. THOMPSON:  Thank you, Your Honor.

5          THE COURT:  You can be excused.

6          MR. KLEIN:  Your Honor, may the witness be

7   excused?

8          THE COURT:  Yes; yes.  I did invite him to be

9   excused.  Thank you, Mr. Klein.  Yes, Mr. Levinson are we?

10         MR. LEVINSON:  None for us, Your Honor.

11         THE COURT:  No rebuttal?

12         MR. LEVINSON:  No rebuttal, Your Honor.

13         THE COURT:  Okay, all right.  So I guess the

14  evidence -- Mr. Werkheiser, I'm sorry.

15         MR. WERKHEISER:  Your Honor, we have some

16  exhibits to offer for the record.

17         THE COURT:  Yes, let's clean up the record here.

18         MR. WERKHEISER:  To offer for the record.  We're

19  not moving ours in as we went along, so I think some of them

20  are duplicative.

21         THE COURT:  Are you going from your book?

22         MR. WERKHEISER:  From our book; yes, Your Honor.

23  You ready?

24         THE COURT:  I'm ready, yes.

25         MR. WERKHEISER:  So we would move in Exhibit 1,

1  the telecast right's agreement.

2          MR. LEVINSON:  I think it's already in evidence

3  as our Exhibit 1, so I'm not sure.  I think having one is

4  plenty.

5          MR. WERKHEISER:  Yeah I mean if you want I'll try

6  to edit to anticipate ones that you've already moved in.

7          THE COURT:  Do you want to move it in any event?

8          MR. WERKHEISER:  We're fine to have Debtors'

9  Exhibit of the telecast agreement, Your Honor.

10          THE COURT:  That makes sense.

11          MR. LEVINSON:  I think that's the one everybody's

12  been looking at, Your Honor --

13          THE COURT:  Yes, of course with the amendment

14  attached.

15          MR. LEVINSON:  Yes.

16          MR. WERKHEISER:  Yes, Your Honor.  We move in

17  Exhibit 3, the Court entity structure.

18          MR. LEVINSON:  No objection to Exhibit 3, Your

19  Honor.

20          MR. WERKHEISER:  We move in Exhibit 4, binding

21  term sheet dated November 3rd, 2011 for the divorce settlement

22  of McCourt.

23          MR. LEVINSON:  Objection, Your Honor; lack of

24  foundation and relevance.

25          MR. WERKHEISER:  Your Honor, as to the relevance

1   objection we've had a lot of discussion about the April 30th,

2   2012 date which has found its way into the MLB settlement and

3   not coincidentally appeared to this document.  I think it is

4   relevant and Your Honor can give it whatever weight is

5   appropriate in making a determination.  As far as foundation,

6   I do have a certified copy of that particular document if

7   there's a question as to foundation or authenticity.

8           THE COURT:  You know, I'm going to admit the

9   document for purposes of the date of the document as much as

10  anything.  Is that basically what your purpose is?

11          MR. WERKHEISER:  There is that and then it also

12  does indicate an obligation on Mr. McCourt's part to pay a

13  $131 million dollars by April 30th, 2012 and puts him at risk

14  of having to sell the team if he hadn't made the separate

15  commitment.

16          MR. LEVINSON:  Again, Your Honor, I mean really

17  the lack of foundation here.  It's about authenticity.  I

18  didn't object on the authenticity.  It's the lack of

19  foundation as to, if anything, having to do with this

20  particular document.  All that they've shown is it was filed

21  in a Courtroom without any context and they haven't put on a

22  witness that can say anything about, so we would continue to

23  object to it.

24          MR. WERKHEISER:  Your Honor, we can say the same

25  thing about the MLB agreement.

1          THE COURT:  I will admit Exhibit 4.

2     (Fox's Exhibit #4 received into evidence).

3          MR. WERKHEISER:  Thank you, Your Honor.  Your

4     Honor, Exhibits 5, 6, 7, 8, 9, 10 are all a series of various

5     financial projections and valuation presentations that were

6     made relative to evaluate Dodger entities and the team.

7          THE COURT:  My recollection is the witness didn't

8     know anything about these documents?

9          MR. LEVINSON:  Yeah and that is correct and it

10    was only with respect to the ones that were shown.  Not all

11    of these were even shown and as to the ones that were shown,

12    the witness said he never seen them before, so we object.

13         MR. WERKHEISER:  Well they all came from the

14    Debtors, Your Honor, from their production and presumably

15    maintained by the Debtors in the ordinary course of business.

16    We, obviously, not had an opportunity for discovery as would

17    be traditional before we would offer documents like this.

18         MR. LEVINSON:  That's not correct, Your Honor.

19    They got these documents through discovery and had an

20    opportunity through Your Honor's scheduling order originally

21    and chose not to pursue it.  So, again, Your Honor, with

22    respect to these documents we would object to their

23    admission.

24         THE COURT:  Yeah I'm going to sustain the

25    objection of these documents and for purposes of this

1  hearing, I don't that they, they never substantiated.  I

2  don't know really what purpose they would serve so.

3             MR. WERKHEISER:  Your Honor, they go to valuation

4  and what is the value of the team asset in here which has

5  been put at issue by their motion and the question whether

6  they really need the relief that they're seeking.

7             MR. LEVINSON:  Your Honor, there's again just no

8  foundation with respect to any of this.

9             THE COURT:  There's no foundation here, Mr.

10  Werkheiser, I'm sorry.  This isn't a valuation hearing.  So

11  I'm going to sustain the objection to these documents.

12             MR. WERKHEISER:  Understood, Your Honor.  Your

13  Honor, we offer the declaration of Jeffrey J. Ingram in

14  support of the first day petitions.  Mr.  Ingram is an

15  officer of the Debtors.

16             MR. LEVINSON:  Objection, Your Honor.  Again, a)

17  relevance and b) I don't think that, you know, simply the

18  fact that he's an officer entitles them to submit a

19  declaration.  There's no federal rule of evidence that

20  applies to declaration.  This isn't a deposition, Your Honor.

21             MR. WERKHEISER:  If I may finish my proffer, Your

22  Honor.

23             THE COURT:  Yes, please.

24             MR. WERKHEISER:  Mr. Ingram testified to among

25  other things the solvency of the Debtors and if at the time

1   of the filing as well as -- well I'll just leave it at that,

2   Your Honor.  And we asked to have Mr. Ingram here as a

3   witness today.  Your Honor made a ruling limiting testimony

4   to the experts, so we've not been able to ask him directly.

5   He's not available.

6            THE COURT:  I will admit it.

7            MR. WERKHEISER:  Thank you, Your Honor. Your

8   Honor, the next item is Fox Exhibit 12.  That's the June 28th

9   transcript.  I believe that's a statement of counsel from LAD

10  making an admission as to solvency.  We'd ask that that be

11  admitted to the record as well.  It is a statement against

12  interest by a party opponent.

13           MR. LEVINSON:  Objection, Your Honor.  I, a)

14  again I don't think it fits within that particular rule of

15  evidence and, b) it's just a transcript of counsel arguing.

16  I don't know what possibly this would have to do with respect

17  to the issue.

18           MR. WERKHEISER:  Counsel made an admission of --

19  I'm sorry I didn't mean to cut you off.

20           THE COURT:  No, go ahead.

21           UNKNOWN:  I'm available, why didn't they call me.

22           THE COURT:  I would say look -- I can, can't I

23  take judicial notice of all of these?

24           MR. WERKHEISER:  I think Your Honor can.  And if

25  you want to receive it that way, that would be fine by us.

1           MR. LEVINSON:  That'd be fine, Your Honor.

2           THE COURT:  As opposed to actually admitting it

3    as evidence, a piece of evidence, yes.

4           MR. LEVINSON:  And that answered that question,

5    Your Honor.

6           MR. WERKHEISER:  Your Honor, Exhibit 13 is

7    testimony of Mr. Ingram from the first -- from, I'm sorry,

8    the July 20th hearing.  The proffer of what he is discussing

9    was the Dodgers pre-filing plan I believe in 2010 to develop

10   their own RSN and their intention to try to do that in

11   conformity with the deadlines and the Fox telecast agreement.

12          MR. LEVINSON:  Your Honor, I thought that the

13   judicial notice would apply to all the transcripts.  There's

14   five here, so; 12, 13, 14 to 15, 16, we have no objection to

15   Your Honor taking judicial notice.

16          MR. WERKHEISER:  To be clear, though, that that

17   will be evidence for the record that Your Honor can consider

18   in connection with ruling on this motion or if there's a

19   subsequent appeal.

20          THE COURT:  This portion of that transcript is

21   the proffer?

22          MR. WERKHEISER:  It was Mr. Ingram's direct or,

23   excuse me, testimony -- I don't recall whether it was direct

24   or cross.  It's direct, Your Honor.

25          MR. LEVINSON:  I'm not sure.  I mean normally,

213

1   Your Honor, when you're offering this kind of testimony it's

2   in the context of a prior inconsistent statement when you

3   have a witness on the stand.   I mean there's a specific

4   federal rule of evidence that applies here.   To shortcut

5   this, Your Honor, you suggested judicial notice.   We're fine

6   with that, but we're objecting with respect to whatever

7   admissibility they're seeking.   Again, Your Honor can look at

8   it and take judicial notice, that's fine, Your Honor.

9            MR. WERKHEISER:   Again, so long as judicial

10  notice is going to be sufficient for it to allow, become part

11  of the evidentiary record in connection with this hearing so

12  that it can have some probative effect, we're fine with it

13  coming in that way, Your Honor.

14           THE COURT:   Well I think that is what Mr.

15  Levinson is opposed to is having it as.

16           MR. LEVINSON:   Well Your Honor can certainly --

17  you know, to the extent Your Honor takes judicial notice of

18  it, Your Honor will take judicial notice.   It will be in the

19  record, but to the extent that they're trying to ascribe some

20  additional evidentiary value to it that's a different story,

21  and so that we would object to, but we don't object to Your

22  Honor taking judicial notice.

23           MR. WERKHEISER:   Your Honor, this is testimony of

24  a witness that we sought to have here today.   The Debtors

25  opposed and argued that the record should be limited.   They

214

1  made the witness unavailable to us and so we are simply

2  trying to rely on the prior testimony in the same proceeding

3  of this witness.

4              MR. LEVINSON:  I think this was the DIP hearing,

5  Your Honor.  Number 13 was from the DIP hearing.  It wasn't

6  from this proceeding.

7              MR. WERKHEISER:  I'm sorry, the same case, Your

8  Honor.

9              THE COURT:  Let's move on and let me look at this

10 and reserve ruling while you're proceeding, Mr. Werkheiser.

11             MR. WERKHEISER:  Thank you, Your Honor.  Again, I

12 think Your Honor I would accept that because of the statement

13 of counsel that tab, Exhibit 14 and 15 -- there's also

14 statement of counsel, yes it is -- can come in through

15 judicial notice.  The point there is counsel is admitting

16 solvency.

17             THE COURT:  Okay.

18             MR. WERKHEISER:  Your Honor, that also applies to

19 Tab 16, I'm assuming there is no objection to, Your Honor

20 considering that.

21             THE COURT:  And I'm going to admit Exhibit 13.

22 That was testimony of a witness who was unavailable to

23 testify today, and I will accept that as evidence, as prior

24 testimony in this Courtroom.

25        (Fox's Exhibit 13 received into evidence)

215

1          MR. WERKHEISER:  Thank you, Your Honor.  Your

2   Honor, I think that brings us to Exhibit 17.  That was the

3   offer letter dated August 30th, 2011 and this was examined

4   with respect to that.

5          MR. LEVINSON:  No objection, Your Honor.

6          THE COURT:  It's admitted

7      (Fox Exhibit #17 received into evidence)

8          MR. WERKHEISER:  Exhibit 18, Your Honor, is the

9   joint press release of Major League Baseball and the Dodgers

10  did in November 2nd, 2011.

11         MR. LEVINSON:  No objection to 18, Your Honor.

12         THE COURT:  All right.

13     (Fox Exhibit #18 received into evidence)

14         MR. WERKHEISER:  Exhibit 19, Your Honor, is a

15  news story that was retrieved from the Dodgers' website that

16  announced the finalization of a 8 year $160 million dollar

17  deal with Matt Kemp.

18         MR. LEVINSON:  I don't know where Mr. Stone went,

19  but according to Mr. Stone this is hearsay, so I will object.

20         MR. WERKHEISER:  Your Honor, it comes from their

21  own website.

22         THE COURT:  Well --

23         MR. LEVINSON:  It's hearsay, Your Honor.

24         THE COURT:  I'm going to sustain the objection.

25  That will not be admitted.

1           MR. WERKHEISER:  Your Honor, item 20 is an income

2   and expense declaration filed about Mr. McCourt in connection

3   with the divorce proceeding.  The relevance here is obviously

4   one of our positions is that this is being connected to Mr.

5   McCourt's benefit and not for the benefit of the other

6   constituents.

7           MR. LEVINSON:  Object on foundation, grounds and

8   relevance.  I'm assuming that he has an authenticated copy so

9   assuming that's the --

10          THE COURT:  But that's not the issue.

11          MR. LEVINSON:  -- I've never seen this exhibit.

12          THE COURT:  All right I'm not going to admit that

13  document.

14          MR. WERKHEISER:  Your Honor, item 21 is the order

15  to show cause document, but the relevant portion of it that

16  we seek to have admitted is the declaration of Frank H.

