# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | |
| Los Angeles Dodgers LLC, *et al.*, | : | Chapter 11 |
| | : | C.A. No. 11-12010 (KG) |
| Debtors, | : | (Jointly Administered) |
| | : | |
| Fox Sports Net West 2, LLC, d/b/a | : | |
| FSN Prime Ticket, | : | |
| | : | |
| Appellant, | : | |
| v. | : | C.A. No. 11-01235- LPS |
| | : | |
| LOS ANGELES DODGERS LLC., *et al.*, | : | (On appeal from the Honorable |
| | : | Kevin Gross) |
| Appellees. | : | |
| | : | |

Robert J. Dehney, Esq., Gregory W. Werkhesier, Esq., Andrew R. Remming, Esq., MORRIS NICHOLS, ARSHT & TUNNEL LLP, Wilmington, DE.

Richard L. Stone, Esq., Kenneth D. Klein, Esq., JENNER & BLOCK LLP, Los Angeles, CA; Catherine Steege, Esq., David H. Hixon, Esq., JENNER & BLOCK LLP, Chicago, IL.

Paul J. Laurin, Esq., C. John Melissinos, Esq., Christian A. Jordan, Esq., Neeta Menon, Esq., RUTTER HOBBS & DAVIDOFF INCORPORATED, Los Angeles, CA.

   Attorneys for Appellant.


Robert S. Brady, Esq., Pauline K. Morgan, Esq., Donald J. Bowman, Jr., Esq., Ryan M. Bartley, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE.

Bruce Bennett, Esq., James O. Johnston, Esq., Sidney P. Levinson, Esq., Monika S. Wiener, Esq., DEWEY & LEBOEUF LLP, Los Angeles, CA.

Martin J. Bienenstock, Esq., DEWEY & LEBOEUF LLP, New York, NY.

   Attorneys for Appellees.

Donna L. Harris, Esq., Joanne P. Pickney, Esq., Kevin M. Capuzzi, Esq., PICKNEY, HARRIS & WEIDINGER, LLC, Wilmington, DE.

Brett H. Miller, Esq., Lorenzo Marinuzzi, Esq., Todd M. Goren, Esq., MORRISON & FOERSTER LLP, New York, NY.

Attorneys for the Official Committee of Unsecured Creditors.

## OPINION

December 27, 2011
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge**:

Pending before the Court is the Emergency Motion for Stay Pending Appeal of Order Approving Procedures for the Licensing of Telecast Rights ("Stay Motion" or "Mot.") (D.I. 1)[1] filed by Fox Sports Net West 2, LLC d/b/a FSN Prime Ticket ("Fox" or "Prime Ticket" or "Appellant"). After receiving briefing, the Court heard oral argument on the Stay Motion on December 22, 2011. (*See* Motion Hr'g Tr., Dec. 22, 2011 ((hereinafter "Tr.")) On December 23, 2011, the Court issued an Order granting the Stay Motion and indicating that the Court would issue an opinion explaining its reasoning. (D.I. 34) This is that opinion.

## BACKGROUND

### I.     The Parties and Their Relationships

This case involves the bankruptcy and impending sale of the famed Los Angeles Dodgers baseball team (the "Dodgers" or "Team"). Five entities have filed for bankruptcy: Los Angeles Dodgers LLC ("LAD"); Los Angeles Dodgers Holding Company LLC; LA Holdco LLC; LA Real Estate Holding Company LLC; and LA Real Estate LLC (collectively, the "Debtors"). Debtor LAD operates the Dodgers. (D.I. 17 at 5)

On June 27, 2011, the Debtors filed voluntary petitions under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (C.A. No. 11-12010 D.I. (hereinafter "B.D.I.") 3 at ¶ 3) At the time, LAD's sole equity holder, Frank McCourt, was in the midst of a public battle for control of the team with Major League Baseball ("MLB"). (B.D.I. 994 at 2) McCourt was also engaged in a

---

[1]Unless otherwise indicated, all citations to the docket refer to C.A. No. 11-1235.

1

divorce dispute. (*See* D.I. 5, Ex. 8)[2] As part of the divorce settlement, McCourt must make a state court-ordered $131 million payment to his ex-wife no later than April 30, 2012. (*Id.* at ¶ 1)

On July 13, 2011, the U.S. Trustee appointed the Official Committee of Unsecured Creditors of Debtors ("Creditors Committee"), pursuant to 11 U.S.C. § 1102(a)(1). (*See* B.D.I. 190) On October 25, 2011, the U.S. Trustee filed an Amended Notice of Appointment of Committee of Unsecured Creditors, adding two additional members. (*See* B.D.I. 704)[3] The Creditors Committee is the representative and fiduciary of general unsecured creditors in the Debtors' Chapter 11 cases. (D.I. 19 at ¶ 1)

## II.     Fox's Telecast Agreement with the Dodgers

On November 1, 2001, LAD and Fox entered into the Telecast Rights Agreement, which has been amended and extended two times and currently runs through the end of the 2013 MLB season. (*See* D.I. 5, Ex. 2) The Telecast Rights Agreement establishes a multi-year production and licensing relationship, the primary feature of which is Fox's exclusive right to produce, record, and telecast 100 regular season Dodgers games on cable television. (*Id.* at § 3)

On February 13, 2004, LA Team Co., LLC[4] and Fox entered into the "Dodgers/Fox Rights Amendment - Amendment to the Telecast Rights Agreement" (hereinafter, the "Current

---

[2]All citations to D.I. 5, Ex. # refer to the appendix filed contemporaneously with Fox's Emergency Motion for Stay Pending Appeal, with the Ex. # referring to the tab number of the appendix.

[3]The Creditors Committee is comprised of AVM Systems Limited Partnership; Elizabeth Ann Stow and/or David Edward Stow, as Conservators to Bryan Stow; KABC Radio LLC; Major League Baseball Players Association; Pyro Events, Inc.; and Jeffery Berkowitz. (*See* B.D.I. 704)

[4]LA Team Co. LLC acquired all of LAD's rights, titles, obligations, and interests in the Telecast Agreement pursuant to an asset purchase agreement. (*See* D.I. 5, Ex. 2)

Telecast Agreement"). (*See* D.I. 5, Ex. 2) Several provisions of the Current Telecast Agreement

govern the negotiations between Fox and LAD with respect to the post-2013 future telecast rights

(the "Future Telecast Rights Provisions").

Specifically, Section 2(b) of the Current Telecast Agreement contains a right of exclusive

negotiation:

> From October 15, 2012 through November 30, 2012
> (the "Exclusive Negotiating Period"), LAD and
> FOX Sports shall negotiate confidentially,
> exclusively and in good faith with respect to the
> terms and conditions on which FOX Sports may
> retain exclusive Cable Television Rights to Exhibit
> future Games for a subsequent term of at least five
> years beginning with the 2014 MLB season. LAD
> shall not solicit offers from or negotiate with any
> person or entity (other than FOX Sports) for Cable
> Television Rights with respect to any future Games
> at any time preceding November 30, 2012.