17  McCourt.  Again, a witness that we sought to have here today,

18  but we were precluded from doing so.  And the relevance of

19  this, and this was a Court filed document, the relevance of

20  this is Mr. McCourt is stating that Blue Landco is his

21  primary source of income and that he needs to have an adjust

22  -- and he's doing asking for an adjustment of his support

23  obligation.  And, again, it blusters our theory that there's

24  not bankruptcy purpose here.  That the reason for these

25  actions are to benefit Mr. McCourt personally.

1          MR. LEVINSON:  I'm, again, Your Honor, object to

2   foundation.  I'm going to object on grounds of lack of

3   relevance.  And, here, this particular declaration unlike the

4   testimony of Mr. Ingram in this proceeding, this is just a

5   declaration from somewhere else.

6          THE COURT:  Yeah I will sustain that objection.

7          MR. WERKHEISER:  Item 22, Your Honor, again, is a

8   financial statement from Mr. McCourt filed in connection with

9   the divorce proceeding.  I'll incorporate my prior

10  statements in support of similar exhibits.  I expect there's

11  an objection.

12         MR. LEVINSON:  I object on lack of foundation and

13  as to relevance.

14         THE COURT:  Sustained.

15         MR. WERKHEISER:  Your Honor, I would also offer

16  the declaration, and these were included -- they were not in

17  our binder -- but they were included in the agenda materials

18  transmitted to Your Honor, the declaration of Edwin Desser

19  which is docket item 836 that we filed on November 24th, 2011

20  and the declaration of Bob Thompson, docket item 837 also

21  filed on the same date.  I'm sorry I can do that

22  individually.  Why don't we do Mr. Desser first.

23         MR. LEVINSON:  Yeah objection, Your Honor.  I

24  know they were the subject of questioning, but that's

25  obviously different context.  Here, they're seeking -- those

1   were prior to establish prior inconsistent statements of

2   witnesses that were cross examining who were testifying here

3   in trial.  Here, they're offering it for the affirmative

4   purpose in support of their case, so we would object to the

5   admissibility of both exhibits of both of those two exhibits.

6           MR. WERKHEISER:  Your Honor, I mean in some

7   degree this is duplicative, but Mr. Desser was here.  He

8   testified for hours.  He was subject to cross examination for

9   more hours.  None of the reasons that would normally warrant

10  keeping an out of Court statement out of the record would

11  apply here.

12          MR. LEVINSON:  Your Honor, the witness was here

13  and testified and they had every opportunity to ask whatever

14  questions they wanted to on direct examination.  And so and,

15  in fact, I want to say maybe even object it in terms of going

16  outside the scope of the cross or of the direct at certain

17  times, so I would object to the admissibility of those

18  declarations.

19          THE COURT:  We do have the testimony.  The

20  gentlemen were here.  I will sustain those objections.

21          MR. WERKHEISER:  Your Honor, we also move to

22  introduce the Cohen declaration which is tab 2 in the

23  Debtors' exhibit binder.  Again, this is something they filed

24  in connection with their own motion and included in their own

25  exhibit binder.  It appears at docket item 444 on the Court's

1   docket.  Mr. Cohen testifies, to among other things, the

2   expected solvency and lack of any sort of liquidity issue had

3   they done a deal like the Fox deal immediately before the

4   bankruptcy.

5           MR. LEVINSON:  Objection, Your Honor, these are

6   expert witnesses, although we did include the declarations in

7   our binder.  Ultimately, we decided to put the live testimony

8   on, which we did.  With respect to Mr. Coleman, with respect

9   to Mr. Cohen we didn't call him.  They're our experts and so

10  there's no basis on which they should be entitled to offer

11  our declarations, our expert declarations so we would object

12  to their admissibility.

13          MR. WERKHEISER:  Your Honor, they offered it in

14  support of their motion.  They filed it in connection with

15  their motion.  It constitutes admissions by a party opponent

16  as to value which is a relevant issue in a matter of

17  litigating.  I just simply don't see the basis to keep it

18  out, Your Honor.

19          THE COURT:  It's referred to in your moving

20  papers.

21          MR. LEVINSON:  It is --

22          THE COURT:  And relied upon.

23          MR. LEVINSON:  Yeah in our original moving papers

24  not -- yes, but --

25          THE COURT:  When you say the original you don't

220

1   mean the amended motion?

2           MR. LEVINSON:  They were actually they were

3   referred also in the amended motion.

4           THE COURT:  I'm going to admit those two the --

5           MR. WERKHEISER:  We offer just the Cohen

6   declaration.

7           THE COURT:  Oh I'm sorry, Mr. Werkheiser.  All

8   right that is admitted.

9     (Fox Exhibit, Declaration of Cohen received into evidence)

10          MR. WERKHEISER:  Thank you, Your Honor.  Let me

11  just make sure I haven't missed any.

12          THE COURT:  And then I'll make -- that will make

13  Fox 26 by the way, the Cohen.

14          MR. WERKHEISER:  Thank you, Your Honor.  Your

15  Honor, I'm not sure if the record is clear whether we had a

16  ruling on Thompson.  I talked about it.

17          THE COURT:  Yes I did I --

18          MR. WERKHEISER:  I probably confused everybody

19  talking about it at the same as Mr. Desser's declaration.

20          THE COURT:  I sustained that objection; I'm

21  sorry.

22          MR. WERKHEISER:  Okay.

23          THE COURT:  Yes I did.

24          MR. WERKHEISER:  All right.  I think that

25  concludes our exhibits for the record, Your Honor.

221

1          THE COURT:  All right.

2          MR. WERKHEISER:  Subject to Your Honor keeping

3   various matters out and reserving our rights with respect to

4   those rulings.

5          THE COURT:  I assume we want to go to argument.

6          MR. BENNETT:  Yes, Your Honor and actually given

7   that I want to split mine and given that I think Your Honor

8   wants to because I want to deal with my affirmative case.  I

9   propose you adopt time limits and I'll consent to time limits

10  so long as they're scrupulously and rigorously enforced.

11         THE COURT:  Yes, I will rigorously enforce them

12  and give notice of them, but let me do this.  Rather than put

13  Mr. Werkheiser or Fox on the spot let's take a 10 minute

14  recess.  You can -- for other purposes obviously, but during

15  that recess you can discuss those time limits and whether or

16  not, you know, they are workable for both sides.

17         MR. BENNETT:  How much time do you have and want

18  to devote to this?

19         THE COURT:  Well I would say, you know, I have --

20  I hate to tell you this I'm going to regret it, but I have

21  tonight until 6:30.

22         MR. BENNETT:  I think that will be more than

23  adequate, Your Honor.

24         THE COURT:  And the guards, you know, we're on

25  this budget crunch and the guards have to leave by 7:00.  We

222

1  can all pitch in, you know, and probably pay overtime.

2          MR. BENNETT:  So the maximum is 45 minutes each.

3          THE COURT:  It will be a little more than that,

4  but roughly yes.

5          MR. WERKHEISER:  That sounds fine, Your Honor,

6  thank you.

7          THE COURT:  Let's stand in recess for 10 minutes.

8     (Recess 4:43:38 to 4:54:06)

9          THE CLERK:  Please rise.

10         THE COURT:  All right, everyone, thank you.

11  Please be seated.  And have you discussed timing and --

12         MR. BENNETT:  Okay what we've decided is 40 and

13  40, 10 for Mr. Marinuzzi for the Creditor's Committee.  What

14  I propose was is that I would 20 in front, 20 in the back.  I

15  think Mr. Werkheiser wants to do a sur reply; split his time

16  and have a sur reply.  If that's what Your Honor wants; it's

17  a little unusual, but I'm amenable today.

18         THE COURT:  All right that's fine.  How would you

19  like to split yours 30 and 10 or --

20         MR. WERKHEISER:  Thirty and 10 was what I was

21  thinking, Your Honor, thank you.

22         THE COURT:  Okay.

23         THE COURT:  And, Mr. Marinuzzi, if you'll argue

24  obviously before Mr. Werkheiser argues.

25         MR. MARINUZZI:  Of course, Your Honor.

1          THE COURT:  Okay, good.  All right, Mr. Bennett.

2           MR. BENNETT:  If I was a carpenter I would build

3  a little ledge over here.  You can't put anything --

4          THE COURT:  Oh we'll take care -- I'll get that

5  fixed.  We'll call it the Bennett ledge.

6          MR. BENNETT:  That's probably would make me, you

7  know, held to a higher esteem in Delaware than anything else

8  we've done here.

9          THE COURT:  Okay.

10         MR. BENNETT:  Okay I want to make this as brief

11  as possible and I'm going to focus on what I think are the

12  central issues.  I do want to say, Your Honor, if I would

13  focus you on our papers the place I would focus on is our

14  reply papers where we discuss a lot of the cases and so

15  compacting I'm going to skip over that.  But we're going to

16  talk about on this part the best interest of the estate.

17         And the best interest of the estate has two

18  components in which I'm going to fit I think most of

19  everything that we heard today.  On the one hand is what's to

20  be gained.  And then on the other hand is what are the

21  potential losses.  And Your Honor heard extensive testimony

22  about both of those things.

23         But first I want to say that Your Honor commented

24  yesterday about an irony connected to the current situation

25  and I have another one, and I think it's even more

224

1  pronounced.  It's the irony in a counterparty, Fox is a

2  counterparty with the Debtors in a business transaction in a

3  potential new business transaction.  And they are claiming

4  that some action it's determined to resist by the Debtors is

5  not in the best interest of the estate or an appropriate

6  business judgment of the Debtors.  And they do that when the

7  Creditor's Committee is sitting here which ought to be

8  sitting in the right position to make that determination has

9  said therefore they're looked at it.  They think it's

10  reasonable.

11          So we have Fox saying that it will really suffer

12  if the marketing procedures are implemented, but it's not in

13  the Debtors' best interest.  Those two things cannot be true.

14  Either it's in the Debtors best interest and its bad for Fox

15  or it's in -- it's possible it's in Debtors best interest and

16  it's not bad for Fox at all.  But it's not really possible

17  okay for the Debtors to suffer and Fox to suffer.  That one

18  position could never be sustained.

19          And so it's partly amusing when we hear a lot of

20  testimony about how this great would be for a future owner

21  and the benefits should go there instead of the current

22  estate.  And how great this would be for the fans as if they

23  know how money would be used by a future owner.  And it's --

24  and then, of course, they've got all kinds of comments about

25  my estate.  And so when evaluating everything that Fox has to

225

1  say about best interest remember where they stand and where

2  they sit.  It's very informative.

3          The law, of course, is that a Debtor that files

4  in good faith and I'm not going to go into that until reply

5  if I have to -- files in good faith is supposed to maximize

6  value.  And it's common sense, as we said, in our opening

7  statements and in Mr. Coleman's testimony that improving a

8  Debtor and its business will increase its value.  Mr.

9  Coleman's testimony was clear the marketing procedures will

10  benefit the estate.  By the way, the first declaration filed

11  by Mr. Desser was also clear the best way to get maximum

12  value out of media rights is to somehow get them exposed to a

13  competitive marketplace.  I'm paraphrasing; those are not

14  exact words.  That's their witness, not our witness.

15          So we've established that the new telecast

16  right's deal will improve the business and financial

17  condition of L.A. Dodgers.  That was not something that was

18  opposed effectively.  They said, at most, that you might be

19  able to improve the business even more if you wait because

20  right fees will go up.  We'll talk about that more in a

21  second.  Most of the complaint is the idea that equity can't

22  benefit from use of bankruptcy powers to improve the business

23  and improve values.

24          I said in opening statement, I want to repeat it

25  now so that Your Honor doesn't forget it, but I think it's a

226

1   really important point.  All of Fox's rhetoric skips a step.

2   Their story is you're doing this so you can get more money

3   from Fox and hand it to Frank McCourt.  That's their story;

4   that's their imagery.  Nothing could be further from what's

5   going on here.

6          What is happening here is the Debtors are trying

7   to do a better rights deal.  The Debtors would like to see

8   the $100 million dollars a month in right's payments bolted

9   down for the years 14, 15, 16 with escalators, you know,

10  going on.  That money is going to come to the team in the

11  future.  All other benefits from the contract is either going

12  to go to the team or to a Debtor affiliate, not going outside

13  a Debtor affiliate of the team.

14         Then there's the next step because someone is

15  going to look at this stuff and they're going to decide what

16  to pay for it.  They're going to reach into their pocket and

17  pay for it.  That money can go all kinds of different places.

18  But the money that is going to be raised by reason of all of

19  this is going to go to the Dodgers, the Dodgers' estate, and

20  to the reorganized business, if we be so lucky to get there

21  from here.  That someone will pay more is recognition that

22  the business improvement is really working.  It's not a bad

23  thing.  It's a good thing.  It's effectively a seal of

24  approval.

25         And as I said before, the very best evidence Your

1   Honor is going to take judicial notice of lots of things that

2   have been happening in this case.  Your Honor should also

3   take judicial notice about the fact that this motion was

4   filed before a sale was on our agenda.  This motion was filed

5   at a time when a sale was the last priority of the Debtors in

6   possession.  And it has been carried through the entire

7   process and is being continued to be pursued after there's an

8   agreement for a sale.

9          So the entire assertion that this is number one,

10  something to do with the sale solely; we agree.  It's going

11  to help the sale process because it's going to make things

12  clear, but what we were doing is improving the Debtors and

13  whether it be ultimately to get that sale of approval of a

14  higher purchase price.