(*Id.* at § 2(b)) Additionally, the Current Telecast Agreement grants Fox a right of first refusal,

which applies if the Debtors and Fox do not reach agreement during the Exclusive Negotiating

Period. (*Id.* at § 2(c)) Section 2(c) of the Current Telecast Agreement provides:

> If, at the end of the Exclusive Negotiating Period,
> LAD and FOX Sports have not reached an
> agreement, LAD shall make a final written offer
> (the "Team Final Offer") to FOX Sports for the
> exclusive Cable Television Rights. . . . Any offer
> made to any third party by LAD which such third
> party has expressed intention to accept, or made to
> LAD by any third party and which LAD intends to
> accept, and which such offer by or to LAD is less
> favorable to LAD than the Team Final Offer, must
> be presented to FOX Sports prior to its acceptance
> by such third party or LAD (as applicable), and
> FOX Sports shall have ten (10) days following its

receipt to accept such less favorable offer (each a
"Less Favorable Offer").

(*Id.*)

## III. MLB Settlement Agreement

On November 2, 2011, following a lengthy mediation conducted by retired U.S. District

Judge Joseph J. Farnan, Jr., Debtors and MLB entered into a settlement agreement. (*See* D.I. 5,

Ex. 7) (hereinafter, the "MLB Agreement") The MLB Agreement provides that Debtors

"irrevocably agree to sell . . . the 'Team'[ ] by selling either (a) 100% of the shares in LA Holdco

('Holdco') or (b) all assets owned directly or indirectly by Holdco that relate to the baseball

operations of . . . the 'Team'[ ], including without limitation (1) the Team's media rights . . . ."

(*Id.* at 1) The MLB Agreement goes on to state:

> The Team, including all media rights owned by the Team, may be
> sold to a single buyer or group of buyers (the "Buyer"). The
> interests in the Team and in any entities that exist or may be
> formed to own regional sports networks ("RSNs") may be divided
> among the members of the group of buyers as the Buyer shall
> determine. The decision to enter into a telecast rights agreement
> shall be in the sole and exclusive discretion of the Buyer.

(*Id.* at 2)

Under the MLB Agreement, Debtors are not prohibited from pursuing efforts to market

the future telecast rights in conjunction with any sale of the Team or negotiate an agreement to

license such rights. (*See id.* at 2; B.D.I. 911 at 5) It is equally the case that Debtors are also not

obligated by the MLB Agreement to market the future telecast rights in conjunction with a sale of

the Team. Thus, while the MLB Agreement does require that "all media rights owned by the

Team" be sold with the rest of the Team, it does ***not*** require that the Team have marketed,

4

licensed, or sold its future telecast rights in conjunction with or prior to the sale of the Team. As far as the MLB Agreement is concerned, the Debtors may simply transfer their existing future telecast rights to the new owner of the Team, preserving all provisions of the Current Telecast Agreement with Fox.

Further, the MLB Agreement requires that an auction for the rights of the Team be completed by April 1, 2012, and that the sale of the Team be consummated no later than April 30, 2012. (D.I. 5, Ex. 7 at 2) The MLB Agreement also expressly requires MLB to be neutral in disputes between the Debtors and Fox. (*See id.* at 3) The Bankruptcy Court has scheduled a hearing to consider approving the MLB Agreement on January 11, 2011. (*See* D.I. 4 at 46 n.11)

## IV.    Proceedings in Bankruptcy Court

On September 16, 2011, LAD filed a "Motion for an Order Approving Marketing Procedures for the License of Telecast Rights." (B.D.I. 443) Subsequently, on November 12, 2011, after LAD and MLB executed the MLB Agreement, LAD filed its "Amended Motion to Approve Marketing Procedures for Licensing of Telecast Rights" ("Amended Motion"). (B.D.I. 783) Fox is the only objector to the Amended Motion. (*See* B.D.I. 835)

Through the Amended Motion, LAD seeks to render unenforceable Sections 2(b) and 2(c) of the Current Telecast Agreement so that Debtors can negotiate with third parties regarding the future telecast rights prior to expiration of the Exclusive Negotiating Period. (*See* B.D.I. 783 at 2-3) Under the proposed "Amended Marketing Procedures," the Exclusive Negotiating Period between Fox and LAD would run from November 30, 2011 to January 14, 2012, instead of from October 15 to November 30, 2012. (*See id.* at 10-11) Additionally, the Amended Marketing Procedures make a deal between Fox and LAD for the future telecast rights subject not only to

5

the approval of MLB and the Debtors but also subject to the approval of any potential buyer of the Team. (*See id.* at ¶ 27) The effect of the Amended Marketing Procedures would be to permit the Debtors to begin third-party negotiations to license the Team's telecast rights for 2014 and beyond beginning on January 20, 2012, which is 10.5 months earlier than the December 1, 2012 date set in the Current Telecast Agreement. (*See* D.I. 4 at 16-17)

Fox filed its objection to the Amended Motion on November 23, 2011. (D.I. 1 at ¶ 13) On November 30, 2011, the Bankruptcy Court heard arguments regarding the Amended Motion and scheduled an evidentiary hearing for December 7 and 8. (*See* D.I. 5, Ex. 10 at 114-15) The Bankruptcy Court denied Fox's request to take discovery from Debtors and MLB and limited testimony at the evidentiary hearing to expert witnesses. (*Id.*)

At the evidentiary hearing on December 7 and 8, the Bankruptcy Court heard the testimony of three experts: Timothy R. Coleman, Edwin S. Desser, and Robert L. Thompson. (*See* D.I. 5, Ex. 11, Ex. 12) Mr. Coleman is Debtors' expert. He is the Senior Managing Director of Blackstone Group L.P. and was qualified by the Bankruptcy Court as an expert in the area of restructuring. (*See* D.I. 5, Ex. 11 at 72, 76) Mr. Coleman testified that "it would be in the best interest of Debtors" to implement the Amended Marketing Procedures, as it would allow the Debtors to maximize the value of their estate. (*Id.* at 124) Mr. Coleman identified the future telecast rights as an asset that can provide long-term liquidity for LAD. (*See id.* at 78-79) He opined that compliance with the Current Telecast Agreement would be "very obviously damaging" because LAD would be unable to enter into negotiations with potential buyers until the end of 2012. (*See id.* at 85) Mr. Coleman was also of the view that the change in timing of the Exclusive Negotiating Period requested by the Amended Motion was not a material change.