15         THE COURT:  As I recall the, your effort to

16  market the telecast rights was to avoid a sale.

17         MR. BENNETT:  Exactly, Your Honor.  It was to fix

18  the business so much that a sale would not be necessary.  Now

19  we have to fix and we're going to fix the business and have

20  to sell it anyway.  No one should think it's the first

21  choice, but it's still part of the same program.

22         I'm not going to spend time dwelling on the case

23  law.  It's cited in our reply.  It's dealt with in our reply.

24  And I'm just going to pause to say that numerous cases say

25  that solvency on a value basis is not an indication of bad

228

1   faith.   I said before it's got to be solvency on a value

2   basis and no financial distress.   Those words I wish they

3   will someday describe us.   They do not describe us yet.

4            There's also a little bit in the rhetoric again

5   about the identity of the person whose going to get the money

6   matters.   They're technically wrong.   They keep talking all

7   this money is going to Frank McCourt.   That he's the seller.

8   He's not; it's an entity.   The entities have creditors and

9   other interests too.   It's a small point.   I don't want to

10  belabor it, but it is a manner in which some of the PR

11  surrounding the case is being -- someone is attempting to use

12  it to influence Your Honor's decision for all of the wrong

13  reasons.

14           There's another benefit and we've been saying

15  this in our papers for a long time and Mr. Coleman touched on

16  it as well in his testimony and that is reducing risk.   Every

17  Fox witness is confident that the value is going to go up;

18  that the value cannot go down.   Your Honor and I were both

19  alive in 2003, 2004, 2005 and the first half of 2006.   And at

20  some point in 2006 or early 2007 was the first time people

21  were willing to admit that residential real property could go

22  down.   I fear the same thing coming here.   I don't know when.

23  But, once again, we are a Debtor in possession.   Everyone

24  agrees that things are pretty damn good right now; pardon the

25  expression.   And, frankly, it's time to capture us.

229

 1          If there's additional money being left on the

 2   table that might be, but it is as likely that prices can go

 3   up as prices can go down.  And the people who aren't supposed

 4   to be taking the risks to get the last incremental dollars

 5   are Debtors before Your Honor.  So the reckless thing

 6   arguably and consistent with Mr. Coleman's testimony would be

 7   to sit here and wait to get to try to catch the top of the

 8   market or to try to write it up still further.  And, Your

 9   Honor, in the testimony and in the declarations I think

10   you've seen there's hedging in the words that people use.

11   And when they use hedging words, it means there's real risks

12   that they're not talking about.

13          Now let's turn to the cost side and weighing

14   potential costs.  And we say, Your Honor, the cost is zero to

15   very small.  And in this category is all of the different

16   things that you've been hearing about today with the most

17   time.  First, the negotiation terms that they start with are

18   of questionable value to begin with.  You heard the

19   testimony.  We went through it very carefully about whether

20   or not Fox today can figure out what's going to happen as a

21   result of the implementation of their terms; one of their

22   most knowledgeable experts.  What can they figure out about

23   the future based upon those terms; nothing.

24          At the ends of the examination, I said if you

25   were going to fill in any of this what would you be doing;

1   speculating.  I don't remember exactly how the word came out.

2   That was a business conclusion.  That word happens to be the

3   same word the Courts have used to eliminate the idea that

4   there were going to be damages for breaches of negotiation

5   provisions.  Those damages are termed speculative.  Why are

6   they termed speculative?  We can talk about the cases.  They

7   were given to you.  You saw a concrete demonstration about

8   why it is that Courts determine that damages from breaches of

9   negotiation provisions are speculative.  You cannot figure

10  out what can happen.  You heard Fox's best internal expert

11  could not figure out what was going to happen.  And, of

12  course, at the very end he repudiated his entire damage

13  analysis.  He just said I don't know how I get there from

14  here, which, frankly, is what a Court would do when

15  confronted with genuine truthful testimony concerning what

16  the situation really is.

17          So and besides that, forgetting that, you have

18  the evidence that the batting average in Los Angeles for this

19  year is zero.  We heard what, you know, 90% over a long

20  period of time; 95% over a long period of time.  Frankly,

21  Your Honor, that was emblematic for something that happened

22  all day today.  The expert witnesses produced by Fox, one in-

23  house expert so not really an expert the we think of an

24  expert; the other somewhat more independent, although he had

25  an interesting sales pitch that he focused on Fox about how

231

1   he was really personally felt about this case.  You know,

2   they were great about generalities.

3            When they were testifying on direct, they had

4   general statements about lots of things that, of course,

5   incapable of being tested.  And then when they were tested

6   about the specifics everything started to fall apart, and I

7   mean everything.  If I had time we would talk about examples.

8   One of the things that should fix into your mind, Your Honor,

9   is the last witness Mr. Thompson when he threw out this idea

10  that there might be contracts for carriage; contracts between

11  Fox and cable distributors that might be expiring in the very

12  near future and it would, of course, cause damages.  Did he

13  know of any; no.  Did he check; no.  Do you know how many

14  subscribers were affected; no.  So the grand broad statements

15  all disintegrated with even the slightest bit of pushing; by

16  the way no discovery; no discovery that happened.  Imagine

17  where we would be.  How many corrections to the declaration

18  we would have heard if there had been discovery.

19           Okay so we talked about all the different

20  provisions.  They're weaker than the ones in the original Fox

21  contract, so I'm going to move on.  To begin with, the

22  provisions we're dealing with are just not that strong.  Okay

23  secondly, the procedures; all they do is shift in time.

24  There was extensive testimony on that point as well.  I told

25  Your Honor the only thing I said in rebuttal at the beginning

232

1   was if there are changes we need to make we're going to make

2   them.  The only change I think we need to make based upon all

3   of the testimony is to make clear there's a 100 games, that

4   it's cable exclusive.  We think it's clear already.  We will

5   use the exact words.  We will fix that.

6            We will accept Your Honor's order on the issue of

7   disclosure.  Now it's really interesting disclosure of

8   bidders.  There was some testimony that -- Fox may be talking

9   to bidders and it might be different.  I would say to Your

10  Honor that if there's an order one way or the other on that,

11  it's the same.  Neither side talks to bidders.  That would be

12  -- we would live with that just fine.  And another approach

13  is to let both sides talk to bidders, but have a carve out

14  that no one talks to competitors who are bidders.  That seems

15  reasonable under the circumstances.

16           THE COURT:  ESPN, TW and whose the third?

17           MR. BENNETT:  ESPN.

18           THE COURT:  Thank you.

19           MR. BENNETT:  And by the way, the party -- this

20  is important someone representing someone else sent me an e-

21  mail during the hearing.  There's Time Warner, which is the

22  person on the list is Time Warner and Time Warner Cable.

23  Time Warner Cable is a different company so we have to be

24  careful if we're going to write an order that if we're trying

25  to capture the entity on the schedule it's Time Warner is the

233

1   difference.

2          THE COURT:  Not Time Warner Cable?

3          MR. BENNETT:  Time Warner Cable happens to be the

4   one that did the Lakers, but Time Warner Cable is not the one

5   listed.  And I don't know whether that difference is

6   significant for purposes of application of the agreement.

7   I'm only interested in being accurate; that's all.

8          Okay so the other criticisms of the procedures

9   are wrong.  As I said before, we're going to make the

10  changes.  The binding, you know, in a world where the word

11  binding appeared in one agreement distinguishes one provision

12  for another and then binding disappears.  Binding was never

13  part of this -- is not part of the current deal.  It's too

14  much in the core of basic contract interpretation.  You

15  rarely get it to be this crisp where it was a word used to

16  make a distinction, then the word disappeared entirely.  And

17  so it has to be that it had significance that it was removed.

18         THE COURT:  What is the significance?  I wanted

19  to ask you about that because to me an offer and an

20  acceptance creates a binding agreement.

21         MR. BENNETT:  Except here that's never true.

22  There was always baseball approval.  And the contention --

23  they tried to make a contention that baseball approval was a

24  formality that happened all the time, and it wasn't a big

25  deal.  Well, of course, the only experience that the sport

234

1  actually knows about is quite the contrary.  The only

2  experience that I've lived through is quite the contrary.

3  And so what they're saying is, is that they're saying is well

4  yes it was always conditional upon approval of baseball.

5  They don't want it to be conditional upon approval of

6  baseball and approval of the buyer even though that's a

7  baseball requirement.

8          THE COURT:  Right.

9          MR. BENNETT:  And by the way, we can manage that

10 in the sale process very well.  I'm not really worried about

11 it because I'll get baseball comfortable with what they need

12 to be comfortable with.

13         The point here is that there are two reasons why

14 the additional buyer approval is nothing Fox can complain

15 about.  Number one, there was never a requirement of binding.

16 Everybody knew there was going to be conditionality of at

17 least some kind all the time.  If they meant to eliminate the

18 conditionality, they knew how to do it.  They had the word

19 binding they could have used.

20         Secondly, it turns out that the incremental

21 conditionality or what they contend is incremental

22 conditionality is actually a baseball requirement.  So and

23 they testified that baseball they can do whatever they want.

24 And by the way, before Your Honor when they joined baseball's

25 pleadings baseball, of course, said they could do whatever

1  they want and Fox joined that pleading.  So it's very, very

2  hard -- it's not going to stop them for Fox to say that

3  you're stuck; that you're stuck on offer and acceptance when

4  they knew baseball approval was required, and they knew that

5  baseball could do whatever they want, and this time what they

6  wanted was to make sure the buyer was on board.  That's all

7  there is to that particular issue.

8         And so we think that the terms are right.

9  They're consistent with what the agreement says.  That there

10 really isn't a change and that one shouldn't be disturbed.

11 And it would only be the time shift.

12        Okay so next point in the way I think about this

13 is that since -- it's really important.  I said this in the

14 opening that the shifting of timing only eliminates the

15 effect of a no-shop provision and that's about one of the

16 most important things.  And I want to spend -- this is the

17 only long one I'm going to talk about and I'm going to talk

18 about it a little bit differently that's been discussed in

19 the brief.

20        First of all, Big Rivers; I'm sure you read it.

21        THE COURT:  Yes.

22        MR. BENNETT:  There are two kinds of cases that

23 are before Your Honor.  There are cases that announce several

24 of the bad faith cases that says that this opinion is

25 confined to the facts of this case.  They say it.  The Judge

1   says I don't want this to be precedential because this is

2   like unusual and different.  And then there's Big Rivers

3   where a District Judge says, he recites a whole bunch of

4   facts and then he says this is what I think about no-shops.

5   And he's right.  They're not good.  And he notes that in

6   Delaware law they're disfavored and in bankruptcy, he's

7   disfavoring them as well.

8           And I do understand that the circumstances that

9   the Court recites up front about it being a sale transaction.

10  It having been negotiated a month or two before the

11  proceeding.  Those are all facts that are recited in the fact

12  section.  Those facts are not mentioned at all in the section

13  where the Judge is deciding the case.  You can't even tell

14  from the opinion whether the provisions relating to the no-

15  shop were effective and not require Bankruptcy Court approval

16  or whether they've been approved in an earlier stage.  You

17  can't tell.  He doesn't discuss it; not part of his holding.

18  All he said, all he does is confront break ups.

19          And I want to bring two more things into this.

20  One is Mr. Coleman's testimony and he's never seen anything

21  like this before, this long a term, and I haven't either.

22  And I kind of think about this and say how apart is this

23  really and I'm saying to myself that if Your Honor says that

24  these things are okay there's now another tool.  For not

25  every kind of contracting party, but many kinds of

1   contracting parties to entrench themselves and hurt unsecured

2   creditors because they can put no-shops to any asset they can

3   think of or no-shops to any asset that's in any way connected

4   to the contract.  And if those are valid whose going to lose;

5   everybody involved in a bankruptcy case.  And the idea in

6   Section 363 and 1123 that estate assets can be sold, that

7   goes out the window.  That's not what we mean.

8            I will say something else, it's kind of one of

9   the most effective disguise liens you can imagine because

10  look at the facts in this case.  This no-shop is in a

11  confidential agreement.  There's no filing -- it's not like

12  there's on filing.  No one's supposed to talk about the

13  agreement with anyone.  Why is that okay?  We got away from

14  that, I think, many, many years ago.  I don't have to say any

15  of this extend Judge McKinley's opinion.  It just is

16  additional support things he didn't even think of which,

17  frankly, support the opinion.  There is no reason to depart

18  from it.  He certainly doesn't invite the Court to restrict

19  it to the specific facts of that case.

20           Clearly, that's something our -- it's

21  interesting.  Our opponents want to take that opinion which

22  has no indication that it's supposed to be restricted to

23  facts and restricted to facts, yet they want to take all of

24  the bad faith cases which you really are restricted to the

25  specific facts and apply them here.  I think they've got the

1   law exactly backwards.

2          The last point I'm going -- I'm running out of

3   time so I'm going to lump it together; damages.  I could have

4   a lot of very, very specific things to say about damages.  I

5   will say this.  We heard today that none of the claims that

6   have asserted before the Court concerning damages are going

7   to stand up ever because they were not damage models that

8   anyone would ever in a million years accept.  The Courts have

9   held that even if you just breach negotiation provisions

10  outright expectancy damages are speculative.  Everything you

11  heard about today was expectancy damages except for that

12  crazy cost change theory, which I don't think is recognized

13  by any Court.