6

(*See id.* at 103) Mr. Coleman analogized the sale of the Team presuming the Amended Motion was granted with the sale of a building that was fully leased at market rates; he contrasted such a transaction with a sale of the Team with the Current Telecast Agreement being enforced, which Mr. Coleman said would be like selling an empty building with no tenants. (*See id.* at 94)

Fox presented two experts at the hearing. First was Mr. Desser, President of Desser Sports Media, Inc., a company that represents sports clients with respect to media arrangements. (*See* D.I. 5, Ex. 12 at 6) The Bankruptcy Court qualified Mr. Desser as an expert in sports media rights and sports media representation. (*See id.* at 14) Mr. Desser testified about the importance of the Future Telecast Rights Provisions in the Current Telecast Agreement and opined that if these provisions were enforced as negotiated the effect would be a strong likelihood that Fox would win the right to telecast Dodgers' games for the period after the 2013 MLB season. (*See id.* at 17) To Mr. Desser, the changes made to the Current Telecast Agreement by the Amended Motion – particularly the acceleration of the Exclusive Negotiating Period and the necessity that a potential new buyer approve any agreement between Fox and LAD – are material. (*See id.* at 42-43) He opined that "Fox [will] suffer significant harm if the amended marketing procedures are approved." (*Id.* at 43) Mr. Desser further opined that the Amended Marketing Procedures would not be in the best interest of LAD and were not necessary either to effectuate a sale of the Team or pay off the Debtors' debts. (*See id.* at 49, 52)

The final witness was Mr. Thompson, a former President of Fox Sports Networks and Fox Sports International. (*See id.* at 135) Mr. Thompson was qualified by the Bankruptcy Court as an expert on media rights agreements. (*See id.* at 136) Mr. Thompson opined that it is "significantly more likely" that Fox will be able to reach an agreement for renewal of its telecast

7

rights with LAD under the Current Telecast Agreement than it would be under the Amended Marketing Procedures. (*Id.* at 200-01) He also described the importance of the Future Telecast Rights Provisions to the Current Telecast Agreement and explained that he believed the changes sought by the Amended Motion would be material. (*See id.* at 142, 144, 146-48) Mr. Thompson expressed the view that Fox would suffer considerable damage if the Court were to grant the Amended Motion. (*See id.* at 152-54)

At the conclusion of the two-day hearing, the Bankruptcy Court informed the parties that it intended to rule in favor of LAD and approve the Amended Marketing Procedures because it was "satisfied that the proposed modifications are not material." (D.I. 5, Ex. 12 at 283)

Throughout the course of the proceedings in the Bankruptcy Court, counsel for the Debtors repeatedly informed the Bankruptcy Court that the Debtors are solvent. (*See* D.I. 5, Ex. 10 at 17 (Debtors' counsel stating, "[w]e're not disputing that we're a solvent Debtor. We said that throughout the case."); *id.* at 28 ("[B]ecause the Debtors are solvent, any excess after Creditors get paid in full will go to the equity owner. We don't dispute that. It will be under a plan, but we don't dispute that will be the case."); B.D.I. 61 at 10 (Debtors' counsel stating that "[D]ebtors are unquestionably solvent on a balance sheet basis.")) Counsel for the Creditors Committee also informed the Court it had been advised the Debtors were solvent. (*See* D.I. 5, Ex. 11 at 67 ("When this case filed, [Creditors] Committee was told and everybody was told everybody was going to get paid in full, it's – it's a 'solvent debtor' there's a lot of value here.")) Neither the Debtors nor the Creditors Committee made an effort to prove at the evidentiary

hearing on the Amended Motion that Debtors are not solvent.[5]

Before this Court, during oral argument on the Stay Motion, counsel for the Debtors and the Creditors Committee were somewhat less confident of the Debtors' solvency. (*See* Tr. at 51 (Debtors' counsel: "[W]e hope [Debtors are] solvent but there is no guarantee that they are."); *id.* (Debtors' counsel: "[W]e don't disagree that we're solvent. We certainly hope that we're solvent."); Tr. at 80 (Creditors Committee's counsel contending there has not been "a stipulation that [Debtors] are solvent")) However, at this time it appears to the Court that the Debtors and the Creditors Committee will likely be bound, for purposes of this appeal, to the repeated statements that the Debtors are solvent, statements which may have contributed to the Bankruptcy Court's decisions to limit discovery as well as the evidence to be presented at the hearing on the Amended Motion. (*See generally* D.I. 5, Ex. 12 at 210-11 (Bankruptcy Court admitting declaration of Dodgers' Mr. Ingram, after Fox's counsel pointed out that "Mr. Ingram testified to among other things the solvency of the Debtors" and noted that Bankruptcy Court had "made a ruling limiting testimony to the experts, so [Fox's counsel has] not been able to ask him

---

[5]Other than, arguably, presenting the ambiguous testimony of Mr. Coleman. On direct examination, Mr. Coleman testified that he understood once the Team is sold, Debtors will have enough to pay off Debtor-in-Possession financing and not face a liquidity crisis. (*See* D.I. 5, Ex. 11 at 135; *see also id.* ("[A]s of right now, the projection is they should be okay from a liquidity perspective."); *id.* at 141-42 ("I don't think that we have any doubt that this should pay off all the creditors. . . . I think when this process finishes we think they'll be enough value to pay all the creditors in full and, therefore, the owners would receive whatever the difference is."); *but see id.* at 117 ("This is an estate that we believe is solvent [but] the proof is in the pudding. We'll see what the offers are . . . .")) Yet on cross-examination, Mr. Coleman disagreed with the suggestion that he had testified that a sale of the Team without marketing the future telecast rights would yield enough to pay off all creditors and denied even having that expectation, asserting, "I don't know. I haven't considered it." (*Id.* at 164-65; *see also id.* at 168 (same)) The Court addresses this testimony further in connection with assessing the likelihood of Appellant's succeeding on the merits of its appeal. *See infra.*

directly" about solvency))

## V.    The Bankruptcy Court's Order and Opinion

On December 13, 2011, the Bankruptcy Court entered an Order granting the Amended

Motion (the "Order") and stated that an opinion explaining the basis for the Order was "to be

issued shortly thereafter." (B.D.I. 974) In its Order, the Bankruptcy Court concluded that

"[s]ections 2(b) and 2(c) of the Fox Contract [i.e., the Current Telecast Agreement] would, if

strictly enforced, unduly interfere with LAD's duty to maximize the assets of its estate for the

benefit of creditors and prevent LAD from emerging from bankruptcy in a timely manner, and

are therefore unenforceable to the extent that they conflict with the terms of this Order, including

the Marketing Procedures." (*Id.* at 3)

Thereafter, on December 15, 2011, the Bankruptcy Court issued a Memorandum Opinion.

(*See* B.D.I. 994) In the Memorandum Opinion, the Bankruptcy Court held that what it referred to

as the "no-shop" provision of the Current Telecast Agreement – which the Court understands to

be Section 2(b)'s Exclusive Negotiating Period – is invalid. (*Id.* at 15) Specifically, the

Bankruptcy Court held that a no shop provision is not enforceable against a bankruptcy entity.