14         And so the bottom-line is, is that there isn't

15  going to be a material damage claim.  There may well be a

16  zero damage claim and the law I just recited is for

17  eliminating the negotiating rights entirely.  All we're doing

18  is shifting them.  So there are two ways to get here for the

19  Court.  One is to find they're unenforceable under Big

20  Rivers.  The other is to say there's no damages and that's

21  the other half of the best interest test.  We don't have the

22  -- we're not taking on cataclysmic risk. All we're doing is

23  embarking on a path to maximize value and I've used 20.

24         THE COURT:  Thank you; yes, Mr. Marinuzzi.

25         MR. MARINUZZI:  Good evening, Your Honor.  I'll

1    be brief.  It's not always that we agree with the Debtors and

2    their arguments, but tonight I have to say, Your Honor, we

3    do.  We think Mr. Bennett's right.  We heard two days of

4    testimony on some of the important issues in the case that

5    were raised in Fox's objection, and we agree with Mr.

6    Bennett's conclusions.

7            Now yesterday, Your Honor, I stood up here on

8    behalf of the Committee in support of a process, and I

9    thought the process made sense for a number of reasons.  We

10   keep hearing that we're going to get paid in full and

11   unsecured creditors will be unimpaired and it's all great to

12   hear, but as I said yesterday sometimes you're surprised and

13   when you're expecting a hundred cents any surprise is a bad

14   surprise.

15           THE COURT:  Yes.

16           MR. MARINUZZI:  Mr. Bennett just described the

17   real estate market and the crash in '06 -- well after '06

18   when everybody thought the market was spectacular, we don't

19   know what's going to happen between now and the time this

20   case ends.  We don't know what the value of these

21   intellectual property rights might be in a year or two.

22           But we do know that today we heard testimony that

23   was quite different from the alleged significant damage

24   claims that Fox would suffer if the Debtors embarked on this

25   strategy.  And that was a, and still remains a concern of the

240

1  Committee.  And I thought a process outlined in the Debtors'

2  papers that allowed us to have a hearing where Your Honor

3  would decide were there damages and were they significant

4  would give us an opportunity to tell the Debtors stop.  This

5  doesn't make any sense.  You're creating additional claims.

6  It's not clear to us that the value we're going to get from a

7  sale of the team is going to offset that additional damage

8  claim.

9          Now I'm still hopeful.  I mean the Committee is

10  still hopeful that at the end of the day we'll have a hundred

11  cents.  But this process can only increase value.  If the

12  amount of additional claims as we believe it will be based on

13  the testimony we heard today will not be increased by

14  whatever damage claim Fox will assert.  For us it's a win/win

15  for the unsecured creditors.  It helps ensure that hundred

16  percent recovery.

17          We heard the changes that Mr. Bennett talked

18  about that the Debtors will implement in the process to try

19  to address some of the concerns that Fox raised.  From our

20  perspective, the information we learned from the Debtors, the

21  changes they're prepared to make, the testimony from Fox's

22  own witnesses has just made us more convinced that this was

23  the right process and the unsecured creditors remain behind

24  it.  Thank you, Your Honor.

25          THE COURT:  And if I'm not mistaken, Mr. Marinuzzi,

241

1  I should have asked Mr. Bennett this, but this is a may

2  approval.  In other words if a buyer of the Dodgers comes

3  along and says we're very happy with what the Fox deal is in

4  its present form, that's the deal.

5          MR. MARINUZZI:  Correct.

6          THE COURT:  Yeah.  Okay.  Thank you.  Mr. Werkheiser.

7          MR. WERKHEISER:  Give me just a second here to get

8  set up, Your Honor.

9          THE COURT:  The clock has not started.

10         MR. WERKHEISER:  Let's see.  By my watch it is 5:21

11 p.m.

12         THE COURT:  All right.

13         MR. WERKHEISER:  Thank you, Your Honor.  So obviously

14 appearing on behalf of Fox Sports Prime Ticket, we've covered

15 a lot of ground.  What do we know now after two days of

16 testimony?  We've had testimony from Mr. Coleman, the

17 Debtors' advisor, who testified that he's never done an M&A

18 deal for a baseball team before, that he's never negotiated a

19 media rights contract for a baseball team before or any

20 sports team, and that he hadn't read a telecast agreement

21 before this deal.

22         We also have unrebutted testimony from Mr. Desser,

23 who has 35 years of experience in the industry and makes his

24 living counseling teams with respect to media rights and

25 telecast rights agreements.  And Mr. Thompson, who has done

242

1   that many years for Fox and testified that he negotiated 180,

2   at least 180 contracts and 85 franchise sales.  What have

3   they told us?  They told us that every one of these changes

4   that was in the procedures as proposed, and I understand they

5   backed off on some of them now, we'll talk about that, was

6   material.  Most critically for the first time in the history

7   of the parties' relationship, any deal is not just subject to

8   MLB approval, it's now subject to approval to a potential

9   team buyer.  We don't know who that is.  We heard it's

10  possibly a competitor of Fox, we don't know.  And the

11  testimony we got today made it very clear that this was

12  tremendously material to Fox that this provision, the end

13  agreement and not the altered.  I think Mr. Desser's

14  testimony was that these rights are practically universal in

15  telecast agreements, excuse me, and that not having backend

16  rights like those that Fox negotiated is basically a non-

17  starter for Fox.  And what do we know if Fox would have these

18  rights based on the history what was the testimony?

19  Historically 90 percent by Mr. Desser, 95 percent by Mr.

20  Thompson of those backend right would contract deals result

21  in a binding agreement.  Yet, they want to gut that here.

22          Your Honor, the second piece of course is, and let me

23  just step back, that's the piece they won't acknowledge.  If

24  you recall yesterday, my partner, Dave Teklits, tried to get

25  Mr. Coleman to acknowledge that, and he simply just would not

1   admit that an element of the process was to make it subject

2   to a team buyer approval, although it says it in black and

3   white in their documents.  And I also, I need to respond to

4   the comment that this is in there because MLB required it.

5   There is nothing in the record to the effect that MLB

6   required it.  What their settlement agreement says, Your

7   Honor, it says the decision to enter into the telecast

8   agreement, telecast rights agreement, excuse me, shall be the

9   sole exclusive discretion of the buyer.  They stipulated to

10  it, but that's not evidence of who required it or why it's

11  there.  They agreed to that, they imposed that condition, but

12  MLB has not put a witness on that said this was the decision

13  of the Commissioner.

14          Your Honor, you heard testimony as well about the

15  damage done by the advancement of the schedule by nearly 11

16  months, and how that disrupts the process that is

17  contemplated by the telecasting agreement backend rights.

18  And I think Mr. Desser called it a marriage, it's designed to

19  prevent cheating and if the parties are not able to do that

20  near the end of the term, then that doesn't work.

21          We heard that testimony about the damaging impact of

22  not having a confidentiality agreement, Your Honor, I

23  understand that has been changed now.

24          And we also heard damaging testimony about, excuse

25  me, testimony about the elimination of the, I call it the

244

1  apples to apples component of the team final offer.  And I

2  understand they've backed up, backed off on this stuff, Your

3  Honor, but these are very intelligent, very savvy people.

4  And I think if it was drafted that way, there as tremendous

5  thought put into it.  That wasn't accidental.  They knew what

6  they were doing when they put those procedures together.

7  It's changed now because they've been called on it.  But

8  there was no accident in that process.  Excuse me Your Honor.

9         Let's talk about the issue of how Fox is harmed here.

10 Now, they've glossed over a lot of issues with damages and

11 they've glossed over the fact that the damage testimony was

12 unrebutted.  What is going to happen here, is that there's

13 going to be a breach first of the exclusive negotiation

14 provision, then of the right of final team offer provision,

15 and then ultimately a breach of the matching right provision,

16 because all of those now are made subject to the consent of a

17 potential team buyer, among other changes that they did.  So

18 you know, to say that this is just an exclusive negotiation

19 provision, and therefore there would never be any damages

20 associated with that, that's not accurate.  There are other

21 material backend right provisions that will be breached over

22 and above that.  And Mr. Bennett conveniently glosses over

23 the fact that there was testimony today that is unrebutted

24 and I don't think they made any success in knocking it down,

25 Mr. Thompson, when he said, look, if I had to negotiate this

1  agreement again, knowing that it was vulnerable to this sort

2  of attack and somebody could destroy my backend rights by the

3  expediency of filing a chapter 11 petition, I would have

4  reduced the value by 25 percent.  That translates into

5  $75,000,000, Your Honor.  And that is the direct damage

6  simply from not honoring backend rights.  That's the benefit

7  of the bargain that Fox didn't get.  That's not speculative,

8  there's no argument to be made that that's speculative,

9  that's just denial of their benefit of the bargain.

10           Our witnesses also testified to the  potential loss

11  of the Prime Ticket RSN and the, excuse me, the waterfall of

12  damages if you will to the enterprise if they lose this, and

13  that number was north of a billion dollars, Your Honor.  And

14  then there's of course a question of whether they would honor

15  their obligations of 2012/2013 season, and mitigation, but we

16  can leave that aside for now.  That's been addressed in the

17  papers.

18           THE COURT:  I thought they said they would.

19           MR. WERKHEISER:  Well.  So, I have to watch my time.

20  Okay.

21           THE COURT:  You've only used seven minutes.

22           MR. WERKHEISER:  Thank you, Your Honor.  So let's

23  talk about, let's talk about their burden in the bankruptcy.

24  Obviously we've argued in our papers and we've attempted to

25  prove, although the record has been limited, by the witnesses

1   we could bring, the exhibits we could get in, that this is a

2   self-interested transaction, Your Honor, I'll have to apply

3   the entire [indiscernible] standard.  Whichever standard you

4   apply, I don't think they've met it here.

5        The only offerings we've had are counsel statements

6   about what he supposes might happen or might not happen.  We

7   heard you know Mr., we heard argument that, and I'm sorry,

8   Your Honor, in Mr. Coleman's testimony where he among other

9   things, disputed solvency on the basis that maybe they might

10  have been kicked out of Baseball if they had gone a different

11  route.  Well they didn't go a different route, Your Honor,

12  they committed to sell the team.  Mr. McCourt committed to

13  sell the team in his divorce settlement with his wife, and

14  then he caused the team, the Debtors to commit to sell the

15  team in their agreement with MLB.  So I'm not sure where that

16  is at all relevant to any analysis.  More importantly, I

17  don't understand how they can claim to have satisfied their

18  duty of business judgment or entire fairness when they

19  haven't supported the decisions with any valuations

20  whatsoever.

21       And that was the testimony yesterday from Mr.

22  Coleman, Your Honor, that they hadn't done a valuation, they

23  hadn't valued it with the Fox contract in place, and they

24  hadn't valued it trying to market it without the Fox

25  contract.  They just went off and took on this enterprise so

1   the consequences be damned and, you know, maybe there's going

2   to be damages, maybe not, but we'll subject Fox to an

3   estimation process that I'll talk about in a minute which is

4   just, cannot happen under the Bankruptcy Code.  And we'll do

5   that.  So I don't believe, and I don't think they carried

6   their burden.

7          The contrary testimony on that from Mr. Desser was

8   that these are very sophisticated parties that will be

9   looking at these assets, and these are sophisticated parties

10  that have access to advisors like himself.  And even Mr.

11  Coleman had to acknowledge on cross that there was lots of

12  information out in the marketplace.  He testified yesterday

13  that everybody knows everything, so I think people like Time

14  Warner are obviously, I don't know this, they don't call me,

15  but they must be aware of what's happening.  And then again,

16  he testified later on yesterday -- I can give you transcript

17  references, Your Honor, but it's an unofficial transcript, I

18  don't know that they'll be consistent.  Mr. Teklits asked him

19  again, but there's a lot of information out there on

20  comparable teams.  And the answer, I think there's a lot of

21  information in the marketplace about Baseball, Baseball

22  assets and everything else.  So I think we all agree that

23  there's lots of information out there, and sophisticated

24  parties can value the assets without violating Fox's rights.

25  Okay.

248

1          Let's talk about whether in fact they can do what

2     they want to do, Your Honor.  The first problem them have,

3     which Mr. Bennett didn't speak to at all, is the secret

4     settlement.  Now, for 34, 35 days, none of us got to see it.

5     The day before the hearing, they file it, but they're the

6     special terms that nobody can still see.  What we do know

7     about the settlement is that among other things, it delegates

8     Your Honor's authority to retire Judge Farnan.  There's a

9     provision in the settlement that says there are disputes with

10    the sale process.  Your Honor doesn't get to deal with them,

11    Judge Farnan deals with them.  This is not disputes with

12    respect to the consummated sale, this is the actual

13    disposition of the assets of the estate.  That can't be.

14    That's as far as I know unprecedented in a bankruptcy case.

15          THE COURT:  I don't think that's -- well I'll ask.  I

16    didn't think that was the case about the sale issues.  I

17    thought it was the settlement issues that would be resolved,

18    but we'll talk about that.

19          MR. WERKHEISER:  Okay.  Sure, Your Honor.  And just

20    for your reference --

21          THE COURT:  Yes.

22          MR. WERKHEISER:  -- that provision is on the first

23    page of the settlement, one, two, three, four paragraphs

24    down.

25          THE COURT:  Okay.

249

1        MR. WERKHEISER:  And, let's see, any disputes arising

2   in connection with the sale of the team and in connection

3   with that valuation of prospective purchasers are subject to

4   review by the mediator only.