(*Id.*) The Bankruptcy Court added that a no shop provision is also unenforceable under Delaware

law in a situation, such as the Bankruptcy Court concluded was present here, where it would

prevent the exercise of the fiduciary duty to maximize value. (*Id.*)

The Bankruptcy Court went on to conclude that the relief requested by the Amended

Motion constitutes a proper exercise of business judgment by the Debtors. (*Id.* at 16) The

Bankruptcy Court found unpersuasive Fox's argument that the Amended Marketing Procedures

would cause Fox grave damages and place creditor recovery at risk. (*Id.*) The Bankruptcy Court

held that "[i]t is only the Back End Rights which are affected [by the Court's grant of the Amended Motion] and then only a few terms which are non-material." (*Id.*) Moreover, the Bankruptcy Court found that due to the absence of a "time is of the essence" clause in the agreement between Fox and LAD, the time for performance is immaterial. (*See id.* at 17)

Finally, the Bankruptcy Court waived the automatic fourteen-day stay provided for under the Federal Rules of Bankruptcy Procedure. (*See id.* at 19) The Bankruptcy Court explained that it had taken this action because "Debtors are operating within a small time frame" and, therefore, it is "critical that the Exclusive Negotiating Period continue to run during the period of time that a stay would be in place." (*Id.*) In the view of the Bankruptcy Court, "[a] stay would only delay and thereby prejudice Debtors' marketing opportunity." (*Id.*)

## VI. **Proceedings on Appeal**

Appellant filed a notice of appeal from the Bankruptcy Court's Order granting the Amended Motion on December 14, 2011. (*See* D.I. 2) On that same day, Appellant filed its Stay Motion and sought expedited treatment of both the Stay Motion and the merits of the appeal. (*See* D.I. 1) On December 15, 2011, the Court set a procedure for Debtors to respond to Appellant's filings and for all parties to participate in a teleconference on December 16, 2011. (*See* D.I. 9) That teleconference occurred as scheduled and, at its conclusion, the Court set a schedule for the completion of briefing on the Stay Motion, for further briefing on the merits of the appeal, and for separate oral arguments on the Stay Motion and the appeal. (*See* D.I. 14) Consistent with that schedule, the Court heard oral argument on the Stay Motion on December 22, 2011. The Court issued its Order granting the Stay Motion on December 23, 2011. (D.I. 34) The parties are presently in the process of preparing their briefs on the merits of the appeal, on

11

which the Court will hear oral argument on January 12, 2012. (D.I. 14)

## LEGAL STANDARDS

### I.    Standard of Review

In undertaking a review of the issues on appeal, the District Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (internal quotation marks omitted).

In reviewing the Bankruptcy Court's denial of a stay pending appeal, the Court applies an abuse of discretion standard. *See Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1203 (3d Cir. 1991); *Family Kingdom, Inc. v. EMIF N.J. Ltd. P'ship*, 225 B.R. 65, 69 (D.N.J. 1998). An abuse of discretion exists where judicial action "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004); *see also In re FRG*, 115 B.R. 72, 73 (E.D. Pa. 1990) (holding that abuse of discretion exists whenever judicial action is "arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures are used").

### II.    The Four-Factor Test for a Stay Pending Appeal

"The test for determining whether to grant a stay pending appeal under Federal Rule of Bankruptcy Procedure 8005 mirrors . . . the standard for preliminary injunctions pursuant to

Federal Rule of Civil Procedure 65(a)." *Madera v. Ameriquest Mortgage Co. (In re Madera)*, 2008 WL 447497, at *4 (E.D. Pa. Feb. 7, 2008); *see also Official Comm. of Equity Sec. Holders v. Finova Grp., Inc. (In re Finova Grp., Inc.)*, 2007 WL 3238764, at *1 (D. Del. Oct. 31, 2007). To demonstrate that a stay pending appeal is justified, the moving party must establish: (1) a strong showing of likelihood of success on the merits, (2) irreparable harm absent a stay, (3) that issuance of the stay will not substantially injure the other parties to the proceeding, and (4) that a stay is in the public interest. *See Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

In its Memorandum Opinion, in granting Debtors' request to waive the stay of its ruling pursuant to Bankruptcy Rule 6004(h), the Bankruptcy Court did not expressly apply the four-factor test for evaluating whether to enter a stay pending appeal. (*See* B.D.I. 994 at 19) Earlier, at a hearing, the Bankruptcy Court informed the parties that "under normal circumstances while [it] would normally give a courtesy stay of a few days, [it didn't] need to do that here because nothing can happen . . . until sometime in early January." (D.I. 5, Ex. 13 at 54) Under the circumstances, in order to determine whether the Bankruptcy Court, in not staying its Order, committed an abuse of discretion – by potentially basing its decision on an error of law or clearly erroneous factual finding – it is necessary for the Court to consider the four-factor test (as both parties do in their briefing and did at the oral argument).

## DISCUSSION

### I.  Appellate Jurisdiction

The first issue the Court must address is whether it has jurisdiction to handle this appeal. *See OFC Comm Baseball v. Markell*, 579 F.3d 293, 297 (3d Cir. 2009) ("We begin . . . by

13

considering whether we have jurisdiction to hear this appeal"). The burden is on Appellant to demonstrate that the Court has jurisdiction over its appeal. *See Council v. Nash*, 400 Fed. Appx. 680, 682 (3d Cir. Nov. 9, 2010). Appellant contends that the Bankruptcy Court's Order is a final order for purposes of appeal and, alternatively, that the Court has discretion to review it pursuant to the interlocutory order doctrine. (*See* D.I. 22 at 1-6) Debtors disagree on both grounds. (*See* D.I. 17 at 14-28)

Whether the Order is a final order for purposes of appeal is governed by 28 U.S.C. § 158(a)(1). On this issue, Appellant cites *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 103 (3d Cir. 1988), in which the Third Circuit stated:

> The unique characteristics of bankruptcy cases have led us to consistently consider finality in a more pragmatic and less technical way in bankruptcy cases than in other situations. . . . [B]ankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.

(Internal quotation marks and citation omitted) The various factors the Third Circuit considers for determining the finality of a Bankruptcy Court's order here point in both directions. However, as the parties have agreed, it is not necessary, in determining whether to grant a stay pending appeal to determine whether the Order is a final order, given the Court's conclusion (explained below) that it has jurisdiction over this appeal at least pursuant to the interlocutory order doctrine. (*See* Tr. at 16, 43)[6]

---

[6]It may be necessary in resolving the appeal on the merits to determine if the Order is a final order. It may be that the scope of the matters the Court may review is different depending on whether the Order is an interlocutory or a final order. This is a point the parties may choose

The Court finds that the instant matter is appropriate for an interlocutory appeal. *See* 28

U.S.C. § 158(a)(3); *Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't*

*Grp., Inc.)*, 209 B.R. 832, 837 (D. Del. 1997) ("*Marvel*"); *In re Gracey*, 80 B.R. 675, 677 (E.D.

Pa. 1987).[7] In determining whether to grant leave to appeal an interlocutory order of the

Bankruptcy Court, District Courts apply the standards of 28 U.S.C. § 1292(b), which permits

appeal of an order: (1) involving a controlling question of law, (2) upon which there is

substantial ground for difference of opinion, and which (3) if appealed immediately may

materially advance the ultimate termination of the litigation. *See Marvel*, 209 B.R. at 837.

Here, the enforceability of the no shop provision in the Current Telecast Agreement is a

controlling question of law. *See Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1973)

("A controlling question of law must encompass at the very least every order, which, if

erroneous, would be reversible error on final appeal."); *see also generally* D.I. 5, Ex. 10 at 22

(Debtors' counsel stating: "on the issue of the no shop, I mean the law is there. I mean my point

there is it's an issue of law."); Tr. at 42 (Debtors' counsel stating that "[t]he passage" of the

Bankruptcy Court opinion relating to enforceability of the no shop provision "standing alone

reads as if it's a legal conclusion").[8] The enforceability of the no shop provision is also a

---

to address in their merits briefing.