5        MR. BENNETT:  Can I just state, I'll give him extra

6   seconds, that's between these parties.

7        MR. WERKHEISER:  But that's --

8        MR. BENNETT:  [indiscernible]

9        MR. WERKHEISER:  But that fundamentally is the point,

10  Your Honor.  This is a settlement with a Debtor.  And the

11  Debtor is a fiduciary, and the Debtor is subject ultimately

12  to the supervision of this Court for anything that is outside

13  the ordinary course.  And that, you know, really runs into

14  the problem with the settlement itself.  The settlement, one,

15  was not filed and not disclosed to anybody even in part until

16  the day before the hearing, and they're essentially asking

17  Your Honor to approve this process which is entirely

18  predicated on the settlement without ruling on the settlement

19  which he won't do for another three weeks.  And I don't know

20  how the Court can exercise its duties under [indiscernible]

21  request to carefully examine the settlement under those

22  circumstances.

23        THE COURT:  Thank goodness I don't have to worry

24  about that today.

25        MR. WERKHEISER:  But you do because --

1          THE COURT:  Tell me why.

2          MR. WERKHEISER:  -- they put the cart before the

3   horse.   I mean the procedures are baked into the settlement,

4   and the settlement is baked into the procedures, and so

5   there's, one cannot be approved without considering the

6   other.  So I, that alone is a reason that this cannot be

7   approved today, Your Honor.

8          Let's talk about the estimation concept here.   Excuse

9   me.  Estimation under 502(c), Your Honor, is designed for --

10          THE COURT:  Voting purposes.

11          MR. WERKHEISER:  -- prepetition claims.

12          THE COURT:  Oh.

13          MR. WERKHEISER:  If Your Honor is comfortable with

14   that proposition, I won't go into details.

15          THE COURT:  No, no, go ahead.

16          MR. WERKHEISER:  But section 502(c) says that

17   estimation is for claims, sorry Your Honor, under this

18   section in 502(a) says a claim or interest proof which is

19   filed under section 501 of this title.   And then you put the

20   501, and that says a creditor or indentured trustee may file

21   a proof of claim.  And a creditor of course we know is

22   defined as someone who holds a claim --

23          THE COURT:  That's right.

24          MR. WERKHEISER:  -- before the case is filed.  So

25   their concept of estimation, Your Honor, is predicated on the

251

1   idea that they can subject to an estimation process for

2   claims that result from their post-petition breaches of our

3   agreement.   And there's no bases in law to do that under

4   502(c).

5          Your Honor, decisions such as In Re *HNRC Dissolution*,

6   371 Br. 210, and *In Re Indian Motorcycle Company*, 261 Br.

7   800, both support that proposition.   A handful of courts have

8   considered estimation of administrative claims in a very

9   narrow context of like determining feasibility on a plan.

10  But those courts have stated very explicitly that you cannot

11  cap a claim, you cannot disallow a claim for allowance and

12  distribution in an estate.   That is essentially just for

13  planning purposes.   So if you're going to have an estimation,

14  you can't do it under the authority of these decisions.   And

15  one is *In Re Adelphia*, 341 Br. 415, and the other one is *In*

16  *Re McDonald*, 128 Br. 161.   Even if you look within the four

17  corners of 502(c), Your Honor, they can't satisfy it.   Your

18  Honor, we dealt with this issue back in the *15375 Memorial*

19  case where there was [indiscernible] motion filed that Your

20  Horn denied, and if I can approach, I have a copy of that

21  order.

22         THE COURT:  Yes sir.  Thank you Mr. Werkheiser, thank

23  you.

24         MR. WERKHEISER:  And Your Honor was really

25  summarizing law, but in much of the order, but to make it

1   clear the Debtors have the burden of establishing an undue

2   delay in administering a case will result from fixing or

3   liquidating Pepco's claim in that case, through the

4   litigation that was ongoing there, or contemplated.  And then

5   Your Honor says later, in the last page of the order, any

6   delay will not [indiscernible] fresh start.  Now I'm not

7   suggesting this is all on all fours with 15375 Memorial, but

8   it's close enough, because here they've committed to sell the

9   team.  And the team will be sold no matter what, and

10  estimation is not going to affect that outcome at all.

11       Your Honor, I also need to note a couple of cases

12  that I think significantly restrict the jurisdiction of this

13  Court to conduct estimation proceedings in circumstances like

14  this.  In Orion Pictures, 4 F3d, 1095 1098-1100, that's a

15  Second Circuit Decision, the Court made very clear that

16  estimation was not permissible when they were seeking in

17  effect to estimate a cure claim under contract, which is I

18  think essentially what they're contemplating here, and that

19  was outside the power of the Bankruptcy Court.  And in that

20  context, the Bankruptcy Court was simply supposed to evaluate

21  the Debtors' business judgment on the likelihood that there

22  would be a claim or not, and then the actual liquidation of

23  the cure claim would be left for later in an appropriate

24  proceeding where it could be resolved fully on the merits.

25  There is similar, although they're not exactly the same

1   authority in the Third Circuit, the *Rhone-Paulenc* Decision,

2   249 F.3d 175 at 182.  And, Your Honor, I think everyone on

3   their side acknowledges that this whole process falls apart

4   without the estimation, and the estimation is just plainly

5   improper here.  Excuse me, Your Honor.  We heard that from

6   the Committee's counsel yesterday who said importantly

7   because we didn't want to wind up with the process that

8   resulted in the creation of hundreds of millions of dollars

9   of additional claims that Fox would assert because then we

10   were probably worse off because on this day we wanted

11   estimation built in.  Later on Mr. Coleman is being examined,

12   he testifies it's very important to the company, it's

13   important to know what the size of the claim may be.  They

14   can't do it, but they propose it just isn't feasible, it's

15   not going to work, Your Honor, under the laws that exist in

16   Third Circuit.

17          Let's talk about materiality, Your Honor, and why

18   there is no basis for what they want to do here.  I assume

19   from Mr. Bennett's comments that I don't need to revisit the

20   fact that there's an absence of any specific statutory

21   authority for what they want to do.  The only case they rely

22   on is, excuse me, I'm sorry, Your Honor, is *Bay Rivers* and as

23   much as Mr. Bennett would like it to say something different

24   than it does, it says explicitly that the case only involves

25   a situation where somebody entered into a contract shortly

1   before bankruptcy in contemplation of a bankruptcy.  The

2   lockup was designed specifically to lock up the assets in

3   bankruptcy and that the Bankruptcy Court found expressly that

4   the agreement was not an enforceable executory contract

5   because it was subject to Court approval.  So it was

6   considering all those factors that the Court took issue with

7   the lockup agreement there.  Obviously, it's not binding on

8   this Court.  It has whatever persuasive value it has.  I

9   don't think that's very much at all.  And to the extent it

10  comments on Delaware law, I think Your Honor probably knows

11  the Delaware law better than that Judge did.  But Delaware

12  law does not say as has been suggested that lockups are

13  impermissible.  They are permissible in certain situations

14  and they are permissible when somebody actually makes the

15  record that they're appropriate and that the minority equity

16  holders, usually when it's a Delaware case, are not going to

17  be harmed by the lockup and that it promotes the process.

18  And we've had that evidence here today.

19          Your Honor, they can't do what they want to do

20  because there's nothing in the code that allows them to do

21  it.  And I talked about it in the opening, there's no roving

22  equity power that lets them do it.  And at minimum to do it

23  they have to show that the changes, if they can find some

24  source in the code to do it, they would at minimum have to

25  show that the changes were not material.  All the evidence

1  has been to the contrary.  And just to foot a finer point on

2  that, the Third Circuit standard on materiality makes very

3  clear that you don't need to show specific economic harm.  It

4  says the resolution of this dispute, this is talking about

5  funding, does not depend on whether a term is economically

6  material, rather the focus is rightly placed on the

7  importance of the term within the overall bargain or

8  exchanges.  And we heard from Mr. Desser and Mr. Thompson

9  that these provisions go in virtually every telecast

10  agreement, and that you cannot function in this media rights

11  environment without having these provisions to ensure that

12  the marriage stays together long term.  And we also heard

13  that these are negotiated provisions, and that they allow for

14  the limited market check to ensure that everybody can get

15  value in that arrangement.  So they accomplish two things.

16  They keep the parties together and they ensure that maximize

17  value is obtained because they get to go look at the market.

18         Let's talk about some of the points that Mr. Bennett

19  has attempted to have made about the elimination of the word

20  binding.  So we know binding was in the original version of

21  the agreement, and we know that that agreement was put

22  together at a time that Fox was negotiation with Fox.  Then

23  Fox had to negotiate with an independent third party owner of

24  the team, reputed owner of the team and things got

25  renegotiated as one might often happen and provisions got

1    changed as a result of that.  But it is not accurate to say

2    that the result of that negotiation was that everything that

3    was binding before became nonbinding.  One, when they had the

4    original agreement, Your Honor, it was still subject to MLB

5    approval then, but they used the word binding.  So to suggest

6    that something changed because they took binding out doesn't

7    really fit what we know of this case.  And two, binding here,

8    the elimination of the word binding is essentially parole

9    evidence of the agreement, Your Honor.  The agreement on its

10   face is clear, it's not ambiguous.  If you look at section

11   2C, Your Honor, you'll see it has the word, it commits the

12   Los Angeles Dodgers to make a final written offer and then it

13   commits, let's see, one, two, three, four, five times, it

14   uses the word accept.  And that's A-C-C-E-P-T in reference to

15   Fox, either accepting or not accepting the offer.  So it

16   clearly describes a situation where there's going to be offer

17   and acceptance.  And yes, it is presumed and there is other

18   MLB language in the agreement that says we have to go to MLB

19   and ask for their approval, but the unrebutted testimony was

20   that except for this one transaction, just before the

21   petition date with Mr. McCourt, they have never had or

22   affected any problem with obtaining MLB approval in Fox

23   transactions.

24           THE COURT:  You've got five minutes by the way.

25           MR. WERKHEISER:  Thank you, Your Honor.  I do want to

257

1   speak to one other point, Your Honor.   Right.   So, this idea

2   was presented in the reply that time is of the essence

3   doesn't really apply here.   The idea that the deadlines don't

4   matter because the words time of the essence don't actually

5   appear in our contract.   But that's not reflective of

6   California law, Your Honor.   And what California law says on

7   the subject is that you just look at the nature of the

8   contract.   I told you about the *Johnson vs. Alexander*

9   Decision in our opening.   I think an even more applicable

10  decision is *Simons vs. Young*, it's 93 Cal. App. 3d, 170.   It

11  was an option contract like in the *Empire Equity's* case that

12  we talked about where the, excuse me, the Court did not allow

13  the Debtor to vary the terms.   But this one didn't actually

14  use the words time is of the essence in exercising an option.

15  And the Court goes on at length to talk about the requirement

16  of abiding for the contract terms and that under California

17  law, there is no equitable basis to adjust them because the

18  nature of the contract says that the deadlines are important.

19  And that's true here too, Your Honor.   The nature of the

20  contract says that the deadlines are important.   All the

21  testimony unrebutted was that these deadlines are important

22  to keeping the parties together and they're important to Fox

23  getting the benefit of its [indiscernible].

24          Let me just make sure I have covered everything else.

25  Your Honor, we've obviously argued no bankruptcy purpose.   We

1  cite a bunch of cases to support that proposition.  You know,

2  I think two of them that I would refer Your Honor back to

3  before you decide this matter --

4          THE COURT:  Please.

5          MR. WERKHEISER:  -- are the *Dunes* Decision 245 Br.

6  492 506-512, it has some common issues with this case because

7  you had a debtor that claimed to be in financial distress

8  when it arrived, that had clearly resolved some point into

9  the case, and then the Debtors still tried to use bankruptcy

10 powers to negate the contract rights of really its principal

11 remaining creditor.  Of similar important, *In Re Xianzhi Wang*

12 (phonetic), my Chinese is not good, so I probably butchered

13 that, but it's 23 Br. 798, 803, that's a Ninth Circuit case.

14 The Court there says that if the estate is solvent and the

15 unsecured creditors would receive 100 percent of their claim

16 rejection would then accomplish nothing for the unsecured

17 creditors, circumstances rejection by the only imposed

18 unwarranted administrative expenses.

19         Let me then wrap up by responding to a couple of Mr.

20 Bennett's comments.  I understand the Committee supports this

21 transaction.  I think, and it is not suggesting anybody is

22 breaching fiduciary duties, but, you know, they come out fine

23 under any scenario, and the evidence in the record any

24 scenario short of a total meltdown, the evidence in the

25 record is that they could do the old Fox contract, they could

259

1   sell the team without disturbing the Fox contract, and

2   they're going to be fine.  Mr. Bennett said something

3   curious, it's not possible that the Debtor could suffer, and

4   Fox could suffer.  But that scenario is very possible here,

5   because the Debtor could undertake this process and bidders

6   could be deterred by the uncertainty in this process, and by

7   the fact that they have to deal with the team owner who is

8   not going to be involved going forward, and not be willing to

9   participate in the process.  And in fact there's an incentive

10  for them to hang back and see what happens, and really wait

11  for the process to fail.  So that process could fail.  And

12  then Fox could be harmed because they've breached our rights

13  and they've subjected us to a process that we've never

14  expected to be subjected to based on our backend rights.