[7]As Debtors point out, Appellant did not ask the Court to certify an interlocutory review
until filing their Reply Brief. (*See* D.I. 22 at 4) Under the circumstances presented here,
Debtors' request is not untimely. In any event, the Court has authority to find jurisdiction
pursuant to the interlocutory order doctrine *sua sponte*. *See In re Gianakas*, 112 B.R. 737, 740
(W.D. Pa. 1990). Debtors concede this point. (Tr. at 43)

[8]In this Court, at oral argument, Debtors' counsel did argue that the conclusion Chief
Judge Gross made regarding the enforceability of the no shop provision is "colored by his factual
findings" and is "properly described . . . as a mixed question" of fact and law. (Tr. at 41-42) As

question upon which there is a substantial difference of opinion, i.e., a "genuine doubt as to the correct legal standard." *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996). Indeed, as explained in the next section, the Court concludes that Appellant is likely to succeed on the merits of its contention that the no shop provision is valid and enforceable against Debtors. Finally, determining the enforceability of the no shop provision will likely materially advance the ultimate termination of the litigation. The Court agrees with Appellant, which writes: "[a]djudicating Prime Ticket's rights under the Telecast Agreement will streamline or eliminate litigation involving Prime Ticket's proof of claim, the estimation hearing, Prime Ticket's adversary complaint against Debtors, and Debtors' adversary complaint against Prime Ticket." (D.I. 22 at 6)

Furthermore, there are "exceptional circumstances" to justify immediate appellate review of the Order. *See In re Advanced Mktg. Servs., Inc.*, 2008 WL 5680878, at *1 (D. Del. Apr. 3, 2008). Among other things, the Order gives rise to allegations of an "unprecedented evisceration of a creditor's enforceable contract rights" and a contention that a solvent Debtor is abusing the bankruptcy process in order to benefit an equity holder at the expense of a creditor losing valuable rights for which the creditor paid large sums of money. (D.I. 22 at 6) Hence, this case is distinguished from the procedural norm. *See Bowie Produce Co. v. Magic Am. Café, Inc. (In re Magic Rests., Inc.)*, 202 B.R. 24, 26-27 (D. Del. 1996).

Accordingly, the Court finds it has jurisdiction to hear the instant appeal.

---

the Court reads the Bankruptcy Court Opinion, however, it appears the Bankruptcy Court made a determination of law that "[t]he 'no shop' provision is invalid" and "[t]his 'no-shop' provision is not enforceable against a bankruptcy entity." (B.D.I. 994 at 15)

## II.    Likelihood of Success on the Merits[9]

Appellant has shown a strong likelihood of success on the merits of its appeal. In particular, Appellant has demonstrated that the Bankruptcy Court likely erred in concluding that the "no shop" provision is unenforceable in bankruptcy and further that the Bankruptcy Court likely made at least two clearly erroneous findings of fact.

### A.    Enforceability of No Shop Provision

The Court reviews the Bankruptcy Court's legal conclusions under a *de novo* standard of review. *See In re Kane*, 628 F.3d 631, 636 (3d Cir. 2010). In its Memorandum Opinion, the Bankruptcy Court held that a "'no-shop' provision is not enforceable against a bankruptcy entity." (B.D.I. 994 at 15) In support of this conclusion, the Bankruptcy Court cited a single case: *In re Big Rivers Elec. Corp*, 233 B.R. 739 (W.D. Ky. 1998).

Appellant has demonstrated a strong likelihood that the Court will disagree with the Bankruptcy Court's conclusion that the "no shop" provision is unenforceable. As an initial matter, the case on which the Bankruptcy Court relied, *Big Rivers*, is not binding precedent, does not apply the law of any state relevant to the instant dispute, and does not arise within the Third Circuit. More importantly, *Big Rivers* does not stand for the proposition that a no shop provision is *per se* unenforceable against a bankruptcy entity. Rather, the *Big Rivers* Court stated that in the specific factual context of that case – in which a contract containing a no shop provision was

---

[9]The analysis contained here with respect to likelihood of success on the merits is necessarily preliminary. While the Court finds a likelihood that Appellant will succeed on the merits of its appeal, a likelihood is not a guarantee. *See Univ. of Tx. v. Camenisch*, 451 U.S. 390, 393-94 (1981) (stating that district court's findings on "likelihood of success on merits" are not "tantamount to decisions on the underlying merits"). Moreover, by focusing on certain points on which the Court finds a likelihood of success on the merits, the Court does not mean to exclude the possibility that Appellant may ultimately prevail for other or additional reasons.

executed in anticipation of a bankruptcy filing and was "condition[ed] on approval of the

bankruptcy court" – the no shop provision was invalid as a matter of public policy. *See* 233 B.R.

at 751. The Court agrees with Appellant that *Big Rivers* "merely reflects the *Revlon*-like

principle that 'no shop' provisions are invalid only if at the time they were adopted they were in

violation of a board's fiduciary duty." (D.I. 22 at 13 (citing *Big Rivers*, 233 B.R. at 751-54 and

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986)))

    *In Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000), the United States

Supreme Court explained:

> Creditors' entitlements in bankruptcy arise in the first instance
> from the underlying substantive law creating the debtor's
> obligation, subject to any qualifying or contrary provisions of the
> Bankruptcy Code. The basic federal rule in bankruptcy is that state
> law governs the substance of claims, Congress having generally
> left the determination of property rights in the assets of a
> bankrupt's estate to state law.

(Internal quotation marks and internal citations omitted) The Current Telecast Agreement is

governed by California law. (*See* D.I. 5, Ex. 2 A.2 at ¶ 20(b)) California courts "do not rewrite

any provision of any contract . . . for any purpose." *Rosen v. State Farm Gen. Ins. Co.*, 70 P.3d

351, 353 (Cal. 2003). More specifically, California law is tolerant of no shop provisions. *See*

*Jewel Cos. v. Pay Less Drug Stores Nw., Inc.*, 741 F.2d 1555, 1564 (9th Cir. 1984).

    Debtors are Delaware limited liability companies. (*See* B.D.I. 4 at ¶ 6) To the extent

Delaware law governs, "Delaware law observes the well established general principle that . . . it

is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."

*Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys.*, 708 A.2d 989, 992 (Del. 1998).

While Delaware is less tolerant of no shop provisions than California, *see Paramount Commc'ns,*

*Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. 1994); *Revlon*, 506 A.2d at 182, it appears that under Delaware law the Exclusive Negotiating Period of Section 2(b) of the Current Telecast Agreement would be enforceable. The so-called "no shop" would likely not even be viewed as a "no shop" provision under Delaware law, as it was not executed as part of Debtors' efforts to merge with another entity, nor does it concern the sale of all of Debtors' assets. Instead, Section 2(b) is merely an ordinary contract (executed many years prior to the Debtors' filing of their bankruptcy petitions). It binds Debtors only by requiring, for a period of 45 days, that if they are to negotiate the sale of future telecast rights they do so initially with a single entity (Fox). Such ordinary contractual limitations on an entity's future freedom are generally enforceable under Delaware law. *See, e.g.*, *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., LLC*, 2010 WL 3706624, at *17 (Del. Ch. Sept. 17, 2010) ("Delaware entities are free to enter into binding contracts . . . so long as there was no breach of fiduciary duty involved when entering into the contract in the first place."); *In re Infousa, Inc.*, 2007 WL 3325921, at *25 (Del. Ch. Aug. 13, 2007) ("Every contract approved by a board of directors, after all, limits the discretion of the board in future transactions, but a board is empowered to make agreements with other actors in commerce . . . ."). Moreover, Delaware courts enforce "lenient" and reasonable "no shop" provisions. *See, e.g.*, *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 502 (Del. Ch. 2010); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 997-1002 (Del. Ch. 2005).