15         Mr. Bennett talked about what he perceived as the

16  dangers of waiting.  But they're not waiting, they're going

17  to sell the team no matter what.  And what you heard today is

18  that they will sell the team and the team buyers will show up

19  and that the team buyers will be armed with their information

20  and they'll get access to the Debtors' information and they

21  will have their own advisors and they will be able to value

22  the deal.  Because remember we're not selling the media

23  rights separately.  That's not what they're proposing.

24  They're just proposing the sale of the team but they want to

25  breach our contract along the way to do that because they

1   perceive somehow that's going to create more value for them.

2   And I think that also goes to Mr. Bennett's comment about

3   reducing risks.  Again, no matter what, this team gets sold

4   by April 30th, and so there is no risk, they're done.  Mr.

5   McCourt and the entities that are in bankruptcy are done in

6   the baseball business on April 30th.

7          Your Honor, I addressed damages, so I don't think I

8   need to respond specifically to any of Mr. Bennett's

9   comments.

10          One thing I will point out.  He picked at the

11  testimony of our witnesses quite a bit.  But the point is

12  that this is not a damages trial, we're not liquidating the

13  claims today.  We are trying to make a proffer of evidence to

14  Your Honor that yes, if this goes forward, there's a risk.

15  And there's a fairly substantial risk that this is going to

16  happen.  It's not proof beyond a reasonable doubt.  Your

17  Honor doesn't need to decide whether the claims will be

18  allowed or not allowed today.  But I think Your Honor is

19  either applying the entire fairness standard or the business

20  judgment standard in deciding whether by subjecting the

21  estate to this risk, they put the estate in an untenable

22  position.  I need to clarify one thing, Time Warner versus

23  Time Warner Cable on the agreement.

24          THE COURT:  Yes.

25          MR. WERKHEISER:  That exhibit was prepared at a time

261

1   before, it is my understanding that those two entities split

2   off from one another, so there was just Time Warner then, so

3   the fact that there are two separate entities now doesn't

4   necessarily free them up to do things with one and not the

5   other.

6          THE COURT:  I think your time is up for now.

7          MR. WERKHEISER:  I think so.  okay, Your Honor.  I

8   think I have a --

9          THE COURT:  Unless you want to borrow, you can borrow

10  but --

11         MR. WERKHEISER:  Well, I, I'm sure everybody's in a

12  charitable mood, but I have my I think ten minutes, so I'll

13  preserve that for the end, Your Honor.

14         THE COURT:  You bet.  Okay.  Very well.  Mr. Bennett,

15  I'm not going to count this time against you yet.  But I do

16  have a question that's troubling me, and it's this.  On

17  December the 27th, I am supposed to have a hearing on a motion

18  to dismiss, a motion to estimate claims, a motion to

19  terminate exclusivity, and I know there's some of them up on

20  those, on the dismissal and the exclusivity issues.  But how

21  are we going to do that?

22         MR. BENNETT:  Okay.  First of all, the estimation is

23  not on for the 27th.

24         THE COURT:  Oh.

25         MR. BENNETT:  So --

1      THE COURT:  Oh thank goodness.  When is it?

2      MR. BENNETT:  I think we were holding February 8th

3  and thinking about moving it into January.

4      THE COURT:  Good.

5      MR. BENNETT:  And so that is not your problem.

6      THE COURT:  Okay.  Thank goodness.

7      MR. BENNETT:  Your Honor, again, I'm glad I'll be

8  calm about this because this, the motion to dismiss, they

9  have the right to do it, I can't stop them.  By the way,

10  there's an attorneys fees provision that applies to, you

11  know, things that they lose and we may well actually be

12  presenting a bill as a result of this hearing, as a result of

13  exclusivity hearing, we may have to start implementing that

14  provision in order to get closure from some of this.  So we

15  honestly believe and the facts will show, you know the facts,

16  or most of them, you know, there's part of this case is not

17  happening in this courtroom to be sure, but part of the case

18  has.  There is no basis whatsoever for dismissal motion.

19  It's just tactical.  There's no basis at all for, I don't

20  even know what the grounds are going to be for the

21  termination motion because they can't be the same ones as

22  Major League Baseball did that they supported because of

23  course they supported the idea that there should be a plan

24  for the sale of the company.  There are consequences to these

25  joinders that they want to stand on.  So I am sorry that the

263

1   rules compel you to set at least the termination hearing for

2   the 27th, and it's up to them, I will be very courteous to

3   move it if they want to move it.  And frankly I think it

4   should be.  It's not a religious problem for me, or for Mr.

5   Levinson, but it is for others.

6         THE COURT:  Yes.

7         MR. BENNETT:  And, I was going to call it the third

8   day of Christmas, but I don't know when you're supposed to

9   start counting.

10        THE COURT:  Christmas.

11        MR. BENNETT:  So in any event, so I don't think it's

12  even at those two things, the 27th looks like a fairly busy

13  day to put it, as mildly as I possibly can.

14        THE COURT:  Yes.

15        MR. BENNETT:  But estimation is not there, or

16  whatever steps we take to cap the claim or disallow the

17  claim, it's not there.

18        THE COURT:  Maybe I should speak to Mr. Werkheiser's

19  wife.

20        MR. BENNETT:  You know, actually if you put all of

21  the wives in the room --

22        THE COURT:  Yes.

23        MR. BENNETT:  -- I think this would get results.

24  There's strong interest in the Bennett household on this

25  topic as well.

1    THE COURT:  Yes.

2    MR. BENNETT:  Okay, now I'll start my time.  I

3 actually set my --

4    THE COURT:  Yes, now you'll start it.

5    MR. BENNETT:  I actually set my timer this time so

6 that should tell me what I'm doing.

7    THE COURT:  Okay.

8    MR. BENNETT:  Okay.  I don't think I'm going to need

9 all of it, at least I'll try not to take all of it.  First

10 order of business, the agreement, the Major League Baseball

11 agreement.  There's a really important term in the public

12 document.  Your Honor will find it and read it yourself, but

13 it's the other provision section, and it says, except as set

14 forth herein, the parties have no agreements regarding Fox.

15 And the only thing that's set forth herein is the withdrawal,

16 the provisions withdrawing things and the provision that says

17 that Major League Baseball is going to be neutral.

18    THE COURT:  Right.

19    MR. BENNETT:  And again, I say this because it is

20 incontrovertible, and every single time Mr. Werkheiser stands

21 up, he ignores it.  This isn't predicated on a settlement.

22 Not because I'm saying it's not predicated on a settlement,

23 it's because it was a year before the settlement.  We made a

24 site modification favoring Fox as a result of the supplement.

25 We did not do anything to expand the relief.  So the idea of

265

1    predicated on the settlement it's just not true.  And so I'm

2    going to put that aside.  We'll have an issue with respect to

3    approval of the agreement maybe, I can't even imagine what

4    the issues are going to be.  When they are raised, we will

5    deal with them.

6         I think also, very important, I know Your Honor

7    understands this.  We're not eliminating the backend rights.

8    And so a lot of the testimony you heard at least in direct

9    examination was the backend rights are worth, and then they

10   said, that's what you're taking away from me.  And we're not.

11   We're just moving them.  So even if moving them is a problem,

12   it's a subset of the backend rights.  So there was a little

13   bit of bait and switch that I actually thought I revealed on

14   cross-examination.  But as he said, oh, 25 percent, is that

15   for the backend rights for all them.  He said yes, it's for

16   all of them.  Okay, and then he said well not just for moving

17   them, he said no, 25 percent is for all of them.  And then I

18   said put a number on the difference between the old ones and

19   the new ones.  Five percent.  Remember, the old ones were

20   better, the new ones were less good and the old ones include

21   one time deferral exactly the same.  It was one of the

22   decrements.  So remember we dealt with an estimate that was

23   taken out of the air, he couldn't justify the 25 percent

24   except it's kind of how he felt, no comparables consulted,

25   none of the things we usually do.  I don't think in my

1   experience, that's what the damages are is going to cut it in

2   any court in the land, much less in this Court.  But even

3   accepting that basis of calculating damages, it's like it

4   shrinks, it shrinks, it shrinks, it shrinks, which is why we

5   say not material.

6          Also on the materiality point, remember there was

7   discussions about shrinking the exclusive negotiation period

8   by 50 percent.

9          THE COURT:  Um-hum.

10         MR. BENNETT:  Not material.  So it can't be that

11  every single term and condition defined exactly the way they

12  say, is material.  Once again, this is Mr. Werkheiser

13  crediting his general direct examination and forgetting when

14  the specifics were drilled down in cross-examination, all

15  kinds of things started to scatter around.  By the way, Your

16  Honor, Mr. Coleman did in fact testify that the buyer consent

17  things is an MLB demand.  And by the way, why would we ever

18  restrict our own flexibility.  It's a common sense issue.

19  But the evidentiary record is complete.  Mr. Levinson found

20  it, but in the unofficial transcript.  If the Court has

21  problems, you know how to reach out to us, we will file

22  something.

23         All, there's also a huge disconnect between the

24  feelings by the two experts, one the Fox expert, one the more

25  independent expert, not saying completely independent, just

267

1   more independent expert.  These things are important.  They

2   can say that until they're blue in the face.  These are not

3   issues of first impression.  The courts have dealt with this.

4   The courts are sending the opposite message.  The courts --

5   and this is actually, this is actually the second time I've

6   stumbled onto something like this in my career.  In the movie

7   industry, they have terms and conditions in their contracts,

8   they're like things that don't look like anything normal

9   commercial lawyers seen.  They kind of grow up in the

10  industry and they think they have meaning.  They have a

11  different meaning for secured, for example, that doesn't

12  involve recording anyplace, and they actually thing they have

13  rights that they don't have.  Because in their little world

14  of confidential documents, they started doing things certain

15  ways thinking they really meant something, but never having

16  really hit the crucible of actual law enforcing under the

17  law.  We may be having the same problem here.  They think all

18  this stuff is important, but if they went to their lawyers,

19  and they have good ones, and asked them, what's the law in

20  negotiation rights?  Are we supposed to be putting all of

21  this materiality on such things?  They would run into the

22  word speculative, not once, not twice, but over and over and

23  over again, in cases in California, in cases in Delaware.  A

24  cute case involving the Rockets by the way, they decided in

25  Delaware how that happens, different story.  New York.  Every

268

1  jurisdiction gets this the same way.  You run into the word

2  speculative over and over and over again.  You can't say

3  these are material against the legal backdrop that's not

4  ambiguous.  You have to pay attention to the legal backdrop.

5         The assertion that damages issue was not rebutted is

6  insane.  Maybe it wasn't the subject of rebuttal testimony,

7  but the cross-examination, the cross-examination of Mr.

8  Thompson concerning how he built his damage models and when

9  he had to say as to how did he justify paragraph 23 of his

10  declaration after he could not figure out what the baseline

11  was going to be much less the size of the increment, his

12  answer was I don't know.  Okay.  That is the end of that

13  damage theory.  I've never accomplished that before in cross-

14  examination, I probably will not accomplish that again.  But

15  I think we know a lot about damages.

16         So now let's talk about the whole issue of estimation

17  just for a second.  Of course, criticism of estimation didn't

18  come up until today.  We still believe we're dealing with

19  what will be a prepetition claim as a result of if any, as a

20  result of a contract provision that Your Honor will say is

21  invalid.  Under Delaware law, there's a severability

22  provision that protects us, off we go.  If on the other hand,

23  we have a damage claim to deal with, if estimation applies,

24  which we think it does, that's one procedure.  There's

25  something called summary judgment 2.  Remember we're talking

1   about negotiation rights, we're talking about a no shop,

2   which is a form of negotiation restriction.  We are, we have

3   simplified this case, we are only talking about the no shop.

4   I have been actually impressed at the extent and range of

5   creativity Fox has been willing to go to state damage claims.

6   But you saw today we dealt with someone who is tied for most

7   knowledgeable inside the Fox empire on this subject.  This is

8   it.  This was state of the art knowledge.  I'm sure they're

9   going to try something else.  I think they're really pretty

10  good at trying this time.  This probably is the best they can

11  do.  So we can think about whether or not demolishing this

12  damage claim or putting it into a sensible dimension is going

13  to be a big challenge or a little challenge.

14        Also, delayed administration by the way, is used in

15  estimation, it's not delay the sale, it's not delay the plan,

16  it's delay administration, which is lots of things we have to

17  do here including make distributions.

18        And by the way, your opinion, I read it quickly, it's

19  a case that had no operations, and was liquidated.

20        THE COURT:  That's correct.

21        MR. BENNETT:  Okay.  *Dunes*, two cases they cite,

22  *Dunes*, *Xianzhi Wang*.  *Dunes*, worth reading, it involves a

23  hotel with unrecorded lease and one creditor who was secured,

24  fully covered as to value.  And here's the kicker.  The owner

25  was a $23 billion, $23 billion dollar fund.  The $23 billion

1   fund in the middle of the case bought the loan from the

2   creditor.   So the case gets to the Judge where the creditor,

3   he's not sure, taken out, or there's an agreement to take it

4   out by the person who owns the equity.   Okay.   Does that

5   sound like m y case?   I don't have anybody writing those kind

6   of checks.   So that's what *Dunes* is about.   Xianzhi Wang,

7   written by Judge Peter Elliott, he's passed away, he's a

8   Judge in California.   That case is good reading because it

9   basically says in that case the Court rejected it because

10  there was a damage claim that would sop up every bit of the

11  benefit.   Okay.   We don't have that case.   We have a case

12  where there is no damage claim or there is a very small

13  damage claim.   And that got proved to you today.   So *Xianzhi*

14  *Wang*, if that's the bad faith case they're relying upon,

15  that's not it either.