To the extent the Bankruptcy Court believed the "no shop" provision is unenforceable in the circumstances of this case because its enforcement would prevent maximizing value to the Debtors, it does not appear to the Court that – even assuming enforcement of the contract is incompatible with maximization of value, *but see infra* Section II.B.2 – this is a correct legal

conclusion. *See generally In re Federal-Mogul Global* Inc., 222 Fed. Appx. 196, 202 (3d Cir. 2007) ("Simply noting in passing that modification will be convenient or provide minimally more money for reorganization is not enough to rewrite the terms to which the parties agreed."); *In re Morristown & Erie R.R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989) (stating bankruptcy courts do not have power to "create substantive rights that would otherwise be unavailable under the [Bankruptcy] Code"); *Nextel Retail Stores Inc. v. LTCW Trust (In re Telephone Warehouse, Inc.)*, 124 Fed. Appx. 724, 728 (3d Cir. 2005) (holding "there is no room for equity to interfere with the unambiguous and enforceable terms to which the parties have agreed to be bound," and further opining that bankruptcy courts are "without power 'to ignore the parties' contractual agreements'"); *Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 91 (Bankr. D. Del. 2001) (stating courts may not "remake a contract . . . or . . . alter it for the benefit of one party to the detriment of the other").

Moreover, the cases that Debtors rely on in their brief in support of the claim that the Bankruptcy Court's decision was based upon well-established precedent appear to be unavailing. (*See* D.I. 17 at 24-25) None of these cases involve no shop provisions; instead, all the cases involve no-call provisions that precluded (or imposed penalties for) early repayment of debt (and several also involve secured creditors). *See In re Calpine Corp.*, 365 B.R. 392, 397 (Bankr. S.D.N.Y. 2007), *rev'd in part and vacated in part*, 2011 WL 2421303 (S.D.N.Y. June 7, 2011); *Cont'l Secs. Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 774 (W.D. Va. 1996), *aff'd*, 104 F.3d 359 (4th Cir. 1996); *In re 360 Inns, Ltd.*, 76 B.R. 573, 757-76 (Bankr. N.D. Tex. 1987); *see also* D.I. 22 at 15-16 n.9 (distinguishing these cases).

Finally, and importantly, as explained in the Background, it is likely that the Debtors (and

Creditors Committee) will be bound on appeal not to contest the solvency of the Debtors. Thus, it appears this is a solvent debtor case, "and, as such, the equities strongly favor holding the debtor to his contractual obligations so long as those obligations are legally enforceable under applicable non-bankruptcy law." *Gencarelli v. UPS Cap. Bus. Credit (In re Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007). Accordingly, the Court finds that Appellant has demonstrated a strong likelihood that the Court will disagree with the Bankruptcy Court's conclusion that the "no shop" provision is unenforceable.

## B. Findings of Fact

The Court concludes that Appellant has demonstrated a substantial likelihood that at least two of the Bankruptcy Court's factual findings were clearly erroneous: (1) that the marketing of the Dodgers' future telecast rights separate from the sale of the Team is necessary to ensure full payment to all creditors, and (2) that the marketing of the Dodgers' future telecast rights separate from the sale of the Team is necessary to maximize the value of the Debtors.

### 1. Must the future telecast rights be marketed to ensure full payment to creditors?

The Bankruptcy Court found: "The testimony of Mr. Coleman made it clear that there is no certainty that the sale of the Team alone, without marketing the telecast rights, will provide creditors with payment in full, but the sale of the Team and telecast rights will result in full creditor recovery." (B.D.I. 994 at 15) In support of this finding, the Bankruptcy Court cited to three pages of Mr. Coleman's testimony. (*See id.* (citing D.I. 5, Ex. 11 at 164-65, 172); *see also id.* at 10 (citing Coleman testimony at pp. 164-65 for same point); *see also* Tr. at 63-64, 79 (counsel for Debtors' and Creditors Committee also relying on Mr. Coleman)) However, the

21

substance of Mr. Coleman's pertinent testimony at these pages is that he ***does not know*** if the

Debtors will be able to pay all creditors in full after a sale of the Team without a separate

marketing of the future telecast rights ***because he has not considered it***. (*See* D.I. 5, Ex. 11 at

164-65) In a portion of the testimony not cited by the Bankruptcy Court, Mr. Coleman made

plain that he has not performed the analyses that would be necessary to demonstrate that

marketing the future telecast rights prior to sale of the Debtors is necessary to pay back all

creditors (or to maximize value):

> Q: Even if you leave this Fox contract in place, the expectation
> would be there'd be sufficient proceeds?
>
> A: I didn't testify to that and I don't think that's the way to sell
> this company. So I haven't really done that analysis. I
> don't think it's a good idea to do it that way, so that is not
> what I've testified to.
>
> Q: Well now I'm asking you a separate question to what you
> testified in the past. I'm asking you right here, point blank,
> your expectation, you're the expert, is that if you sold these
> assets leaving the Fox contract in place you'd be able to get
> sufficient proceeds from that sale to pay off all the
> creditors?
>
> A: You know I'm up here testifying under oath and the only
> way I would testify under oath is if I've done that analysis.
> I haven't done it so I can't give you a yes or no answer.
>
> Q: Do you know if anybody else at Blackstone has done that
> analysis?
>
> A: Not that reports to me.

(D.I. 5, Ex. 11 at 168)

Additionally, the record contains evidence to support a finding contrary to that of the

Bankruptcy Court. Fox's expert, Mr. Desser – who, according to the Bankruptcy Court "has 35

years of experience with the sports media industry, . . . has spent 17 years in the Los Angeles sports and media market . . . [and] has negotiated with virtually all of the major sports networks and cable operators" (B.D.I. 994 at 11) – testified that he "seriously doubt[s] that it is necessary" to market the future telecast rights "in order to pay off Debtors' debts" (D.I. 5, Ex. 12 at 52).[10] Finally, as the Court has already noted, it appears likely that for purposes of this appeal Debtors will be bound by their statements that they are solvent, making it even less likely that a separate marketing of the future telecast rights is actually necessary in order to repay all creditors in full.

For all of these reasons, the Court concludes that Appellant has demonstrated a substantial likelihood that the Bankruptcy Court's finding of fact was clearly erroneous.