16          We dealt with time is of the essence in our brief.   I

17  want to propose a way for Your Honor to think about it that I

18  think is consistent with the way you may be thinking already.

19  This is kind of what we're saying in our brief, but I think

20  it gives it a little bit of edge.   One of the big questions

21  here is materiality.   One way to read the time is of the

22  essence cases, is that the words time is of the essence takes

23  something that is ordinary not material and proposes it to be

24  material.   That is, if Your Honor takes a look at the cases

25  and I can't take him through it now because on the proponents

271

1    of time limits, you will find that that explains results very

2    nicely, and is a good way to give sense to a lot of the cases

3    that were decided in the area.

4           Conditionality, people accept conditional deals all

5    the time, accept is not the decisive word.  The decisive word

6    would have been binding.  The decisive word binding was in

7    another document, it is not in any of the documents that we

8    are dealing with.

9           THE COURT:  Well not only was it in another document,

10   but it interestingly it was in a document between affiliated

11   parties.

12          MR. BENNETT:  The same -- it was in the same document

13   before it was amended.

14          THE COURT:  Right.

15          MR. BENNETT:  In the same sections that were amended.

16          THE COURT:  Right.

17          MR. BENNETT:  It's as close as it gets.

18          THE COURT:  Yeah.

19          MR. BENNETT:  We're not reaching to something on the

20   back of page 50 to reconcile something on page 2, which I've

21   tried before.  But no, this is the same exact, this is the

22   same exact sentence.

23          Okay.  Lastly, how to run a sale.  Actually next to

24   the last, I have time, so I'll cover two things, and I'll

25   still have leftover time.  One, we, the accusation was made

272

1   that we want to go through with this consequences be damned.

2   That's kind of insulting to me and my team as well as to

3   Blackstone, as well as to all the other professionals in this

4   case.   I think one thing that we've demonstrated throughout

5   the filing of the initial motion, the supplement which made

6   modifications to make Your Honor's job easier to cut back on

7   the relief requested is we decided we could get this done a

8   little bit more simply.   Our proposal made at the closing of

9   opening argument that if there were any issue that we didn't

10  cover right in the procedures.   And by the way, the only

11  reason we didn't copy the old agreement and put it there is

12  because the old agreement was confidential.   So we didn't

13  want to copy it and put it there.   We wanted to try to

14  replicate without copying.   That was kind of what we were

15  trying to do here.   So we, if we made any mistakes on the

16  issues that we talked about, they were not intentional, and

17  we will fix them.   So the exact contract language with

18  respect to items 4 and 5, we'll adopt it.   The

19  confidentiality I propose two different solutions for it.   No

20  one talks to anybody, everyone talks except to competitors.

21          THE COURT:  Right.  Yes.

22          MR. BENNETT:  Either one I'll live with.

23          THE COURT:  Yes.

24          MR. BENNETT:  And if there were any other problems

25  which we think there are none, we're okay.  But there's

1  consequences be damned is not appropriate description of

2  anything that happened here.

3          And now my final point, and I'll have leftover time.

4  How to run a sale.  You had two witnesses, and that's part of

5  what this is about, how to run a sale.  You had Mr. Coleman

6  from Blackstone who's run more sales than I can count.  I've

7  done every side of them, I've been a bidder, a disappointed

8  bidder, an objector and I've been on the side, all different

9  ways.  And he's been in this business for a good long time.

10 He so testified, and it's actually interesting on cross-

11 examination one of the lawyers for Fox actually elicited from

12 Mr. Coleman testimony about how often he's been doing this

13 and how many deals he's done.  And it's, and it's an

14 incredibility impressive list.  He's probably older than he

15 looks, given the number of things that he's been involved in.

16 And he wasn't really affectively touched on cross-

17 examination.  And then the other side of that question we

18 didn't have Mr. Thompson, we had Mr. Desser, who could

19 testify to a participation in one M&A deal that didn't

20 happen, and he was consulted, not the person in charge, and

21 he was mostly about media rights.  And we also should think

22 about how those witnesses fared on cross-examination.  Your

23 Honor is one of the nicest men in the world, and it's hard to

24 do this.

25          THE COURT:  I have my moments too.

274

1        MR. BENNETT:  It's hard to do this, but credibility

2   has to be a factor --

3        THE COURT:  Yes.

4        MR. BENNETT:  -- in everything.  And Your Honor was

5   here listening, I was listening from a slightly different

6   vantage point, I was participating to some extent.  And

7   again, you had direct testimony of sweeping generalizations

8   about how, about things very untestable statements about the

9   way the world is and the way the world should be, and

10  perceptions and what have you, and then with respect to most

11  if not all of those generalizations, there were specifics

12  that could be drilled down on.  And when you drill down the

13  specifics, you found declarations riddled with errors,

14  declarations that weren't read very carefully, adoptions of

15  attorney arguments in the review process.  You found

16  everything wrong with testimony that can be wrong with

17  testimony, you found sentences that people didn't ever find

18  support for.  You didn't find that with Mr. Coleman's

19  testimony.  So when you have conflicts between Mr. Coleman's

20  testimony with his experience notwithstanding less experience

21  to be sure on the media rights things, but his experience in

22  selling a company and what you need to do in connection with

23  that, fixing a company, what you need to do in connection

24  with that, and then media rights experts trying to do Mr.

25  Coleman's business, you have very, very different levels of

275

1 expertise, and candidly, very different levels of credibility

2 as a result of what Your Honor listened to.

3        The way I'm supposed to close is tell you what we

4 want to do, we want you to do.  We want you to enter the

5 order in the form that we submitted, with such modification

6 as you see fit, authorizing the Debtors to proceed with the

7 revised marketing procedures with such amendments as you see

8 fit.  We reached a deal that the first seven days have

9 started already by reason of this continuance.

10        THE COURT:  That's right.

11        MR. BENNETT:  So we want to get back on schedule.  We

12 have a lot of work to do.  As you know, there's a mediation

13 ongoing, we will continue to be ongoing with Fox.  I'm going

14 to say this on the record, because it's been misinterpreted

15 before, we are available to talk about anything any

16 reasonable place, any reasonable time, no preconditions, no

17 particular list of topics, with mediation, without mediation.

18 So I think that eliminates all the ambiguity I've been

19 previously accused of in that regards.

20        And with that I have leftover time, and I thank Your

21 Honor for the time you've given us the past few days.

22        THE COURT:  Thank you, Mr. Bennett.  Thank you sir.

23 Mr. Werkheiser.

24        MR. WERKHEISER:  Yes Your Honor.  It's getting late,

25 so I'll try to be quick.  I'll start at the end actually.

276

1   Coleman testimony, Your Honor, what he testified to, he sort
2   of just waxed poetic about what he thought the process should
3   be and what he thought might or might not create more value.
4   But on cross, when we were going to try to dig down and how
5   did he get there, we found out he never did a valuation.   He
6   didn't want to do a valuation, at least not one that he was
7   willing to shore with anybody in the courtroom today.   So you
8   know credibility, take what you want from that, Your Honor,
9   but that causes questions in my mind.   Materiality, Your
10  Honor, the elephant in the room is that they've taken an
11  agreement that has offer and acceptance and results in the
12  parties binding themselves, and yes there's an MLB condition,
13  there always has been, that was there before the amendment
14  that's there now.   And it's never been a problem before
15  except with one court transaction.   They've taken that
16  agreement and they've gutted it because they said among other
17  things, in addition to moving it up, we're going to take
18  whatever you agree to with us and shop it to the world of
19  people who have signed this in the case.   And that's never
20  what we bargained for, it completely as you heard through the
21  testimony changed the dynamics of the deal.   It's material.
22  There is no getting around the fact that it's material.   And
23  when it's material that means that they can't assume the
24  agreement, they can't modify it, they have to live with it.
25          THE COURT:   Well they were entitled to shop before.

277

1          MR. WERKHEISER:  Within a limited window, Your Honor.

2          THE COURT:  Yes.

3          MR. WERKHEISER:  Right.  They had a five business day

4    window as --

5          THE COURT:  That's right.

6          MR. WERKHEISER:  -- I understand it before they made

7    their team final offer, and then if we didn't accept that,

8    then they went out to shop after that.  But as Mr. Desser

9    testified, that's all structured very carefully to promote

10   the marriage of the parties because of the capital investment

11   that everybody makes here.  And because it's a relationship

12   of trust and confidence, and if you aren't comfortable with

13   your team partner, it's not going to work.

14         THE COURT:  Well this marriage, I'm telling you --

15         MR. WERKHEISER:  Well sometimes marriages end in

16   divorce, I mean --

17         THE COURT:  That's right.

18         MR. WERKHEISER:  -- that's been a running theme in

19   this case, Your Honor.  Damages, I'll say it again, it's not

20   a damages trial.

21         THE COURT:  No, it's not.

22         MR. WERKHEISER:  We're here because we're testing at

23   minimum the Debtors business judgment or whether it's

24   entirely fair.  And in that context, they have to show that

25   the estate is not likely to be harmed.  And there was

1   testimony, and I, it was attacked, but there was testimony

2   that's unrebutted that at the very minimum, there's likely

3   going to be a significant reduction in value based on the

4   benefit [indiscernible].  And that is, this is different than

5   the cases that they talk about whether three's an agreement

6   to agree or an agreement to negotiate in good faith, because

7   one we had more than that.  We had the agreement to

8   negotiate, we had the right to get the team final offer, and

9   we had the matching right.  That's way more than that, and

10  that was value, and as you heard from the experts today,

11  that's value that was baked into $300,000,0000 that Fox paid

12  over the term of this agreement thus far.

13          Your Honor, on, I touched on binding.  Yes, Your

14  Honor, it looks like you have a question.

15          THE COURT:  No, no, no.

16          MR. WERKHEISER:  Okay.

17          THE COURT:  I'm thinking about a matter of concern,

18  but I won't burden you with it.

19          MR. WERKHEISER:  okay, Your Honor.  Your Honor, on

20  *Dunes* --

21          THE COURT:  Binding, yes.

22          MR. WERKHEISER:  -- the fact of the recitation is

23  correct, but the theme is precisely the same.  There is a

24  claim in financial distress.  They were facing a foreclosure,

25  the foreclosure gets resolved mid-case, there's no reason for

1  the entity to be in bankruptcy at that point or to use the

2  avoidance powers, in that case to invalidate a contract, a

3  long term lease of the operator of the hotel.  And what the

4  Court said at that point is you know technically, yeah, you

5  can do this which isn't even this case, because technically

6  they can't do this.  But because it's only going to serve the

7  equity, I'm not going to let you do that.  And that's

8  precisely the situation we have here.  It's only going to

9  serve the equity because they know they can sell the team

10 with the contract intact, and produce enough value to pay off

11 all the creditors.  Your Honor, and I hope Mr. Bennett won't

12 jump all over me because I did forget to mention this in my

13 primary argument.  But I just, I hope you will rule for us,

14 but in the event that you don't, I do want to mention our

15 view on not waiving the stay.  Our rights can begin being

16 prejudiced immediately because of the exclusivity negotiating

17 period will begin to run, and this process will continue.

18 And we do --

19         THE COURT:  Do you not agree that the negotiation, if

20 I find for the Debtors, the negotiating process has already

21 begun?  It began on November 30th.

22         MR. WERKHEISER:  We did stipulate to let them have

23 seven days to start it on November 30th.  However, I think in

24 the procedures they've now proposed, they've changed that

25 back again, so I'm not sure where we are in the blackline

280

1   that was circulated.  I think it has the 45 days running from

2   the date of the order.  So there's some ambiguity I think on

3   that point, Your Honor.

4           MR. LEVINSON:  We didn't intend to change.  It starts

5   on November 30th.

6           MR. WERKHEISER:  Your Honor, to close, I think, we

7   think you should deny.  I'm sorry, where I was going before

8   you asked your question was just on the issue of the 14 day

9   stay.

10          THE COURT:  Yes, please.

11          MR. WERKHEISER:  We ask Your Honor not to waive that,

12  we don't think they're prejudiced.  The only deadlines they

13  have are self-imposed pursuant to their agreement with MLB

14  and pursuant to Mr. McCourt's agreement with his wife and his

15  divorce.  Those are not estate issue.  There is no external

16  pressure that forces them to go forward immediately.

17          But to close my comments, I want to suggest to Your

18  Honor what they should have proposed if in fact they were

19  being accurate in their statement that they really aren't

20  trying to do anything except advance from the timing.  And

21  we're not agreeing to this, but this is what the order should

22  have said if that's what they wanted, notwithstanding any

23  other provision in the telecast rights agreement, dated

24  November 1st, 2001 between LAD and Fox as amended from time to

25  time the exclusive negotiation period, which is a defined

281

1  term in their motion, provided in Section 2B of the telecast

2  agreement shall run from November 30th, 2011 to January 14,

3  2012.  No other provision of the telecast agreement shall be

4  modified in any manner whatsoever.  And there should be

5  another decree paragraph that says LAD is authorized and

6  directed to proceed under sections 2B and 2C of the telecast

7  agreement as modified by this order.  Based on what they told

8  you what they want out of this process, that's the order that

9  they should have submitted.  We don't think they're entitled

10 to go forward at all, but that's the order that should be

11 submitted if they forward at all.  Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Werkheiser.