### 2. Must the future telecast rights be marketed to maximize value to Debtors?

Appellant has demonstrated a substantial likelihood that the Bankruptcy Court's factual finding that marketing of the future telecast rights is necessary to maximize value to Debtors is clearly erroneous. This conclusion follows from the discussion above, which explained that Mr. Coleman evidently has not undertaken a comparative analysis of the price at which the Debtors will likely be sold with the future telecast rights still available to the new Dodgers owner to market in late 2012 versus the price at which the Debtors can be sold with the future telecast rights already having been licensed in early 2012.

The undisputed evidence demonstrates that the value of future telecast rights is

---

[10]Debtors contend that "the Bankruptcy Court conspicuously made no finding that the testimony of either of . . . [Fox's] witnesses was credible." (D.I. 17 at 12) However, the Bankruptcy Court opinion is devoid of any suggestion that the court found Messrs. Desser or Thompson to be non-credible. To the contrary, on at least one point the Bankruptcy Court appeared to rely on the testimony of Fox's witnesses. (*See, e.g.*, B.D.I. 994 at 17 ¶ 4) On other points, the testimony of Fox's witnesses was uncontested.

increasing. (*See* D.I. 5, Ex. 12 at 124-26 (Mr. Desser stating that value of sports teams telecast rights has been increasing, at a rate of approximately ten percent per year, for at least the past decade, and this trend is anticipated to continue); *id.* at 151-52 (Mr. Thompson stating that for the past fifteen years value of sports franchise media rights has only gone up and he expects that to continue; he has not seen a team receive less in total compensation for extension or renewal of media rights than it had been receiving under existing contract; and he believes Dodgers will get higher bids for media rights in 2013 than they will in 2012); B.D.I. 994 at 17 ¶ 4)  Mr. Coleman agreed that there is great interest in the media rights of sports teams in the Los Angeles market. (*See* D.I. 5, Ex. 11 at 79 ("I think [there] are a lot of people interested in these rights."))  Given this record, the Court is persuaded that the Bankruptcy Court's finding that the Amended Marketing Procedures "will enable Debtors to seek at present *what they will be unable to obtain later, better telecast terms*" – and, relatedly, that the Amended Marketing Procedures are necessary in order to maximize value of the Debtors – is likely a clearly erroneous factual finding. (B.D.I. 944 at 20) (emphasis added))

### III.  Irreparable Harm to Appellant in the Absence of a Stay

The Court concludes that Appellant has demonstrated that it will likely suffer irreparable harm in the absence of a stay.  Irreparable harm is an injury that "cannot be redressed by a legal or equitable remedy following a trial." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002).

#### A.  Lesser Likelihood of Winning Future Telecast Rights

Appellant has shown irreparable harm because without a stay Appellant is less likely to obtain the future telecast rights for Dodgers games in the 2014 MLB season and beyond.

Appellant argues that its "exclusive negotiating period, right of first refusal, and right to a final offer all serve an important purpose: they make it significantly more likely that Prime Ticket will retain the right to broadcast future Dodgers games by limiting the Debtors' ability to negotiate with third parties." (D.I. 4 at 15) Mr. Desser and Mr. Thompson testified, without contradiction, that the Amended Marketing Procedures approved in the Order will significantly reduce the likelihood of Prime Ticket obtaining the future telecast rights of the Dodgers. (*See* D.I. 5, Ex. 12 at 17-18; *id.* at 35-42; *id.* at 148-154) Mr. Desser testified that telecast agreements with back-end rights result in the incumbent media outlet retaining those rights approximately 90% of the time. (*See id.* at 22, 44) Similarly, Mr. Thompson testified that in his extensive experience (negotiating approximately 180 media rights transactions) the renewal rate with such back end rights exceeds 90%. (*See id.* at 124, 154) Mr. Thompson also testified that it is "significantly more likely" under the Current Telecast Agreement that Fox will obtain the future telecast rights than it is under the Amended Marketing Procedures. (*Id.* at 201)

The Court concludes that the Amended Procedures make it less likely that Fox will be the winning bidder in the forthcoming competition to obtain the right to telecast Dodgers games after the 2013 season. This is harm to Appellant. (*See, e.g.*, Tr. at 61 (Debtors' counsel acknowledging that if Fox is less likely to obtain future telecast rights this constitutes harm)) This harm is irreparable because the right to telecast Dodgers games is a unique asset that cannot be replaced. Courts have found that losing unique sports-related marketing or media opportunities may constitute irreparable harm. *See AT&T Mobility LLC v Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 487 F. Supp. 2d 1370, 1379-80 (N.D. Ga. 2007) ("The Court agrees that plaintiff's inability to exercise its exclusive right of negotiation is a form of irreparable injury."),

*vacated on other grounds*, 494 F.3d 1356 (11th Cir. 2007); *Mastercard Int'l Inc. v. Federation Internationale de Football Ass'n*, 464 F. Supp. 2d 246, 301-02 (S.D.N.Y. 2006), *rev'd in part on other grounds*, 239 Fed. Appx. 625 (2d Cir. 2007).

It is true, as Debtors emphasize, that the "actual licensing of those [future telecast] rights will require substantial additional proceedings and activities before the Bankruptcy Court." (D.I. 17 at 2-3) It is likewise true that the 2004 amendment makes the Current Telecast Agreement between Prime Ticket and the Dodgers less favorable to Prime Ticket than were the earlier versions of the parties' agreements. (D.I. 17 at 7) But neither of these points detracts from the central reality, which is that the amended procedures – imposed by the Bankruptcy Court, without any compensation (and perhaps never any compensation) to Appellant – reduces Fox's chance of obtaining the unique and extremely valuable asset of the right to telecast future Dodgers baseball games. Thus, the Court is persuaded that Appellant has shown that it will be irreparably harmed in the absence of a stay.

**B.     Lesser Leverage in Negotiations**

Without a stay, Fox would be forced to negotiate with LAD with less leverage than it contracted for, and this, too, is irreparable harm. As Appellant contends: "Prime Ticket is harmed by being forced under penalty of a Court Order to negotiate towards a stalking horse bid that Debtors are incapable of accepting but that will be used to drum up higher bids from Prime Ticket's competitors." (D.I. 22 at 24) Additionally, under the Current Telecast Agreement, in order to obtain the future telecast rights, Fox needs to reach a deal that is acceptable to Debtors and to the MLB. Under the Amended Marketing Procedures, however, in order to obtain the future telecast rights, Fox needs to reach a deal that is acceptable not only to Debtors and the

26

MLB but also acceptable to an as-yet-identified future buyer of the Debtors. This, too, reduces Appellant's leverage in negotiations. Courts have recognized that negotiating with respect to a unique asset with decreased leverage constitutes irreparable harm. *See Brady v. Nat'l Football League*, 640 F.3d 785, 793 (8th Cir. 2011) (stating that NFL "met its burden to demonstrate that it likely w[ould] suffer some degree of irreparable harm" where it showed that, absent a stay pending appeal, NFL would lose "leverage" in negotiations with its players, and it would be impossible later to "recreat[e] a negotiating environment" that would otherwise have existed).