13         MR. BENNETT:  Three minutes.

14         THE COURT:  But it seems to me that if we only

15 advance the exclusive negotiating period, there won't be much

16 incentive for Fox --

17         MR. BENNETT:  You're paying attention.  I wanted to

18 point that out.

19         THE COURT:  For Fox to negotiate.

20         MR. BENNETT:  That's right. Your Honor.

21         THE COURT:  Yeah.

22         MR. BENNETT:  And the other thing on the stay.  We

23 want to move continuously for those last seven days and move

24 to the end of the 45 days, and the problem with the stay is

25 that that completely disrupts the schedule.  So we actually,

1   the form of order has the stay waiver, the brief, the reply

2   brief has in it our position with respect to why the waiver

3   of the stay provision is important.  And for the same it's

4   important that we get an order from Your Honor is that we

5   can.

6           THE COURT:  Is it possible to waive just a portion of

7   the relief?  In other words, to waive the stay, I'm sorry, to

8   waive the stay just for example with respect to the exclusive

9   negotiating period?

10          MR. BENNETT:  I think so.  I'd want to talk to Mr.

11  Werkheiser exactly about it from what he wants to achieve,

12  but I think that's achievable, I want to think about it and I

13  want to talk to Mr. Werkheiser about it.

14          THE COURT:  All right.  Thank you, Mr. Bennett.  Is

15  there anything further?  Anything else?

16          MR. BENNETT:  Good night.

17          THE COURT:  Well look, I've heard a lot of good

18  testimony and seen a lot of good lawyering and I know the

19  parties would love me to rule right now.  But I couldn't do

20  justice on the record to a discussion of the facts here that

21  would give anyone any sort of peace of mind in proceeding if

22  there were an appeal or whatever.  So I will say this.  And

23  it always pains me to kind of make a ruling with a lot of

24  anxious people looking at me.  I'm going to approve the

25  motion.  I stayed here last night until around midnight

283

1   researching and writing and working on this thing, and I am

2   satisfied that the proposed modifications are not material.

3   And that to me is the key.   I'm also satisfied that the

4   arguments relating, that the Debtors' arguments relating to

5   the no shop provision are appropriate.   But your time for

6   appeal is not running as of this moment because I want a

7   couple of days to write something.   The danger in writing

8   something, I will tell you, and writing something somewhat

9   quickly is that the deeper I go the deeper I get, you know,

10   and it's hard to pull out.   But it just seems to me that

11   something has to be written, some analysis.   Or it's really

12   going to be unfair to all of us for me to right now at the

13   end of the day to try to rule verbally on what the facts are

14   and what the law is and that sort of thing.   First of all, it

15   would take forever to do it.   And secondly, even then I don't

16   think I could be quite precise enough so I do think it's

17   appropriate here to grant the relief, and I will explain why

18   in detail.   And that is the time that your time for appeal or

19   whatever would start to run Mr. Werkheiser, not from right

20   now, I'm not, you know, entering an order in any respect.

21   But I just think that it is in the Debtors' best interest.

22   It has the support of the Committee.   I think that business

23   judgment was properly exercised in evaluating the pros and

24   the cons and the risks involved.   So but I will put that on

25   paper.

284

1          MR. WERKHEISER:  Your Honor, obviously we're

2     disappointed.

3          THE COURT:  I understand.

4          MR. WERKHEISER:  But there's an issue that comes up,

5     and I do think it's appropriate for Your Honor to take some

6     time to formulate your thoughts on whatever decision you're

7     making and --

8          THE COURT:  Please, go ahead.

9          MR. WERKHEISER:  If you know there's divine

10    intervention, you may change your mind between now and

11    issuing whatever ruling you're issuing, the issue comes up

12    with the fact that the parties stipulated to essentially one

13    week period of running the exclusive negotiating period to

14    allow for the mediation process to happen when it did and for

15    this hearing to go forward starting yesterday.

16         THE COURT:  Right.

17         MR. WERKHEISER:  If Your Honor wants to take some

18    time, that's certainly appropriate.  I just don't want us to

19    be prejudiced on the exclusive negotiating period if --

20         THE COURT:  No, I think the Debtors themselves want

21    it to be running now and want you to be negotiating now.

22    Maybe I'm misunderstanding Mr. Werkheiser's point.

23         MR. WERKHEISER:  Well the Debtors have said that the

24    period started on November 30th.

25         THE COURT:  Right.

285

1       MR. WERKHEISER:  And so it's, we're eight days in

2 now, and I know Your Honor wants to take some time to

3 formulate your thoughts --

4       THE COURT:  I'm talking about a few days, I'm not

5 talking about a month.

6       MR. WERKHEISER:  Whatever your ruling is going to be.

7 But that's, you know, it's Tuesday or Wednesday, whatever it

8 is you issue your ruling that's another week off of that

9 period and it's another week that we're prejudiced in the

10 process that I don't think we bargained for or agreed to when

11 we agreed to push things back a week to have the mediation to

12 this hearing today, or yesterday.

13       THE COURT:  Well one of the reasons I told you where

14 I'm heading is so that you would understand that the time is

15 running, you would be involved in negotiation.  This is the

16 45 days for negotiating.  I don't under -- you know, it would

17 be one thing if I said you know what Mr. Werkheiser, I'm

18 coming out on your side in favor of, in favor of Fox --

19       MR. WERKHEISER:  Yes, Your Honor.

20       THE COURT:  -- and then issue a ruling three weeks

21 from now going the other way, then you would be prejudiced.

22       MR. WERKHEISER:  Well --

23       THE COURT:  Maybe I don't understand, but I don't

24 understand the prejudice.

25       MR. WERKHEISER:  I think we'd be conducting ourselves

286

1  the same why whether Your Honor was silent or previewed where

2  you were headed with the ruling, but the fact of the matter

3  is that we're prejudiced because in all likelihood we're

4  going to pursue appellate rights.

5          THE COURT:  Sure.

6          MR. WERKHEISER:  And the exclusive negotiating period

7  is prejudiced to us, but once you get beyond that, the

8  prejudice compounds exponentially to us.  So because they,

9  you know, they go out to the market, they start talking to

10  people on their procedures, you know confidentiality gets

11  relaxed, etc., etc., and so prejudice is compounded to us

12  once you get beyond that.  So it is prejudicing us especially

13  with respect to appellate rights and anything else, even

14  though Your Honor hasn't yet issued a formal order.  So

15  that's, I was just going to ask if Your Honor would suspend

16  it for the short period of time between today and a couple of

17  days from now when presumably Your Honor issues a ruling.

18          MR. BENNETT:  Your Honor, there are a couple of

19  things.  On the law, you were told today by their witnesses

20  that a change in an exclusive negotiating period from three

21  months to 45 days was not material.  And we're talking about

22  a couple of days.  I will say this, because sometimes

23  communications aren't as good as they should be.  There was a

24  session yesterday, not supervised by Judge Farnan, because I

25  think he was here, but there were people in New York together

1   talking about this.  I got a report, and I assume you guys

2   got a report --

3           MR. WERKHEISER:  I understand there were

4   communications, I don't know the result, Your Honor..

5           MR. BENNETT:  Okay.  So I didn't think things had

6   stopped and I'm troubled that anything about this ruling that

7   the first reaction to this ruling is let's stop as opposed to

8   let's continue.  We're prepared to continue.  If there's a

9   good reason why you want to stop other than you just don't

10  want to talk anymore, I'm game to listen to it, and maybe

11  we'll work something out.

12          MR. WERKHEISER:  May I respond Your Honor?

13          THE COURT:  Sure.

14          MR. WERKHEISER:  I think Mr. Bennett is conflating

15  two different issues.  There's the issue of will we

16  communicate and hope that people will be reasonable and find

17  some way to resolve this, which is yes, we're willing to do.

18          THE COURT:  Sure.

19          MR. WERKHEISER:  But then there's the issue are we

20  prejudiced because this matter is still under advisement and

21  hasn't been decided.  So we're happy to communicate with

22  them, but the idea here now is that the period continues to

23  run so we're doing it even more under the gun, without a

24  ruling yet, a formal ruling yet from the Court.  And that's,

25  that doesn't strike me as fair to us, Your Honor.

1          THE COURT:  Well, here's what's peculiar about your

2     position.  If I hadn't said anything, and just issued my

3     ruling on Tuesday or Wednesday or sooner --

4          MR. WERKHEISER:  Yes, Your Honor.  I would be up here

5     anyway at the end of the hearing probably taking this

6     position, if you hadn't said anything, Your Honor.

7          THE COURT:  Oh.  Well I am, I must admit I don't, I

8     truly don't understand it.  It's not you know four days, it's

9     45 days, the parties have already been negotiating, and in

10    fact I believe were negotiating well in advance of November

11    30 in mediation.  So --

12         MR. WERKHEISER:  Yes, and Your Honor, from --

13         THE COURT:  -- what would you like me to put in the

14    order?  Tell me the language that you're suggesting so I'll

15    better understand your point.

16         MR. WERKHEISER:  Well if I had my druthers, I'd say

17    it was denied, but --

18         THE COURT:  I know that.  I know that.

19         MR. WERKHEISER:  But what I'm asking you to say is

20    that from today until whatever date you issue your order,

21    that period of time does not count against the exclusive

22    negotiating period.  It's not that we're not going to talk to

23    them during that period, we would, we were frankly having

24    communications even before the period started to run, it's

25    just that we shouldn't be prejudiced by that.  And that

289

1    prejudice, is because when that ends, they go out to the

2    market under the procedures and start talking to people and

3    they start defeating precisely the issue we've been

4    litigating about for the last few days, and well beyond that,

5    and we're prejudiced.  That's, that for certain at that point

6    is irreparable harm.  I think we're suffering irreparable

7    harm immediately, but it gets compounded when that event

8    occurs.  And look, I'll be direct with you, we're going to

9    appeal, Your Honor.

10             THE COURT:  Sure.

11             MR. WERKHEISER:  And we're going to seek a stay.

12             THE COURT:  Yes.

13             MR. WERKHEISER:  Here and in the District Court if we

14    can't get one here.

15             THE COURT:  Yes.

16             MR. WERKHEISER:  And presumably if Your Honor is not

17    going to give us the 14 day stay, that is mandated by the

18    rule, absent a showing it should be waived, I assume you're

19    not going to give us a further stay pending appeal, and

20    perhaps Your Honor should make that clear in your ruling so

21    that we can go directly to the District Court at that point.

22             THE COURT:  Well --

23             MR. WERKHEISER:  Because we want to make sure we have

24    a chance to be heard by an appellate Court.

25             THE COURT:  Yes.

1          MR. WERKHEISER:  Before we've gotten so far down the

2   process that we can't get effective relief.

3          THE COURT:  Well first of all, I always include, what

4   I call a courtesy stay, which then gives the District Court

5   an opportunity not to be faced with lawyers running in, you

6   know, on no notice basically because it's you know it's got

7   to be there right away, they've got to get the stay right

8   away from the District Court.

9          MR. WERKHEISER:  Yes, Your Honor.

10          MR. BENNETT:  May I make a suggestion?  I think I'm

11   going to cut through, first of all I don't want to rush them

12   or you.

13          THE COURT:  Right.

14          MR. BENNETT:  Or any appellate tribunal.  So I'm of a

15   mood to try to find a way to make a deal on the 14 days that

16   also provides for negotiations to happen continuously so they

17   could have time to have the appellate guys doing their

18   appellate things.

19          THE COURT:  Right.

20          MR. BENNETT:  Or the business guys will do their

21   business thing.  Rather than do it right now, and besides I

22   don't think there's a whole bunch of lawyers left, I would

23   propose that we confer tomorrow and give a joint report to

24   Your Honor whether we were or weren't able to settle this

25   issue.  And if we weren't, there will be two alternative

291

1   forms of order as to what this, how this issue should be

2   resolved.

3          THE COURT:  That would be helpful.  Here's the other

4   point though that I would like to make.  I am going to

5   impose, the confidentially on both sides as far as

6   discussions with third parties are concerned.  I think that's

7   only fair, and particularly when Fox is going to pursue an

8   appeal, you know, we shouldn't get involved in disclosures to

9   third party at this point.  Do you agree with that Mr.

10  Werkheiser?

11         MR. WERKHEISER:  Your Honor, I think Your Honor is

12  making a ruling and I'll accept it, but I need to evaluate

13  that in the context of the other rulings that Your Honor is

14  proposing to make.

15         THE COURT:  Okay.

16         MR. WERKHEISER:  So if I can reserve.  Thank you.

17         THE COURT:  That's fine.  All right.  Counsel --

18         MR. BENNETT:  We'll figure out who to talk to and --

19         THE COURT:  I thank you.  I wish everyone a safe trip

20  home and you will hear from me in a few days.

21         MR. WERKHEISER:  Thank you, Your Honor.

22         THE COURT:  Good evening to everyone.

23      (Hearing adjourned at 6:32 P.M.)

24

25

292

1                              CERTIFICATE

2

3     I certify that the foregoing is a correct transcript from the

4     electronic sound recording of the proceedings in the above-

5     entitled matter.

6
      /s/Mary Zajaczkowski                    December 11, 2011
7     Mary Zajaczkowski, CET**D-531                  Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25