Debtors and the Creditors Committee contend that having to negotiate cannot create the kind of harm that the law recognizes as irreparable harm. (*See* D.I. 17 at 4; D.I. 19 at 2) Debtors further observe that Prime Ticket and Debtors are already engaged in negotiations, and were engaged in negotiations even prior to the Debtors' bankruptcy filings. (D.I. 17 at 4) Yet, as noted, courts have recognized that reduced leverage in negotiations can constitute irreparable harm. *See Brady*, 640 F.3d at 793. Furthermore, the voluntary negotiations that Fox entered into earlier this year (and apparently at other times as well) are wholly different from the compelled negotiations in which Fox must engage under the Bankruptcy Court's Order. Parties are always free to negotiate and presumably do so when they see it to be to their advantage. Fox paid for the opportunity to have an exclusive negotiating window with the Dodgers in late 2012; forcing it to "enjoy" this exclusive negotiating window at an earlier time, not of its own choosing, when it perceives itself to have reduced leverage, imposes on Fox irreparable harm.

## C.    Equitable Mootness

"[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *Williams v. Republic (In re*

27

*Cujas)*, 376 B.R. 480, 487 (Bankr. E.D. Pa. 2007). Although the risk of equitable mootness is

not, by itself, sufficient to demonstrate irreparable harm to justify a stay pending appeal, *see*

*Schroeder v. New Century Liquidating Trust (In re New Century TRS Holdings, Inc.)*, 2009 WL

1833875, at *2 (D. Del. June 26, 2009), this risk is a factor courts may consider. As the Third

Circuit has stated, "[c]ertainly, the fact that the decision on the stay may be dispositive of the

appeal . . . is a factor that an appellate court must consider" in determining whether irreparable

harm will result from the denial of a stay. *Republic of Philippines*, 949 F.2d at 658.

Notwithstanding the speed with which this appeal is proceeding, to the extent there is any risk of

equitable mootness – and there appears to be some risk, given the "small time frame" in which

the relevant events are occurring (B.D.I. 994 at 19) – this further supports the Court's conclusion

on irreparable harm. Appellant has demonstrated that, in the absence of a stay, its appeal may be

rendered moot by events and the passage of time (as the Court cannot be certain as to how

quickly it will be able to resolve the appeal on the merits).

**IV.     Absence of Harm to Other Parties if Court Grants the Stay**

   The Court concludes that entry of a stay will not cause Debtors or the Creditors

Committee to suffer significant harm. As discussed earlier, the record does not appear to support

a finding that Debtors will necessarily be more valuable if sold with already having a future

telecast rights contract in place; nor does the record appear to support a finding that marketing

the future telecast rights now is necessary to ensure that creditors are paid in full. If the MLB

Agreement is approved by the Bankruptcy Court, sale of the Team will go forward with or

without the Amended Marketing Procedures, and Debtors will emerge from bankruptcy and

creditors will be paid. At oral argument, Debtors' counsel admitted that there is no evidence that

the sale of the Dodgers will not go forward and be completed by April 30, 2012 even with entry of a stay. (Tr. at 64)

Debtors complain that a stay would deprive them of the opportunity granted to them by the Bankruptcy Court under the Amended Marketing Procedures to sell the future telecast rights now, for a sum certain, and present that new contract to a new buyer of the Team. Debtors insist that, even if they win the appeal, there will not be enough time left before April 30 to implement the Amended Marketing Procedures. For several reasons, the Court does not find these contentions persuasive. First, the "opportunity" Debtors might be losing is one they contracted with Appellant to give up by executing the Current Telecast Agreement. Second, several of the key legal and factual underpinnings for the Bankruptcy Court's decision to grant Debtors this "opportunity" are likely to be reversed or vacated on appeal. Additionally, if this Court ultimately affirms the Bankruptcy Court, it would seem likely that this Court will have concluded that the Bankruptcy Court has authority to revise the terms of the Back-End Rights (e.g., invalidate the "no shop" provision). If that is the case, and if Debtors are able to show that shorter time frames are needed (e.g., an Exclusive Negotiating Period of less than 45 days) due to loss of time resulting from the stay, then Debtors will have the ability to ask the Bankruptcy Court to shorten these time frames.

## V.  **Public Interest**

Appellant has demonstrated that the public interest favors granting a stay. "The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *Rex. Med. L.P. v. Angiotech Pharms (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010); *see also Siemens Bldg. Techs., Inc. v. Camacho*, 168 F.

Supp. 2d 425, 427 (E.D. Pa. 2001) ("As a general matter, it is in the public interest to enforce valid contractual obligations . . . .").

Debtors are correct that the public also has an interest in the efficient resolution of bankruptcy cases. (*See* D.I. 17 at 39) But here there is no basis to believe that a stay will undermine that interest. As counsel for Debtors candidly acknowledged during the initial teleconference with the Court, Debtors are likely to exit bankruptcy as quickly with or without a sale of the future telecast rights. (D.I. 30 at 27-28)

The Creditors Committee adds that "continued negotiations may instead give rise to a consensual resolution, which would be in the interest of all parties," and the public. (D.I. 19 at 5) This is true. However, the public does not have a great interest in compelling negotiations in a manner that deprives one party of contractual rights for which it paid. Moreover, the parties are free at all times to engage in consensual negotiations (and nothing about the Court's Stay Order or this Opinion is intended to interfere with the mediation efforts undertaken under the supervision of Judge Farnan). Accordingly, the Court finds that the public interest favors granting a stay.

## VI.   **Bond**

Finally, the Court concludes that payment of a bond is not necessary. In Section 15(d)(iii) of the Telecast Agreement, LAD and Prime Ticket agreed that each would suffer "irreparable harm" if the other party breached any provision of the Telecast Agreement. (D.I. 5, Ex. 2 at §15(d)(iii)) Section 15(d)(iii) goes on to provide that "[s]uch breaching party waives any requirement that the non-breaching party be required to post a bond in connection with any request for an injunction." (*Id.*) This appeal is essentially analogous to a request for an

injunction, as Prime Ticket seeks what is essentially injunctive relief, in the form (presently) of a stay and (ultimately) specific performance by Debtors of Debtors' obligations under the Current Telecast Agreement.[11] Moreover, in light of the Court's finding that Debtors will not suffer harm in absence of a stay and the fact that the Bankruptcy Court's Order does not require any monetary payment, there is no need for a bond. (*See* Tr. at 35) Therefore, the Court will hold the parties to their contractual agreement not to require Fox, in the circumstances of this appeal, to post a bond. *See Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428-29 (7th Cir. 2011) (enforcing agreement to waive requirement for injunction bond); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 270 F. Supp. 2d 1205, 1216 (D. Colo. 2003) (stating parties are permitted to "allocate[ ] the risk of loss from an improvidently granted injunction to the party enjoined"), *rev'd on other grounds*, 356 F.3d 1256 (10th Cir. 2004).

## CONCLUSION

For the reasons stated above, the Court has granted Appellant's Stay Motion.

---

[11]Indeed, in numerous places Debtors have contended that the Amended Procedures should be implemented because Fox's contrary position is tantamount to a request for an order of specific performance. (*See, e.g.*, D.I. 5, Ex. 10 at 78 (Debtors' counsel stating that "the notion that [Fox] could somehow get specific performance" is incorrect); D.I. 30 at 21 (Debtors' counsel stating, "in particular, they're seeking specific performance of something that would effectively prevent the marketing of assets in bankruptcy"))